**E-FILED**
Friday, 19 October, 2007  11:20:27 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| STEVEN ABRON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-1157 |
| | ) | |
| STATE OF ILLINOIS, DEPARTMENT OF | ) | |
| CORRECTIONS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

NOW COMES Defendant, ILLINOIS DEPARTMENT OF CORRECTIONS[1], by and

through its attorney, Lisa Madigan, Attorney General for the State of Illinois, and in support

of its Motion for Summary Judgment states as follows:

**INTRODUCTION**

Plaintiff, an African-American male, brings this action pursuant to Title VII alleging

that the Illinois Department of Corrections failed to hire him based on his race.  The Illinois

Department of Corrections ("Department") had an opening for a barber at the Henry Hill

Correctional Center.  The Department received eight applications for this open position.

All of the applicants met the minimum qualifications for the position.  The eight applicants

were interviewed in accordance with the Department's Rutan interview policy[2].  All

---

[1]The remaining defendants were dismissed from this lawsuit January 23, 2007.

[2]The Rutan interview policy was instituted in response to the Supreme Court's decision in <u>Rutan v. Republican Party of Illinois</u>, 497 U.S. 62 (1990).

candidates were asked the same ten questions by the same two interviewers.  Each interview was scored based on the answers given, and the applicant that scored the highest was given the position.  Larry Thompson, a white male with 40 years experience as a barber, received the highest score and was offered the position.  There is simply no evidence in the record that would allow a reasonable trier of fact to conclude that race played any role in the decision to hire Larry Thompson and not Plaintiff.  Nor is there any evidence in the record that would allow a reasonable trier of fact to conclude that the stated reason for hiring Larry Thompson, that he received the highest score after the interviews, was pretextual.  Therefore, the Department respectfully requests that summary judgment be entered in its favor.

### STATEMENT OF MATERIAL FACTS

1.      On December 12, 2004, the Illinois Department of Corrections ("Department") posted an open position for a barber at the Henry Hill Correctional Center.  (Exhibit A).

2.      The posting described the position as follows:

> Under general supervision, performs journeyman work as an Illinois registered barber being responsible for supervising and instructing inmate workers in performing various barbering services.  Maintains barber shop and equipment in a sanitary, serviceable, and orderly condition; requisitions all barber supplies and tools.  (Exhibit A)

3.      The posting listed the required education, training and experience for the position as follows:

> Requires possession of a valid Illinois License as a barber. Requires experience necessary to qualify as a journeyman barber.  Requires working knowledge of barbering techniques, methods, practices, and the operation, maintenance and sterilization of barber shop tools and equipment.  Requires elementary knowledge of first aid.  Requires responsibility for

-2-

the safekeeping of barbering tools and the ability to perform all
tasks usually associated with journeyman barbers.  (Exhibit A).

4.      A total of eight individuals applied for the barber position: Larry Thompson,
Samuel Schaumleffel, James Anderson, Steven Abron, Gaylen Elliott, Loren Conard, John
Dredge, and Brian Wilkerson.  (Exhibit B).

5.      All eight individuals who applied for the position met the minimum
qualifications for the position.  (Exhibit C, p. 124, line 22 – p. 125, line 6).

6.      Steven Abron is an African American male; the other seven applicants were
white males.  (Exhibit D).

7.      The eight applicants were interviewed on December 21, 2004.  (Exhibit B).

8.      The interviews were conducted by Frank Shaw, then assistant warden at
Henry Hill Correctional Facility, and William Smith, business administrator at Henry Hill
Correctional Facility, both white males.  (Exhibit E, p. 11, line 20 – p. 12, line 1).

9.      The barber position at Henry Hill Correctional Facility is a Rutan position,
meaning that the Rutan interview process was used.  (Exhibit E, p. 10, lines 10-12).

10.     As part of the Rutan process, Mr. Shaw and Mr. Smith were provided
interview sheets containing the questions to be asked the candidates and the weight to be
given to each question.  (Exhibit E, p. 36, line 22 – p. 37, line 22).

11.     The interview sheet was obtained by Margaret Foley, human resource
representative at Henry Hill Correctional Center, from Logan Correctional Center.  (Exhibit
E, p. 37, lines 6-17, Exhibit F).

12.    The same questions, and same weights given to those questions, that were used when Logan Correctional Center hired a barber were used at Henry Hill Correctional Center on December 21, 2004.  (Exhibit E, p. 37, lines 6-22).

13.    The interview sheet used for the barber position at Henry Hill Correctional Center contained 10 questions divided into four categories: 1.  Education, Training and Skills, 2.  Job Knowledge and Experience, 3. Interpersonal Relations, and 4. Work History. (Exhibit F).

14.    Each category was weighted as follows: Education, Training and Skills = 30%, Job Knowledge and Experience = 30%, Interpersonal Relations = 25%, and Work History = 15%.  (Exhibit F).

15.    Pursuant to the Rutan interview process, each candidate was asked each question on the interview sheet.  (Exhibit G, p. 27, line 23 – p. 28, line 1).

16.    During each interview, each interviewer takes notes of the applicant's answers on a copy of the interview sheet.  (Exhibit G, p. 27, lines 18-22).  Interview sheets for each applicant are attached as Exhibits N through CC.

17.    After each interview, each interviewer would enter a point score for each question.  (Exhibit G, p. 28, line 8 – p. 29, line5).

18.    The two interviewers would not discuss the candidate until after they had written down the points.  (Exhibit G, p. 29, lines 12-15).

19.    For each question, the possible scores are 4, 3, 2, and 1.  (Exhibit C, p. 122, lines 21-22).

-4-

20.     The scores are based strictly on the interviews; applications and resumes are not considered in determining the score.  (Exhibit G, p.36, lines 10-16; Exhibit C, p. 122, line 23 – p. 123, line 3; Exhibit DD, p. 37, lines 10-21).

21.     During his interview, Mr. Thompson indicated that he had 40 years of experience as a barber and that he had experience owning and managing his own shop. (Exhibits P and Q).

22.     During his interview, Plaintiff indicated that he had 28 years experience as a barber, including owning and managing his own shop, and had some experience as a contractual barber at Kewanee Youth Center, a correctional facility for youths, and at Knox County Jail.  (Exhibits N and O).

22.     Each candidate received a score calculated as follows: 1.  the points per question were averaged for each hiring criteria (for example, there were three questions in the Education, Training, and Skills category.  The point total from each of these three questions were added together and then divided by three to determine an average score for that category.  The average scores from each interviewer were added together and divided by two to average the scores from the two interviewers.)  2.  The average score was multiplied by the weight assigned to that category to determine a weighted score for that category (For example, Education, Training, and Skills had a 30% weight.  The average score was multiplied by .3 to determine a weighted score.)  3.  The weighted scores from the four categories were added together to determine the overall score. (Exhibit H; Exhibit C, p. 72, lines 15-18).

23.    The final overall scores were as follows: Larry Thompson = 3.43, Steven Abron = 3.22, Samuel Schaumleffel = 2.76, Brian Wilkinson = 2.66, Gaylen Elliot = 2.59, James Anderson = 2.39, John Dredge = 2.37, Loren Conard = 2.24 (Exhibit I).

24.    Following the interviews, Mr. Shaw completed an employment decision form selecting Larry Thompson for the position.  (Exhibit J; Exhibit G, p. 21, lines 10-15).

25.    The Employment Decision Form completed by Mr. Shaw was signed by Illinois Department of Corrections Director Roger Walker, or someone with signature authority for Director Walker, on January 19, 2005.  (Exhibit J).

26.    Frank Shaw has interviewed approximately 500 people using the Rutan interview process, and he cannot recall a single time that the Rutan process was used and the Department hired someone who did not get the highest score after a Rutan interview. (Exhibit G, p. 11, lines 9-12; Exhibit G, p. 24, line 22 – p. 25, line 3).

27.    Don Hulick, who was Warden at Henry Hill Correctional Facility at the time of the interviews, has never been involved in a Rutan interview process in which a candidate was hired who did not have the highest score based on the interview.  (Exhibit K, p. 12, lines 3-18).

28.    On or about January 31, 2005, Plaintiff sent a letter to Margaret Foley asking for reasons why he did not receive the barber position at Henry Hill Correctional Center. (Exhibit L).

29.    On or about February 2, 2005, Margaret Foley sent a letter to Plaintiff stating "Please be advised that you were not selected based on scores from the interview process."  (Exhibit M).

-6-

**LEGAL STANDARD**

Summary judgment is appropriate where, as here, there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* Celotex v. Catrett, 477 U.S. 317, 322-3 (1986) (stating same). A fact is material if it affects the outcome of the matter before the Court. *See* Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment); Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc., 254 F.3d 644, 650 (7th Cir. 2001)(internal citation omitted)("A disputed fact is only material if it 'might affect the outcome of the lawsuit under the governing law.'"). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. Gleason v. Mesirow Financial, Inc., 118 F.3d 1134, 1139 (7th Cir. 1997).

A motion for summary judgment will not be defeated because of "the mere existence of *some* alleged factual dispute between the parties, nor the existence of some metaphysical doubt as to the material facts." Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000)(internal citations omitted)(emphasis in original). The facts set forth above directly affect the outcome of this matter and plaintiff cannot, in good faith, dispute them. As discussed more fully below, the governing law, as applied to the material facts, requires a finding in the defendants' favor.

**ARGUMENT**

**I.     Plaintiff cannot establish discrimination using the direct method because there is no direct evidence or circumstantial evidence of discrimination.**

Proving discrimination using direct evidence "essentially requires an admission by the decision maker that his actions were based on the prohibited animus." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 616 (7th Cir. 2000). There is no such admission in this case. A plaintiff can also prevail under the direct method if he can construct "a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decision-maker." Rhodes v. Ill. Dept. Of Transp., 359 F.3d 498, 504 (7th Cir. 2004). However, this circumstantial evidence must point directly to a discriminatory reason for an employer's action. Jordan v. City of Gary, IN, 396 F.3d 825, 832 (7th Cir. 2005). There is no such circumstantial evidence in the record in this case. Therefore, Plaintiff is left to proceed under the indirect method of the McDonnell-Douglas test.

**II.     While Plaintiff can demonstrate the elements of a prima facie case, the Department had a legitimate, nondiscriminatory reason for hiring Mr. Thompson and not Plaintiff.**

To state a prima facie case of discrimination for failure to hire, a plaintiff must show that: (1) he was a member of a protected class, (2) he was qualified for an open position for which he applied, (3) his application for employment was rejected, and (4) the employer filled the position with someone outside the plaintiff's protected class, or the position remained open. Blise v. Antaramian, 409 F.3d 861, 866 (7th Cir. 2005). For the purposes of this Motion for Summary Judgment, the Department will assume that Plaintiff can state a prima facie case. He is African-American. He met the minimum qualifications for the

-8-

barber position he applied for (as did the other 7 applicants that were interviewed).  He was not chosen for the position, and the position was filled by a white male.

"Simply making out a prima facie case does not, however, entitle [a plaintiff] to a judgment in [his or] her favor or even a chance to present [his or] her case to a jury."  Id. at 867.  When the plaintiff has stated a prima facie case, the employer is given the opportunity to come forward with a legitimate, nondiscriminatory reason for the decision. Id.  "An employer may hire or refuse to hire an employee "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for discriminatory reason."  Malacara v. Madison, 224 F.3d 727, 731 (7th Cir. 2000).

The Department hired Mr. Thompson because his interview was scored the highest of all the applicants.  Plaintiff was not hired because his interview was not scored the highest.  Eight applicants were interviewed for the position for barber.  All met the minimum qualifications for the position.  All but Plaintiff were white males.  Mr. Thompson's interview was scored the highest; Plaintiff's interview was scored second highest.  Mr. Smith and Mr. Shaw conducted the interviews.  Each candidate was asked the same questions in the same order.  Mr. Smith and Mr. Shaw kept notes on the applicant's responses to each question.  After each interview, Mr. Smith and Mr. Shaw scored the candidate's answer to each question from 1-4 before starting the next interview.  The scores from each category were added together and the sum was multiplied by a weight factor.  The interviewers did not discuss the candidates with each other until the scoring was complete.  There is no evidence in the record that the Department of Corrections has ever conducted a Rutan interview process and not offered the position to the candidate that scored the highest on the interview.

Because the Department has stated a legitimate, nondiscriminatory reason for its decision to hire Mr. Thompson and not Plaintiff, Plaintiff must come forward with evidence that would allow a reasonable trier of fact to conclude that the proffered reason is pretextual. *See* Blise, 409 F.3d at 867. A plaintiff shows that a reason is pretextual directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. Id. The 7th Circuit has "emphasized that an employer's decision to hire is pretextual when it is a lie–a phony reason meant to cover up a disallowed reason. Otherwise, an employer's decision to favor one candidate over another can be 'mistaken, ill-considered or foolish, [but] so long as [the employer] honestly believed those reasons, pretext has not been shown.'" Id. *quoting* Millbrook v. IBP, Inc., 280 F.3d 1169, 1175 (7th Cir. 2002). The courts do not "sit as a superpersonnel department where disappointed applicants or employees can have the merits of an employer's decision replayed to determine best business practices." Blise, 409 F.3d at 867. In short, the pretext inquiry focuses on the honesty of the Employer's belief, not the accuracy of that belief.

III.    **Plaintiff cannot establish that the Department's proffered reason for not hiring him, that he was outscored by another applicant on the interview, is pretext because the only evidence in the record demonstrates that the Department and its agents honestly believed Mr. Thompson was the better candidate based on the interviews.**

The evidence in the record demonstrates that the Plaintiff was not hired for the position of barber at Henry Hill Correctional Facility because he was outscored by Larry Thompson in the Rutan interview process. Therefore, Plaintiff cannot establish that the Department's stated reason for not hiring him, that he was outscored by another candidate,

is pretext.  At best, Plaintiff can establish that reasonable minds could differ as to whether he or Larry Thompson was the better candidate.

The Department is not required to prove that Larry Thompson was more qualified than Plaintiff.  "Title VII prohibits all discrimination in employment based upon race, sex, and national origin."  <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 259 (1981).  "Title VII, however, does not demand that an employer give preferential treatment to minorities."  <u>Id.</u>  An "employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria."  <u>Id.</u>

In making the pretext determination, the Court does not sit as a super-personnel department questioning the business decisions of the Defendant.  In order to show pretext, a plaintiff must demonstrate that the employer's "proffered reason is a lie or completely lacks a factual basis."  <u>Jordan v. Summer</u>, 205 F.3d 337, 343 (7th Cir. 2000).  Basically, to meet his burden, the plaintiff must present evidence to suggest not that the employer was mistaken but that it was lying to cover up the true reason.  <u>Id.</u> *see also* <u>Jordan v. City of Gary</u>, 396 F.3d at 834 (To establish pretext, plaintiff must show that the proffered explanation was designed to obscure the unlawful discriminatory employment action.)

In <u>Jordan v. Summer</u>, the plaintiff argued that the fact that she was rated below "Good" by two panel members while the third ranked her as "Excellent"demonstrated that the first two panel members were biased against her.  In rejecting this argument, the Seventh Circuit stated:

> Even if Jordan is correct that the third panel member was the most perceptive in assessing her abilities, the strongest (yet reasonable) inference we can draw in her favor is that the first two panelists were mistaken in their ratings of Jordan.  But, even assuming that their ratings were horrendously inaccurate, Jordan does not come close to showing a pretext with this

-11-

argument.  Pretext is a lie, not merely a mistake.  Discrimination laws serve only to prevent consideration of forbidden characteristics-like race- but not, as we have repeatedly noted, court enforced merit selection programs.  Nor do we use them merely to second guess the validity of employer programs. . .

Jordan, 205 F.3d at 344 (internal citations omitted) see also Monroe v. Childrens Home

Assoc. Of Ill., 128 F.3d 591, 593 (7th Cir. 1997)("Whether the employer's stated reasons

were wrong is irrelevant, for a mistake by the personnel department does not violate any

federal law.")(emphasis in original).  Identical reasoning applies in the current case.  Even

if the Court was convinced that the interviewers were mistaken, even horrendously

inaccurate, in their scoring of the interviews, Plaintiff cannot establish that the Department's

proffered reason for not hiring him was a pretext, i.e. a lie to cover its tracks.  See also

Ghosh v. Indiana Dep. Of Environmental Management, 192 F.3d 1087, 1092 (7th Cir.

1999)("to the extent Ghosh argues that the assessment was incorrect, as noted above, a

mistaken assessment without more does not establish pretext.")

> **A.    The fact that Plaintiff had some qualifications that Larry Thompson lacked does not establish that the Department's proffered explanation was pretext because the interviewers considered many factors in scoring the interviewees.**

In Millbrook, the 7th Circuit laid out the burden on a plaintiff claiming discriminatory

failure to hire where the employer claims it hired the most qualified candidate.  The 7th

Circuit stated that, where an employer's proffered non-discriminatory reason for its

employment decision is that it selected the most qualified candidate, evidence of the

applicants' competing qualifications does not constitute evidence of pretext unless those

differences are so favorable to the plaintiff that there can be no dispute among reasonable

persons of impartial judgment that the plaintiff was clearly better qualified for the position

at issue.  Millbrook v. IBP, Inc., 280 F.3d 1169, 1180 (7th Cir. 2002).  In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person in the exercise of impartial judgment could have chosen the candidate selected over the plaintiff for the job in question.  Id. at 1180-1181.  The court went on to state that:

> [t]his makes sense because a court's role is to prevent unlawful hiring practices, not to act as a 'super personnel department that second-guesses employers' business judgments.  As we have stated, '[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [Title VII] does not interfere.'  Rather, this 'court must respect the employers unfettered discretion to choose among qualified candidates.'  If we were to allow a jury to evaluate competing credentials to determine whether the employer's assertion that it selected the best candidate was pretextual, the jury would in most cases be replacing the employer's personnel department.  Yet neither the judge nor the jury is 'as well suited by training and experience to evaluate qualifications for high level promotion in other disciplines as are those persons who have trained and worked for years in that field of endeavor for which the applications under consideration are being evaluated.'. . .  A plaintiff's contention that he is the better candidate for a vacancy constitutes nothing but the employee's own opinion as to his qualifications.  This cannot create an issue of material fact because '[a]n employee's perception of his own performance. . . cannot tell a reasonable factfinder something about what the employer believed about the employee's abilities.'

Id. at 1181 (internal citations omitted).  The 7th Circuit went on to find that, while Millbrook's qualifications may have exceeded those of the candidate selected for the position, they were not so superior that no reasonable employer could have concluded that Harris was the better person for the job.  Id. at 1182.  Therefore, the 7th Circuit reversed a jury verdict in favor of Millbrook.  Id. at 1184.

In Blise, the plaintiff argued that she was more qualified than Ms. Davis, the candidate hired.  In upholding summary judgment for the employer, the 7th Circuit stated

"Blise may be right–she may be more qualified than Davis, and Davis may not be qualified at all-but so long as [the employer] genuinely believed differently (and Blise offers us no evidence that its agents did not), it is entitled to act on that belief.

While it is true that Plaintiff had some correctional experience working part-time on a contractual basis at an Illinois Youth prison and at a county jail, this does not establish that the Department's proffered reason for hiring Larry Thompson was pretextual. Initially, it should be noted that the position announcement did not list correctional experience as either a necessary or desired qualification for the barber position. It is also worth noting that another white male applicant, Mr. Samuel Schaumleffel, also had Corrections experience and twenty-one years experience running his own barber shop and was outscored by both Plaintiff and Mr. Thompson. (Exhibits R and S). Nevertheless, the interviewers did give some weight to Plaintiff's correctional experience, and that is reflected in the interview scores. Plaintiff outscored Mr. Thompson in several categories that involved training, experience, and job knowledge. However, Mr. Thompson outscored Plaintiff in several other areas, giving him a slight edge in the final scoring.

In Ghosh, the plaintiff argued that he was more qualified than the candidate chosen because he had supervisory experience while the candidate selected did not. In rejecting this argument, the Seventh Circuit pointed out that supervisory experience was just one of several recommended skills for the position. "The fact that Ghosh may have been more experienced than [the selected candidate] in one specific area does not undermine [the employer's] explanation that overall Counterman possessed more relevant experience than Ghosh. Ghosh has not shown that [the employer's] explanation was anything other than [its] honest appraisal of the applicants' experience. Even if the evaluation was erroneous,

-14-

this court does not sit as a 'super-personnel department' to review a company's honest business decisions." Ghosh, 192 F.3d at 1094.

In Blise, an interview process similar to the one used in the present case was used to choose a candidate from six finalists. The candidates were interviewed, scored by two interviewers, and then ranked in terms of their average score. The plaintiff did not receive the position because she scored fifth out of the six candidates. In the subsequent discrimination lawsuit, the plaintiff stated a prima facie case of discrimination, and the employer stated that it did not hire the plaintiff because she was not the highest ranked candidate. Plaintiff challenged this proffered reason, but summary judgment was entered on behalf of the employer. In upholding summary judgment, the 7th Circuit pointed out that the "two decisionmakers scored each applicant and ranked them in order of their averaged score. It is not for us to second-guess their formula." Blise, 409 F.3d at 867.

The rational Ghosh and Blise applies to the current case. Plaintiff did have experience that Mr. Thompson did not. Plaintiff had some correctional experience, and Plaintiff had barbers that worked for him in his shop while Mr. Thompson did not (although both men ran their own shops, which Mr. Smith testified was the more significant factor. (Exhibit C, p. 22, lines 16-23)). This additional experience was reflected in the interview scoring, as Plaintiff outscored Mr. Thompson in some categories. However, Mr. Thompson had been a barber for longer than Plaintiff had, and both interviewers felt Mr. Thompson did a better job answering questions about security, sanitizing barber equipment, and interpersonal communications. The fact that Plaintiff outscored Mr. Thompson in one or two specific areas does not undermine the Department's explanation that Mr. Thompson outscored Plaintiff overall in the interviews. Plaintiff can point to no evidence that would

allow a reasonable trier of fact to conclude that the interview scores were anything less than the Department's honest appraisal of the applicants.  *See also* Senner v. Northcentral Technical College, 113 F.3d 750, 756 (7th Cir. 1997)(Summary judgment for employer upheld where plaintiff's arguments only showed that the employer did not give plaintiff's credentials the emphasis they may have deserved.)

> **B.    There is no evidence in the record that the interview scores were so out-of-line with the answers given that no reasonable person could have scored the applicants this way.**

There is no evidence in the record to suggest that the interview scores represent anything other than the interviewers' honest assessment of the answers given by the candidates.  Each candidate was asked the same 10 questions.  Both interviewers gave Plaintiff a higher score than Mr. Thompson on 4 of them.  Both interviewers gave Mr. Thompson a higher score than Plaintiff on 5 of the ten questions.  Both candidates received the same score from both interviewers on one question.  (Exhibits N, O, P, and Q).  In general, Plaintiff did better on questions dealing with experience and skills, reflecting that he had some corrections experience and supervised other barbers in his shop.  Mr. Thompson generally scored better on questions related to interpersonal communications and the more specific questions, such as how to sterilize barber equipment and what to do if an inmate receives a cut.  The interview sheets reflect that Mr. Abron had some correctional experience, had 28 years experience as a barber, and supervised barbers in the shop he owned and managed.  The interview sheets also reflect Mr. Thompson's 40 years of experience as a barber, including managing and owning his own shop.  Nothing in the interview sheets, or in the entire record in this case, indicates that the scores given

to the candidates were so out-of-line that no reasonable individual could have scored the candidates this way.  There is simply no evidence in the record to suggest that the scores are anything but the interviewer's honest assessment of the answers given by the candidates.

### C. While there may be flaws in the Rutan interview process, those flaws are not evidence of pretext as the process was applied to all applicants the same way regardless of race.

The record contains evidence of aspects of the Rutan interview process that could be viewed as flaws.  For example, the interviewers only considered information that the candidate states in the interview, not information contained in the application or resume. The candidates were not given model answers, and therefore were not sure what the ideal answer would be to the question about sanitizing barber equipment.  However, the record also establishes that the process was applied to all applicants for the barber position in the same way.  All candidates were asked the exact same questions in the same order.  None of the candidates were asked follow-up questions, and none of their resumes or applications were considered.   They were all interviewed and scored by the same interviewers with the same knowledge to judge their scores.  Mr. Abron was considered using the same process as all the other applicants, and in fact he outscored all but one of them.

In Ghosh, the plaintiff argued that the interview scores should not constitute evidence of non-discrimination, asserting that he received low interview scores because of the interviewer's discriminatory attitude toward him.  Plaintiff criticized the interview process, claiming that it did not take certain relevant factors into account.  In rejecting this

argument, the Seventh Circuit stated that "Ghosh fails to meet his burden of showing pretext. Criticism of an employer's evaluation process, even if well founded, is not enough to establish pretext. Ghosh points to no facts which would suggest that the interviewer scored him differently because of his national origin. Ghosh, 192 F.3d at 1093 *see also* Scott v. Parkview Memorial Hospital, 175 F.3d 523, 525 (7th Cir. 1999)("The ultimate decision may be good or bad, but the employment-discrimination laws do not allow judges to second-guess managers. [Courts] inquire not whether the decision is right, or was reached after the process judges would use were [they] running the business, but whether the defendants' submission that sex (and other forbidden characteristics) played no role is honest.")

In Blise, the plaintiff challenged the interview process because the candidates were not judged on objective criteria. In upholding summary judgment for the employer, the 7th Circuit stated that it has "never held that a job interview must be scored according to some sort of objective criteria." Blise, 409 F.3d at 868. "There is no doubt that an interview also allows an interviewer to get a sense of the applicant's personality, poise, and manners. These are all traits that are in the eye of the beholder and all traits that any employer would surely like to have a sense of before making a hiring decision. It is difficult to see how such traits could be measured by any objective criteria. . . A subjective analysis of the varying traits of each applicant is entirely appropriate." Id. (internal citations omitted) *see also* Scott, 175 F.3d at 525 ("Unless evidence demonstrates that an open-ended process was used to evade statutory anti-discrimination rules, subjectivity cannot be condemned."); Vitug v. Multistate Tax Commission, 88 F.3d 506, 515 (7th Cir. 1996)(Evidence that interview process was "subjective, and perhaps unreliable. . . is. . . not evidence that Vitug

was intentionally passed over for promotion simply because of his religion or national origin. Demonstrating that an interview process is influenced by subjective factors does not go any distance toward proving that Vitug's religion or national origin were among those subjective factors.")

The rational from Ghosh and Blise applies to the current case. Plaintiff's criticism of the Rutan interviewing process, even if the Court finds it to be well-founded, is not evidence of pretext. The process was applied equally to all applicants regardless of race. There is no evidence in the record that the interviewers treated Plaintiff any differently because of his race. The fact that the scoring was to some degree subjective does not render the proffered reason for hiring Mr. Thompson and not Plaintiff pretextual. Therefore, Plaintiff cannot show that the proffered explanation for hiring Mr. Thompson was pretextual.

**CONCLUSION**

The Illinois Department of Corrections was faced with eight qualified candidates for a barber position. The Department interviewed all eight candidates, scored their interviews, and hired the candidate with the highest score, Larry Thompson. Larry Thompson has 40 years experience as a barber. Plaintiff has 28 years experience as a barber, but has some correctional experience and supervisory experience Mr. Thompson lacks. While reasonable minds could differ as to who was the better candidate, there is no evidence in the record to allow a reasonable trier of fact to conclude that race played a role in the decision to hire Mr. Thompson and not Plaintiff.

WHEREFORE, Defendant, Illinois Department of Corrections, respectfully requests that summary judgment be entered in its favor.

Respectfully submitted,

ILLINOIS DEPARTMENT OF CORRECTIONS,

Defendant,

LISA MADIGAN, Attorney General,
State of Illinois,

Attorney for Defendant,

Thomas H. Klein, #6271653
Assistant Attorney General
500 South Second Street                    By:  __s/ Thomas H. Klein_____
Springfield, Illinois 62706                         THOMAS H. KLEIN
(217) 782-9014                                       Assistant Attorney General

Of Counsel.

-20-

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2007, I electronically filed the foregoing Memorandum of Law in Support of Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

John Rehn
john@johnrehn.com

and I hereby certify that on October 19, 2007, I mailed by United States Postal Service, the document to the following non-registered participant:

None.

Respectfully submitted,

 s/ Thomas H. Klein
THOMAS H. KLEIN, #6271653
Assistant Attorney General
500 South Second Street
Springfield, IL  62706
Telephone:  (217) 782-9014
Facsimile:  (217) 524-5091
tklein@atg.state.il.us

**E-FILED**
Friday, 19 October, 2007  11:21:35 AM
Clerk, U.S. District Court, ILCD

*Attachment #1*

# ILLINOIS DEPARTMENT OF CORRECTIONS

### An Equal Opportunity Employer

## CAREER OPPORTUNITY

The Illinois Department of Corrections is inviting applications for the following position which is available at Hill Correctional Center.

| | |
|---|---|
| **POSITION TITLE:** | **BARBER** |
| **SALARY RANGE:** | **$ 28.94 per hour** |
| **WORK SHIFT:** | **MONDAY – FRIDAY (8:00 A.M. – 4:00 P.M.)** |

## POSITION DESCRIPTION

Under general supervision, performs journeyman work as an Illinois registered barber being responsible for supervising and instructing inmate workers in performing various barbering services. Maintains barber shop and equipment in a sanitary, serviceable and orderly condition; requisitions all barber supplies and tools.

## EDUCATION, TRAINING AND EXPERIENCE

Requires possession of a valid Illinois License as a barber.  Requires experience necessary to qualify as a journeyman barber.  Requires working knowledge of barbering techniques, methods, practices and the operation, maintenance and sterilization of barber shop tools and equipment.  Requires elementary knowledge of first aid.  Requires responsibility for the safekeeping of barbering tools and the ability to perform all tasks usually associated with journeyman barbers.

**WHERE TO APPLY:**  Applicants must submit a completed State application (CMS-100) or resume and any required bid form to Margaret Foley, Human Resources Assistant, Hill Correctional Center, P.O.Box 1327, Galesburg, IL 61401, telephone 309/343-4212, ext. 105, no later than December 16, 2004.  A copy of the applicant's license should be attached to the bid form.

Employees bidding on a position that would result in a promotion and who have not submitted an application for a promotional grade must complete the CMS-100B, Promotional Employment Application, and submit it to Central Management Services within the posted time limit.

DATE POSTED: __12/10/04__          CLOSING DATE: __12/16/04__

PIN# 0104
Position # 04250-29-98-280-00-01

Cc:   Kathleen Danner          Laura Norton     A/W Programs
      Lori Gumble              AFSCME           Stephanie Kirk
      Jessica Nunes

| **EXHIBIT** |
|---|
| tabbies® A |

*Attachment # 2*

**ILLINOIS DEPARTMENT OF CORRECTIONS**

## Employment Bid Record

Facility, Office, or Unit: __Hill Correctional Center__

Position Title: __Barber__          Bargaining Unit (if applicable): ____

Posting Dates:  From: __12/10/2004__          To: __12/16/2004__

### Bidders

**To be completed by Personnel Office**

| SS# / Name | Current Bargaining Unit / Current Work County | Current Title / Current Facility | Grade / Grade Date | Seniority Date | Date Bid Received | Type of Action |
|---|---|---|---|---|---|---|
| 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 Larry Thompson | | Licensed Barber | | | | Other Means |
| 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 Samuel Schaumleffel | | Licensed Barber | | | | Other Means |
| 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 James Anderson | | Licensed Barber | | | | Other Means |
| 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 Steven Abron | | Licensed Barber | | | | Other Means |
| 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 Gaylen Elliott | | Licensed Barber | | | | Other Means |
| 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 Loren Conard | | Licensed Barber | | | | Other Means |
| 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 John Dredge | | Licensed Barber | | | | Other Means |
| 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 Brian Wilkinson | | Licensed Barber | | | | Other Means |

Summary of bid results (include name of applicant selected): __There is one position posted, with eight bidders. Interviews on Tuesday, December 21, 2004.__

__Larry Thompson was picked for the Barber position, effective date 2/1/05.__

__Margaret A. Foley, HRA__
Print Personnel Liaison's Name

s/ Margaret A. Foley
Personnel Liaison's Signature

__1/19/2005__
Date

Distribution:  Personnel File

DOC 0100 (Eff. 1/2002)
(Replaces DC 7650)

**EXHIBIT B**

tabbies®

*Printed on Recycled Paper*

(05/17/07)   00016

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

```
Steve Abron,                      )
                                  )
            Plaintiff,            )
                                  )
      -vs-                        )   No. 06-1157
                                  )
State of Illinois, Department     )
of Corrections, Henry Hill        )
Correctional Center and Don       )
Hulick, Warden, Individually,     )
Bill Smith, Business Admini-      )
strator, individually, and        )
Frank Shaw, Assistant Warden,     )
Individually and in their         )
official capacity,                )
                                  )
            Defendants.           )
```

THE DEPOSITION OF WILLIAM G. SMITH, taken

before Amy S. Powers, Illinois CSR 084-003053,

PPR 030540, a Notary Public, on Thursday, the

24th day of May 2007, commencing at the hour of

11:55 a.m., at 600 South Linwood Road, in the

City of Galesburg, County of Knox, and State of

Illinois.

CIRCUIT WIDE REPORTING
Suite 316 Hill Arcade Building
Galesburg, Illinois 61401
(309) 343-3376 • 1-800-342-DEPO

---

COPY

---

**Page 2**

```
 1   PRESENT:
 2
 3        JOHN REHN, ESQ.,
         311 East Main Street, Suite 412
 4        Galesburg, Illinois 61401
             on behalf of the Plaintiff;
 5
 6        THOMAS KLEIN, ESQ.,
         500 South Second Street
 7        Springfield, Illinois 62706
             on behalf of the Defendant.
 8
 9   ALSO PRESENT:
        MR. STEVE ABRON
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

**Page 3**

```
 1                  I N D E X
 2
 3   WITNESS                                    PAGE
 4     WILLIAM G. SMITH,
         Direct Examination by Mr. Rehn      4 - 122
 5       Cross-Examination by Mr. Klein     122 - 173
         Redirect Examination by Mr. Rehn   173 - 124
 6       Recross Examination by Mr. Klein   124 - 125
         Certificate of Reporter            126 - 1
 7
 8   EXHIBITS
       Exhibit 1 so marked for i.d.            11
 9     Exhibit 2 so marked for i.d.            14
       Exhibit 3 so marked for i.d.            18
10     Exhibit 4 so marked for i.d.            32
       Exhibits 5-6 so marked for i.d.         50
11     Exhibit 7 so marked for i.d.            51
       Exhibit 8 so marked for i.d.            54
12     Exhibit 9 so marked for i.d.            54
       Exhibit 10 so marked for i.d.           54
13     Exhibit 11 so marked for i.d.           55
       Exhibit 12 so marked for i.d.           56
14     Exhibit 13 so marked for i.d.           57
       Exhibit 14 so marked for i.d.           60
15     Exhibit 15 so marked for i.d.           63
       Exhibit 16 so marked for i.d.           65
16     Exhibit 17 so marked for i.d.           71
       Exhibit 18 so marked for i.d.           88
17     Exhibit 19 re-marked for i.d.           91
       Exhibit 20 so marked for i.d.           91
18     Exhibit 21 so marked for i.d.           94
       Exhibit 22 so marked for i.d.           95
19     Exhibit 23 so marked for i.d.          110
20
21
22
23
24
```

---

**Page 4**

```
 1   (Witness sworn.)
 2
 3              WILLIAM G. SMITH,
 4   having been first duly sworn, was examined and
 5   testified on his oath as follows:
 6
```

**DIRECT EXAMINATION BY MR. REHN:**

Q.   Why don't you state and spell your name for the record, please.

A.   Sure.  William G. Smith, W-I-L-L-I-A-M, G., Smith, S-M-I-T-H.

MR. REHN:   We are here today for a deposition in a case involving Steve Abron and the Department of Corrections.  Have you been deposed before?

THE WITNESS:   Yes.

MR. REHN:   All right.  I don't think it will be anything new or tricky in regards to the rules today.  We're just having a formal conversation, which means that the things we all do at the dinner table, sometimes we might say, that's not right today.  Don't get offended if I say, "Is that a yes" or "Is that a no?"  We want you to answer out loud to all questions,

---

**EXHIBIT**

C

**5**

1      okay?
2              THE WITNESS:   Yes.
3              MR. REHN:   Amy's heard me do it lots
4      of times to ask very bad questions.  If you
5      don't understand the question, just ask me
6      to repeat it, okay?
7              THE WITNESS:   Yes.
8
9    BY MR. REHN:
10   Q.    Why don't you tell me what your job is now.
11   A.    I'm the business administrator.  I'm
12         responsible for the financial operation of
13         the facility.
14   Q.    And when you say "the facility" are you
15         talking about Henry Hill?
16   A.    Henry Hill Correctional Center.
17   Q.    And how long have you been in that position?
18   A.    I'm sorry, seven years.
19   Q.    Okay.  So you would have been in that
20         position back in December of 2004?
21   A.    Yes.
22   Q.    And you were involved in the interviewing in
23         December of 2004 of some applicants for the
24         barber position; is that correct?

**6**

1    A.    Yes.
2    Q.    Okay.  And can you tell me how it is that
3          you got involved in that process?
4    A.    Due to the fact that I'm Rutan certified.
5          When there are positions to be filled, they
6          select basically at random who will be doing
7          the interview, but they have to be
8          certified.
9    Q.    Why don't you tell me what Rutan
10         certification is.
11   A.    Rutan certification, to the best of my
12         knowledge, was based on the Supreme Court
13         case Rutan versus Illinois Republican Party
14         to make certain that there was not political
15         influence within the hiring practice.
16   Q.    And how do you get certified?  What do you
17         do to become certified?
18   A.    I was certified in November of 1999.  I went
19         to Springfield, and Central Management
20         Service, CMS, held the class.  The class ran
21         for three days.
22   Q.    And would it be your understanding that when
23         people in the Department of Corrections are
24         filling barber positions at different

**7**

1      facilities, they would typically have
2      somebody who's Rutan certified do these
3      interviews?
4    A.    I believe so, yes.
5    Q.    Okay.
6    A.    Yeah.
7    Q.    Do you do interviews anywhere besides for
8          Henry Hill?
9    A.    I have.  I've interviewed for financial
10         positions at East Moline.
11   Q.    As far as the barber position, have you ever
12         interviewed to fill the barber position at
13         Henry Hill, interviewed applicants for that,
14         other than in December 2004?
15   A.    No.
16   Q.    And do you know how the barber position
17         became open in December 2004?
18   A.    Through a retirement.
19   Q.    And were you familiar at all with the -- who
20         is it that retired?
21   A.    A gentleman named Donald Whitmer,
22         W-H-I-T-M-E-R, from Alexis, Illinois.
23   Q.    And do you have any familiarity with the job
24         responsibilities of the barber at the Henry

**8**

1      Hill Correctional Facility?
2    A.    Other than through the questions, the
3          interview questions, no.  I've never had my
4          hair cut back there.  You know, I know where
5          the building is, but I don't, you know.
6
7    Q.    As far as the interview questions, it looks
8          like there was a standard set of questions
9          that were asked to all applicants?
10   A.    Yes.
11   Q.    Were you involved at all in the process of
12         determining what questions should be asked?
13   A.    No.
14   Q.    Who makes that determination?
15   A.    I believe it comes from the Human Resource
16         Department.
17   Q.    Okay.  And I'm just -- I have a bunch of
18         documents --
19   A.    Oh, sure.
20   Q.    But before I get into that, I want to get
21         some background --
22   A.    Sure, laying some groundwork.
23   Q.    I think you said maybe there was a list or
24         roster of people who are Rutan certified and

**9**

1      then is it randomly selected who does the
2      interviews?
3   A.   I do not know. I'm not privy to that. I'll
4      get a call from my warden, who is my boss,
5      and he'll say we're doing interviews next
6      Tuesday for whatever position.
7   Q.   And how many times have you participated in
8      interviewing applicants for jobs at Henry
9      Hill?
10   A.   Approximately eight, if I can give you an
11      approximate. You know, they all kind of run
12      together.
13   Q.   That's fine. And this was -- the one we're
14      here about is from December of 2004, the
15      barber position. Out of those eight, how
16      many of those would have been before
17      December of 2004 and how many would have
18      been after?
19   A.   Seven. That was my last one.
20   Q.   Okay. Why was this your last one?
21   A.   We haven't hired many people. I can't
22      remember somebody coming off the street, to
23      be honest with you. You know, we're just
24      not hiring.

**10**

1   Q.   It's not like you asked or told anybody, I
2      don't want to do this anymore?
3   A.   No, no, no, no.
4   Q.   Are you still Rutan certified?
5   A.   Yes.
6   Q.   Do you go through continuing education on
7      that?
8   A.   No.
9   Q.   Would have the only time you were trained in
10      Rutan certification would have been the one
11      time in '99 in Springfield?
12   A.   Yes.
13   Q.   And as far as the interview process in
14      general, how does it work? It sounds like
15      the warden contacts you and says would you
16      like to or to be able to interview some people
17      for a position that's coming up?
18   A.   Yes.
19   Q.   And then if you tell him that you are
20      available, do they give you the questions?
21      Do they talk about the position? How does
22      it typically work out in regards to what's
23      done before the interviews start?
24   A.   We -- I do not see the questions. You know,

**11**

1      they say we will interview ten people on
2      March 1 for a barber position. The
3      interviews start at 9:30. I show up and we
4      go down the list.
5   Q.   And as far as information of what the
6      Department of Corrections is looking for
7      when they're making the decision to hire a
8      barber, is there any discussion of this is
9      the characteristics we're looking for, this
10      is what we want, or is it here's a document?
11      How does that all work?
12   A.   Here's the document. Ask the questions, you
13      know, and that's it. We're not directed to
14      look for traits.
15
16             (Exhibit 1 so marked for
17             identification.)
18
19   BY MR. REHN:
20   Q.   I guess I'll hand you what I've marked as
21      Exhibit 1. For your reference, I've gone
22      through pretty much the Bates order. And
23      I'm not going to hand him all the documents
24      in the Bates order. But for following

**12**

1      along, this document's labeled
2      "Administrative Directive" and it's dated
3      January 2, 2002. Have you ever seen this
4      document before?
5   A.   Yes.
6   Q.   Okay. When have you seen this document?
7   A.   I reviewed it briefly a few weeks ago. We
8      keep a full set of AD's in the warden's
9      office. And when I was notified there would
10      be a deposition, I pulled the AD just to
11      refresh my memory. You can see the AD's
12      dated 2002, so it's not a -- one that
13      changes that you need to necessarily keep up
14      on.
15        MR. REHN:   Off the record.
16
17             (Whereby a discussion was held
18             off the record.)
19
20   BY MR. REHN:
21   Q.   And every profession has their own little
22      words or language. You called this an AD,
23      and I think you said --
24   A.   Administrative Directive.

13

1   Q.   What is an Administrative Directive?
2   A.   Within the department you have Department
3        Rules and you have Administrative
4        Directives. Administrative Directives are
5        developed in Springfield by Department of
6        Corrections. Department Rules that we have
7        here may be developed in certain cases for
8        our use only. Now, those would be like how
9        we count inmates at the end of the day, or
10       how they may run a dairy plant, where there
11       is only a dairy here and not one in 15
12       prisons.
13              So basically the AD's are the big
14       ones. That's the Bible. Everything else
15       comes under them. Internal documents can be
16       up to the strength of the AD, but cannot go
17       over, meaning they don't have to be as
18       tough. But you wouldn't have a local
19       program that was more stringent than the
20       Administrative Directive.
21  Q.   And so in the Department of Corrections,
22       there's a hierarchy of rules, and the
23       Administrative Directive is the top level?
24  A.   Yes. To the best of my knowledge.

14

1   Q.   And it sounds like this Administrative
2        Directive is still in effect today?
3   A.   I believe so. And the reason why I'm just
4        going by memory, because they were right
5        around the corner there when I pulled it,
6        and I believe it was 2002.
7   Q.   And it --
8   A.   I know they're not updated yearly. They're
9        reviewed, but they're not changed.
10  Q.   It sounds like you took a look at this
11       document recently in preparation for this
12       deposition?
13  A.   Yes, right.
14  Q.   And you did that as -- because this sort of
15       controls the general rules for how
16       interviewing is done?
17  A.   Right. Just -- it was just a refresher.
18  Q.   And if you go to the second page of
19       Exhibit 1, there's General Provisions. And
20       if you go to No. 6 on there, it says,
21       Interviews shall be conducted by persons
22       authorized to interview officers; is that
23       right?
24  A.   Yes.

15

1   Q.   And is that consistent with your
2        understanding as far as you have been Rutan
3        certified?
4   A.   Yes, that's -- that's the litmus test there.
5   Q.   And so you would be authorized to interview
6        officers?
7   A.   Yes.
8   Q.   And if you go to page 5 of 7, which is Bates
9        stamped 5, you go to Subsection I, it
10       addresses the interview and selection
11       process for positions filled under Rutan
12       guidelines, right?
13  A.   Yes.
14  Q.   And the barber position is one that's filled
15       under Rutan guidelines, or do you know?
16  A.   You know, I apologize, I don't know.
17  Q.   Okay.
18  A.   I mean, I would say it would be, because I
19       was requested to do it. So, you know, if it
20       wasn't a Rutan position, then it probably
21       wouldn't have mattered. But it would have
22       to be, because they had us in. But I cannot
23       specifically say that the barber is a Rutan
24       position.

16

1   Q.   If you were going to try to figure that out,
2        who would you ask?
3   A.   I would -- I would -- I hate to assume, but
4        Personnel in Springfield probably. My
5        feeling was if the warden said, you know,
6        you're certified to do the interview, that
7        it is a Rutan.
8   Q.   Okay. Underneath that section on the same
9        page, it says, Prior to interviewing, the
10       interviewing officer shall, and then there's
11       a list of eight numbered things on that
12       page. Do you see that?
13  A.   Yes.
14  Q.   Would you consider yourself to have been the
15       interviewing officer?
16  A.   Well, there were two of us.
17  Q.   Okay. I understand there was two.
18  A.   Yes.
19  Q.   One of the two?
20  A.   Yes. I mean. . .
21  Q.   And No. 1 is you should have completed
22       Rutan. We've already been through that, and
23       you did that.
24              No. 2 says identify the major job

17

1    responsibilities and essential functions by
2    reviewing the current position description.
3    Do you see that?
4  A.   Yes.
5
6         (Exhibit 2 so marked for
7         identification.)
8
9  BY MR. REHN:
10 Q.   I'm handing you now a document that's been
11   labeled Exhibit No. 2. And I believe at the
12   top of that it says Position Description?
13 A.   Yes.
14 Q.   Is that the same document that is referred
15   to in subparagraph 2 on page 5 of Exhibit
16   No. 1?
17 A.   Yes. I was looking for the actual form
18   number on the document. But that is a 104,
19   CMS 104, and that describes -- every
20   position in the facility has a position
21   description, and it's basically a CMS 104,
22   and that's what this is.
23 Q.   Okay.
24 A.   I'm a little surprised I don't see the

19

1    sequence following it, but I'm not sure if
2    it's one document or if they're different
3    documents.
4  A.   I'm just not familiar with it.
5  Q.   Going to Exhibit No. 2, is this something
6    that you would have reviewed prior to doing
7    the depositions (sic) in December of 2004?
8         MR. KLEIN:   You mean the interviews?
9         MR. REHN:   Yes. Did I say
10   "depositions"?
11        MR. KLEIN:   Yes.
12        MR. REHN:   Thank you.
13        THE WITNESS:   Interviews. As a rule,
14   I review them. In this particular case, I
15   don't think I did.
16
17 BY MR. REHN:
18 Q.   Why don't you tell me why.
19 A.   By having the layman's knowledge of a barber
20   as opposed to a steam fitter or an
21   electrician or a very technical position, I
22   probably did not.
23 Q.   Okay. Well, do you know as you sit here
24   today, does the barber just cut hair, or

18

1    actual form number on it, but that's what
2    that is.
3  Q.   And we get all sorts of things that are
4    copied, and it's possible it's at the top or
5    the bottom and it's been cut off somewhere.
6  A.   I'm confident that's a CMS 104 form for the
7    barber position.
8
9         (Exhibit 3 so marked for
10        identification.)
11
12 BY MR. REHN:
13 Q.   And we get documents and we don't know what
14   they are sometimes. This is a separate
15   document, I believe, or maybe it's all part
16   of the same document. I've labeled it
17   Exhibit No. 3. And this is a document that
18   has the word "Barber" at the top of it and
19   then it has an SPEC code to the right of it.
20   Do you know what that document is that's
21   Exhibit No. 3?
22 A.   No.
23 Q.   And it may very well be part of Exhibit 2,
24   I'm not sure. It came to us in numerical

20

1    does a barber at this facility also have a
2    supervisory role or position?
3  A.   The barber here supervises inmates, not
4    civilians.
5  Q.   Yes.
6  A.   Okay.
7  Q.   But they supervise inmates who actually cut
8    hair?
9  A.   Yes, yes.
10 Q.   And if you look at this CMS form, Exhibit 2,
11   it lists 40 percent of the time of this
12   position is supervising, instructing, and
13   training all inmate barbers in cutting other
14   inmates' hair in the inmate barbershop. Do
15   you see that?
16 A.   Yes.
17 Q.   And is that your understanding,
18   approximately, of the amount of time that
19   the barber would spend doing that?
20 A.   Yes.
21 Q.   And would that have been your understanding
22   back in December of 2004 also?
23 A.   Yes.
24 Q.   And this form, it sounds like it's one that

21

1   maybe you did not look at right before the
2   interview. Have you looked at this before
3   today's deposition?
4   A.  No.
5   Q.  I'll give you a couple minutes to read the
6       breakdown of percentage of time under the
7       bottom half of the first page of this
8       document, and just let me know after you've
9       had a chance to read it.
10  A.  (Complies.) All right.
11  Q.  And after having a chance to read that, is
12      your understanding of the barbershop
13      position similar to the percentage breakdown
14      of time that is spelled out in Exhibit 2?
15  A.  Yes.
16  Q.  And was your understanding in 2004 the same?
17  A.  Yes.
18  Q.  When you were conducting the interviews in
19      December of 2004 for the barber position,
20      was experience as a supervisor important to
21      you?
22  A.  Yes.
23  Q.  And why is that?
24  A.  In my estimation, and I do not remember how

22

1       many we interviewed, but we follow the
2       questionnaire. But in my mind a person that
3       owned his own shop and managed his own shop,
4       as opposed to renting a chair in a shop,
5       showing up, cut hair, leave. If a person
6       was responsible enough to be able to order
7       parts, maintain inventory, maintain
8       sanitation and that type of thing. So in
9       that -- and back there, as a supervisor
10      supervising inmates, to me that would be
11      important to have some supervisory skills.
12  Q.  And when you say "supervisory skills" -- and
13      I think maybe I was thinking of the word a
14      little differently than you were.
15  A.  Okay.
16  Q.  That's fine. No, that's good. Was the
17      consideration of experience of -- when I'm
18      saying "supervisory" I'm talking about
19      supervising other people working underneath
20      them. Was that something that was of
21      significance to you?
22  A.  Not as significant as the management of a
23      shop. Does that make sense?
24  Q.  Yes, that makes sense. In the hierarchy it

23

1       looks like it might be more important in
2       managing a shop than it would other people?
3   A.  That's kind of what it would appear. That's
4       what I look for.
5   Q.  Is the fact that somebody is managing other
6       people, did that have any effect one way or
7       another in your evaluation of them as a
8       candidate for the barber position?
9   A.  I don't remember. I apologize. You know,
10      because that was not a level I was truly
11      looking at at that time.
12  Q.  Well, it sounds like you do agree that at
13      that time about 40 percent of the time on
14      the job was supervising inmates doing the
15      hair cutting and training those inmates,
16      right?
17  A.  Yes.
18  Q.  Okay. And with that fact in mind, it sounds
19      like -- I'm just trying to figure out if
20      there is -- that you gave any weight to a
21      candidate if they had supervisory experience
22      or experience supervising others when you
23      were doing the interviews?
24  A.  Yes.

24

1   Q.  Okay. And would that be something that
2       would be beneficial?
3   A.  Yes.
4   Q.  You would be looking for that attribute?
5   A.  I think I more or less see them both hand in
6       hand, where apparently the question looks
7       like supervising a shop and actually
8       supervising inmates. To me if a person
9       owned his own shop or managed his own shop,
10      as this gentleman, he is supervising his
11      barbers that work for him, which would be
12      the same as supervising the inmate barbers.
13  Q.  Okay.
14  A.  That's how I would have approached that.
15  Q.  This document also, going back to Exhibit
16      No. 1, page 5, the section addressing prior
17      to interviewing a person for a Rutan
18      position says the interviewing officer shall
19      identify hiring criteria such as education,
20      experience, skills, by reviewing the job
21      specifications. Did you actually identify
22      hiring criteria for this position?
23  A.  I picked that up off the questionnaire.
24  Q.  That was something somebody else had done

**25**

1      that?

2 A. Yes. We -- I have -- we have nothing to do

3      with the questionnaire. It came to me. But

4      that's where I. . .

5 Q. Who is it that developed that questionnaire?

6 A. I believe -- I'm shaky ground. I believe

7      that's a canned set of questions that come

8      from Springfield. You know, I don't see

9      them before they come to me. Because I

10     wouldn't think -- and I -- I keep relating

11     back to a more technical position. Somebody

12     would have to know what they were doing if

13     they wanted to know pressure valve pop-offs

14     or steam-fitters or phases of switch gear

15     for electricians, so it wouldn't be an

16     in-house type thing. I believe those come

17     from Springfield. I don't want to speak for

18     somebody else. That's just what I believe.

19 Q. Okay. As far as going back to Document No.

20     1, it looks like the interviewing officer

21     should assign percentage weights to each

22     hiring criteria. Do you see that?

23 A. Yes.

24 Q. Is that something you did, or is that

**26**

1      something that somebody else did?

2 A. Those are on the form. No, I didn't say,

3      well, this is worth this percent, this is

4      worth that, no.

5 Q. And it also says the interviewing officer

6      shall develop the interview questions, but

7      it sounds like somebody else --

8 A. No.

9 Q. And I talk slow and you know where I'm

10     going --

11 A. Yeah, she's got to write it all down. I

12     apologize.

13 Q. Just try and hold back. Just so the record

14     is clear, it sounds like you did not develop

15     the interview questions; is that right?

16 A. I did not develop them.

17 Q. And it says the interviewing officer shall

18     develop the rating system to be used and

19     indicate the numerical rating assigned. And

20     that's something you did not do, right?

21 A. No, I did not do that.

22 Q. And it also says -- as far as the next,

23     No. 7 in Exhibit 1, on page 5, it indicates

24     that the interviewing officer shall develop

**27**

1      the Candidate Evaluation Form. And that's

2      something you did not do, right? Is that a

3      bad question or --

4 A. No, I'm trying to think on a Candidate

5      Evaluation Form, that's a preprinted form.

6      I would say no.

7 Q. "No" that somebody else did it as opposed

8      to --

9 A. Yes, yes, it was done on a different level

10     than the interview.

11 Q. Okay. And then the last thing that the

12     interviewing officer shall do is forward the

13     Candidate Evaluation Form interview

14     questions, job posting, position

15     description, and class specifications to the

16     interview coordinator. Do you see that?

17 A. Yes.

18 Q. Do you think it's possible maybe you weren't

19     the interviewing officer, maybe you were the

20     interviewing coordinator here?

21 A. Yes, it's possible.

22 Q. I mean, I would have thought you would have

23     been an interviewing officer --

24 A. I would have thought two guys were doing the

**28**

1      interviews. I didn't see where one would be

2      the coordinator and the other would be the

3      officer or whatever.

4 Q. You interviewed these with a guy by the name

5      of Shaw; is that right?

6 A. Yes.

7 Q. Did you think you and Mr. Shaw basically did

8      the same thing in regards to these

9      interviews?

10 A. Yes.

11 Q. It's not like you think he's the one who

12     came up with the forms?

13 A. No, I'm sure he didn't come up with the

14     forms.

15 Q. You think they were both forwarded -- the

16     forms were forwarded to both you and

17     Mr. Shaw?

18 A. Uh-huh.

19 Q. Is that yes?

20 A. Yes.

21 Q. And the percentage weights for the different

22     attributes of the candidates, that's

23     something that was determined by somebody

24     else other than and you Mr. Shaw, right?

29

```
1   A.   Yes.
2   Q.   Okay. Continuing to the next page on
3        Exhibit 1, page 6 of 7. If you go to
4        paragraph number 2, there's a subpart C
5        under paragraph 2 that says, Ensure
6        background investigations are conducted as
7        appropriate. Do you know when it would be
8        appropriate to do background investigations?
9   A.   No.
10  Q.   Okay. Do you know who would make that
11       decision?
12  A.   The Human Resource coordinator.
13  Q.   And as far as this last part on this No. 2,
14       subpart D, it says, Complete the Employment
15       Decision Form DC 5654. Do you see that?
16  A.   Yes.
17  Q.   Do you know if there was an Employment
18       Decision Form completed in this case?
19  A.   That's a form that the Human Resource
20       representative or coordinator completes.
21       And I don't know if it was done. In all
22       honesty, I can't imagine it wouldn't be, but
23       I did not have -- I was not privy to the
24       document.
```

31

```
1        employment decisions regarding positions
2        filled under Rutan guidelines, except for
3        confidential medical records, shall be
4        maintained on file in the Personnel office
5        in a Rutan file. Do you see that?
6   A.   Yes.
7   Q.   Do you know what Personnel office they're
8        talking about? Is that something at Henry
9        Hill, or is that something at Springfield?
10  A.   I believe that's at Henry Hill.
11  Q.   Okay. Who would be the person in charge of
12       the documentation for these interviews at
13       Henry Hill currently?
14  A.   Her name is Margaret Foley, F-O-L-E-Y. And
15       she's the Human Resource representative.
16  Q.   And it looks like she was in that role in
17       2004 also, right?
18  A.   Yes.
19  Q.   Have you, in preparing for this deposition,
20       gone through and tried to look at the Rutan
21       file or a file for Mr. Abron here at Henry
22       Hill?
23  A.   No.
24  Q.   And if you go to subpart E of that paragraph
```

30

```
1             (Whereby a discussion was held
2             off the record.)
3
4   BY MR. REHN:
5   Q.   Going back on the record, as we've gone
6        through this form, it looks like there was a
7        lot of stuff that the correctional -- or the
8        interviewing officer was supposed to do that
9        you did not do; is that right?
10  A.   Yes.
11  Q.   And, I mean, that's -- it sounds like -- we
12       were just talking a little off the record,
13       it's somewhat, I think maybe doing with word
14       processing or whatever. You were forwarded
15       a lot of the stuff it looks like the
16       interviewing officer, according to this 2002
17       form, should have been doing; is that right?
18  A.   I believe the documents that we were
19       forwarded came from the Human Resource
20       representative and not necessarily an
21       interview coordinator per se.
22  Q.   Okay. And if you go to No. 5, paragraph no.
23       5, which is on page 7 of 7 of No. 1, it
24       indicates that interview documentation for
```

32

```
1        5, you'll see that it looks like the
2        Employment Decision Form for the candidate
3        selection should be in the Rutan file; is
4        that right?
5   A.   It should be.
6   Q.   It looks like at some point in time a Janet
7        Richmond, who's an administrator at the
8        Office of Affirmative Action, started to get
9        some correspondence related to the hiring
10       position of the barber position in 2004.
11       Did you ever have any contact with Janet
12       Richmond?
13  A.   No, I've never talked to her. I believe at
14       one time -- well, at one time, I think she
15       was the Affirmative Action person for
16       Department of Corrections. I'm not sure
17       she's even there anymore. I just -- I have
18       not had any correspondence or contact with
19       her at all ever.
20
21            (Exhibit 4 so marked for
22            identification.)
23
24
```

33

BY MR. REHN:

Q.  Handing you what's marked Exhibit No. 4 and what is Bates stamped No. 15, can you tell me what that document is?

A.  That is the document that is posted whenever there's an opening for a position. It's posted on a bulletin board so employees can see that there is a position available.

Q.  So that gets posted here at the Henry Hill facility?

A.  Yes.

Q.  Is this something that you would have reviewed before doing the interviews in December of 2004 for the barber position?

A.  No.

Q.  And I'm not going to mark this document just yet, but there's -- it's been Bates stamped 16. It's called an Employment Bid Record. Have you seen this document before?

A.  No.

Q.  Okay.

A.  Sorry. Evidently those were just the candidates that applied for it, from glancing at the names. I had never seen

34

them.

Q.  As far as the interview process goes, it looks like you have a set of questions that every candidate was asked; is that right?

A.  Yes.

Q.  And it looks like you followed the same order in asking those questions?

A.  Yes.

Q.  And there's two people that are doing the interview; is that right?

A.  Yes.

Q.  And it also looks like there are scores that are marked on the interview forms after the interview is completed?

A.  Yes.

Q.  Or maybe it's during the interview. Why don't you tell me the process of how it is that you determine what numerical score to give on each answer.

A.  Okay. On the questionnaire there's a rating block from 0 through 4. So as you ask the question, you have the option of either putting down the numerical score at that time, but as long as you write what was said

35

in that question is the main thing. Honestly, I don't remember if I put the actual number down as I'm writing it, or after the gentleman leaves. Because we're asking questions right down the line and we're writing fast as we do it.

Q.  As a practical matter, are you the one that's asking the questions? Do you rotate back and forth?

A.  It varies. There's no set rule. No, we don't have one person that asks all the questions of one candidate and then another that asks all the next. It just -- it's somewhat at a random.

Q.  As you're sitting here today, do you have any recollection of interviewing Mr. Abron?

A.  Sir, I apologize, but -- now that I see you, you look familiar, but, no, I don't. And, you know, I apologize, I just don't.

Q.  That's fine. It was just basically another day at work for you --

A.  Yes.

Q.  -- that day you were doing interviews?

A.  Yes. And I didn't know the guys. I

36

don't -- we didn't set up the sequence of how they were interviewed or anything. They just come down the line.

Q.  Did you know Larry Thompson at all before you interviewed him?

A.  No. I had never seen any of the candidates.

Q.  And as far as when you're putting the numbers in on your interview sheets, is that something that you and the other interviewer agree to a number before you put it down on your sheet, or do you independently, you rank them, and he's ranking them on the other side of the room and you don't know initially what the numbers are? How does that work?

A.  We do not correspond on our answers. The thing I find is when there's such a short range, if you have professionals and they have a license, you almost have to throw out 0 and 1, or they wouldn't even have a license. So the range of what you can score is so limited. But I don't try to say -- you know, I don't try to correspond the two.

Q.  It looks like, and we'll get into the

**37**

1    documents here in a little bit, but there's
2    handwritten notes and then there's -- it
3    looks like somebody types up an Evaluation
4    Form for each one of the applicants?
5  A.  Yes.
6  Q.  Who is it that actually types up the
7    application?
8  A.  The Human Resource person.
9  Q.  Okay. Do you tell the Human Resource person
10   as one of the interviewing officers, do you
11   tell that person what to type into the
12   evaluation?
13 A.  Boy, you're going to think I'm a dummy. Oh,
14   no. I can't remember. No, I don't sit down
15   with her and say do this and this and this.
16   I believe, and I haven't done this since
17   2004, that that -- that document is put
18   together from the questionnaires, the typed.
19   I know I don't sit down and type in. And I
20   honestly do not remember. I do not think
21   so.
22 Q.  As far as the process goes, did you -- did
23   you do all the interviews in one day here;
24   is that right?

**38**

1  A.  Yes.
2  Q.  Okay. Was it the same room we're in today?
3  A.  Yes. I had to check with him.
4  Q.  And as far as when the interviews were
5    completed, did you know who it was that had
6    the job?
7  A.  No. I mean, we have to add -- you assign a
8    number and you add it and you divide it by
9    2. And then from there it goes to the
10   warden and he makes the final decisions.
11   All we are are information gatherers and
12   number calculators.
13 Q.  Did you know who had the highest number when
14   you were done with the interviews that day?
15 A.  I would say yes. I'm sorry. Just from
16   adding whatever interview you're doing for
17   whatever position. Generally if you know
18   your numbers, you can pretty well tell, you
19   know, if somebody's consistent or whatever.
20 Q.  When you are interviewing candidates for --
21   and this would be any position first, and
22   then I'll follow up one specifically for
23   barbers, but any position at the
24   correctional facility here in Galesburg, do

**39**

1    you consider or take into consideration
2    whether they have experience working in
3    correctional facilities?
4  A.  Yes.
5  Q.  And what kind of consideration do you give
6    that fact?
7  A.  I would give consideration strictly from a
8    security standpoint, meaning if an
9    individual worked in a facility, even say a
10   contractual or an employee. If they're
11   familiar with key control, that type of
12   thing.
13 Q.  And what is key control?
14 A.  Meaning everybody's assigned a key chip, you
15   draw your keys, you put the chip on the
16   board. You're trained not to leave your
17   keys, because it would create a security
18   situation. It may not be the determining
19   factor, but it is a factor.
20 Q.  And it would be a benefit -- it's an
21   attribute you're looking for in candidates
22   is to have experience in a correctional
23   environment?
24 A.  It's not specific, but it would be an asset.

**40**

1  Q.  If two candidates were equal but one of them
2    had correctional experience, that may be
3    something that tips in favor of the person
4    that has correctional experience.
5  A.  It would carry some weight. It may not tip
6    the balance, but it would be considered.
7  Q.  As you're sitting here today, do you know
8    whether Mr. Abron had any experience working
9    in a correctional facility prior to the time
10   he interviewed in December of 2004?
11 A.  At the interview, as I recall, Mr. Abron
12   advised us he had been a contract barber at
13   the juvenile facility.
14 Q.  Do you know if he discussed during the
15   interview having any experience at the Mary
16   Davis Home in Galesburg?
17 A.  I do not remember.
18 Q.  It's possible he did, but you're not sure?
19 A.  Yes. It's quite possible. I truly don't
20   remember.
21 Q.  Do you remember if he discussed working at
22   the Knox County Jail during the interview?
23 A.  I do not think so. But in all fairness, I
24   do not remember that. He very well could

41

1    have. You know, when you're interviewing
2    eight or ten guys, they all tend to, I don't
3    want to say run together, but I do not
4    remember that conversation. The thing that
5    stuck out in my mind was his experience with
6    the juvenile facility.
7  Q.  Okay. And why did that stick out in your
8    mind?
9  A.  Because there's a difference between a
10   juvenile facility and a Level 2 secure
11   facility that is one step below a maximum
12   security facility.
13  Q.  What is the difference there?
14  A.  The difference is juvenile facilities are
15   juveniles that don't -- I mean, I do not see
16   the security risk in a juvenile facility
17   that there is from a Level 2 secure
18   facility.
19  Q.  Is there -- before I get into all this
20   stuff, I guess, let me step back.
21  A.  Sure.
22  Q.  Ultimately Larry Thompson was hired for the
23   barber position in December of 2004.
24   Without going through all the forms, do you

43

1  Q.  That's all right. That's all right. And
2    all I'm here to do is try to find out
3    information. And what I'm trying to figure
4    out is whether you have an opinion as to
5    whether Mr. Thompson was more qualified than
6    Mr. Abron for the barber position.
7  A.  No. I mean --
8      MR. KLEIN:  Are you saying you don't
9    have an opinion?
10     THE WITNESS:  Well, I guess I'm
11   struggling with this. I mean, obviously --
12   no, I can't say he scored out higher,
13   because I'm not sure I scored him higher or
14   lower as an individual.
15     My feelings were Mr. Thompson in
16   the interview stated that his shop was in a
17   rather rough area of town and he was used to
18   dealing with adults, that he would not be
19   intimidated by an adult population. In the
20   final analysis to me, having a shop in an
21   area of town where you're used to adults and
22   you will not be intimidated was every bit or
23   even a little bit more than having
24   experience in a juvenile facility. So --

42

1    have an opinion one way or another as to
2    whether Larry Thompson was a better
3    candidate than Steve Abron for the barber
4    position?
5  A.  As I recall, they were both at the top of
6    the list. I do not remember how many we
7    interviewed. I think maybe eight. They
8    were both well-qualified candidates.
9  Q.  And my question was whether you have an
10   opinion as to whether Larry Thompson should
11   have been hired or Steve Abron should have
12   been hired?
13  A.  The delay, pardon me, you know, I want to be
14   fair and honest, and I need to formulate my
15   thought, because to me they were one, two
16   out of eight, and the choice of who to hire
17   was not mine to make. My -- my concern
18   through Rutan was to ask the questions and
19   try to score it. I felt both were good
20   candidates.
21     I know that's not an answer. Do
22   you need a yes or a no or something on that?
23   I'm sorry. Help me out here. I'm not used
24   to this stuff, guys.

44

1  BY MR. REHN:
2  Q.  So you thought the location of the shop was
3    a very significant factor for you?
4  A.  Yes, to me.
5  Q.  Where do you live?
6  A.  I live? Monmouth.
7  Q.  Monmouth's about 15 miles west of Galesburg,
8    20?
9  A.  Yes.
10  Q.  I was there yesterday morning. You would
11   think I'd know the miles. You also come to
12   Galesburg pretty regularly -- well, for work
13   obviously, you work here in Galesburg?
14  A.  Yes.
15  Q.  And how long have you worked in Galesburg?
16  A.  Nineteen and a half years.
17  Q.  And you probably come to Galesburg
18   occasionally to shop or go to restaurants?
19  A.  Yes.
20  Q.  Are you familiar with Henderson Street in
21   Galesburg?
22  A.  Yes.
23  Q.  It's one of the main streets in Galesburg,
24   probably the main north-south street in

45

1    Galesburg, right?
2  A.  Right. Yes.
3  Q.  And are you familiar with South Henderson
4    Street?
5  A.  Yes.
6  Q.  And most of the businesses and commercial
7    properties, I guess, for retail and
8    restaurants are on North Henderson Street.
9    There's some industrial businesses on South
10    Henderson Street, right?
11  A.  Yes.
12  Q.  There's a barbershop on South Henderson
13    Street that Mr. Abron owns. Are you
14    familiar with the location of that shop?
15  A.  I think it's on the east side of South
16    Henderson Street.
17  Q.  You're absolutely right, yes.
18  A.  Yes, then I am.
19  Q.  And that's just a little bit south of the
20    railroad tracks that cross within about a
21    half a block of the intersection of Main
22    Street and Henderson Street in Galesburg.
23    Those are where the railroad tracks are.
24  A.  Yes, I think we're talking about. . .

46

1  Q.  And you go a little bit further south of
2    that a few blocks, and you're at the
3    building Abron's Hair Design, the building
4    where he works. Are you familiar with
5    that --
6  A.  Yes, I believe so. I couldn't pick the
7    building out, but I believe I saw a sign at
8    one time.
9  Q.  And how would you describe that
10    neighborhood?
11  A.  Commercial. I go down to the Al's Sporting
12    Goods store and buy things, and it's down
13    the road, you know, a few blocks.
14  Q.  Al's Sporting Goods is also on South
15    Henderson Street?
16  A.  Yes. That's why I was familiar with
17    Mr. Abron's shop. I'm sure at some point in
18    time I've gone to Al's Sporting Goods and,
19    you know, as you observe, you see a shop or
20    whatever.
21  Q.  Do you know where Mr. Thompson's shop was?
22  A.  No.
23  Q.  Would you be surprised to know it's within a
24    few blocks of Mr. Abron's shop?

47

1  A.  I would not be surprised.
2  Q.  Would you have known that back in 2004 when
3    these interviews were done?
4  A.  No, because I didn't know where Mr. Abron's
5    shop was actually physically located at that
6    point in time. I -- I may have driven by
7    it, but I couldn't -- couldn't picture it.
8  Q.  If the location of the shop was an important
9    factor, did you ask Mr. Abron where his shop
10    was?
11  A.  I don't remember.
12  Q.  Do you remember asking any of the applicants
13    where their shop was located?
14  A.  I believe in the interviews the candidates
15    would state if their shop was in their home
16    and that type of thing. So, no, we didn't
17    specifically ask the address of every shop
18    of every candidate.
19  Q.  But it sounds like the location of
20    Mr. Thompson's shop is the main factor as to
21    why you selected him?
22  A.  It was a factor based on his description of
23    his shop and the fact that I believe he was
24    open some odd hours and things like that.

48

1  Q.  Did Mr. Thompson indicate he had any
2    experience cutting either juvenile or adult
3    clients or customers that were being held in
4    custody for violations of state law or
5    federal law?
6  A.  No.
7  Q.  If Mr. Abron had told you during the
8    interview that he had worked at the Knox
9    County Jail, which holds adult offenders,
10    would that have changed your mind in regards
11    to this -- I think before you thought it was
12    a significant factor he just dealt with
13    juveniles as opposed to adults. Would that
14    have changed your opinion in regards to his
15    work experience and his application to the
16    job here at Henry Hill?
17  A.  It would have carried a significant amount
18    of influence in it. It would not have been
19    the determining factor, but whether it's a
20    state prison or a county jail, those are
21    still adult inmates with a certain
22    intimidation factor.
23  Q.  And how does that compare as you're trying
24    to evaluate candidates for the position, the

49

1  fact that somebody has experience working
2  with adult inmates as compared to experience
3  working in a rough neighborhood?
4  A.  I'm sorry, would you give me that --
5  Q.  That's probably a bad question.  I'll try
6  and rephrase it.
7  A.  No, I just need to know.
8  Q.  All right.  I think you thought it was
9  significant that Mr. Thompson had worked in,
10 I think, a rough neighborhood?
11 A.  Yes.
12 Q.  And I'm trying to figure out how that
13 compares to somebody who's worked with
14 clientele that are inmates that are adults.
15 A.  I'd say it would be almost even.
16 Q.  Okay.  When you say "almost even" --
17 A.  Okay.  Equitable.  Equitable.  But you see
18 what I mean, I'm just trying to be honest
19 and fair.
20 Q.  I appreciate you being honest.  This is why
21 lawyers get a bad name.  You used that word
22 "almost" which gives you wiggle room, and we
23 hate wiggle room.
24 A.  I understand.

50

1  Q.  You said it's "almost even" or "almost
2  equitable."  Whichever factor, "even" or
3  "equitable" term you want to use, is there
4  one of them that has an edge, because when
5  you say "almost" it suggests that one of
6  them would be more preferable than the other
7  in regards to experience for this position.
8  A.  No, I wouldn't give either one an edge.
9
10              (Exhibits 5-6 so marked for
11              identification.)
12
13 BY MR. REHN:
14 Q.  I'm going to hand you what's been marked
15 Exhibit No. 5.  It's a Candidate Evaluation
16 Form for Mr. Thompson.  Have you seen that
17 form before?
18 A.  Yes.
19 Q.  When is it that you would have first seen
20 that form?
21 A.  Pardon the delay.  When the Human Resource
22 person typed it and asked me to sign it.
23 Q.  Okay.  And do you know -- it looks like it's
24 dated December 22, 2004.  Is that when you

51

1  would have signed it?
2  A.  Yes.
3  Q.  And handing you what's been marked as
4  Exhibit No. 6, is that the same type of form
5  and you would have received and signed it
6  the same day?
7  A.  Yes.
8  Q.  And No. 6 is for Mr. Abron; is that right?
9  A.  Yes.
10 Q.  All right.  If you can slide those aside for
11 now, we'll ask you more about them later.
12
13              (Exhibit 7 so marked for
14              identification.)
15
16 BY MR. REHN:
17 Q.  Handing you what's been Bates marked 28 and
18 we've marked it as Exhibit 7 here, this is a
19 Rutan Interview Package Checklist.  Now,
20 this is not for Henry Hill.  This is for
21 Illinois River Correctional Center.  But I'm
22 trying to see if you're familiar with a form
23 like that being used at Henry Hill.
24 A.  I'm not.

52

1              (Exhibit 8 so marked for
2              identification.)
3
4  BY MR. REHN:
5  Q.  Handing you what's been marked as Exhibit
6  No. 8, this again, I believe, was something
7  from the Illinois River Correctional Center.
8  Looking at that document, would you agree
9  that that looks to be the same document as
10 what we previously marked as Exhibit No. 3?
11 A.  It looks like it was developed off the CMS
12 104 basically.  Exhibit 3 to me looks more
13 like a working document that you might hand
14 the individual and say these -- you know,
15 these are your jobs, as opposed to the
16 document that states their pin number and
17 their county and that type of thing.
18 Q.  So the document that's labeled Exhibit 3 --
19 A.  And the one that looks like 8, they're the
20 same document.
21 Q.  Yes, I believe they're the same document.
22 And do you have any reason to believe why
23 the barber position in Illinois River
24 Correctional Center would have different

**53**

1      responsibilities than the barber position at
2      Henry Hill?
3  A.  Only because of the difference in level of
4      security.
5  Q.  Okay. And which place --
6  A.  They're both adults. Henry Hill is a Level
7      4 secure facility. Illinois River is a
8      Level 3. Meaning our guys are more of a
9      security risk than theirs. But basically
10     the barber position would appear to be
11     close.
12  Q.  Do you think it would be more important to
13     have correctional experience for the barber
14     position at a Level 4 or at a Level 3?
15  A.  A Level 4.
16  Q.  And that's because this is more --
17  A.  Of a secure environment. I didn't mean to
18     put words in your mouth. I apologize.
19  Q.  That's fine. And we were talking sort of --
20     you were finishing off my sentence.
21          Just so the record is clear, you
22     believe the correctional experience would be
23     more important at a Level 4 because there's
24     more risk with the inmates; is that right?

**54**

1  A.  Yes.
2
3         (Exhibit 9 so marked for
4         identification.)
5
6  BY MR. REHN:
7  Q.  A document that we've labeled Exhibit 9 and
8     is Bates stamped 34, I just don't know what
9     this document is. I'm not sure if you're
10     familiar with what this document is or not.
11     If you are, let me know. If you're not, let
12     me know.
13  A.  No.
14
15         (Exhibit 10 so marked for
16         identification.)
17
18  BY MR. REHN:
19  Q.  Handing you what's marked Exhibit 10 and
20     Bates stamped 35. This looks like to be an
21     Employee Bid Record from Henry Hill, and
22     since you weren't familiar with the form for
23     Henry Hill, I doubt you're familiar with
24     this for Illinois River. By Mr. Abron they

**55**

1     indicated the type of action if you were to
2     get the job would be a transfer. And I'm
3     just trying to get in your mind would you
4     consider Mr. Abron coming here from the
5     correctional center in Kewanee a transfer,
6     would you consider that new hire, promotion,
7     or would you consider it something else?
8  A.  I would consider it new hire, because he was
9     not a state employee, he was a contractual
10     barber. Where a transfer would be a state
11     employee that's already in state service.
12  Q.  Okay.
13
14         (Exhibit 11 so marked for
15         identification.)
16
17  BY MR. REHN:
18  Q.  And part of this deposition is just trying
19     to see what you're familiar with, what
20     you're not familiar with. This again is
21     from the Illinois Correctional Center as
22     opposed to Henry Hill. But have you ever
23     seen a document similar to this at Henry
24     Hill in regards to job applications or job

**56**

1     hiring?
2  A.  No.
3  Q.  And what you were just holding and what I
4     just asked you about was Exhibit 11, right?
5  A.  Right.
6
7         (Exhibit 12 so marked for
8         identification.)
9
10  BY MR. REHN:
11  Q.  Handing you what's been marked Exhibit
12     No. 12, and is Bates stamped 41, this
13     document is labeled at the top "Employment
14     Decision Form." Have you ever seen this
15     type of form before?
16  A.  Yes.
17  Q.  And this one -- this decision form deals
18     with the decision about hiring a barber at
19     Illinois River Correctional Center, not at
20     Henry Hill.
21         Have you ever seen an employment
22     decision form at Henry Hill for an
23     application or a hiring decision for Henry
24     Hill?

**57**

1   A.   Yes.

2   Q.   And have you ever seen an Employment

3        Decision Form relating to the hiring of a

4        barber in December 2004 at Henry Hill?

5   A.   I do not remember.

6   Q.   Is this the type of form that would be

7        filled out by the interviewing officers, or

8        is it something that's done at the Personnel

9        office?

10   A.   It is not done by the interviewing officer.

11          MR. KLEIN:   Could we go off the record

12        for a second?

13

14             (Whereby a short recess was

15             taken.)

16

17             (Exhibit 13 so marked for

18             identification.)

19

20  BY MR. REHN:

21   Q.   All right. I've handed you what's been

22        marked Exhibit No. 13 and Bates stamped page

23        42. And at the top it says "Hiring And

24        Promotional Monitor." And again it appears

**58**

1        to me like this document came from the

2        stuff -- from the other prison as opposed to

3        Henry Hill. Are you familiar at all with

4        this form?

5   A.   Yes.

6   Q.   Okay. Can you tell me what you know about

7        this form?

8   A.   The extent of my knowledge is the Human

9        Resource representative fills the form out

10        and sends it in.

11   Q.   And so there would have been a form like

12        this likely filled out at Henry Hill

13        relating to the barber position in December

14        '04?

15   A.   Yes.

16   Q.   And is this a form that you would have

17        reviewed or looked at at all during your

18        involvement in the hiring of the barber in

19        December of '04?

20   A.   No.

21   Q.   Okay. Going to Question No. 2 -- or not

22        question. Well, I guess it is a question.

23        Question No. 2 on this form, the question

24        is: Is there documented underutilization of

**59**

1        an affirmation action group in the EEO

2        category? And this box is checked: Yes.

3        And my guess is it probably meant

4        affirmative action, although I'm not sure of

5        that.

6          I tell you what, I read that as

7        meaning, and I may be way out of bounds --

8        before that, do you have any understanding

9        of what this question is addressing?

10   A.   No, I don't.

11   Q.   Do you have any information to believe

12        that -- well, how about I ask you this, do

13        you know what an EEO category is?

14   A.   I'm sure that's Equal Opportunity, but I

15        don't know what the category is.

16   Q.   Do you have any information one way or

17        another as to whether there is a study that

18        would indicate that there is

19        underrepresentation of minorities in the

20        barber positions at the Department of

21        Corrections?

22   A.   No.

23   Q.   Do you know -- underneath that question, No.

24        2, it says: See "Workforce Analysis

**60**

1        Affirmation Action Report" or contact the

2        Office of Affirmation. Do you know what

3        that Workforce Analysis Report is?

4   A.   No.

5   Q.   And Office of Affirmation Action, have you

6        ever heard of that?

7   A.   No.

8   Q.   Do you think it might be the Office of

9        Affirmative Action?

10   A.   I don't know.

11          MR. REHN:   Okay. That's all right.

12        While they're looking for that

13        other decision form, I don't think we have a

14        form like this relating to the barber

15        position from Henry Hill.

16          MR. KLEIN:   Let me go and I'll ask

17        them about this one as well.

18

19             (Whereby a short recess was

20             taken.)

21

22             (Exhibit 14 so marked for

23             identification.)

24

**61**

BY MR. REHN:

Q.  It sounds as though they have found the Employment Decision Form here at Henry Hill, and it also looks like what we previously marked as Exhibits 12 and 13 are actually part of the same document.

MR. KLEIN:  It actually says page 1 of 2 and 2 of 2.

THE WITNESS:  I was looking to see if I signed that after I said no.

BY MR. REHN:

Q.  We're handing you what's been marked Exhibit 14, and there's not a Bates stamp on this. This was just given to us. It's an Employment Decision Form relating to the hiring of Mr. Thompson; is that correct?

A.  Yes.

Q.  And this is a form, it looks like it was signed by a Roger Walker. Do you know who that is?

A.  He is the director of the Department of Corrections.

Q.  Okay. And is this a form that would have

**62**

been filled out then by somebody other than yourself? I think you said before you thought --

A.  I think Personnel fills this out.

Q.  And as you see this now, have you ever seen this form before?

A.  Yes.

Q.  And when I'm saying "this form," have you ever seen the form addressing Larry -- the hiring of Larry Thompson before?

A.  I don't know.

Q.  Do you know if there was any preference to be given to applicants who are residents of the State of Illinois?

A.  No.

Q.  No, you don't know?

A.  That's what I was trying to formulate my answer, I apologize.

Q.  That's all right.

A.  I don't know.

Q.  And do you know whether there is any preference by the Department of Corrections in making the hiring decision such as the barber in 2004 based upon military

**63**

experience?

A.  I do not know.

Q.  In these documents, and I'm not going to go through all of them with you, there are questionnaires relating to the interviewing of Mr. Abron and a number of candidates at the Illinois River Correctional Center in regards to a barber position there. Have you gone through or reviewed the interview documents from Illinois River relating to their hiring?

A.  Absolutely -- no.

Q.  And you were not involved in the hiring of a barber at Illinois River?

A.  No.

MR. REHN:  Off the record.

(Whereby a discussion was held off the record.)

(Exhibit 15 so marked for identification.)

**64**

BY MR. REHN:

Q.  Handing you what's been marked Exhibit No. 15, this document is labeled "Barber Interview." Do you know what this document is?

A.  This looks like the standard set of questions that we ask in the interview.

Q.  And this would have been -- and I believe that's what it is too. It looks like from the December 2004 interviews relating to the candidates for the barber at Henry Hill, this would be the form that you used for the interviews?

A.  Yes.

Q.  And underneath the -- each question, there's some lines where you would fill out information as you were doing the interview; is that right?

A.  Yes.

Q.  And then there's a point section right beside each question, right?

A.  Yes.

Q.  And after completing the interview, or maybe during the interview, you would put a number

65

1      beside each answer; is that right?
2   A.  Yes.
3   Q.  And then at some point you would add up the
4      point total and do some division and try and
5      figure out what the correct number would be
6      as far as an average for each section of the
7      interview form; is that right?
8   A.  Yes.
9   Q.  Would you consider documents that the
10     applicants provided to the Department of
11     Corrections when you were -- when you were
12     filling out these forms?
13  A.  No.
14  Q.  Did you look at the resumes of different
15     candidates if they provided you with a
16     resume?
17  A.  I don't remember.  My emphasis was on --
18     strictly on the questionnaire.
19
20              (Exhibit 16 so marked for
21              identification.)
22
23  BY MR. REHN:
24  Q.  Handing you what we've labeled Exhibit 16,

66

1      and I'll have to tell you, because it looks
2      like the Bates numbers are off of your
3      exhibit, it begins at Bates No. 238 and
4      continues to Bates No. 257.  It appears to
5      me that this is a document which would be
6      all of the documents relating to an
7      applicant by the name of Brian Wilkinson in
8      his application for the barber position here
9      in 2004.
10              Generally speaking, it looks to me
11     like the first part of this would be -- the
12     first four pages are a form that's labeled
13     "Examining Employment Application."  Would
14     you have seen an "Examining Employment
15     Application" for the applicants for the
16     barber position?
17  A.  Each -- we get a file folder, and I believe
18     it has the application in it.
19  Q.  So this is something that you would have
20     been provided before you had the interviews
21     of the different applicants?
22  A.  At each interview -- I mean, each one.  We
23     don't get them in advance.
24  Q.  Would you have had them the day of the

67

1      interview?  It's not like you got them the
2      week before?
3   A.  The minute of the interview.
4   Q.  When you say "the minute of the interview,"
5      do they walk in and give you the
6      application, or how does it work?
7   A.  I believe there's a stack on the table that
8      the Human Resource Department must put
9      everything together, and then they have a
10     folder.
11  Q.  Is there somebody from the Human Resource
12     Department that's actually in the room when
13     the interviews are being done?
14  A.  No.
15  Q.  It's just the applicants and then the two
16     interviewers?
17  A.  Yes.
18  Q.  And it sounds like there was a stack of
19     papers on the table and there maybe would be
20     a stack for each applicant that you would
21     have an opportunity to look at, at least
22     when they came in to interview?
23  A.  Yes.
24  Q.  And it looks to me, as going through the

68

1      documents we have here, some of the
2      applicants provided you a resume and some
3      did not.  Does that sound typical for this
4      type of procedure?
5   A.  It sounds typical.
6   Q.  Okay.  It looks like Mr. Wilkinson provided
7      a copy of his license showing that he's a
8      barber, and I think that that's in all of
9      the packets that we have for the applicants.
10     Is that something that you would have been
11     provided also before, or at the time of the
12     interview?
13  A.  If not, we would request it.  As an example,
14     a union card, if it was a union position, a
15     union electrician, we would need the proof.
16     And if they didn't have their billfold with
17     them, as long as they can provide it.
18  Q.  Looks like you also have a copy of the
19     driver's license and Social Security card.
20     I guess that's just to prove they're a U.S.
21     citizen?
22  A.  I don't know.  It's part of the employment
23     packet that Human Resource puts together.
24  Q.  And Mr. Wilkinson also has a Candidate

**69**

1    Evaluation Form, and this would have been
2    provided to you -- it's probably about eight
3    or ten pages into this. The Candidate
4    Evaluation Form would have been provided to
5    you along with the Evaluation Form for all
6    of the candidates after somebody from
7    Personnel typed in the information; is that
8    right?
9  A.  Yes.
10 Q.  Would you go through the Candidate
11   Evaluation Forms and make any corrections,
12   say, oh, my gosh, they missed something, we
13   need to change it, or did you just as a rule
14   sign these things?
15 A.  Sign it.
16 Q.  Would you review them and make -- see if the
17   information is correct at all?
18 A.  Yes.
19 Q.  As far as the back end of this document I
20   gave you is two different sets of Barber
21   Interview Forms. It looks to me like this
22   is the questions and answers and you filled
23   out, it looks like, the first set of them,
24   and then the last few pages of this would be

**70**

1    the interview section that was filled out by
2    Mr. Shaw; is that right?
3  A.  Yes.
4  Q.  Okay. And just so I'm clear, and I haven't
5    taken the time to go through all of the
6    different forms on each of the different
7    applicants, but looking at these forms, it
8    appears as though the points that each
9    candidate or applicant gets for each
10   question may be the same on both your form
11   and the other interviewer's form for each of
12   the questions. Is that the way -- would you
13   guys come to an agreement on numbers, or
14   would you do it independently?
15 A.  Not necessarily would we come to the
16   agreement. With the limited number that you
17   can use, it's not uncommon they would be
18   pretty close to the same. I'm not sure not
19   everybody on every one is. But it would not
20   be uncommon.
21       MR. KLEIN:  I'll object to the extent
22   that the question misrepresents the form,
23   because there are a couple places where
24   they're different on Mr. Wilkinson's.

**71**

1        MR. REHN:  Maybe they are. Like I
2    said, I haven't been through them all.
3    Which one?
4        MR. KLEIN:  Work History.
5
6  BY MR. REHN:
7  Q.  And your attorney has done a good job
8    pointing something else out. For instance,
9    in Work History, it appears as though you
10   gave Mr. Wilkinson 1 point, whereas
11   Mr. Wilkinson gave Mr. Shaw 2 points. Do
12   you see that?
13 A.  Yes.
14 Q.  It sounds like you didn't come to an
15   agreement about this. Would you have
16   discussed that at all doing the interviews
17   or after the applicant walks out, you say I
18   gave him this, what did you give him? Would
19   there be discussions like that?
20 A.  I don't know. When we totaled out the grand
21   total, there would be a question, you know,
22   I mean, when you total everything up and you
23   were done.
24 Q.  Okay.

**72**

1  A.  But as far as -- no.
2  Q.  And maybe that's --
3  A.  He asked -- he grades himself, I grade my
4    guys.
5  Q.  You grade, he grades, and what I guess I'm
6    getting at is at some point in time there's
7    a final number that is put on the evaluation
8    forms by Personnel, the typed-up Evaluation
9    Form?
10 A.  Right.
11 Q.  Do you know, is it -- would the number that
12   they get on the Candidate Evaluation Form,
13   is that something that they do all the
14   tallying for, or is that something you --
15 A.  We would do the tallying, but they divide --
16   they take the scores and divide it by the
17   interview, like if two of us, it's an
18   average of the two.
19 Q.  Okay. As a general rule, it sounds like you
20   don't recall specifically going through the
21   numbers with the other interviewer, but it
22   sounds to me as though it's something you
23   didn't believe was strictly prohibited or
24   anything?

**73**

1    A.    Not to my knowledge. But since they're
2          averaged, to me it wouldn't be -- I might
3          see a person at one number, the other
4          interviewer another. In the final analysis,
5          since you do the division and it averages
6          out, I didn't -- I don't see it as a major
7          stumbling block.
8    Q.    Would you and the other interviewer
9          typically discuss the candidates after they
10         left the room and before the next person
11         would come in for an interview?
12   A.    Briefly.
13   Q.    And would that be before or after you had
14         filled out the numbers, or would it be while
15         you're filling out numbers?
16   A.    I don't recall.
17   Q.    Do you recall how long these interviews
18         took?
19   A.    No, I don't. I would -- this is a pretty
20         straightforward interview. So I would say a
21         half hour per interview. And that's
22         strictly a guess.
23
24

**75**

1          the No. 10 in it. Do you see that?
2    A.    Yes.
3    Q.    It sounds to me like you weren't really
4          aware of any Veterans Preference. Did you
5          pay attention to this at all when you were
6          doing the interviews?
7    A.    No.
8    Q.    Underneath that box it says Veterans
9          Preference. If you go towards the
10         right-hand margin there are a number of
11         little boxes numbered 0 through 4 with a
12         checkmark on the 4 just on the same front
13         page. I have no idea what those numbers
14         mean. Do you?
15   A.    That's what I was looking for, to see if I
16         could see in here what that 0, 1, 2, 3, or 4
17         meant. Veterans Preference section. I
18         don't know.
19   Q.    Okay. On this application, I don't see
20         anything in regards to Mr. Thompson
21         indicating he had experience supervising
22         other employees or people working underneath
23         him. If there was that type of experience,
24         do you know where that would be on this

**74**

1                (Exhibit 17 so marked for
2                 identification.)
3
4    BY MR. REHN:
5    Q.    Handing you what's been marked as
6          Exhibit 17, this appears to be the
7          Examining/Employment Application" for
8          Mr. Thompson. This document is -- I think
9          in our copies it's just -- it looks like
10         things have been blacked out, but it might
11         just be -- it may just be the form, the way
12         that copies are made.
13   A.    No, there was like a dark green on the apps.
14         That's nothing that's been lined out or
15         blacked out. That's the form.
16   Q.    Would there have been words written in that
17         green part, or was it just a green box
18         without any words in it?
19   A.    It's just a green box. It's right outside
20         on the wall. I could look real quick.
21         That's not wording in there. Those are
22         borders, I believe.
23   Q.    Okay. You will see there is a box in here
24         for Veterans Preference. I think that has

**76**

1          form?
2    A.    No, I do not.
3    Q.    Okay. As you sit here today, do you
4          remember Mr. Thompson ever telling you that
5          he had experience supervising other people
6          working underneath him?
7    A.    I do not remember.
8
9                (Exhibit 18 so marked for
10                identification.)
11
12   BY MR. REHN:
13   Q.    I'm handing you what's been marked Exhibit
14         No. 18 and it's Bates stamped 350 through
15         354. This appears to be the questions that
16         were asked to Mr. Thompson and the notes
17         that you took during his interview; is that
18         right?
19   A.    Yes.
20   Q.    Going to the first question, it looks like
21         he was asked what special skills he had that
22         would enable him to successfully perform the
23         duties of the job, and it looks like you
24         wrote, Cut all nationalities, knows wet and

77

1     dry cutting.
2   A.   Yes.
3   Q.   Do you know what wet and dry cutting are?
4   A.   Yes.
5   Q.   Just cutting hair wet and cutting hair dry?
6   A.   No, I go to a barber, he cuts me dry. If I
7        go to a beauty shop, they wet me and cut it.
8        Does that sound reasonable?
9   Q.   Do you know what percentage of the inmates
10       here are black and what percentage are not
11       black?
12  A.   Approximately 70 percent black.
13  Q.   Are you aware of any difference in the way
14       black inmates have their hair cut compared
15       to people that are white?
16  A.   No, I do not.
17  Q.   Did you take into consideration at all an
18       applicant's experience in regards to cutting
19       black people's hair compared to white
20       people's hair when you were interviewing
21       candidates for this job?
22  A.   No.
23  Q.   Are you aware at all of black hair treatment
24       involving chemicals?

78

1   A.   Yes.
2   Q.   What are you aware of in regards to that?
3   A.   I'm responsible for the inmate commissary
4        operation. There are certain hair products
5        that are designed for minorities, and we try
6        to stock items that work for minorities.
7        And that's my extent. But being responsible
8        for everything that's sold in the
9        commissary, if there's a product that works
10       better, and I -- I think I'm more familiar
11       with shave cream, bump guard and things like
12       that, than a true hair product. But I know
13       that there is a difference, and I'm
14       responsible for ordering the supplies that
15       are used in the barbershop, but I do not see
16       the orders.
17  Q.   Okay.
18  A.   Meaning the barber places the order and I
19       bless the deal and send it on. But they're
20       for hair products. There may be a
21       difference.
22  Q.   Do you think that experience cutting a black
23       person's hair as opposed to a white person's
24       hair should be considered when making a

79

1        decision about hiring a person in the barber
2        position at the Department of Corrections?
3   A.   No, based on the fact that the barber does
4        not cut the hair.
5   Q.   The barber does train the people that cut
6        the hair; is that right?
7   A.   The barber's required to be there because he
8        has a license to oversee it, maintain the
9        sanitation. It's not a barber school. So I
10       do not put a lot of stock in being able to
11       cut one type of hair over another,
12       because -- based on the fact that he doesn't
13       cut; he oversees the operation. And he
14       doesn't train.
15  Q.   Go back to is it --
16  A.   And, you know, I might not be qualified to
17       state whether he trains or not, you know. I
18       could be speaking out of turn there.
19  Q.   Going back to Exhibit 2, I think you agreed
20       earlier that 40 percent of the time would
21       be -- barber would be supervising,
22       instructing, and training barbers in cutting
23       other inmates' hair. Do you think that's
24       still accurate, or do you think they don't

80

1        instruct and train? Is it just supervising?
2   A.   I believe it's virtually supervising. But
3        I'm not qualified to say they instruct and
4        train back there. I know they supervise.
5   Q.   Do you have any reason to believe they don't
6        instruct or train?
7   A.   No.
8   Q.   You're just aware that they supervise and
9        you're not sure about instructing and
10       training?
11  A.   Right.
12  Q.   Okay. Going to Question No. 2, can you just
13       read your answer for me -- not your answer,
14       but your notes for Question No. 2 on the
15       first page of the barber interview?
16  A.   You mean the 40 years experience?
17  Q.   Yes.
18  A.   Graduated in 1964. Active behind the chair.
19  Q.   Do you know what you meant by "active behind
20       the chair"?
21  A.   Yes, he was actually cutting and not just
22       managing a shop.
23  Q.   All right. Now, the -- and again we're
24       dealing with -- going back to Exhibit 18,

**81**

```
 1        your notes for Mr. Thompson's interview,
 2        Question No. 3, Explain how to sanitize and
 3        sterilize barber equipment.  What was --
 4        what do your notes say in regards to the
 5        answer there?
 6   A.   I can't read the first word.  It's I-N-E-T
 7        or N-E-T.
 8   Q.   My guess is it's wet.
 9   A.   Oh.  Wet, sterilize, and dry.  Dip in
10        Barbicide.  Keep things clean in general.
11   Q.   Did you have any specific training or
12        information provided to you in regards to
13        how to sanitize and sterilize the barber
14        equipment --
15   A.   No.
16   Q.   -- before this interview was done?
17   A.   No.
18   Q.   Do you know as you sit here, without looking
19        at this, what the best way is to sterilize
20        equipment at a barbershop here?
21   A.   No.
22   Q.   Do you know of any way to sanitize or
23        sterilize equipment, other than what is put
24        down in your notes here for Mr. Thompson?
```

**82**

```
 1   A.   No.
 2   Q.   Looks like you gave him a 4, which would be
 3        an excellent on this answer; is that right?
 4   A.   Yes.
 5   Q.   Do you know what made that answer excellent?
 6   A.   Based on the delivery and the fact that he
 7        was straightforward and had command of the
 8        question.  There wasn't the hesitation.
 9   Q.   So it wasn't necessarily the content of his
10        answer, but it was more how that answer was
11        delivered?
12   A.   Yes.
13   Q.   Okay.  Going to page 352 -- Bates stamp 352,
14        the next page in your Exhibit 18 there.  Can
15        you tell me the answer that you have -- or
16        your notes for his answer to Question No. 1?
17   A.   Manage own shop, order supplies, handle
18        towels, set hours.
19   Q.   And what do your notes for the Question No.
20        2 on the same page --
21   A.   Stop doing the cut.  Would not start if open
22        cut.  Call officers.  And treat by
23        Healthcare.  The "call officers" in that
24        answer was the determining factor in that
```

**83**

```
 1        one.
 2   Q.   Why is that?
 3   A.   It's a secure environment, a prison.  First
 4        thing you do in any situation is call for
 5        officers if it's an unusual circumstance.
 6   Q.   And do you know whether there are officers
 7        at the barbershop when the barber is in
 8        there cutting?
 9   A.   Yes, within 20 feet.
10   Q.   And I'm not familiar with the layout.
11   A.   Sure.
12   Q.   When you say "within 20 feet" it sounds like
13        there's not an officer in the area where
14        they're doing the haircut but close to it;
15        is that what you're saying?
16   A.   Yes, the barbershop, right by the barbershop
17        is the employee dining room.  It's in the
18        Academic Building, and the officer in charge
19        of the Academic Building is the responsible
20        one for all of that area, and it's within a
21        few feet.  He can see the barbershop.
22   Q.   Do you know what the barbershop layout is at
23        the youth correctional facility in Kewanee?
24   A.   No, I don't.
```

**84**

```
 1   Q.   As far as Interpersonal Relations, what were
 2        the notes that you put in regards to his
 3        answer there?
 4   A.   Can get along with anyone.  Treat like I
 5        wanted to be treated.  And not smart acting.
 6   Q.   Do you know whether he had any coworkers
 7        when he was working at his shop,
 8        Mr. Thompson?
 9   A.   I believe he owned the shop, co-owned the
10        shop with his brother.  I'm not certain.
11   Q.   Do you know his brother's name?
12   A.   No, no.
13   Q.   Do you remember, is that based on something
14        he told you at the interview, something you
15        saw in writing, or do you know what that
16        belief is based on?
17   A.   I do not remember.
18   Q.   You're not sure what that belief is based
19        on?
20   A.   No, I don't know.  That's why I was so
21        hesitant in my answer.  I was trying to make
22        sure I did the right thing.
23   Q.   In looking at your answer -- or your notes
24        concerning Question No. 2 at the top of the
```

85

1    next page, can you tell me what your notes
2    say here?
3  A.  Has a shop in the rough end of town.  Can
4    deal with all types of people.  No --
5  Q.  My guess is harassment, but I'm not sure.
6  A.  Okay.  Yes.
7  Q.  I'm not sure if that's right or not.
8  A.  I -- I'm sure.
9  Q.  You do believe that says "no harassment"?
10  A.  Yes, I believe that's "no harassment."
11  Q.  Okay.  It says, Has shop in rough end of
12    town.  What does the rough end of town mean
13    to you?
14  A.  Monmouth Boulevard.
15  Q.  As far as -- before I think when we talked
16    earlier today in your deposition, I think
17    you said this is one of the more significant
18    factors in your decision why you would think
19    Mr. Thompson is more qualified; is that
20    right?
21  A.  It was a determining factor, yes.
22  Q.  Okay.  And as far as the answer goes, you
23    gave him a 3 for this answer; is that right?
24  A.  Yes.

86

1  Q.  Which I forget, excellent is 4, 3 is very
2    good, or something like that?
3  A.  Yeah.  It's on the -- there you go.
4  Q.  Very good.  What do your notes for the next
5    question say?
6  A.  The point that I see that is you have to
7    work with the inmates and treat them with
8    respect.  You can't be their friend, but you
9    also need to be respectful of them.  You
10    don't want to go too far and be too
11    friendly, and you've got to be able to work
12    with them, but they're not here to be your
13    friend.
14  Q.  And it looks like that was in response to
15    what role he sees communication playing in
16    the job?
17  A.  Yes.
18  Q.  And what's your notes for the Work History,
19    Question No. 1?
20  A.  Forty years experience, owns his own shop,
21    be honest with people and straightforward.
22  Q.  Why don't we go to the last question on the
23    next page, Question No. 2.  What do your
24    notes say?

87

1  A.  Only had three sick days in 22 years.  Never
2    had hospital.  In on time.
3  Q.  And do you do anything as an interviewer to
4    verify or check out the statements that
5    people tell you when they're doing the
6    interview?
7  A.  No.
8  Q.  Do you remember whether Mr. Thompson
9    interviewed before or after Mr. Abron?
10  A.  No.
11  Q.  Do you remember comparing Mr. Thompson to
12    Mr. Abron at all that day in any discussions
13    with the other interviewer?
14  A.  No.
15  Q.  Do you remember having any discussions with
16    the other interviewer about Mr. Thompson's
17    lack of experience working with people in
18    correctional facilities?
19  A.  No.
20  Q.  Do you remember having any discussions with
21    the other interviewer or Mr. Thompson about
22    his experience or lack of experience
23    relating to cutting black people's hair?
24  A.  At one point the interview questions, I

88

1    believe he mentioned that he cut various
2    types of hair.  That would have been the
3    extent of it.
4  Q.  And I think --
5  A.  And I may not have it spelled out exactly in
6    here, but that was the gist of. . .
7  Q.  Your first answer on the first question, I
8    think it says, Cut all nationalities.
9  A.  Okay.
10  Q.  Is that what you're talking about?
11  A.  Yes, yes.
12  Q.  Did you think that it was significant that
13    he did cut all nationalities?
14  A.  Yes.  I gave it a 3.
15  Q.  And why did you think that was significant?
16  A.  Because we have a minority population here,
17    and I wanted to be sure that he had an
18    appreciation in the variation in hair here.
19  Q.  When Mr. Thompson was done with the
20    interview, would you have filled out these
21    numbers and done the calculations before the
22    next person comes in for their interview on
23    that day?
24  A.  I don't remember.

89

1   Q.   Is that your handwriting that puts in the
2        numbers also though?
3   A.   Down at the bottom you mean?
4   Q.   Well, throughout the whole form.
5   A.   Yes, yes.
6   Q.   Both the totals and --
7   A.   Yes.
8
9           (Exhibit 19 so marked for
10          identification.)
11
12  BY MR. REHN:
13  Q.   Handing you what's been marked Exhibit
14       No. 19, would this have been the
15       interview -- I've got to make sure I gave
16       you the same thing I marked 19. I didn't
17       want to give you -- I scrambled the deck
18       somewhere here.
19  A.   What I thought was ironic, sometimes I
20       write, sometimes I print. The further into
21       the interview process, the shorter my
22       answers tend to be.
23  Q.   Can you give me back 18? Maybe that might
24       be the problem.

90

1   A.   Sure. That was mine.
2        MR. REHN:   Off the record.
3
4          (Whereby a discussion was held
5          off the record.)
6
7          (Whereby Exhibit 19 is re-marked.)
8
9  BY MR. REHN:
10  Q.   I've handed you what's been marked as
11       Exhibit 19. And this appears to be the
12       interview notes for Mr. Thompson that were
13       done by Mr. Shaw on December 21, 2004; is
14       that right?
15  A.   Okay.
16  Q.   And would you have reviewed Mr. Shaw's notes
17       about the Thompson interview at all prior to
18       today?
19  A.   No.
20  Q.   Okay.
21  A.   I can't even read his writing.
22  Q.   That's okay. That's all we're going to ask
23       him on that one, so. . .
24

91

1          (Exhibit 20 so marked for
2          identification.)
3
4  BY MR. REHN:
5  Q.   Handing you what's been marked Exhibit
6       No. 20, this is an Employment Application
7       that was completed by Mr. Abron. Have you
8       seen this before?
9  A.   I don't know.
10  Q.   One of the things that's interesting, you
11       do --
12  A.   They're different now. I was trying to
13       compare them, and they're a different form.
14  Q.   You're right, Mr. Thompson does have a
15       different form from Mr. Abron on the
16       application, and I don't know if that's of
17       any significance to you or not.
18  A.   No. No. It's just when we talked about
19       these areas, I thought, boy, we've got one
20       here, I can make sure I didn't lead you
21       astray when I said there was nothing there.
22  Q.   It's a different -- the form looks
23       different.
24  A.   One is dated --

92

1        MR. KLEIN:   Looks like the form
2       Mr. Abron used is revised in 1995 and the
3       one that Mr. Thompson used was revised in
4       2001.
5        THE WITNESS:   Yes.
6
7  BY MR. REHN:
8  Q.   As far as Mr. Abron's form, he indicated
9       that he did have experience with the Army on
10       the application. Were you aware of him
11       having any experience in the Armed
12       Services --
13  A.   No.
14  Q.   -- prior to me bringing that up?
15  A.   I was not aware.
16  Q.   Okay. Mr. Abron's application, if you look
17       at the second page of this exhibit where he
18       describes the duties and responsibilities of
19       his current employment, it indicates on the
20       first line he's supervisor of three licensed
21       operators. Do you see that?
22  A.   Yes.
23  Q.   Were you aware that he did supervise three
24       licensed operators when he was doing his

93

1   interview?
2   A.  No. Without reviewing the interview
3       questions, because I was going off the
4       questionnaire and not the application, so I
5       will say no.
6   Q.  If he would have brought that up, would that
7       have been significant to you, that he did
8       have experience supervising other barbers or
9       people that were cutting hair?
10  A.  It would have been important.
11  Q.  And that's because that's consistent with
12      what this job is, right?
13  A.  Supervisory.
14  Q.  So just so the record's clear, you would
15      agree that it would be important that he had
16      experience supervising other barbers, right?
17  A.  Yes.
18  Q.  And this form also indicates that he was
19      currently working at the Illinois Youth
20      Center Corrections in Kewanee, and you were
21      aware of that at the time of the interview,
22      right?
23  A.  Yes.
24  Q.  The second to the last page, and actually

94

1       this looks like it's -- the second to the
2       last page and the last page are the same
3       thing, I think. It indicates Mr. Abron had
4       studied at Carl Sandburg College. Were you
5       aware of that during his interview?
6   A.  No.
7   Q.  Would that have had any significance to you
8       that he had had some college education in
9       regards to management classes at Carl
10      Sandburg?
11  A.  No.
12
13              (Exhibit 21 so marked for
14               identification.)
15
16  BY MR. REHN:
17  Q.  Okay. I've handed you what we've marked
18      Exhibit No. 21. That's the resume of
19      Mr. Abron. Do you know if you would have
20      reviewed this at all at the time of or prior
21      to his interview?
22  A.  No.
23  Q.  No, you don't know?
24  A.  No, I did not review it.

95

1   Q.  Okay.
2
3              (Exhibit 22 so marked for
4               identification.)
5
6   BY MR. REHN:
7   Q.  Okay. I've handed you what's been marked
8       Exhibit 22. These would be your notes from
9       the interview of Mr. Abron; is that right?
10  A.  Yes.
11  Q.  All right. Going back to Exhibit No. 22.
12      We're going to do similar to what we do with
13      Mr. Thompson. Going to Question No. 1, What
14      special skills do you believe you possess,
15      why don't you tell me what the answer --
16      what your notes were to that Question 1.
17  A.  My interpretation of his answer was 28 years
18      experience, three years Corrections
19      experience, 12 years Knox County on call at
20      the jail. Black hair care. Knowledge,
21      experience, and common sense.
22  Q.  So after you look at the notes, do you think
23      he probably told you that he was working at
24      the Knox County Jail in regards to barber

96

1       work?
2   A.  Yes.
3   Q.  Although it says on call as opposed to a
4       full-time position; is that right?
5   A.  Yes.
6   Q.  Black hair care, do you know why you would
7       have put that down in your notes?
8   A.  No, I don't know why I put it down.
9   Q.  And as far as Corrections three years, it
10      doesn't say juvenile corrections; is that
11      right?
12  A.  No.
13  Q.  Do you -- how do you remember it was
14      juvenile, or what was the significance of
15      the juvenile? I guess let me go back. I
16      asked you two questions there at once.
17  A.  Sure.
18  Q.  I think earlier you said it was significant
19      that it was juvenile corrections as opposed
20      to adult corrections in Kewanee. The
21      corrections three years, is that the Kewanee
22      Corrections?
23  A.  That was my understanding, that the
24      correction experience was at the juvenile.

97

1   Q.   Okay. Going to the next question, No. 2,
2        what do your notes say in regards to his
3        answer to No. 2 there.
4   A.   Twenty-eight years experience. Looks like
5        Military National Barber in Springfield. I
6        don't have an explanation for my notes
7        there.
8   Q.   Okay.
9             MR. KLEIN:   Could we go off the record
10       a second?
11
12            (Whereby a discussion was held
13            off the record.)
14
15  BY MR. REHN:
16  Q.   All right. We're going to the next
17       question. Explain how to sanitize and
18       sterilize barber equipment. What do your
19       notes say here on this one?
20  A.   Boil, steam, disinfect, ultraray chemical,
21       Barbicide, mix and set, hot soap, then
22       rinse, ultraray.
23  Q.   All right. Do you know what that ultraray
24       means, or do you know what it's referring

98

1        to?
2   A.   No.
3   Q.   Do you as you're sitting here today have any
4        recollection as to whether Mr. Abron
5        provided you more information or less
6        information than Mr. Thompson in regards to
7        explaining how to sanitize and sterilize
8        barber equipment?
9   A.   I don't remember.
10  Q.   Do you know what Barbicide is?
11  A.   It's a germicidal chemical to sterilize the
12       equipment.
13  Q.   And do you have -- I think on Mr. Thompson
14       you indicated in his notes that you really
15       weren't familiar with the sterilization and
16       sanitation of equipment, but you gave him a
17       4 based in large part on his delivery of the
18       answer; is that right?
19  A.   Yes. There's only five lines on an
20       explanation. And I don't write every line
21       that's said on every interview. I just try
22       to pick out highlights.
23  Q.   I understand.
24  A.   And consequently, as in No. 2 where I've

99

1        only listed three items on Mr. Abron, he may
2        have put more information in there and I did
3        not put it on the interview question.
4   Q.   And as far as why you gave Mr. Abron a 3, do
5        you know why he got a 3 for that
6        sterilization answer as opposed to -- a
7        finding of very good as opposed to
8        excellent?
9   A.   No, I don't.
10  Q.   Do you know what the difference would be
11       between a very good and an excellent answer
12       to that question except for the delivery?
13  A.   No.
14  Q.   What was the answer -- or your notes in
15       regards to the answer for Question No. 1 on
16       the next page under Job Knowledge and
17       Experience?
18  A.   Looks like check machines, tools, and
19       appointment books. Check clerical cut.
20  Q.   Maybe chemical? I'm not sure. It's your
21       writing.
22  A.   I know. Chemical cut, safety in and out of
23       prison. Order supplies. Also retail.
24  Q.   Do you believe that -- in and out of prison

100

1        refers to his prior job experience where he
2        has been -- he's familiar with security at
3        other detention facilities?
4   A.   Yes.
5   Q.   And as far as general order supplies, also
6        retail, it looks like he's ordering stuff to
7        sell to others and also to use at his shop?
8   A.   Yes.
9   Q.   And as far as the notes about chemical cut,
10       do you know what that would be referring to?
11            MR. KLEIN:   Could it say chemical out?
12            MR. REHN:   Maybe it's chemical out.
13            THE WITNESS:   No, it looks like a
14       chemical cut, which may be a process. I
15       don't know. I apologize.
16
17  BY MR. REHN:
18  Q.   Could that be related to a special treatment
19       for black people's hair in cutting their
20       hair?
21  A.   Yes.
22  Q.   Could be, but you don't know?
23  A.   I'm sorry, yeah, I do not know.
24  Q.   Going to your answer to Question No. 2, can

101

1    you tell me what your notes say there?
2  A.  Antiseptic and send to nurse. Good.
3  Q.  Do you know what the "good" means?
4  A.  The "good" means that it was a good answer,
5    not an excellent answer that made reference
6    to calling security.
7  Q.  Okay. As far as the calling security, was
8    there any discussion about calling security
9    at the interview around this time frame? I
10    mean, would you -- as would you call
11    security or not call security or --
12  A.  No.
13  Q.  Do you do -- and I don't know how the
14    process works. Do you do any follow-up
15    questions when they give an answer to a
16    question, or do you just strictly only ask
17    the things on this sheet?
18  A.  We try to limit it to what's on the sheet.
19  Q.  Okay. Do you know if Mr. Abron would have
20    referred to the procedures at the Kewanee
21    Youth, or his experience there in giving
22    this answer in regards to what would happen
23    if somebody got cut?
24  A.  No.

103

1    as I do a -- you know, an adult prison.
2  Q.  All right. You do agree that this question
3    actually deals with his relationship that he
4    strives to establish with coworkers, right?
5  A.  Right.
6  Q.  As far as coworkers, do you know whether
7    Mr. Abron had coworkers at his hair shop
8    when he was doing this interview?
9  A.  I don't remember.
10  Q.  Okay. Going to the next page, what was
11    your -- what were your notes in regards to
12    Question No. 2 on how you deal with people
13    who have different backgrounds?
14  A.  Evaluate the position, treat as would be
15    treated, no -- can't read the next two
16    comments. No problems with customers.
17  Q.  All right. What's your notes for Question
18    No. 3?
19  A.  I'm having a terrible time reading this
20    stuff. Can call anyone in community.
21    Various -- know who to contact. I can't
22    read my writing.
23  Q.  Okay. Do you think that -- I know that you
24    mentioned before that you don't remember the



102

1  Q.  No, you don't know?
2  A.  No, I don't know.
3  Q.  Okay. As far as the next category,
4    Interpersonal Relations, what are your notes
5    in regards to his answer to Question No. 1
6    there?
7  A.  Experience working in institutions, be nice
8    but can say no. Professional with -- I
9    can't read my last word.
10  Q.  I couldn't either. I can't help you on
11    that. Maybe humor or lumper?
12      MR. KLEIN:  Do you think it's humor?
13      THE WITNESS:  Professional with humor.
14    Very well could be. I don't know.
15
16  BY MR. REHN:
17  Q.  Going to the next -- how about if we stick
18    with that one. Looks like on this question
19    you gave him a 2. Do you know why he got a
20    2 on that one as opposed to a 0, 1, 3, or 4?
21  A.  From the first part, experience from working
22    in institutions, the institution in my mind
23    was a juvenile facility, and I don't weight
24    as much credibility to a juvenile facility

104

1    order of when people were interviewed, but
2    do you think based on your handwriting on
3    Mr. Thompson's compared to Mr. Abron's
4    forms, do you think you could tell which one
5    was done first, which one was done second?
6  A.  I would think Mr. Thompson was done first.
7  Q.  When you say "first" --
8  A.  Prior. Yeah, prior to Mr. Abron based on
9    the penmanship.
10  Q.  Your penmanship was a little better in the
11    earlier interview?
12  A.  Yes.
13  Q.  Before you went through everybody else?
14  A.  Uh-huh.
15  Q.  Is that a yes?
16  A.  Yes, yes.
17  Q.  And as far as Work History, can you tell me
18    what your notes say for that particular
19    category?
20  A.  Twenty-eight years, Correction three years
21    IYC, meaning Illinois Youth Center, the
22    juvenile facility. On call Knox.
23  Q.  All right. And then what are your notes for
24    the last question on the next page?

105

1  A.  No problems.  Don't miss work.  None at
2      Kewanee.
3  Q.  Going to Exhibit 22 and Exhibit 18, you can
4      look at both of them.  One would be your
5      notes for Thompson.  One would be your notes
6      from Abron's interview.  As you sit here
7      today looking at the answers to No. 3 under
8      the first section for both Mr. Thompson and
9      Mr. Abron, your notes from their answers, is
10     there anything about the specific notes that
11     tells you why Mr. Thompson got a 4 and
12     Mr. Abron got a 3 in regards to the
13     sanitation question?  Just from looking at
14     the notes, is there anything there?
15 A.  Not from looking at the notes.
16 Q.  And your recollection, based on previous
17     testimony, Thompson got a 4 there mostly
18     because of his delivery of the answer?
19 A.  Yes.
20 Q.  As far as Question No. 2 is the Education
21     and Training, it looks like actually you
22     don't have any notes on Mr. Thompson's on
23     18, you didn't take any notes in regards to
24     what his training was; is that right?

106

1  A.  No.
2  Q.  When you say "no" are you agreeing with me?
3  A.  I did not take notes on his training.
4  Q.  Okay.  And as far as Mr. Abron goes, do you
5      have any recollection one way or another as
6      to whether he told you that he was -- he
7      participated in continuing education for
8      barber -- for barber work, I guess?
9  A.  I don't remember.
10 Q.  As far as giving the 4 to Mr. Thompson on
11     this question and a 3 to Mr. Abron, do you
12     know why you gave a 4 to Thompson and a 3 to
13     Abron in regards to the education and
14     training?
15 A.  Yes.
16 Q.  Okay.  What was that?
17 A.  Since they both held a valid State of
18     Illinois license, it cut right to the number
19     of years of experience.
20 Q.  Were you aware of Mr. Thompson doing other
21     things besides barbering as far as a
22     full-time position?
23 A.  No.  We don't -- I take what the man tells
24     me, and if it proves not to be true, that's

107

1      not -- not my -- I don't follow up on what
2      they tell me.  I go on the interview
3      questions.
4  Q.  Did he ever during his interview tell you he
5      did some over-the-road truck driving,
6      Mr. Thompson?
7  A.  If he did, I don't remember.
8  Q.  And if that would have been on his job
9      application, that's something you would not
10     have reviewed; is that right?
11 A.  I do not review the applications.
12 Q.  Would you have -- going back to Exhibits 5
13     and 6, which are the Candidate Evaluation
14     Forms, would you have been familiar with the
15     hiring criteria at the time you were doing
16     the interviews?
17 A.  Only to the extent that apparently the
18     hiring criteria follows the interview
19     questions.
20 Q.  And what you mean by that is that Roman
21     Numeral I in the interview questions says
22     Education, Training, and Skills, and that's
23     all also the same hiring criteria on the
24     evaluation forms that are on Exhibits 5 and

108

1      6?
2  A.  Yes.
3  Q.  There is listed under the hiring criteria on
4      Exhibits 5 and 6, Candidate Evaluation
5      Forms, they talk about the skills necessary
6      to maintain and supervise a barber facility.
7      Did you know that supervision of others was
8      part of this job when you were doing the
9      interview?
10 A.  Yes.
11 Q.  And on the Comments on Exhibit No. 5, the
12     first line of Comments for Mr. Thompson, it
13     indicates that he manages his own shop and
14     performs all associated duties, such as
15     scheduling appointments, purchasing
16     supplies, payment of invoices, and
17     maintaining safety and sanitation.  Do you
18     see that?
19 A.  Yes.
20 Q.  Would you agree that Mr. Abron did the same
21     stuff in regards to managing his own shop
22     and performing those same duties?
23 A.  Yes.
24 Q.  Mr. Thompson's form does say that he had 40

109

1  years of experience, right?
2 A.  Yes.
3 Q.  But he did not have any correctional
4  experience, right?
5 A.  Yes. Is that a yes or a no? No, he had no
6  correctional experience.
7 Q.  Thank you for clearing that up.
8 A.  I'm sorry. I could see Amy starting to
9  look.
10 Q.  As far as going to Exhibit No. 6, which is
11  the evaluation form for Mr. Abron, do you
12  see that?
13 A.  Yes.
14 Q.  Do you know why there's nothing in
15  Mr. Abron's section that talks about him
16  managing his own shop, performing associated
17  duties, and scheduling appointments,
18  purchasing supplies?
19 A.  No.
20 Q.  And in Mr. Thompson's evaluation form, it
21  lists that Mr. Thompson graduated from
22  barber college. Do you see that?
23 A.  Yes.
24 Q.  There's no mention about Mr. Abron on his

110

1  form, which is Exhibit 6, graduating from a
2  barber school. Do you know why that is?
3 A.  I would have to go back to the
4  questionnaire, I presume, and go through the
5  questions to see if it was specifically
6  mentioned in the question.
7 Q.  Actually --
8 A.  You know, as we questioned. You know, not
9  off the app.
10 Q.  Actually, off your questions, and you can
11  look at it, I think it's 18 and 22. If I
12  remember correctly, for your notes it
13  indicated that Mr. Abron had something to do
14  with Military National Barber in
15  Springfield.
16 A.  Would that be the name of a barber school?
17 Q.  I believe so. You don't know?
18 A.  No, I do not know.
19 Q.  That's all right. There is nothing in your
20  notes, going to Exhibit 18, that shows what
21  school Mr. Thompson went to; is that
22  correct?
23 A.  I have to look. No, there's nothing to
24  indicate it.

111

1 Q.  And for both going to Exhibit 6, which is
2  the Evaluation Form for Mr. Abron, on both
3  the first two categories, Education,
4  Training, and Skills, along with a second
5  category, Job Knowledge and Experience, it's
6  noted that he has -- Mr. Abron has
7  correctional experience; is that right?
8 A.  Yes.
9 Q.  And do you think it's significant for both
10  those categories that he has correctional
11  experience?
12 A.  I struggle with the terminology.
13  Correctional experience in a juvenile
14  facility and correctional experience in an
15  adult facility are not the same. So I
16  wouldn't put as much weight with
17  correctional experience in a juvenile
18  facility.
19 Q.  You would agree that the evaluation form,
20  Exhibit 6, does not include the word
21  "juvenile" on there; is that right?
22 A.  Yes.
23 Q.  And you also agree that he, Mr. Abron, did
24  inform you during the depositions (sic) that

112

1  he had experience both at Kewanee
2  Correctional Center, plus the Knox County
3  Jail?
4 A.  After reading.
5 Q.  Okay. Yeah. You saw it in your notes?
6 A.  I saw it in my notes, yes.
7 Q.  Would you consider Knox County Jail
8  experience correctional experience?
9 A.  Yes.
10 Q.  Going to Exhibit No. 5, under the Comments
11  section for Job Knowledge on Mr. Thompson,
12  the first sentence says, "As manager of his
13  own shop that is subject to all rules
14  pertaining to sanitation, in order to keep
15  his state license, the candidate has a
16  working knowledge of current laws." That's
17  the end of the first sentence. Would you
18  agree that the same thing is true for
19  Mr. Abron?
20 A.  Yes.
21 Q.  And for Mr. Thompson, the next sentence in
22  the comments on that section of the hiring
23  criteria is "The candidate expressed a
24  thorough knowledge of equipment sanitation

113

1      procedures." Would you agree that the same
2      is true for Mr. Abron?
3  A.  I do not remember.
4  Q.  And as far as Interpersonal Relations, I
5      think the hiring criteria for this position,
6      according to the evaluation form was, "Must
7      be capable of supervising and instructing
8      inmate workers and performing various
9      barbering services;" is that right?
10  A.  Yes.
11  Q.  Going to Exhibit 6, it notes that he has
12      good instructions for working with inmates;
13      is that right?
14  A.  Yes.
15  Q.  And as far as Mr. Thompson's Comments on
16      Exhibit 5, it says, "He has never had any
17      problems and no harassment charges in his
18      entire career." Do you see that?
19  A.  Yes.
20  Q.  Do you have any reason to believe that
21      Mr. Abron had any problems or harassment
22      charges in his career?
23  A.  No.
24  Q.  The first part of the Comments for

114

1      Mr. Thompson on this line says, "Candidate
2      indicated that his shop is in an
3      economically depressed area and he's used to
4      serving a wide range of personnel." Would
5      you agree that Mr. Abron's shop is in an
6      area that has the same level of economic
7      depression?
8  A.  No.
9  Q.  Why not?
10  A.  I will clarify that. I don't know. The
11      reason being I just -- Mr. Abron did not
12      indicate in his interview that his shop was
13      in an economically depressed area.
14      Mr. Thompson did.
15  Q.  But it did sound like -- did you know at the
16      deposition (sic) that Mr. Abron's shop was
17      basically three blocks from Mr. Thompson's
18      shop?
19          MR. KLEIN:   Asked and answered, and he
20      said he did not know that.
21          THE WITNESS:   I didn't know where
22      either shop was at the interview, at the
23      job interviews.
24

115

1  BY MR. REHN:
2  Q.  Going to Mr. Thompson's Comments on
3      Exhibit 5 for Work History, it indicates,.
4      "In addition to managing his own shop, the
5      candidate also works nights in a second shop
6      in another town. This indicates a diversity
7      and strong worth ethic." During the
8      interviews were you aware that Mr. Abron ran
9      his own shop and also worked at -- for the
10      Kewanee Department of Corrections and also
11      did stuff at the jail in Knox County?
12  A.  Yes.
13  Q.  So would you agree that that would also
14      indicate a diversity -- or a strong work
15      ethic for Mr. Abron?
16  A.  Yes.
17  Q.  Comparing the Candidate Evaluation Form of
18      Mr. Thompson with Mr. Abron, without looking
19      at the words, it appears like the boxes are
20      filled in a lot greater for Mr. Thompson
21      than Mr. Abron in the Comment section; would
22      you agree with that?
23  A.  Yes.
24  Q.  Do you know why that is?

116

1  A.  No. I didn't fill them in, so I don't know.
2
3          (Exhibit 23 so marked for
4          identification.)
5
6  BY MR. REHN:
7  Q.  Handing you what's been marked Exhibit
8      No. 23, it's labeled "Interview and
9      Selection Quick Reference." Have you ever
10      seen this document before?
11  A.  I don't believe so in this revision. My
12      training was in '99, and there's been not
13      additional training. I stumbled over that.
14      You know what I mean? Ongoing training. It
15      could have been updated. This apparently
16      was an updated version.
17  Q.  And in the '05 version, if you go to page
18      15, I don't think these are Bates stamped,
19      it talks about how structured interview
20      process -- let me try that again, Amy, see
21      if I can read.
22          "How does the Structured Interview
23      Process affect Affirmative Action." Are you
24      aware at all of Affirmative Action in

117

1    regards to how it would affect the
2    interviews for the barbershop position in
3    2004 at Henry Hill?
4    A.    No.
5    Q.    Was that anything that was ever discussed
6    with you?
7    A.    I do not remember.
8    Q.    The next section of this document on the
9    same page, page 15 of Exhibit 23, talks
10    about the Absolute Veterans Preference.  Did
11    anybody ever talk to you about the Absolute
12    Veterans Preference at any time prior to or
13    around the time you were doing the
14    interviews for the barber position in 2004?
15    A.    No.
16        MR. REHN:    I'll think I'll just take a
17    minute and talk to my client outside, and I
18    think we'll be wrapped up here.
19
20        (Whereby a short recess was
21        taken.)
22
23    BY MR. REHN:
24    Q.    Just trying to clear up a couple of things.

119

1        your lawyer told you.
2    A.    No, what I mean, I just remember if it was
3    recently or a long time ago.
4    Q.    As far as the other interviewer in this
5    case, have you spoken with him at all about
6    this case since the lawsuit was filed?
7    A.    No.
8    Q.    As far as Mr. Thompson, do you have much
9    interaction with him now?
10    A.    No.  I don't -- we don't work the same
11    hours.  I -- I see him back there when I go
12    back to eat, because the barbershop is
13    around the corner, but I don't know the guy,
14    I don't talk to him.  You know, I say hi to
15    him like I would any of the other 300
16    employees.
17    Q.    As far as Mr. Thompson, he may have had a
18    shop or some experience cutting hair in
19    Monmouth.  Did you know him at all from
20    that?
21    A.    No.
22    Q.    I asked you some general questions before we
23    went into all your notes and everything.
24    Now that you've had a chance to look at your

118

1        Did you know any of the applicants
2    for this position prior to interview?
3    A.    The only contact I had, there was a
4    correctional officer that was one of the
5    applicants out of Stateville or Sheridan
6    that called down one time to see if we were
7    going to fill the position, but I didn't
8    know him and I never laid eyes on him.
9    Q.    There was a person by the name of Gaylon
10    Elliott that may have interviewed.  He may
11    have cut some hair here before.
12    A.    Oh, really?  I don't know.  No, I never laid
13    eyes on any of the guys.  I never knew them.
14    It would be interesting to see what sequence
15    the interviews were in, because I don't even
16    remember how many we interviewed.
17    Q.    Okay.  As far as this lawsuit, when did you
18    first become aware of this lawsuit?
19    A.    The litigation coordinator from Hill
20    Correctional notified me, I'm trying to
21    remember when it was.  We fill out a form
22    requesting representation from the Attorney
23    General.
24    Q.    I don't want to know anything about what

120

1        notes for Mr. Thompson and Mr. Abron, do you
2    remember anything else that jumps out at you
3    as the reason or reasons why you would pick
4    Mr. Thompson over Mr. Abron to be the barber
5    at this facility?
6        MR. KLEIN:    I'll object to the form of
7    the question to the extent that it implies
8    that he made the decision.  But you can
9    answer if you can.
10        THE WITNESS:    I don't hold the same
11    value working in a juvenile facility as I
12    would an adult facility.  So that -- you
13    know, I threw that portion of it pretty
14    much out of my equation.  It was more the
15    location of working with adults.  And not
16    knowing the layout of where the two shops
17    were, since Mr. Thompson stressed he was in
18    the depressed area and he was used to
19    working with rather -- or cutting hair for
20    some unsavory adult characters, that seemed
21    to have more of a bearing.
22
23    BY MR. REHN:
24    Q.    Did he tell you that he was cutting hair for

**121**

1      unsavory adult characters?
2 A. Well, he said it was a rough end of town.
3      That "unsavory adult characters" is my
4      verbiage, not his.
5 Q. Was the race of Mr. Thompson's customers
6      discussed at any extent beyond the cuts all
7      nationalities that you have on your notes?
8 A. No.
9 Q. And who is it that ultimately makes a
10      decision to hire then?
11 A. The warden.
12 Q. And do you know what that decision is based
13      on?
14 A. No.
15 Q. What you do is you fill out the numbers and
16      you give those to Personnel?
17 A. And then I'm done.
18 Q. Did the warden talk to you at all about
19      these interviews?
20 A. No. I stay clear out of that.
21 Q. That's Mr. Hulick who was the warden at the
22      time?
23 A. Yes.
24          MR. REHN: I don't have anything

**122**

1      further.
2          MR. KLEIN: I just have a few
3      questions.
4
5 **CROSS-EXAMINATION BY MR. KLEIN:**
6 Q. Your job as a Rutan interviewer, is it your
7      job to look at the applicants as a whole and
8      decide who should get the job?
9 A. No.
10 Q. Isn't it your job --
11 A. I ask the questions and score them.
12 Q. Is it your job to come up with the scores
13      based on the questions provided to you?
14 A. No.
15 Q. I'm sorry, let me rephrase that. Is it your
16      job to score the answers that the applicants
17      give to the questions you ask?
18 A. Yes. You mean the weighted score, if I put
19      a 4 instead of a 2 or a 3; is that what you
20      mean?
21 Q. Is that your job, to put a 4, 3, 2 or 1?
22 A. Yes.
23 Q. And when you come up with those scores, do
24      you base them on the interview?

**123**

1 A. Yes.
2 Q. Do you consider the application at all?
3 A. I don't.
4 Q. Does the way that the applicant answers the
5      question, their manner, their demeanor,
6      their delivery, does that affect the score?
7 A. Yes.
8 Q. Do you remember -- I mean, do you have a
9      real recollection of being in the room doing
10      these interviews?
11 A. No.
12 Q. Is it difficult to remember why you gave
13      particular scores now two and a half years
14      later?
15 A. Yes.
16          MR. KLEIN: That's all I have.
17          MR. REHN: Just a little
18      clarification.
19
20 **REDIRECT EXAMINATION BY MR. REHN:**
21 Q. What is the purpose of those applications
22      then?
23 A. Isn't it to make sure -- to be sure they're
24      qualified and that they have the "A" grade

**124**

1      for the position.
2 Q. The what grade, I'm sorry?
3 A. They have to have a grade in order to be
4      considered for the position. I believe
5      they're graded from their applications in
6      Springfield.
7 Q. Okay. I'm not just familiar with the
8      process. You're the first one we deposed.
9      You're leading me in the right direction.
10      Sounds like they send in the application, it
11      gets sent to Springfield, and they sort
12      through the applications, they pick who it
13      is that will be interviewed, and you
14      interview them?
15 A. Yes, if they take the "A" grades. And if
16      nobody is selected or you don't get an "A"
17      grade, they will go to a "B" or a "C."
18          MR. REHN: I don't have anything
19      further.
20
21 **RECROSS EXAMINATION BY MR. KLEIN:**
22 Q. Basically if you're doing the Rutan
23      interviews, is it your understanding that
24      everyone that you're interviewing meets the

125

1    minimum qualifications for the position?

2  A.  Yes.

3  Q.  And if they didn't meet the minimum

4      qualifications for the position, they

5      wouldn't make it to the interview process?

6  A.  Exactly.

7  Q.  Is it your understanding that that decision

8      is made based on the application?

9  A.  Yes.

10         MR. KLEIN:   That's all I have.

11         MR. REHN:   I think we're all done.

12

13

14

15

16

17

18         FURTHER DEPONENT SAITH NOT

19            SIGNATURE WAIVED

20

21

22

23

24

---

127

1   that the necessity of calling the court reporter

2   at time of trial for the purpose of

3   authenticating said transcript was also waived.

4       I FURTHER CERTIFY THAT I am neither attorney

5   or counsel for, nor related to or employed by,

6   any of the parties to the action in which this

7   deposition is taken, and further, that I am not a

8   relative or employee of any attorney or counsel

9   employed by the parties hereto, or financially

10  interested in the action.

11      IN WITNESS WHEREOF, I have hereunto set my

12  hand and affixed my notarial seal at Galesburg,

13  Illinois, this 4th day of June 2007.

14

15                    s/Amy S. Powers

16                    ---------------------
                      AMY S. POWERS
17                    Certified Shorthand
                      Reporter
18

19

20        "OFFICIAL SEAL"
21         Amy S. Powers
          Notary Public, State of Illinois
22
          My Commission Exp. 07/21/2009
23

24

---

126

1   STATE OF ILLINOIS  )
                        )
2   COUNTY OF KNOX      )

3

4

5            C E R T I F I C A T E

6      I, Amy S. Powers, CSR, RPR, a Notary Public

7   duly commissioned and qualified in the State of

8   Illinois, DO HEREBY CERTIFY that pursuant to

9   notice there came before me on the 24th day of

10  May 2007, at 600 South Linnwood Road, in the City

11  of Galesburg, County of Knox, and State of

12  Illinois, the following named person, to wit:

13

14        WILLIAM G. SMITH,

15

16  who was by me first duly sworn to testify to the

17  truth and nothing but the truth of his knowledge

18  touching and concerning the matters in

19  controversy in this cause and that he was

20  thereupon carefully examined upon his oath and

21  his examination immediately reduced to shorthand

22  by means of stenotype by me.

23      I ALSO CERTIFY that the deposition is a true

24  record of the testimony given by the witness and

---

**E-FILED**
Friday, 19 October, 2007  11:22:09 AM
Clerk, U.S. District Court, ILCD

**Rod R. Blagojevich**
Governor

**Roger E. Walker Jr.**
Director

HIll Correctional Center / 600 Linwood Road / P.O. Box 1327 / Galesburg, IL  61401 / Telephone: (309) 343-4212 / TDD: (800) 526-0844

## MEMORANDUM

DATE:      February 21, 2006                    *CONFIDENTIAL*

TO:        Janet Richmond, Administrator
           Office of Affirmative Action

FROM:      Frank L. Shaw, Warden
           Hill Correctional Center

SUBJECT:   EEOC 210-2005-05617 – Steve Abron vs. State of Illinois

Per your request, the following information is being submitted.

Interviewers:

|               |            |
|---------------|------------|
| Shaw, Frank   | White male |
| Smith, William | White male |

Candidates Not Selected:

|                      |            |
|----------------------|------------|
| Abron, Steven        | Black male |
| Anderson, James      | White male |
| Conrad, Loren        | White male |
| Dredge, John         | White male |
| Elliott, Gaylen      | White male |
| Schaumleffel, Samuel | White male |
| Wilkinson, Brian     | White male |

FLS:cl

C:  File

**EXHIBIT**

D

```
1           IN THE UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF ILLINOIS
2
3    STEVE ABRON,                    )
                                     )
4                   Plaintiff,       )
                                     )
5           VS.                      ) No. 06-1157
                                     )
6    STATE OF ILLINOIS,              )
     DEPARTMENT OF CORRECTIONS,      )
7    HENRY HILL CORRECTIONAL         )
     CENTER and DON HULICK,          )
8    WARDEN, Individually, BILL      )
     SMITH, BUSINESS                 )
9    ADMINISTRATOR, and FRANK        )
     SHAW, ASSISTANT WARDEN,         )
10   Individually and in their       )
     official capacity,             )
11                                   )
                    Defendants.      )
12
13
14           The deposition of MARGARET FOLEY, called
15   for examination pursuant to the provisions of the
16   Federal Rules of Civil Procedure of the United
17   States District Courts as they apply to the taking
18   of depositions, taken before Paula A. Morsch,
19   C.S.R. License No. 84-002965, a Certified
20   Shorthand Reporter in the State of Illinois, on
21   the 13th day of June, 2007, at the hour of
22   10:00 a.m., at 600 S. Linwood Road, in the City of
23   Galesburg, County of Knox, State of Illinois.
```

**EXHIBIT**

E

**2**

1  PRESENT:
2      MR. JOHN R. REHN, ESQ.
       Attorney at Law
3      311 E. Main St., Suite 412
       Galesburg, Illinois 61401
4      for Plaintiff Steven Abron;
5      MR. THOMAS KLEIN, ESQ.
       Assistant Attorney General
6      500 South Second St.
       Springfield, Illinois 62706
7      for Defendants State of Illinois,
       Department of Corrections, Henry Hill
8      Correctional Center, Don Hulick,
       Frank Shaw, Bill Smith;
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**4**

1           MARGARET FOLEY
2      called by the Plaintiff,
3      being first duly sworn,
4      was examined and testified
5      as follows:
6
7           DIRECT EXAMINATION
8  BY MR. REHN:
9      Q   Can you state and spell your name for
10 the record, please?
11     A   Margaret Ann Foley, M-A-R-G-A-R-E-T,
12 A-N-N, F-O-L-E-Y.
13     Q   And we're here today for a deposition
14 involving a claim made by Steve Abron against the
15 Department of Corrections. I'm here to ask you
16 some general questions about yourself, about the
17 hiring procedures in general, and then some
18 specific questions concerning the hiring decision
19 for the barber position that Mr. Abron applied
20 for. Have you ever been deposed before?
21     A   Yes.
22     Q   Okay. I'm going to be asking you some
23 questions that I'll ask you to answer out loud. I

**3**

1           I N D E X
2  WITNESS                    PAGE
3  MARGARET FOLEY
       Direct By Mr. Rehn .............. 4
4      Cross By Mr. Klein .............. 49
5
6        E X H I B I T S
                          MARKED
7  NUMBER                   FOR ID
8  Deposition Exhibit
9      Nos. 24-25 ...................... 18
10     No. 26 ......................... 20
11     No. 27 ......................... 34
12     No. 28 ......................... 42
13     No. 29 ......................... 43
14     No. 30 ......................... 44
15     No. 31 ......................... 44
16
17
18
19
20
21
22
23

**5**

1  do have the ability to ask very bad questions. If
2  you don't understand, just ask me to rephrase or
3  ask it in another manner, okay?
4      A   Okay.
5      Q   And don't get offended if I say is that
6  a yes or is that a no. We're trying to make a
7  record in writing and a lot of times we slip to
8  informal conversation with head nods and uh-huhs
9  and huh-uhs, and I'm just trying to make a clear
10 record if I hit you with a is that a yes, is that
11 a no; okay?
12     A   All right.
13     Q   Why don't you tell me what you do for a
14 living?
15     A   I'm a human resource rep at Hill
16 Correctional Center.
17     Q   How long have you been the human
18 resource rep at Hill?
19     A   I was hired, I believe, February 2004.
20     Q   What did you do before that?
21     A   I was the human resource assistant
22 working out in the warden's office before that.
23     Q   Here at Henry Hill?

**6**

1    A    Yes.

2    Q    How long have you worked at Henry Hill?

3    A    1995.

4    Q    And is it my understanding you're about

5    ready to either leave the Department of

6    Corrections or leave Henry Hill?

7    A    Both.

8    Q    Okay. Are you retiring or are you

9    moving to a different job?

10    A    I'm moving to a different state,

11    hopefully another job in corrections.

12    Q    Okay. Does your move have anything at

13    all to do with this case we're here about today?

14    A    No.

15    Q    If we were to need to get ahold of you

16    somewhere down the road, do you know where you're

17    moving to?

18    A    Yes. I don't have it memorized though.

19    It's Oregon. They will have the address here with

20    the payroll department.

21    Q    The state of Oregon?

22    A    Yes.

23    Q    Do you know what town you're moving to?

**7**

1    A    Brookings.

2    Q    Can you tell me generally what your job

3    duties are as the human resources rep here at

4    Henry Hill?

5    A    Doing the paperwork for leaves of

6    absence, suspensions, hirings, increases, address

7    changes, generally paperwork, processing

8    paperwork.

9    Q    And what is your involvement when it

10    comes to the hiring of barbers at the Henry Hill

11    facility?

12    A    The paperwork for it. I put up the

13    posting. I collect the bids and I type up the

14    final paperwork.

15    Q    And do you know who the current barber

16    is at Henry Hill right now?

17    A    Larry Thompson.

18    Q    Do you work with Larry Thompson much at

19    all now or how often do you see him out there?

20    A    No.

21    Q    As far as Mr. Thompson, did you know him

22    prior to his employment at the Department of

23    Corrections?

**8**

1    A    No.

2    Q    And before we get into the documents

3    here, do you remember what your specific

4    involvement was in regards to the hiring of

5    Mr. Thompson at Henry Hill as a barber?

6    A    Just doing the paperwork.

7    Q    I'm going to hand you what we marked at

8    a previous deposition as Exhibit No. 1. Are you

9    familiar with this document?

10    A    I've read it, yes.

11    Q    And it's my understanding it's an

12    administrative directive dealing with filling

13    vacancies at the Department of Corrections, is

14    that right?

15    A    Yes.

16    Q    Do you remember how the barber position

17    that Mr. Thompson currently holds, how did that

18    come open or why did that come open?

19    A    The prior barber had retired.

20    Q    And there was -- do you know if there

21    was a period of time after his retirement before

22    there was a decision to fill the position or was

23    it left open for a while?

**9**

1    A    It was open for a while. I'm not sure

2    how long.

3    Q    Do you remember why it was left open for

4    a while?

5    A    Springfield didn't approve hiring.

6    Q    Okay. At some point in time Springfield

7    approved hiring and then it was posted as a

8    position that was available?

9    A    Correct.

10    Q    Okay. When Springfield contacts Henry

11    Hill to say that there's a position or there's

12    funds available for the hiring of a barber, are

13    you the person that then goes and starts the

14    paperwork process for the hiring?

15    A    Yes.

16    Q    And would the hiring decision typically

17    be consistent with this Administrative Directive

18    that's Exhibit 1?

19    A    Yes.

20    Q    As far as going to the second page of

21    Exhibit 1, there's a general provision section

22    that is labeled Section F and under paragraph six

23    of that section it indicates interviews shall be

10

1 conducted by persons authorized to be interview
2 officers. Do you see that?
3 A Yes.
4 Q How does a person become authorized to
5 be an interview officer?
6 A You take the rutan training.
7 Q If you go to Section I on page five of
8 this document, paragraph number one under Section
9 I indicates things that should be done prior to
10 interviewing the person for a rutan position. Was
11 a barber position a rutan position?
12 A Yes.
13 Q What is the difference between a rutan
14 position and a position that is not a rutan
15 position?
16 A One you interview for and one you don't.
17 Q And under Subpart A of that paragraph
18 number one it indicates, "Interviewing officer
19 shall," and number one says "have completed rutan
20 training." As far as who the interviewing officer
21 is, in my mind that would be the person that's
22 actually doing the interview, is that correct?
23 A Yes.

11

1 Q Okay. In this case the directive
2 indicates the interviewing officer shall identify
3 the major job responsibilities and essential
4 functions. Do you know if the persons who were
5 the interviewing officers for Mr. Abron and
6 Mr. Thompson did this Subpart 2, identify the
7 major job responsibilities?
8 A The CMS 104 is in the file with the
9 applications.
10 Q I'm going to hand you what's Exhibit No.
11 2. Is that the CMS 104?
12 A Yes.
13 Q As far as Subpart 3, going back to
14 Exhibit No. 1, under the prior to interviewing any
15 person section of the Administrative Directive, it
16 indicates the interviewing officer shall assign
17 percentage weights to each hiring criteria. Do
18 you know if that was done in this particular case?
19 A I don't know.
20 Q Okay. Do you remember who the people
21 are that interviewed Mr. Abron and Mr. Thompson
22 and the other candidates for this position?
23 A I believe it was Bill Smith and Frank

12

1 Shaw.
2 Q Would you have met with Bill Smith or
3 Frank Shaw to discuss the hiring process before
4 they interviewed the candidates for the barber
5 position?
6 A No.
7 Q Would you have reviewed the CMS -- what
8 did you call it -- the 104, Exhibit No. 2, prior
9 to the interviewing of Mr. Abron and Mr. Thompson
10 and the other candidates for the barber position?
11 A No.
12 Q Would you have any involvement in
13 anything in regards to preparing for the
14 interviews other than posting the position?
15 A I accumulated the bids, I mean the
16 applications.
17 Q Okay. When bids get mailed in, you
18 would be the one that would file them all
19 together?
20 A Yes.
21 Q What would you do with them after you
22 corrected all of them?
23 A Once the posting comes down, I look

13

1 through them to make sure they have a license and
2 then schedule interviews.
3 Q Do you do any other sorting out other
4 than making sure they have a license?
5 A No.
6 Q Do you have any reason to doubt any of
7 the information that's included in Exhibit No. 2
8 in regards to the percentage of time that the
9 barber spends doing different functions?
10 A I have no idea.
11 Q Going to back to Exhibit 1, it indicates
12 that the interviewing officer shall forward
13 candidate evaluation form, interview questions,
14 job posting, major responsibilities, rating system
15 and a position description and class
16 specifications to the interview coordinator.
17 Would you have been the interview coordinator or
18 is that somebody out of Springfield?
19 A I would send everything to Springfield.
20 Q I'm just trying to figure out -- maybe
21 you know, maybe you don't know. I'm just trying
22 to figure out, would you consider yourself the
23 interview coordinator or would that be somebody in

| | 14 |
|---|---|

1 Springfield?
2    A   Probably somebody in Springfield.
3    Q   Going to number two of that Subsection I
4 which is on page six of Exhibit No. 1, it says
5 "Upon approval by the chief administrator of
6 interview questions and the candidate evaluation
7 form." I just want to figure out who these
8 different people are. Do you know who the chief
9 administrator would be?
10    A   That would be the warden.
11    Q   Okay. And there's mention under
12 paragraph number two on that same page of
13 completing the Employment Decision Form DC5654.
14 Is that something that you would have done or is
15 that something the interviewing officers would
16 have done or do you know who does that?
17    A   They pencil it in and then I type it for
18 them.
19    Q   Going to Subpart J, it talks about
20 filing requirements. It's still in Exhibit No. 1.
21 If you go to paragraph number five under Subpart
22 J, it talks about the maintaining of a rutan file.
23 Do you know if a rutan file was maintained in

| | 15 |
|---|---|

1 regards to the barber position that Mr. Abron and
2 Mr. Thompson applied for?
3    A   Yes.
4    Q   Okay. I'm handing you Exhibit No. 3.
5 Can you just tell me what that document is?
6    A   That's a classification spec which is a
7 broad description of the job.
8    Q   And this is something that is prepared
9 by the state or by Henry Hill?
10    A   State.
11    Q   By state, we're talking Springfield?
12    A   Yes.
13    Q   Do you know who prepares these in
14 Springfield?
15    A   No.
16    Q   Handing you Exhibit No. 4, can you tell
17 me what that document is?
18    A   That's the posting for the position.
19    Q   And this is something that you would
20 have done was post this document?
21    A   Yes.
22    Q   Where do you post it when you're posting
23 it?

| | 16 |
|---|---|

1    A   On the bulletin board.
2    Q   Here at the prison?
3    A   Yes.
4    Q   Is it posted anywhere else?
5    A   I believe it's posted at the labor
6 unions. Springfield handles that.
7    Q   And Exhibit No. 4 indicates that under
8 the where to apply, that they should basically
9 send it to you as the human resource assistant at
10 Hill Correctional, is that right?
11    A   Yes.
12    Q   I'm handing you now what's been marked
13 Exhibit No. 5. Can you tell me what that document
14 is?
15    A   Candidate Evaluation Form.
16    Q   And is this something that you fill out
17 or who fills this out?
18    A   I type it.
19    Q   Okay. When you type it, what do you
20 base it on when you're typing it?
21    A   It's been filled out by the
22 interviewers.
23    Q   Do you have the ones that are filled out

| | 17 |
|---|---|

1 by the interviewers?
2    A   Yes.
3    Q   When you say it's been filled out by the
4 interviewers, are you talking about do they
5 actually fill out a form that looks just like
6 this?
7    A   Yes, they pencil it in. I type exactly
8 what they have written.
9    Q   I'm going to hand you what's been
10 marked, we're going out in number now to Exhibit
11 No. 19. I gave you my copy.
12    A   That's all right.
13    Q   Do you know what that document is?
14    A   It's an interview.
15    Q   Okay. It's my understanding this is the
16 form that the interviewers filled out while
17 they're interviewing the applicants?
18    A   Yes.
19    Q   Is this what you're talking about as far
20 as you go through here and put the information
21 from Exhibit 19 into Exhibit No. 5, or do they
22 actually do a form just like this that they fill
23 in?

CIRCUIT WIDE REPORTING

22

1  cover letter or would this have been all the
2  information you got?
3     A   This is it.
4     Q   And when you got this, that's when you
5  then went to, I think you said it was Mr. Shaw
6  that you asked to get the additional words in
7  there, is that right?
8     A   This does not look like his writing so
9  it must be Mr. Smith's.
10    Q   Okay.  And going to the second page of
11 Exhibit 26, it's a typed up form.  Is that the
12 form, the Candidate Evaluation Form for
13 Mr. Thompson as it was initially prepared?
14    A   Yes.
15    Q   And it looks like this was part of some
16 sort of a fax.  I see total page three on the
17 bottom right hand of that second page.  Do you see
18 that?
19    A   Yes.
20    Q   Do you know what the other two pages of
21 the fax would have been or if there were more?
22    A   No.
23    Q   The third and fourth page of this

23

1  Exhibit 26 are some handwritten notes and it seems
2  to be your belief that this would have been
3  Mr. Smith's writing?
4     A   Yes.
5     Q   And after looking at this, do you
6  believe what happened is you got this memo and
7  then you would have gone to Mr. Smith and asked
8  for additional information to type in on the
9  evaluation form?
10    A   Yes.
11    Q   Do you know if you would have asked for
12 additional information on all of the Candidate
13 Evaluation Forms or just on Mr. Thompson's?
14    A   Just Mr. Thompson's which was sent in.
15    Q   Was his the only one that gets sent in?
16 Is that how it works?
17    A   Right.
18    Q   Is it just the person who has the
19 highest score?
20    A   Correct.
21    Q   After Mr. Smith prepared this additional
22 information, you then typed up a revised Candidate
23 Evaluation Form and that is what you should have

24

1  over there as Exhibit No. 5?
2     A   Yes.
3     Q   After you retyped it up with the
4  additional information, what did you do with that
5  form then?
6     A   Sent it in to Springfield.
7     Q   Did you send that with a cover letter or
8  any information other than the form itself?
9     A   I don't remember.
10    Q   Do you know who you would have sent it
11 to?
12    A   My personnel up in Springfield, Lori
13 Gumbel.
14    Q   Do you remember any conversations with
15 Lori Gumbel about these Candidate Evaluation
16 Forms?
17    A   No.
18    Q   Do you know whether there's any veteran
19 preference for hiring persons at the Department of
20 Corrections?
21    A   Yes.
22    Q   Okay.  Is there?
23    A   I believe so.

25

1     Q   And how does that work?
2     A   I don't know.
3     Q   Do you know if there's anything in
4  regards to an affirmative action program in
5  regards to hiring at the Department of
6  Corrections?
7     A   Yes.
8     Q   Do you know how that works?
9     A   They have an affirmative action bureau
10 who keeps track of the statistics.
11    Q   Beyond that, do you know anything about
12 the bureau or what they do?
13    A   No.
14    Q   Have you ever had on any other rutan
15 hiring decisions similar feedback from CMS
16 requesting additional information on a Candidate
17 Evaluation Form?
18    A   Yes.
19    Q   Is that something that's pretty standard
20 or is it something that's every once in awhile?
21 How often does that happen?
22    A   Every once in awhile.
23    Q   As you were typing up Exhibit 5

26

1  initially -- I guess a better way to say it is as
2  you're typing up Exhibit 26, page number two, were
3  you concerned that there was not enough
4  information in there?
5     A   No.
6     Q   Handing you what's been marked as
7  Exhibit No. 6, this is a Candidate Evaluation Form
8  for Mr. Abron, is that correct?
9     A   Yes.
10    Q   And that was something that you would
11 have typed up based upon what was provided to you
12 as part of Exhibit No. 25, right?
13    A   Yes.
14    Q   Handing you Exhibit No. 7, can you tell
15 me what that document is?
16    A   It looks like a document from Illinois
17 River.
18    Q   And I think that, I don't think -- let's
19 go off the record for a second.
20
21    (Whereupon an off the record
22       discussion was held.)
23

27

1  BY MR. REHN:
2     Q   Exhibit No. 7 is labeled a Rutan
3  Interview Package Checklist and it is relating to
4  Illinois River in the hiring of a barber position
5  at the Illinois River facility.  Do you keep a
6  similar type of document in your file that you
7  might label a Rutan Interview Documentation
8  Checklist?
9     A   Yes.
10    Q   We'll get a copy of that before we get
11 out of here.  I'm handing you Exhibit No. 10,
12 which is also from Illinois River, and it looks
13 like you have a similar type of document in your
14 file.  It's called an Employment Bid Record.  Are
15 you familiar with that form?
16    A   Yes.
17    Q   Maybe not that particular form from
18 Illinois River, but you use a similar form at
19 Henry Hill, right?
20    A   Yes.
21    Q   Who is it that fills out the form for
22 you?  It looks like it's you?
23    A   Me, yes.

28

1     Q   The Employment Bid Record for the barber
2  position in 2004 indicated in the box on the right
3  hand side, it says type of action and it says
4  "other means" underneath that?
5     A   Yes.
6     Q   Do you know what that means when you put
7  the "other means"?
8     A   It means it's outside of the
9  institution.
10    Q   As opposed to a promotion or a transfer?
11    A   Correct.
12    Q   Mr. Abron was working at the Juvenile
13 Correctional Center in Kewanee prior to his
14 interview at the Henry Hill center.  Would that be
15 considered a transfer or is that -- I don't know
16 how you consider transfers.  I guess how do you
17 qualify a transfer when you're filling out those
18 forms?
19    A   I get transfer lists from Springfield.
20    Q   Okay.  And a transfer list is employees
21 of the Department of Corrections already.  Is that
22 what that is?
23    A   Yes.

29

1     Q   Okay.  And again I'm going to hand you
2  what's marked as Exhibit No. 11, and this is not
3  from your facility.  It's the Illinois
4  Correctional Center.  Do you have a similar type
5  of form that you use here at Henry Hill?
6     A   No.
7     Q   Okay.  And I can't remember frankly if
8  Exhibit 13 is from Henry Hill or another facility,
9  but do you know what that document is generally,
10 that form, Exhibit 13?
11    A   For the affirmative action.
12    Q   Okay.  Is that something that you fill
13 out or complete or who does that?
14    A   I do that.
15    Q   Okay.  And was this the form that was
16 used in regards to the hiring of the barber at
17 Henry Hill when Mr. Thompson was hired?
18    A   Yes.
19    Q   Okay.
20       MR. KLEIN:  Are you asking if this
21 particular form, this exact form with these same
22 boxes checked?
23    Q   Yeah, and I don't know if it is or

30

1 isn't. Maybe I'm not being clear with my
2 question.
3    A   This type of form.
4    Q   Do you know if this form is from Henry
5 Hill or not or for this position?
6    A   No, I don't know.
7    Q   Do you recognize the signature on the
8 bottom of that?
9    A   No.
10       MR. KLEIN:  This one is from
11 Illinois River.
12       MR. REHN:  It is, okay.
13       MR. KLEIN:  The second page of
14 Exhibit 14 is from Henry Hill.
15       MR. REHN:  Thank you.
16 BY MR. REHN:
17    Q   Well, let's get up to Exhibit 14 then.
18 Handing you what's been marked as Exhibit No. 14,
19 this is a two-page document.  Can you tell me what
20 this is?
21    A   This is an Employment Decision Form.
22    Q   And that's the first page, and what's
23 the second page?  Is that still part of the

31

1 Employment Decision Form?
2    A   Yes, that's the second page.
3    Q   Page one of two and two of two?
4    A   Right.
5    Q   All right.  Who fills this out?
6    A   The first page they pencil it in and I
7 type it, what they have asked me to type, and the
8 second page I fill out according to a chart I get
9 from Springfield.
10    Q   Okay.  Let's go to the second page.
11 What does this question number one, EEO category
12 of position number seven, skilled craft, what does
13 that mean?
14    A   That would be the barber.  It's a
15 skilled craft.  It's a prevailing rate position.
16    Q   Okay.  The second question says "Is
17 there documented underutilization of an
18 affirmative action group in the EEO category," and
19 it's marked yes, is that correct?
20    A   Yes.
21    Q   What does that mean?
22    A   It means that there's underutilization
23 of some of the groups.

32

1    Q   Does that mean that there's -- I guess
2 there's a follow-up question.  It says "If yes,
3 underutilization exists for the following
4 affirmative action groups," and it's been checked
5 females and Asians, is that right?
6    A   Yes.
7    Q   So is that saying that there is -- what
8 does that mean as far as, I guess, is there a need
9 to hire more female and Asians or is there less
10 females and Asians?
11    A   There's a need to hire females and
12 Asians according to their statistics.
13    Q   Okay.  Do you know where the -- do they
14 have statistics for the barber positions
15 specifically then?
16    A   No.
17    Q   Okay.  It's just that they have
18 statistics for skilled craft in general?
19    A   Yes.
20    Q   Okay.  Do you have any idea how many
21 barbers there are in the Department of Corrections
22 that are white, black, Hispanic?
23    A   No, I don't.

33

1    Q   And as far as you know, you've never
2 seen charts or information like that?
3    A   No.
4    Q   And then question number three, "Were
5 there any applicants of the underutilized
6 protective class who were available but not
7 selected," and you filled out no, is that right?
8    A   Correct.
9    Q   That's because there were no females
10 that interviewed and no Asians that interviewed?
11    A   Correct.
12    Q   And then question number five, you fill
13 out the race and sex of Mr. Thompson, is that
14 right?
15    A   Correct.
16    Q   Is that Frank Shaw's signature on the
17 bottom of that page?
18    A   Yes.
19    Q   Okay.  How do you find out what race
20 Mr. Thompson was?  Is that something he fills out
21 on some of his forms?
22    A   On the application.
23    Q   Going to the first page of Exhibit 14,

34

1  the Employment Decision Form, you said somebody
2  provided you with this information and you typed
3  it up?
4    A   Yes.
5    Q   Who is it that provides that to you?
6    A   One of the interviewers.
7    Q   Do you know which of the interviewers
8  provided this information to you?
9    A   No, I don't remember.
10   Q   Do you have the handwritten information
11  that they would have provided you on this?
12   A   Should have been in the file.
13   Q   I don't know which file it would be in.
14       MR. REHN:  Do you want to make a
15  copy before we mark this one?
16       MR. KLEIN:  Yeah, and make copies
17  of the other documents?
18       MR. REHN:  That would be great.  We
19  can go off the record.
20
21  (Whereupon a five-minute break was taken.)
22
23

35

1         (Whereupon Deposition
2          Exhibit No. 27 was marked
3             for identification.)
4  BY MR. REHN:
5    Q   Handing you what's been marked Exhibit
6  No. 27, this is the handwritten Employment
7  Decision Form that you would have relied on before
8  you typed up the other form that we've already
9  discussed, I think Exhibit 14, the first page of
10  Exhibit 14?
11   A   Okay.
12   Q   Is that what it is?
13   A   Yes, I'm sorry.
14   Q   That's fine.  The second sentence in the
15  last paragraph under the justification section of
16  Exhibit 14, Employment Decision Form, states that
17  Mr. Thompson had additional skills demonstrated
18  during the interview process which made him an
19  excellent selection.  Do you have any idea what
20  the additional skills were that Mr. Thompson
21  demonstrated?
22   A   No.
23   Q   Do you have any opinion as you sit there

36

1  today as to why Mr. Thompson would be a better
2  barber that Mr. Abron for this facility?
3    A   No, I don't have any opinion.
4    Q   Do you know if Mr. Smith and Mr. Shaw --
5  well, I'll step back.  Let me try and ask this a
6  different way.  It appears as though looking at
7  the documents what happens is Mr. Shaw and
8  Mr. Smith score the candidates and the person with
9  the highest score is the person who receives the
10  job, is that correct?
11   A   Yes.
12   Q   Do you know if Mr. Smith and Mr. Shaw
13  would have known that this was the procedure?
14   A   I imagine so.
15   Q   Would they have any, would you know of
16  them -- let me try and clear that question up
17  again.  Would you have any reason to believe or
18  any information that would have made you think
19  that somebody else would actually make the
20  decision on something other than the scores here?
21   A   I don't know.
22   Q   Handing you what's been marked as
23  Exhibit No. 15, that looks to be the blank barber

37

1  interview form that was used in the hiring of
2  Mr. Thompson and also during the interview of
3  Mr. Abron.  Do you know who gets these barber
4  interview forms or who prepares them?
5    A   I'm not sure of your question.
6    Q   Okay.  That was a bad question.  Is this
7  something that's prepared at Henry Hill or is this
8  a form that's provided to Henry Hill?
9    A   It wasn't prepared by us.  What usually
10  happens is we will outlook all the human resource
11  reps and say have you ever hired such and such
12  position; do you have any interview questions.
13   Q   Okay.  And so somebody would have sent
14  you these interview questions from some other
15  prison?
16   A   Yes, Logan Correctional Center sent
17  them.
18   Q   Okay.  The interview form includes
19  sections where you put down the weight and the
20  points.  Did you use the same weight for the
21  different categories as what Logan did?
22   A   I believe so, yes.
23   Q   Did anybody at Henry Hill do any -- if

Pages 34 to 37

CIRCUIT WIDE REPORTING

38

1 somebody at Henry Hill was going to change the
2 weighting of the different categories, would that
3 be you or who would be doing that?
4    A  I don't know.
5    Q  Do you ever, as you're hiring somebody,
6 do you guys ever do your own weighting and do your
7 own forms or is it typically just using the forms
8 from other facilities?
9    A  Typically just using standard forms.
10    Q  Would you have reviewed the questions at
11 all with Mr. Shaw or Mr. Smith before they did the
12 interviews?
13    A  No.
14    Q  Would Mr. Smith or Mr. Shaw have been
15 provided with any information as to what a good
16 answer would be in regards to different barbers'
17 specific questions?
18    A  No.
19    Q  Do you have any opinion as to whether
20 prior experience working in a Department of
21 Corrections environment would be beneficial when
22 you're looking for an applicant for this position?
23    A  I don't know.

39

1    Q  Handing you what's been marked as
2 Exhibit 17, do you know what that document is?
3    A  Application for Larry Thompson.
4    Q  And on this application it looks like in
5 box ten it says veterans preference. It sounds
6 like you're sort of familiar with the concept of
7 veterans preference, but beyond that you don't
8 know how that would come into play, is that right?
9    A  Correct.
10    Q  Exhibit 18, that's the handwritten notes
11 of one of the interviewers. Maybe it's of both
12 interviewers of Mr. Thompson, is that right? I
13 don't remember if it's one or both.
14    A  It looks like one.
15    Q  I think I may have already handed you
16 Exhibit 19 earlier.
17    A  Yes.
18    Q  And is Exhibit 19 the same only with the
19 other interviewer's form?
20    A  Yes.
21    Q  And these are something that you would
22 hand blank to the interviewers and then they'd
23 return them back to you. They'd also provide you

40

1 with Candidate Evaluation Forms that they would
2 write notes in. Would you use Exhibit 18 or 19
3 for anything in your part of the hiring process?
4    A  No.
5    Q  All you do is you would rely on the
6 handwritten notes that they gave you, that you
7 would use to fill out the Candidate Evaluation
8 Form and then the decision form, is that right?
9    A  Correct.
10    Q  Would you have instructed Mr. Smith or
11 Mr. Shaw to review the employment applications or
12 any resumes that were provided by the applicants?
13    A  No, I don't instruct them for anything.
14    Q  Do you know if they would typically
15 review those or not review those?
16    A  I don't know.
17    Q  Would you provide them with copies of
18 the -- I'll hand you what's been marked Exhibit
19 No. 20. That's Mr. Abron's application for the
20 position, is that right?
21    A  Yes.
22    Q  And handing you Exhibit No. 21, that's
23 Mr. Abron's resume, is that correct?

41

1    A  Yes.
2    Q  Do you know if the resume and the
3 application of Mr. Abron would have been provided
4 to Mr. Smith and Mr. Shaw before they did the
5 interviews?
6    A  They should have been provided at the
7 time of the interview.
8    Q  Have you ever been to the rutan training
9 too?
10    A  No.
11    Q  Do you have any idea whether the
12 interviewers are supposed to put any weight to
13 what is included in the applications or the
14 resumes?
15    A  I don't know.
16    Q  Are you familiar at all with the
17 document that I've handed you that's labeled
18 Exhibit 23?
19    A  No.
20    Q  And I'm going to hand you -- hopefully
21 it's not been marked yet, but it says Interview
22 and Selection Criteria and Techniques, State of
23 Illinois. Are you familiar with this book at all?

Pages 38 to 41

CIRCUIT WIDE REPORTING

42

1    A  No.
2
3        (Whereupon Deposition
4        Exhibit No. 28 was marked
5        for identification.)
6
7    BY MR. REHN:
8    Q  I'm handing you what's been marked as
9    Exhibit 28. I believe we already discussed this a
10   little bit. That's the Employment Bid Record, is
11   that right?
12   A  Yes.
13   Q  And that's a form that you completed
14   after the interviews were done, is that right?
15   A  No, I complete this as the applications
16   come in.
17   Q  Okay. And I guess there's maybe
18   something at the bottom that you fill in at the
19   end after the interview has been done?
20   A  Yes.
21   Q  And that relates to the hiring of
22   Mr. Thompson and the application of Mr. Abron for
23   the barber position, is that right?

43

1    A  Yes.
2
3        (Whereupon Deposition
4        Exhibit No. 29 was marked
5        for identification.)
6
7    BY MR. REHN:
8    Q  And I'm handing you now what's been
9    marked as Exhibit No. 29, and that is sort of a
10   cover sheet that Henry Hill uses in regards to
11   keeping documentation for the different hiring
12   jobs, and this one is filled out specifically for
13   the barber position that Mr. Thompson received, is
14   that right?
15   A  Yes.
16   Q  When did you first become aware that
17   Mr. Abron had some complaints concerning the
18   hiring process?
19   A  I don't remember the date.
20   Q  Okay. Do you remember how you first
21   became aware of any complaints?
22   A  I believe I received a letter from him.
23   Q  I believe so too. I'm just trying to

44

1    find it.
2        MR. KLEIN:  Bates number 18.
3        MR. REHN:  Oh, it's Bates 18.
4
5        (Whereupon Deposition
6        Exhibit No. 30 was marked
7        for identification.)
8
9    BY MR. REHN:
10   Q  Handing you what's been marked as
11   Exhibit No. 30, is that the document you were
12   referring to when you said you thought you
13   received a letter from him concerning his
14   complaints about the hiring process?
15   A  Yes.
16   Q  What did you do when you received this
17   letter that's labeled as Exhibit 30?
18   A  I replied to the letter.
19
20       (Whereupon Deposition
21       Exhibit No. 31 was marked
22       for identification.)
23

45

1    BY MR. REHN:
2    Q  Okay. Handing you what's been marked as
3    Exhibit No. 31, is that your reply to the letter?
4    A  Yes.
5    Q  Okay. In addition to replying to the
6    letter, is there anything that you have to do in
7    regards to contacting other persons about the
8    complaints of Mr. Abron?
9    A  I believe I told the warden.
10   Q  Was there any investigation or
11   discussions at that time about the hiring process
12   other than talking to the warden?
13   A  Not on my account, no.
14   Q  Do you know if the warden -- and the
15   warden was Mr. Hulick at the time, is that right?
16   A  Yes.
17   Q  Do you know if he did anything in
18   regards to investigating the complaint?
19   A  I don't know.
20   Q  Did you talk to Mr. Smith or Mr. Shaw at
21   all about the complaints of Mr. Abron at that
22   time?
23   A  No.

46

1    Q   I'm going to go back in time a little
2    bit to this exhibit which is No. 32. It looks
3    like it's an E-mail from you to somebody
4    concerning the request to hire Mr. Thompson, is
5    that right?
6    A   Yes.
7    Q   And it talks at the bottom of that about
8    issuing a governor's memo. What is that?
9    A   It's the procedure that Springfield goes
10   through to complete the hiring process. They have
11   to get approval from the governor's office.
12   Q   Do you know how Mr. Smith and Mr. Shaw
13   were selected to be the interviewers for this
14   position?
15   A   No.
16   Q   Who is it that selects them to be the
17   interviewers?
18   A   The warden.
19   Q   Going back to Exhibits 13 and 14, I
20   think 13 was from a different facility but 14 was
21   the form that you completed, and in particular I'm
22   talking about the second page of Exhibit 14 which
23   talks about the underutilization of affirmative

47

1    action groups. I think you said you used some
2    sort of a chart or some sort of information from
3    Springfield in order to fill out or figure out if
4    somebody was underutilized?
5    A   Yes.
6    Q   Do you know what the name of that chart
7    is or do you have that document here?
8    A   Yes.
9    Q   Okay. Maybe we don't need it right now
10   but if you can get us a copy of that. What is it
11   called?
12   A   I don't know the title of it.
13   Q   But you can get the chart?
14   A   Yeah.
15   Q   Okay. If you can get that for us, we'd
16   ask for a copy of that. It looks like, and I just
17   have a question about it, it looks like on
18   Exhibit 13, which I realize is not a form that you
19   filled out, they seem to have more boxes checked
20   in the question number two than was filled out on
21   your form. How often do those charts come out?
22   Is that something they send out?
23   A   Once a year. It has to do with the area

48

1    you're in.
2    Q   So it's possible that it may be
3    underutilized in -- well, is Henry Hill in a
4    different area than the; is it called the Illinois
5    Correctional Center that's in Canton?
6    A   It's possible.
7    Q   Were you involved at all in regards to
8    the EEOC complaint that was filed by Mr. Abron?
9    A   No.
10   Q   Do you or anybody else I guess at Henry
11   Hill typically check on the information that's
12   provided by people when there are resumes or
13   applications in regards to work experience?
14   A   No.
15   Q   Do you have any information or training
16   in regards to what the difference is between a
17   four point answer and a three point answer in
18   regards to the different categories?
19   A   No.
20   Q   And the categories I'm referring to are
21   on the Candidate Evaluation Forms?
22   A   Right. I don't know how to score them.
23   Q   Is that something as far as you know

49

1    that's all explained in the rutan hiring training?
2    A   I believe so.
3    Q   Do you have any opinion as to the
4    importance of experience supervising other barbers
5    in regards to the hiring of the barber at the
6    Henry Hill facility?
7    A   I don't know.
8    Q   Did Mr. Hulick, the warden at the time,
9    have any input at all in regards to the hiring
10   decision?
11   A   I don't know.
12   Q   Who would know that besides Mr. Hulick?
13   A   I don't know.
14   Q   Okay. How many people were working at
15   the personnel department here at Henry Hill? Is
16   that a big department or is it you and somebody
17   else or just you?
18   A   Just me.
19   MR. REHN: Okay. I don't have
20   anything else.
21   MR. KLEIN: I just have a couple
22   quick questions.
23

50

1          CROSS EXAMINATION
2  BY MR. KLEIN:
3      Q    First, Exhibit 29 where it says eligible
4  list, if applicable, there's an N/A, which I
5  assume means not applicable?
6      A    Correct.
7      Q    Did you write that?
8      A    Yes.
9      Q    Why was an eligible list not applicable
10  to this job?
11     A    An eligible list means that if we have
12  bidders inside the institution and nobody
13  qualifies, then we need an eligible list, or
14  nobody wants the position, then we need an
15  eligible list of who is on the hiring list for
16  outside.  That's like for bargaining positions,
17  bargaining unit positions where people have
18  titles.
19     Q    On Exhibit 30 which is the letter that
20  you received from Mr. Abron, is he making a
21  complaint in that letter or is he just asking for
22  information?
23     A    Information.

51

1      Q    And did you provide that information?
2      A    Yes.
3          MR. KLEIN:  That's all I have.
4          MR. REHN:  I don't think we have
5  anything further other than just a request for
6  that chart if you can get that.
7          MR. KLEIN:  Yeah.
8          MR. REHN:  Does she want signature?
9          MR. KLEIN:  We'll waive signature.
10
11          WITNESS FURTHER SAYETH NOT;
12          BY AGREEMENT, SIGNATURE WAIVED.
13
14
15
16
17
18
19
20
21
22
23

52

1  STATE OF ILLINOIS  )
2  COUNTY OF PEORIA  )
3          I, PAULA A. MORSCH, Certified Shorthand
4  Reporter and Officer of the Court authorized to
5  report depositions, do hereby certify that
6  heretofore, to-wit, on the 13th day of June, 2007,
7  at the hour of 10:00 a.m., MARGARET FOLEY
8  personally appeared before me at 600 S. Linwood
9  Road, in the City of Galesburg, County of Knox,
10  State of Illinois.
11          I further certify that the said witness
12  was by me first duly sworn to testify to the
13  truth, the whole truth and nothing but the truth
14  in the cause aforesaid, that the testimony then
15  given by said witness was reported
16  stenographically by me in the presence of said
17  witness and afterwards reduced to typewriting, and
18  the foregoing is a true and correct transcript of
19  the testimony so given by said witness as
20  aforesaid.
21          I further certify that the signature of
22  the witness to the deposition was waived by
23  agreement of counsel.

53

1          I further certify that I am not counsel
2  for nor in any way related to any of the parties
3  to this suit, nor am I in any way interested in
4  the outcome thereof.
5
6
7  _____  C.S.R.
        s/Paula Morsch
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Pages 50 to 53

CIRCUIT WIDE REPORTING

# BARBER INTERVIEW

NAME OF APPLICANT: _____

DATE OF INTERVIEW: _____

INTERVIEWER'S NAME: _____



## BARBER INTERVIEW

| | | WEIGHT | POINTS |
| --- | --- | --- | --- |

**I.     EDUCATION, TRAINING AND SKILLS**          WEIGHT 30%     POINTS

1.   What special skills do you believe you
     Possess which would enable you to successfully
     Perform the duties of this job and why?           _____

     _____

     _____

     _____

     _____

     _____

2.   Describe how the education and training you
     Possess will help you perform the responsibilities
     Of this job.                                       _____

     _____

     _____

     _____

     _____

     _____

3.   Explain how to sanitize and sterilize barber
     Equipment.                                          _____

     _____

     _____

     _____

     _____

     _____

**EDUCATION TRAINING AND SKILLS TOTAL POINTS** _____

|  | | WEIGHT | POINTS |
|---|---|---|---|

**II.**   **JOB KNOWLEDGE AND EXPERIENCE**    30%

1. Describe the specific job duties and responsibilities    _____
   Of your previous barbering position.

   _____
   _____
   _____
   _____
   _____

2. An inmate receives a cut while receiving a    _____
   Haircut and is bleeding moderately.  What
   Would you do?

   _____
   _____
   _____
   _____
   _____

**JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS** _____

|  | | WEIGHT | POINTS |
|---|---|---|---|

**III.**   **INTERPERSONAL RELATIONS**    25%

1. Describe the relationship you strive to establish    _____
   With your co-workers.

   _____
   _____
   _____
   _____
   _____

2.    How do you deal with people who have different
      Backgrounds and interests from yours?                      _____

      _____

      _____

      _____

      _____

      _____


3.    What role do you see communication playing             _____
      In this job and how would you approach this role?

      _____

      _____

      _____

      _____

      _____


INTERPERSONAL RELATIONS TOTAL POINTS _____


|  |  | WEIGHT | POINTS |
|---|---|---|---|
| IV. | WORK HISTORY | 15% | |

1.    Describe your work history and how it will               _____
      Enable you to perform the responsibilities
      Of this job?

      _____

      _____

      _____

      _____

      _____

2.   How would you rate your use of time?  How many
     Sick days have you used within the last 12
     Months?  Explain any extenuating circumstances.

     _____
     _____
     _____
     _____

     _____

**WORK HISTORY TOTAL POINTS** _____

RATING SCALE
0 - UNSATISFACTORY
1 – MARGINALLY MET
2 – ACCEPTABLE
3 – VERY GOOD
4 - EXCELLENT

E-FILED
Friday, 19 October, 2007  11:23:10 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

Steve Abron,                          )
                    Plaintiff,        )
        -vs-                          )   No. 06-1157
State of Illinois, Department         )
of Corrections, Henry Hill            )
Correctional Center and Don           )
Hulick, Warden, Individually,         )
Bill Smith, Business Admini-          )
strator, Individually, and            )
Frank Shaw, Assistant Warden,         )
Individually and in their             )
official capacity,                    )
                    Defendants.        )

THE DEPOSITION OF FRANK SHAW, taken before Amy
S. Powers, Illinois CSR 084-003053, RPR 038549, a
Notary Public, on Monday, the 6th day of August
2007, commencing at the hour of 11:45 a.m., at
Henry Hill Correctional Center, 600 South Linwood
Road, in the City of Galesburg, County of Knox,
and State of Illinois.

CIRCUIT WIDE REPORTING
Suite 316 Hill Arcade Building
Galesburg, Illinois 61401
(309) 343-3376 * 1-800-342-DEPO

COPY

---

**2**

PRESENT:

    JOHN REHN, ESQ.,
    311 East Main Street, Suite 412
    Galesburg, Illinois 61401
        on behalf of the Plaintiff;

    THOMAS KLEIN, ESQ.,
    500 South Second Street
    Springfield, Illinois 62706
        on behalf of the Defendant.

ALSO PRESENT:
    MR. STEVE ABRON

I N D E X

WITNESS                                    PAGE
FRANK SHAW,
    Direct Examination by Mr. Rehn         3 - 62
    Cross-Examination by Mr. Klein        62 - 63
    Redirect Examination by Mr. Rehn      63 - 64
    Certificate of Reporter               65 - 66
    Signature Page                            67

EXHIBITS
    Exhibit 33 so marked for identification   14

---

**3**

(Witness sworn.)
FRANK SHAW,

1    (Witness sworn.)
2
3    having been first duly sworn, was examined and
4    testified on his oath as follows:
5
6    **DIRECT EXAMINATION BY MR. REHN:**
7    Q.   Why don't you state and spell your name for
8         the record, please.
9    A.   Frank Shaw, S-H-A-W.
10        MR. REHN:   All right.  We're here
11   today for a deposition pursuant to the
12   Federal Rules of Civil Procedure in a case
13   brought by a Mr. Steve Abron concerning a
14   hiring decision at the Department of
15   Corrections.
16        Have you ever been deposed before?
17        THE WITNESS:   Yes, sir.
18        MR. REHN:   You're doing great.  The
19   first rule is I want you to try and wait
20   until I'm done with my question, however
21   long and convoluted it is, until you answer
22   so we only have one person speaking when
23   Amy's trying to type up what happened here.
24        And the other is to make sure you

---

**4**

1         answer out loud, okay?
2         THE WITNESS:   Yes, no problem.
3         MR. REHN:   Perfect.  If you don't
4    understand a question, that's probably
5    because I asked a confusing question, and
6    just ask me to rephrase it, okay?
7         THE WITNESS:   I will.  And I'm going
8    to ask you some general questions about
9    your background and then we'll talk a
10   little bit about the interviewing process
11   in general and then specifically the
12   interviewing for the barber position at the
13   Henry Hill facility which is the subject of
14   this lawsuit.
15
16   BY MR. REHN:
17   Q.   Where do you work now?
18   A.   Thomson Correctional Center.
19   Q.   And what do you do there?
20   A.   Warden.
21   Q.   Okay.  And is that the one that was empty
22        for awhile that they just filled up
23        recently; is that right?
24   A.   That's right.  That's correct.

---

**EXHIBIT**

tabbies

G

5

1  Q.  And how long have you been the warden up
2      there?
3  A.  One year.
4  Q.  What did you do before that?
5  A.  I was a warden at Hill Correctional Center.
6  Q.  And how long were you the warden at Hill?
7  A.  A little over a year.
8  Q.  And what did you do before you were the
9      warden at Hill?
10 A.  I was the assistant warden of operations at
11     Hill.
12 Q.  What does the assistant warden of operations
13     do?
14 A.  Specifically you're in charge of operations
15     of the facility.
16 Q.  Okay.  And have you had any specific
17     training in regards to hiring at the
18     Department of Corrections?
19 A.  I'm Rutan certified.
20 Q.  What does it mean to be Rutan certified?
21 A.  You have to go through a training process
22     and become certified in the interview
23     process.
24 Q.  And is that a one-time training, or is that

6

1      something that you have to be continued to
2      be updated on?
3  A.  It's a one-time training.
4  Q.  Do you know when you became Rutan certified?
5  A.  No, sir.
6  Q.  Is that something you would have done in
7      Springfield?
8  A.  Yes.
9  Q.  As far as the hiring of Larry Thompson as
10     the barber at the Henry Hill facility, it's
11     my understanding through the documents that
12     you were involved in the interviewing; is
13     that right?
14 A.  That's correct.
15 Q.  Do you have any -- without going through any
16     of the documents right now -- specific
17     recollection of doing the interviews for
18     that position?
19 A.  No, sir.
20 Q.  Okay.  Do you remember how it was that you
21     got involved in the hiring process for that
22     barber position?  Do you know how it was you
23     ended up becoming an interviewer?
24 A.  I was selected by the warden to conduct the

7

1      interviews.
2  Q.  Okay.  And when you were selected to do the
3      interviews, did the warden tell you anything
4      else about the position that you would be
5      interviewing for?
6  A.  That it was for a barber's position.
7  Q.  Do you have any specific training in
8      barbering?
9  A.  No.
10 Q.  And were you familiar with the barber
11     position at Henry Hill before you did
12     interviews?
13 A.  Yes.
14 Q.  Do you know who the barber was that
15     Mr. Thompson replaced?
16 A.  No, I don't recall.
17 Q.  Did you know Mr. Thompson at all before he
18     interviewed for this position?
19 A.  No.
20 Q.  Did you know Mr. Steve Abron before he
21     interviewed for this position?
22 A.  No.
23 Q.  I'm going to hand you what we've labeled in
24     prior depositions Exhibit No. 1 which is

8

1      labeled an Administrative Directive.  Are
2      you familiar with this document?
3  A.  Yes.
4  Q.  Okay.  And what this document addresses is
5      the procedure for hiring persons in the
6      Department of Corrections; is that right?
7  A.  Correct.
8  Q.  And going to page 2 of this document under
9      General Provisions, which is Section F, if
10     you go down to paragraph no. 6, it says,
11     Interviews shall be conducted by persons
12     authorized to be interview officers.  I
13     believe that would be somebody who's been
14     Rutan qualified; is that your understanding
15     of this also?
16 A.  Correct.
17 Q.  And would -- going to letter I, subpart I,
18     which is page 5 of 7, I guess, it talks
19     about the interview and selection process
20     for positions filled under Rutan guidelines,
21     and the barber position was one that was to
22     be filled under Rutan guidelines; is that
23     right?
24 A.  That's correct.

9

1    Q.   Subpart A under that #1 under I indicates
2         that, The interviewing officer shall, and
3         then it has eight numbered subparagraphs.
4         Do you see that?
5    A.   Yes.
6    Q.   If you go down to No. 3, it says, Identify
7         hiring criteria such as education,
8         experience, skills, et cetera, by reviewing
9         the job specifications.
10              And then paragraph no. 4 says,
11        Assign percentage weights to each hiring
12        criteria. Is that something that you would
13        have done in regards to the hiring of the
14        barber position when you interviewed
15        Mr. Thompson and Mr. Abron?
16   A.   No.
17            MR. KLEIN:   I'll object to the form
18        because you're asking about two
19        different -- really two questions.
20            MR. REHN:   That's fine. As I was
21        asking it, I objected in my head to it.
22
23   BY MR. REHN:
24   Q.   Going to paragraph no. 3, did you do that,

10

1         which is identify hiring criteria such as
2         education, skills, et cetera, by reviewing
3         the job specifications?
4    A.   No.
5    Q.   And paragraph 4, did you assign percentage
6         weights to each hiring criteria?
7    A.   No.
8    Q.   Do you know who did that?
9    A.   The instrument was received from another
10        facility.
11   Q.   Okay. If you go down to paragraph no. 8, it
12        says, Forward the Job Candidate Evaluation
13        Form, interview questions, job posting,
14        major responsibilities, rating system,
15        position description, and class
16        specifications to the interview coordinator.
17        Is that something you would have done?
18   A.   We conduct the interviews and then all the
19        materials and stuff are gathered by
20        Personnel.
21   Q.   Would you have reviewed resumes or
22        applications that were sent in by the
23        different candidates?
24   A.   No.

11

1    Q.   Had you done any Rutan interviewing prior to
2         this barber position?
3    A.   Yes.
4    Q.   How often have you done that?
5             MR. KLEIN:   I'll object to the form.
6         How much before this one, or how often
7         total has he done Rutans?
8             MR. REHN:   I'll try and clear up the
9         question. How often total do you believe
10        you've done Rutan interviewing?
11            THE WITNESS:   I've probably conducted
12        over 500 interviews --
13            MR. REHN:   Okay.
14            THE WITNESS:   -- for different
15        positions.
16
17   BY MR. REHN:
18   Q.   Would those all be the Rutan interviews
19        you're talking about?
20   A.   Yes.
21   Q.   Okay. And as far as prior to the time that
22        the interviews were conducted for Mr. Abron
23        and Mr. Thompson, how many interviews do you
24        believe you've done for Rutan interviewing?

12

1    A.   I'm sorry, can I -- I must have
2         misunderstood your first question. Did you
3         ask me how many I've done prior, or did you
4         ask me how many I've done afterwards?
5    Q.   Okay. My first question I tried to ask,
6         although who knows it came out, I wanted to
7         know total how many prior, and after how
8         many have you done.
9    A.   I'll stay with the same number, around 500
10        probably.
11   Q.   And the question I'm trying to ask now is
12        how many had you done prior to the time that
13        you interviewed Mr. Thompson and Mr. Abron?
14   A.   Probably 450, in that general area.
15   Q.   And what you're talking about is the number
16        of applicants, not the number of positions,
17        correct?
18   A.   Correct.
19   Q.   I'm going to hand you now what's been marked
20        Exhibit No. 2. Are you familiar with this
21        form?
22   A.   Yes.
23   Q.   And it's my understanding this is the form
24        that assigns the percentage weights to each

13

1   hiring criteria for the hiring of the barber
2   position that Mr. Abron and Mr. Thompson
3   applied for; is that right?
4   A.   It's a Position Description Form.
5   Q.   Okay.
6   A.   It goes and lists percentage of duties for
7   the position.
8   Q.   You're right. I apologize. Is this
9   something that -- who would have prepared
10  this?
11  A.   CMS.
12  Q.   And is this one that was prepared for --
13  specifically for the Hill Correctional
14  Center, or is this something that would have
15  been prepared for all barber positions, if
16  you know?
17  A.   I don't know.
18  Q.   Okay. Is this something that would have
19  been provided to Hill prior to the
20  interviewing of Abron and Thompson?
21  A.   Yes.
22  Q.   And would you have reviewed it to see if you
23  believed the percentage of time listed on
24  this form was consistent with what actually

14

1   happens at Henry Hill?
2   A.   No.
3   Q.   Would you have reviewed this document prior
4   to conducting the interviews for the barber
5   position?
6   A.   Yes.
7   Q.   And it appears as though the greatest
8   percentage of time of the barber position as
9   identified in this document would be
10  supervising, instructing, and training
11  inmate barbers in regards to cutting other
12  inmates' hair; is that right?
13  A.   Yes.
14  Q.   Was experience supervising others who cut
15  hair an important criteria for you when
16  you're doing these interviews?
17  A.   If that's where one of the questions -- if
18  that's what one of the questions pertains
19  to, yes.
20  Q.   I'm going to hand you what's been marked as
21  Exhibit No. 3. Do you know what that
22  document is?
23  A.   This is distinguishing features of a
24  position.

15

1   Q.   And this is for the barber position; is that
2   right?
3   A.   Yes.
4   Q.   And is this something that you would have
5   looked at when you were doing the job
6   interviews for Mr. Thompson and Mr. Abron?
7   A.   No.
8   Q.   Okay. Have you seen that form before that's
9   Exhibit 3?
10  A.   Yes.
11  Q.   When would you have seen that form?
12  A.   Prior to doing the interviews.
13  Q.   When you say "prior to doing the
14  interviews," are you talking about the
15  interviews of Mr. Thompson and Mr. Abron?
16  A.   The barber interviews, yes.
17  Q.   Okay. I'm handing you what's been marked
18  Exhibit No. 4. I believe this is the --
19  well, why don't you tell me what this
20  document is.
21  A.   It's a posting for the barber's position.
22  Q.   Okay. And under Position Description it
23  indicates again that the position includes
24  being responsible for supervising and

16

1   instructing inmate workers in performing
2   various barbering services; is that right?
3   A.   That's correct.
4   Q.   It goes on a little bit beyond that, but
5   that's the start of the Position
6   Description. Is this something you would
7   have reviewed before you did the interviews
8   of Mr. Abron and Mr. Thompson?
9   A.   No.
10  Q.   Generally speaking, I don't know if you
11  would have any information about this or
12  not, but if you were the warden, you might
13  have some information, or at least be able
14  to direct us to the right place. This, I
15  believe, the posting shows the salary as of
16  the hiring date for the barber, which was
17  back in December 2004 was the date it was
18  posted, and I believe the hiring was made
19  soon after that. Do you know if there have
20  been any adjustments in the rate of pay to
21  that barber position between the date of
22  hiring and today's date?
23  A.   No.
24  Q.   No, you don't know, or, no, there have not

17

```
1              been?
2    A.   No, I don't know.
3    Q.   Okay.  Do you know who would be the person
4              that would know that?
5    A.   Personnel would be able to find out whatever
6              the prevailing rate is now for that
7              position.
8    Q.   How does that work as far as is there a
9              prevailing rate for each type of position
10             and then the prison is informed on a -- is
11             it a yearly basis, every few years?  How
12             often --
13   A.   Well, it depends on what, you know, each --
14             prevailing rate normally means positions
15             such as skilled positions, electricians,
16             plumbers, those types of positions.  And
17             whatever the prevailing rate is through
18             their union, typically that's what then we
19             pay that employee.  So they would, yes,
20             provide us with the information we need for
21             that.
22   Q.   I'm going to hand you what's been marked as
23             Exhibit No. 5, which is a Candidate
24             Evaluation Form for Larry Thompson.  Were
```

18

```
1              you involved at all in the actual
2              preparation of this document?
3    A.   Yes.
4    Q.   How were you involved in the preparation of
5              this document?
6    A.   This is completed after the interview
7              process, and I write in comments, and then
8              the comments are typed by someone else.
9    Q.   Okay.  Now, for the interviewing of
10             Mr. Thompson and Mr. Abron and the other
11             candidates for that position, there was two
12             interviewers; is that right?
13   A.   Correct.
14   Q.   Do you and the other interviewer hand write
15             the candidate evaluation form, do each of
16             you do your own form, or is it a combined
17             effort?
18   A.   It's a combined effort.
19   Q.   Is that done after all of the candidates are
20             interviewed, or is that done -- do the
21             Evaluation Forms --
22   A.   After all the candidates are interviewed.
23   Q.   Now, there has been some testimony in a
24             prior deposition about the Initial
```

19

```
1              Evaluation Form for Mr. Thompson being
2              inadequate, or needing additional
3              information.  Are you aware of any of that?
4    A.   No.
5    Q.   Do you ever remember anybody coming back to
6              you and asking you to refill out an
7              Evaluation Form or to do anything further in
8              regards to an Evaluation Form on this -- on
9              the hiring of Mr. Thompson?
10   A.   No.
11   Q.   Handing you Exhibit No. 6, this is a
12             Candidate Evaluation Form for Mr. Abron; is
13             that correct?
14   A.   Yes.
15   Q.   And this is again something you would not
16             have typed up, but you would have prepared
17             the information, along with the other
18             interviewer, to give to somebody else to
19             fill in with a typewriter; is that correct?
20   A.   Correct.
21   Q.   I'm not trying to mess you up, but I don't
22             think I'll give you No. 7 because I think
23             that's from another facility, so I don't
24             think I need to ask you about that one.
```

20

```
1              Did you think when you were doing
2              the interviewing for this barber position
3              that experience barbering in a correction
4              facility would or should be a significant
5              factor in making the decision as to whether
6              a person should be employed for this
7              position?
8    A.   Would be a factor.
9    Q.   Okay.  I'm assuming that somebody that did
10             have experience in barbering in a
11             correctional facility, that would be a
12             benefit to that person when they're doing
13             the interview; is that right?
14   A.   A benefit to the candidate?
15   Q.   Yes, I mean, that would be something that
16             you would be looking for?
17   A.   Yes.
18   Q.   That was a badly worded question.  Are you
19             familiar at all with any preference in the
20             hiring procedure for a person who has
21             experience in the military, who is a
22             veteran?
23   A.   No.
24   Q.   Are you familiar at all as to whether there
```

21

1    is any Affirmative Action program in regards
2    to the hiring for the barber position here?
3  A.  No.
4  Q.  Skipping up to Exhibit No. 14, are you
5    familiar with that form?
6  A.  Yes.
7  Q.  Is this something that you would have been
8    involved with in regards to completing?
9  A.  Yes.
10  Q.  What was your involvement in regards to
11    completing Exhibit 14?
12  A.  It's an Employee Decision Form.  Comments
13    are placed on this form based on the
14    candidate's overall ranking after the
15    interview process.
16  Q.  Under the Justification section under the
17    bottom -- the bottom box -- I guess it's
18    middle box.  The middle box it says
19    Justification right above it.  It says,
20    Explain the reasons for hiring the selected
21    candidate.  And then it says, If selection
22    is out of rank order, include the rationale.
23        First off, in regards to
24    explaining the reasons for hiring the

23

1    include rationale, are they talking about
2    the selection being -- when they say rank
3    order, you give a number to the different
4    candidates when you do the Rutan hiring; is
5    that right?
6  A.  In regards to how they score?
7  Q.  Yes, what you're doing is there's a
8    percentage for different categories and then
9    inside that category you rank by number, I
10    think, 0 through 5 or 0 through 4 inside of
11    each category, and then there is a total for
12    each candidate, a numerical total for their
13    interview score I guess I will call that.
14    What do you call that number, or what am
15    I -- I guess I'll put it on the record a
16    little clearer here.
17  A.  It's the actual number the candidate comes
18    out with after the interview process.
19  Q.  Okay.  When they're talking about, If
20    selection is out of rank order, include the
21    rationale, are they indicating there that
22    you can pick a person for the position who
23    maybe does not have the highest number in
24    that ranking of the interview?

22

1    selected candidate, is that your reasoning
2    that's underneath here, is that you and the
3    other interviewer, or is this somebody else
4    who would have --
5  A.  Yes, these are our comments.
6  Q.  Okay.  You and the other interviewer?
7  A.  Correct.
8  Q.  Going to the, I'll call it a second
9    paragraph where it says, All the candidates
10    interviewed had extensive experience as a
11    barber.  The next sentence says,
12    Mr. Thompson had additional skills
13    demonstrated during the interview process
14    which made him an excellent selection.  Do
15    you know what the additional skills were?
16  A.  Not specifically.
17  Q.  If you were trying to figure that out, would
18    there be any way that you would be able to
19    identify that at this time?
20  A.  If I reviewed the Interview Form again.
21  Q.  Okay.  And we'll get through that before we
22    get out of here.  Going back up to that --
23    the top part of that Justification box, it
24    says, If selection is out of rank order,

24

1  A.  That's correct.
2  Q.  Who is it that would make the decision that,
3    boy, this person got a lower number than
4    another applicant, but we're going to hire
5    that one?
6  A.  That's not my -- not my decision to make.
7  Q.  Okay.  Who would be the person that would
8    make that decision?
9  A.  The chief administrator could make that
10    recommendation.
11  Q.  Is the chief administrator the warden?
12  A.  Yes.
13  Q.  Which at the time of this interview would
14    have been Mr. Hulick; is that right?
15  A.  Correct.
16  Q.  Would you have spoken with Mr. Hulick at all
17    about whether that type of decision should
18    be made, taking the people out of numeric
19    order in the case of the hiring of the
20    barber that Mr. Thompson got?
21  A.  No.
22  Q.  Do you remember -- it sounds like you've
23    done a decent number of Rutan hiring for the
24    Department of Corrections.  Do you ever

25

1  remember hiring somebody that did not have
2  the highest score?
3  A.  No.
4  Q.  Do you remember in Rutan training or in your
5      experience as an assistant warden and as a
6      warden anyone at the Department of
7      Corrections ever talking about when it would
8      be appropriate to take a selection out of
9      rank order?
10  A.  No.
11  Q.  Do you have any resource or information that
12      was provided to you as to what type of
13      information should be in this justification
14      box?  Is there some sort of a manual or
15      guideline that's give to you to how to
16      complete these forms?
17  A.  No.
18  Q.  Do you remember anyone ever coming to you
19      after this Exhibit 14 was completed and
20      telling you that additional information
21      should be included in that form?
22  A.  No.
23  Q.  Going to page 2 of Exhibit 14, under
24      paragraph no. 2 it says, Is there documented

26

1  underutilization of an affirmation action
2  group in the EEO category.  Do you know what
3  they're talking about there at all?
4  A.  No.
5  Q.  Are you involved at all in completing the
6      second page of this document?
7  A.  No.
8  Q.  That would be something that probably the
9      Personnel Department would do?
10  A.  Correct.
11  Q.  Moving on to Exhibit 15, this is a Barber
12      Interview Form, and I believe this is a
13      blank form that you would have used in the
14      Rutan hiring of the barber position that
15      we're here for today; does that sound right?
16  A.  Yes.
17  Q.  And I think this form was prepared somewhere
18      besides Hill; is that right?
19  A.  Yes.
20  Q.  And do you know where the history of this
21      form came from?
22  A.  No.
23  Q.  It's got Logan Correctional Center.  I don't
24      know if it's on your copy or not at the top

27

1  on the fax, but I'm -- do you remember ever
2  talking to anybody at Logan Correctional
3  Center about this form?
4  A.  No.
5  Q.  The different categories on this Interview
6      Form are provided different weights
7      throughout the form, for instance,
8      education, training, and skills was weighted
9      at 30 percent.  Do you see that?
10  A.  Yes.
11  Q.  Were you involved at all in the decision as
12      to how to weight these different categories?
13  A.  No.
14  Q.  Did you talk about the weight given to the
15      different categories with the other
16      interviewer prior to doing these interviews?
17  A.  No.
18  Q.  Procedurally while you're doing the
19      interviews, as you're talking to the
20      candidates, are you filling out the lines
21      underneath the different questions?
22  A.  Yes.
23  Q.  And do you ask each one of the questions to
24      each of the candidates?

28

1  A.  Yes.
2  Q.  And how did you break that up?  Were you
3      asking all the questions?  Was the other
4      interviewer asking all the questions?  Did
5      you rotate back and forth, or what do you
6      guys do?
7  A.  We rotate back and forth.
8  Q.  Okay.  There's also a points box beside each
9      question.  Is that something that you would
10      fill out for each question?
11  A.  Yes.
12  Q.  And when you would fill that out, would you
13      talk to the other interviewer before you
14      filled in the point on your form?
15  A.  No.
16  Q.  When would you put the point in for each
17      question?
18  A.  I put the points in after each interview.
19  Q.  Would you do it while the question is being
20      answered, or do you wait until the candidate
21      has left the room and then you go back, look
22      at your notes, and then put the points in?
23  A.  That's correct.
24  Q.  I sort of gave you two options there.  I

29

1  think you're agreeing with the second one
2  probably.
3  A.  Yes.  After each interviewed candidate
4  leaves the room, then I go back and score
5  each question.
6  Q.  Okay.  At some point in time you and the
7  other interviewer compare your points that
8  are given; is that right?
9  A.  After each one of us complete the interview
10  instrument and score the points, then yes,
11  we have to add the points together.
12  Q.  Would you talk about the candidates after
13  they left but before you filled out the
14  points?
15  A.  No.
16  Q.  If a candidate had experience working in a
17  correctional facility, where, looking at
18  this blank form, where do you believe that
19  would come into play in regards to the
20  scoring of this form?
21  A.  There's several areas that could bring it
22  up.  It depends when the candidate, you
23  know, when he answers the question, would
24  give us that information.

31

1  and score it under Education, Training, and
2  Skills.
3  Q.  When you're doing the interviews for people
4  for these kind of Rutan hiring processes,
5  will you tell the applicants -- or what do
6  you tell them in regards to their interview
7  before they start?
8  A.  There's just some general information about
9  the question process.  We tell them that
10  we're going to ask each question, they can
11  give us an answer, we can repeat the
12  question, but we can't -- you know, they
13  can't ask us questions specifically, you
14  know, about the question itself.  There's no
15  information provided.  And then at the end
16  of it, if they have any questions, then
17  they're -- then we'll try to answer them.
18  Q.  Okay.  And just so I -- I tell you, I asked
19  you a very bad question, and I'm just going
20  to try and repeat it, and I'm going a couple
21  questions back.  This is more for
22  clarification.
23      Just to be clear, if a candidate
24  tells you an answer to Question 1 in

30

1  Q.  Okay.
2  A.  So I can't say specifically where it may be.
3  Q.  If the candidate gives you that information
4  in response to one question, can you use
5  that information in scoring another
6  question?
7  A.  Could you reask that question, I'm sorry?
8  Q.  I'll try to.  I probably won't get it
9  exactly.  Hopefully I'll get the same idea
10  to you.  Throughout an interview it may come
11  out, not in the first question, but at a
12  later question, that the candidate has
13  experience working in a correctional
14  facility.  Can you use that information when
15  scoring that candidate on a question where
16  that information was not provided to you
17  specifically on that answer?
18  A.  If he answers a question and provides
19  information, depending on what section he
20  answers that question, that's where he's
21  scored for it.  If, for instance, he
22  answered it under Work History and not under
23  Education, Training, and Skills, I would
24  score it under Work History and not go back

32

1  Section 3 that he has correctional
2  experience -- and I'm not even reading the
3  question, I'm just throwing it out there,
4  you will not consider that correctional
5  experience going back to another section,
6  Section 1, Question 1, for instance, because
7  that correctional experience was not
8  answered -- or offered specifically in
9  response to the question in that prior
10  section; is that correct?
11  A.  That's correct.
12  Q.  Looking at the specific questions about
13  education, training, and skills, Question
14  No. 3 says, Explain how to sanitize and
15  sterilize barber equipment.  Do you have any
16  specific knowledge about how you sanitize
17  and sterilize barber equipment?
18  A.  I'm certainly not a barber, but I have been
19  a safety sanitation coordinator a couple
20  different facilities, and I have general
21  knowledge of how that's completed.
22  Q.  What kind of information are you looking for
23  for a good answer on that question?
24  A.  Just wet and dry sterilization.

33

1  Q.   Do you know if there is any other type of
2       sterilization besides wet and dry?  It
3       sounds like that covers everything.
4  A.   They use barbicide, a chemical that's used.
5  Q.   As far as Question No. 1, What special
6       skills do you believe you would possess
7       which would enable you to successfully
8       perform the duties of this job, what kind of
9       things are you looking for in a good answer
10      there?
11 A.   It could be experience, it could be duties
12      that you've completed already, or things
13      that you're doing now.  Several different
14      things could fall into that category.
15 Q.   Going to Section 2, Question No. 2, An
16      inmate receives a cut while receiving a
17      haircut and is bleeding moderately.  What
18      would you do?  What kind of thing are you
19      looking for in a good answer in that
20      question?
21 A.   In a correctional setting the main thing if
22      you have an accident like that, you seek
23      assistance, and typically you're going to
24      walk out of your barbershop and tell an

34

1       officer I have an injury and I need
2       assistance.
3  Q.   Do you know, would there typically be a
4       guard or someone other than the barber in
5       the barbershop at Henry Hill?
6  A.   There may be.
7  Q.   It's not like somebody's always assigned
8       there; is that what you're saying?
9  A.   At Henry Hill there is someone assigned just
10      outside the barber, unless that's changed.
11 Q.   Are you familiar with the Youth Correctional
12      Facility in Kewanee?
13 A.   Yes.
14 Q.   Have you ever worked at that facility?
15 A.   No.
16 Q.   Are you familiar at all with their
17      barbershop as to whether they have guards
18      posted inside the barbershop or not?
19 A.   No.
20 Q.   Did you review any documents before the
21      deposition today?
22 A.   Yes.
23 Q.   Did you review the Interview Forms that you
24      completed for Mr. Smith and Mr. Abron?

35

1  A.   Yes.
2  Q.   I'm just looking at the answer to -- well,
3       I'm going to give you what's been marked as
4       Exhibit No. 17.  And I believe this is the
5       application for Mr. Thompson when he applied
6       for the barber position here at Henry Hill.
7       Would you have reviewed this application
8       form when you were conducting the
9       interviews?
10 A.   No.
11 Q.   Are you provided with the application form
12      when you are conducting the interviews?
13 A.   No.
14 Q.   In doing -- it sounds like you've done,
15      sounds like, a lot of Rutan interviewing
16      besides just this barber position.  Do you
17      typically review application forms or
18      resumes of candidates?
19 A.   No.
20 Q.   Do you know why not?
21 A.   No.
22 Q.   Is that part of the specific Rutan training,
23      that you're told not to do that?
24 A.   We don't generally have that information

36

1       provided to us.  We have the interview
2       instrument and the information provided to
3       the candidate.
4  Q.   You said "generally."  Do you remember
5       specifically in regards to this case, were
6       you provided with the applications or the
7       resumes of the candidates prior to
8       interviewing Mr. Abron or Mr. Thompson?
9  A.   Not that I recall.
10 Q.   Would it be helpful to you if you did have
11      that when you were doing the interviewing?
12 A.   No.
13 Q.   And why not?
14 A.   Because we ask specific questions in regards
15      to the interview instrument and that's how
16      we base our scoring.
17 Q.   Are the candidates told that their
18      application and resume is not reviewed by
19      the interviewers?
20 A.   No.
21 Q.   Handing you what's been marked Exhibit
22      No. 18.  I believe this document is the
23      Interview Form that we looked at before,
24      only this time it's been completed, and I

37

1    believe it was completed by you in regards
2    to Mr. Thompson's interview, is that
3    right -- no, this is Mr. Smith. This was
4    completed by Mr. Smith; is that right?
5  A.  That's correct.
6  Q.  Let's go Exhibit 19. I apologize. This is
7    the form that you completed for Mr. -- no,
8    this is the form completed by Frank Shaw for
9    Mr. Abron. I apologize. I'll set that
10   aside. I'm not going to ask you anything
11   about that at this time. I'm trying to find
12   the right form.
13           I'm handing you what's been marked
14   Exhibit No. 20, and this is the application
15   completed by Mr. Abron, and I'm assuming,
16   based on your previous answers that this is
17   something that you did not see before you
18   interviewed Mr. Abron?
19 A.  Correct.
20 Q.  Handing you Exhibit 21, that's Mr. Abron's
21   resume. Would you have seen this document
22   before you interviewed Mr. Abron?
23 A.  No.
24 Q.  I'm handing you what's been marked Exhibit

38

1    No. 22. Can you tell me what this document
2    is?
3  A.  This is the interview instrument completed
4    by Mr. Smith on Mr. Abron.
5  Q.  Mr. Smith would be you?
6  A.  No.
7  Q.  I'm sorry. I'm all messed up. You're
8    Mr. Shaw.
9           Did I give you 19? Let's dig back
10   out 19. I apologize.
11 A.  Yes, sir.
12 Q.  I got confused and ahead of myself. This is
13   the form that you filled out for Mr. Abron;
14   is that right?
15 A.  19 is the one filled out by me on
16   Mr. Thompson.
17 Q.  I think I've discovered the problem, I think
18   I renumbered mine incorrectly. I don't
19   think the numbers match.
20 A.  I'm sorry.
21 Q.  Don't be sorry.
22           MR. KLEIN:   I don't think you used his
23   evaluation of Mr. Abron in the first
24   deposition.

39

1           MR. REHN:   Off the record.
2
3           (Whereby a discussion was held
4           off the record.)
5
6  BY MR. REHN:
7  Q.  Exhibit 19, which is your Interview Form for
8    Larry Thompson; is that right?
9  A.  Yes.
10 Q.  And I live in a glass house, so I won't
11   throw any stones, but as far as
12   handwriting --
13 A.  I know it's bad.
14 Q.  -- what did you write down for the answer to
15   Question No. 1 in Section 1 for
16   Mr. Thompson?
17 A.  I've cut hair from all races and
18   nationalities. Been cutting hair 40 years.
19   Graduated in 1964 from barber college.
20 Q.  Okay. And you gave a 4 points score for
21   that answer; is that right?
22 A.  3.
23 Q.  No, you gave a 3, sorry. I'm confusing
24   myself again. Question No. 2, what was your

40

1    answer -- what did you write down for his
2    answer on Question 2 in Section 1?
3  A.  Graduated 1964 barber school, 40 years
4    experience cutting hair. Did his
5    apprenticeship.
6  Q.  And in that one you did give 4 points for
7    Question Number 2; is that right?
8  A.  Yes.
9  Q.  And then Question 3, what did you write down
10   for notes for that answer?
11 A.  Wet and dry sterilizer, dipped combs in
12   barbicide, always keep things clean and
13   wiped off.
14 Q.  Let's go to the next section, Section No. 2,
15   Question No. 1. Can you read what you wrote
16   down for your notes in that answer?
17 A.  I own and manage my own barbershop. I
18   manage my shop and order supplies. I work
19   by myself. No employees with me.
20 Q.  Okay. What is the notes for the answer to
21   Question No. 2 on that section?
22 A.  I would stop cutting his hair, call an
23   officer for assistance, and have treated by
24   healthcare staff.

41

1  Q.  All right. Going to Interpersonal
2       Relations, the answer to Question 1 in that
3       section, can you tell me what you wrote for
4       notes there?
5  A.  I can get along with all people. I treat
6       others as they treat me. I have no problem
7       dealing with inmates and will treat them
8       fair.
9  Q.  Let's go to the next Question No. 2. Can
10      you tell me what your answer was for that
11      question or what the notes were that you
12      wrote for Thompson's answer to Question No.
13      2?
14  A.  Treat them the same as others, can deal with
15      all types of people. Treat them all the
16      same.
17  Q.  And the answer to Question No. 3?
18  A.  Communicate to get the job accomplished but
19      not to the extent of being friends.
20      Remember they are inmates.
21  Q.  Okay. And then go down to the next section,
22      Work History, what did you put down as far
23      as notes for Mr. Thompson's response to
24      Question No. 1?

43

1       to that Justification box?
2  A.  Just the answers to some of the questions in
3      regards to his experience, the way he
4      answered the questions, the reactions he
5      would have in regards to answering the
6      questions.
7  Q.  So that would be the additional skills is
8      the way he answered the questions?
9  A.  Correct.
10  Q.  So just so I understand your answer a little
11      better, would the additional skills be
12      additional -- it sounds like they would not
13      be additional barbering skills -- well,
14      maybe they would be. Are you talking about
15      them being additional barbering skills, or
16      additional skills in regards to how you
17      answer questions, like the interviewing
18      skills?
19  A.  Yes, both.
20  Q.  Okay. If they were both, let's try and
21      break it down a little bit. What additional
22      barbering skills did he have?
23  A.  Additional experience.
24  Q.  Okay. Additional experience being years of

42

1  A.  I have 40 years of experience of being a
2      barber and have worked all types of people.
3  Q.  And then going on to the last question in
4      that section, Question No. 2, what notes did
5      you put for Mr. Thompson's answer to that?
6  A.  I'm on time every day and have only missed a
7      few days in the last 22 days. Should be at
8      work every day.
9  Q.  Going back to Exhibit 14 in front of you,
10      going to the second sentence on the last
11      paragraph in that box of Justification where
12      it said Mr. Thompson had additional skills
13      demonstrated during the interview process
14      which made him an excellent selection, I
15      think you indicated that you didn't know
16      what the additional skills were, but maybe
17      if you reviewed the Interview Form you would
18      be able to identify what those additional
19      skills are. Was that the Interview Form
20      that you were referring to previously?
21  A.  Yes.
22  Q.  After going through the Interview Form, do
23      you know what additional skills you were
24      talking about when you prepared the answer

44

1       experience, or additional years of
2      experience supervising, experience working
3      in the correctional --
4  A.  Years.
5  Q.  Okay. And as far as additional barbering
6      experience -- oh, that was what we just
7      talked about.
8          The interviewing additional
9      skills, what skills did Mr. Thompson have
10      that you considered additional skills in
11      regards to interviewing skills?
12  A.  The way he answered the questions.
13      Specifically one where he indicated that he
14      would get staff assistance and get
15      healthcare involved.
16
17          (Exhibit 33 so marked for
18          identification.)
19
20  BY MR. REHN:
21  Q.  Skipping up a few numbers and handing you a
22      document labeled Exhibit 33, is this the
23      document you completed for Mr. Abron based
24      upon his interview?

45

1    A.    Yes.

2    Q.    Going through the same thing, not much

3         original thought in my question but we're

4         just trying to find out what did you write

5         for your notes in regards to Mr. Abron's

6         answer to Question 1 in Section 1.

7    A.    Own and operate my own shop, Abron's Hair

8         Design, since 1976. Twenty-eight years

9         experience, three in corrections, 12 years

10        on call at the Knox County Jail.

11    Q.    Looks like Mr. Abron told you about his

12        correctional experience in response to the

13        first question that was asked; is that

14        right?

15    A.    Correct.

16    Q.    Now, if I understood your answer before, he

17        would have to repeat that every time he's

18        answering the questions in order for you to

19        consider the correctional experience in

20        regards to the other answers?

21    A.    If he wants credit in another category or

22        another question, yes, he would have to

23        repeat that to get credit for it.

24    Q.    And that's something that -- how would he

46

1        know that he would need to answer that way

2        every time he answers a question?

3    A.    I -- I can't score a question by assuming

4        what his answer is going to be. I score him

5        based on what his answer is.

6    Q.    Okay. Let's go to Answer No. 2. What were

7        your notes for that question?

8    A.    SA, Springfield National Barber College,

9        graduated 1973.

10    Q.    What's SA?

11    A.    I assume I'm referring to the question

12        above. I don't recall what SA meant in this

13        case.

14    Q.    Could it be same as above where he gave the

15        experience again as an answer for that

16        question?

17    A.    I don't recall.

18    Q.    Is that a possible explanation of the SA is

19        that it means same as above, that he

20        repeated his experience in response to

21        Question No. 2?

22    A.    Normally if I put SA, it would mean the

23        question prior. If he repeated that same

24        information, I didn't write it down again.

47

1    Q.    Going to -- do you have any reason to

2        believe -- would SA mean anything else? Any

3        other possible explanation for that SA as

4        you look at it today?

5    A.    No.

6    Q.    So the most reasonable or likely scenario as

7        SA means he repeated his experience or the

8        same stuff as he gave you in answer to No. 1

9        in answering Question No. 2?

10    A.    Correct.

11    Q.    Let's go to Question No. 3. What was

12        Mr. Abron's answer to that? -- or your notes

13        about the answer?

14    A.    Steam disinfectants, use chemical. Use warm

15        water, barbicide, the ultra rays.

16    Q.    Okay. Before you talked about wet and dry

17        sterilization. Can you explain to me -- or

18        do you know what ultrarays means?

19    A.    No.

20    Q.    And, I'm sorry, steam and then what was the

21        next word after steam?

22    A.    Steam disinfectants.

23    Q.    Do you know what the difference is between

24        the steam disinfectant or wet or dry

48

1        sterilization?

2    A.    No.

3    Q.    Let's go to Question No. 1 under Section No.

4        2. What were your notes for that answer?

5    A.    Check appointments, tools, then cutting

6        procedure. I order my supplies in my shop.

7        I supervise three other barbers. Retail

8        experience.

9    Q.    Going to the next question, Question No. 2

10        under Section 2, what were your notes under

11        that section?

12    A.    I would try and treat and send them right to

13        the nurse.

14    Q.    All right. Going to the next section,

15        Section 3, Question No. 1, what were the

16        notes you made --

17    A.    I try to be nice guy, but you know when to

18        say no.

19    Q.    There's also, it looks like, a handwritten

20        note right above the -- what you just read

21        right beside the question, not on the line,

22        and I don't know what that word is.

23    A.    Inmates.

24    Q.    Do you know what you're referring to with

**49**

1     the inmates? Is that something that you
2     would have written?
3 A.  That is my handwriting, yes.
4 Q.  Okay. And I asked you a couple questions at
5     once there. It is your handwriting. Do you
6     know what it means or why you wrote it
7     there?
8 A.  The question would be specific to inmates
9     and not coworkers.
10 Q.  So are you saying that you would have read
11     the question, or Mr. Smith read the question
12     that describes the relationship you started
13     to establish with your coworkers that are
14     inmates? Are you saying you would have
15     changed the question a little bit?
16 A.  I don't recall.
17 Q.  All right. Going to Question No. 2 in that
18     Section 3, what were your notes in regards
19     to Mr. Abron's answer on that question?
20 A.  See where they -- I'm sorry, See where they
21     coming from. I don't -- or, I'm sorry, See
22     where they are coming from. Treat people as
23     they want to be treated. I should be able
24     to read my own handwriting.

**50**

1 Q.  I have the same problem. Let's go to answer
2     to Question No. 3. What was your answer on
3     that?
4 A.  Very important. I'm a decent person and can
5     talk with anybody. I deal with all people
6     and communicate.
7 Q.  Okay. And then go to Work History. What
8     was your notes in regards to Mr. Abron's
9     answer to Question No. 1 under Work History?
10 A.  Twenty-eight years as a barber, three years
11     corrections IYC Kewanee.
12 Q.  And what are your notes in regards to
13     Mr. Abron's answer to Question No. 2 in that
14     last section?
15 A.  I don't miss work. I have never missed a
16     day at Kewanee.
17 Q.  Going back to Question No. 2 in Section
18     Number 1, assume in that SA for Mr. Abron
19     meant same as above and he was telling you
20     about his experience which included both
21     experience in the correctional -- or the
22     Department of Corrections and also
23     experience at the Knox County Jail. Would
24     you find that that correctional experience

**51**

1     and experience in the Knox County Jail would
2     provide beneficial training for a candidate
3     with the Department of Correction barber
4     job?
5 A.  Yes.
6 Q.  What's the benefit of having somebody with
7     experience working with the inmates either
8     in jails or at a youth correctional center?
9     Why is that a benefit?
10 A.  Well, I don't know about youth centers.
11     I've never worked in a youth center, so I
12     would think there would be a big difference,
13     so that's not as much as a benefit. But I
14     would think at Knox County, you're dealing
15     with individuals that are incarcerated, so
16     obviously that experience would help you out
17     in this setting.
18 Q.  And I guess I was just trying to get you to
19     explain that as to why would that help you
20     out? What kind of benefit would you get
21     from that kind of experience?
22 A.  Again, I mean, dealing with those types of
23     individuals and then coming here and dealing
24     with somewhat similar individuals would give

**52**

1     you some experience that you would need --
2     or that would help you out if you, in fact,
3     were working there.
4 Q.  If you take out the -- both Exhibit 19 and
5     33 and put them side by side, you can look
6     at your notes for the answer to Question No.
7     2 for Mr. Shaw (sic) and Question No. 2 for
8     Mr. Abron and you'll see you gave Mr. Shaw
9     (sic) a 4 and Mr. Abron a 3 on that specific
10     question. Can you tell me what was it that
11     made you give a higher score to Mr. Thompson
12     in that category?
13 A.  Probably the 40 years experience.
14 Q.  In looking, comparing the answers to
15     Question No. 3 for Mr. Abron and
16     Mr. Thompson, can you tell me why again in
17     Section 1 you would have given a higher
18     score to Mr. Thompson in regards to the
19     sanitation and sterilization of barbershop
20     equipment?
21 A.  They're both good answers. Wet and dry
22     sterilizers is what I'm familiar with in
23     regards to what barbers do to sterilize
24     equipment.

53

1  Q.  When you say wet and dry sterilizers, why
2      don't you tell me how you're familiar with
3      that one.
4  A.  Just from what I have observed or have seen
5      at different facilities.
6  Q.  Okay. Well, what's a wet sterilizer?
7  A.  I don't know specifically. It's just what
8      I've -- it's the equipment that they use to
9      sterilize equipment.
10  Q.  Is it something called a wet and dry
11      sterilizer?
12  A.  It's a wet and dry process, chemical
13      process.
14  Q.  Mr. Abron in his response to the question
15      about inmate who had a cut talked about
16      taking the person or sending the person to a
17      nurse. Does Henry Hill have a nurse?
18  A.  Yes.
19  Q.  And how would a person -- if there was
20      somebody that's cut in the barbershop, would
21      a nurse come to the barbershop, or is the
22      person taken to the nurse, or how does that
23      work?
24  A.  Depends on the severity of the injury.

54

1  Q.  If it is the type of cut where somebody
2      could go to the nurse, how would they get to
3      the nurse?
4  A.  You would go through security staff, let
5      them know that you have an injury, and then
6      we would call Healthcare and let them know
7      that the inmate is coming over with an
8      injury.
9  Q.  So in order to get the cut inmate to the
10      nurse, somebody would have to be contacted
11      in regards to a guard about the person being
12      moved from one section to another?
13  A.  Correct.
14  Q.  And would there be similar types of
15      communication necessary in order for the
16      nurse to come to the barbershop?
17  A.  Correct.
18  Q.  I have a book here, and I'm not sure -- I
19      don't remember if we've marked this before
20      or not. Interview & Selection Criteria &
21      Techniques from the State of Illinois. Have
22      you ever seen this book before?
23  A.  Yes.
24  Q.  Is this something that you would receive

55

1      because you're a Rutan interviewer, or is
2      this something that you would get because
3      you're a warden or assistant warden, or do
4      you know how you made contact with this book
5      before?
6  A.  I've seen the book. I'm not sure when I've
7      received it.
8  Q.  There's a correctional facility in Canton;
9      is that right?
10  A.  Illinois River.
11  Q.  Would you have any knowledge one way or
12      another as to whether the Illinois River
13      barber position is different than the Henry
14      Hill barber position?
15  A.  No.
16  Q.  We had marked this as Exhibit 23, Interview
17      & Selection Quick Reference. Have you seen
18      this document before? Not sure?
19  A.  I'm not sure.
20  Q.  Okay. I'm going to -- realizing you may
21      never have seen this before, I'm going to
22      point you to page 15 of Exhibit 23 and have
23      you read paragraph no. 21. And you may
24      still be able to help me understand this a

56

1      little bit.
2  A.  The Illinois Supreme Court on April 24,
3      1997, in Denton versus Civil Service
4      Commission held that veterans are entitled
5      to an absolute hiring preference over
6      nonveterans of the same grade category where
7      the appointment is made from the eligible
8      list. Illinois must comply with this
9      decision. You must select a veteran if she
10      or he is on the open competitive eligible
11      list, or you may choose to leave the
12      position vacant. If there are no veterans
13      with A grades or the veterans with A grades
14      decline, then you may interview and select a
15      nonveteran with an A.
16  Q.  Do you know if that has anything to do at
17      all with the hiring of the barber position?
18  A.  No.
19  Q.  No, you don't know or, no, it does not have
20      anything?
21  A.  No, I don't know.
22  Q.  Okay. Do you have any knowledge as you sit
23      here today whether Mr. Abron is a veteran?
24  A.  No.

**57**

1    Q.    Do you know if Mr. Thompson was a veteran?

2    A.    No, I don't recall.

3    Q.    And you don't need to read this one out

4         loud, but I want you to review that

5         paragraph 20 on the same page.  Just give

6         me -- tell me when you're done reading that

7         paragraph.

8    A.    (Complies.)  Okay.

9    Q.    Way back at Exhibit 14 we talked about when

10        a selection could be taken out of rank

11        order, including rationale.  In reading

12        that, it appears to me that maybe

13        Affirmative Action might be a basis for

14        taking something out of rank order based on

15        an agency's wish to pass a higher rank

16        candidate.  Does that refresh your

17        recollection at all in regards to the prior

18        document about taking people out of rank

19        order?

20   A.    I'm not sure what you're asking.

21   Q.    I don't think it does -- it looks like an

22        agency, and I assume by reading this that

23        this probably is something prepared by

24        Central Management, it's not just for the

**58**

1         Department of Corrections, is that right, if

2         you know?

3    A.    I don't know.

4    Q.    Okay.  I'm just going to -- after you've

5         read the paragraph 20 about Affirmative

6         Action, does that provide you with anything

7         in regards to additional information from

8         any of your previous answers about

9         Affirmative -- I mean, does this help you

10        out in regards to whether Affirmative Action

11        applied to this barber position, and if it

12        did, how it would be applied to this hiring?

13   A.    It -- I don't know if it applied to this

14        hiring.

15   Q.    Okay.  That's fine.

16             MR. REHN:   I'm going to take just a

17        minute with Steve outside and be right

18        back.

19

20             (Whereby a short recess was

21             taken.)

22

23             MR. REHN:   Just a couple of other

24        follow-up questions.

**59**

1    BY MR. REHN:

2    Q.    In going through your notes from both

3         Mr. Thompson and Mr. Abron, I don't think I

4         saw anything about the type of neighborhood

5         Mr. Abron's practice was in -- business was

6         in or Mr. Thompson's business was in.  Do

7         you remember there being anything discussed

8         about where the different barbershops were

9         located in Galesburg?

10   A.    I would have to reference back to my

11        interview sheets to see if there was any

12        information provided.

13   Q.    Why don't you go ahead and take a look

14        through those interview information sheets.

15   A.    (Complies.)  No, I don't see anything about

16        neighborhoods.

17   Q.    You've just gone through both your interview

18        sheets for both Mr. Abron and Mr. Thompson,

19        right?

20   A.    Correct.

21   Q.    And in looking through those, would it be

22        fair to say there's nothing in your notes

23        for either Mr. Abron or Mr. Thompson that

24        talks about the neighborhood that their

**60**

1         business is in, right?

2    A.    Correct.

3    Q.    If that would have been an important factor

4         in your scoring of this interview, is that

5         something that you would have included in

6         your notes?

7    A.    I would include in my notes whatever the

8         question -- the response would be.

9    Q.    You're not able to write everything somebody

10        says down when they're answering the

11        question?

12   A.    I try to get most everything someone says.

13   Q.    Do you know where Mr. Abron's shop is

14        located in Galesburg?

15   A.    I have an idea.  I think I've seen it.

16   Q.    He's got a shop on Henderson Street.

17   A.    Yeah, I think I've seen it on Henderson

18        Street when I've gone by.  I think his name

19        is on the shop.

20   Q.    He has a sign outside that says Abron's Hair

21        Design that is right by Henderson Street,

22        which is one of the main streets in

23        Galesburg.  Is that where you remember

24        seeing it?

61

| 1 | A. | Yes. |
|---|----|------|

1  A.  Yes.
2  Q.  Would you have known where that shop was
3      when he was doing the interview, or is that
4      something you think you've learned since the
5      date that you did the interviews?
6  A.  After the interview.
7  Q.  Do you remember talking to the other
8      interviewer, Mr. Smith, at all, about the
9      location of the respective shops when you
10     were talking about the hiring of
11     Mr. Thompson and Mr. Abron -- or Mr. Abron?
12 A.  No, I don't remember doing that.
13 Q.  There was a complaint filed with the EEOC
14     sort of as the process to get this matter
15     rolling. Were you involved at all in
16     responding to the EEOC request for
17     information about the hiring?
18 A.  That was the warden's office that responded
19     to that.
20 Q.  Okay. And you weren't the warden at the
21     time the response was made?
22 A.  No, sir, Warden Hulick.
23 Q.  We've had a chance now to go through both of
24     your notes for both candidate interviews.

62

1      After you've looked at those notes, is there
2      anything else you remember outside of those
3      notes about the interview of Mr. Thompson or
4      Mr. Abron that you think was significant in
5      regards to the hiring decision?
6  A.  No.
7      MR. REHN:  I don't think I have
8      anything further.
9      MR. KLEIN:  I think I have just a
10     couple questions.
11
12 CROSS-EXAMINATION BY MR. KLEIN:
13 Q.  Could we show him -- do you have a copy of
14     Exhibit 18? Exhibit 18, the interview sheet
15     that Mr. Smith filled out on Larry Thompson,
16     could you look at the page, it's got a stamp
17     on the bottom right that says 353. There's
18     a Question 2 at the top. See what I'm
19     talking about?
20 A.  Yes.
21 Q.  Did Mr. Thompson -- or did Mr. Smith write,
22     Has shop in rough end of town? Does that
23     look like that to you?
24 A.  What question, I'm sorry?

63

1  Q.  Question 2 at the top of the page that's
2      stamped 353.
3  A.  That's correct.
4  Q.  Is it possible that that's something that
5      Mr. Thompson said and that you just didn't
6      write it down for some reason?
7  A.  Correct.
8  Q.  Do you know why you wouldn't have written it
9      down?
10 A.  No.
11 Q.  Would you not have written it down if it
12     doesn't seem significant?
13 A.  Either didn't seem significant or didn't
14     write it down because I didn't hear him say
15     it. Doesn't mean he didn't say it.
16     MR. KLEIN:  That's all I have.
17     MR. REHN:  I guess just for clearing
18     up on that.
19
20 REDIRECT EXAMINATION BY MR. REHN:
21 Q.  Are you saying you either thought it wasn't
22     significant or you didn't hear it? Do you
23     know which one it was?
24 A.  Probably didn't hear it. He may have said

64

1      it, I just didn't write it down. Not
2      necessarily that it wasn't significant. I
3      don't want to determine what's significant
4      or not. I want to write down everything
5      that I can that the candidate says.
6      MR. REHN:  I don't have anything
7      further.
8      MR. KLEIN:  Nothing further. If you
9      want to, you can have the opportunity to
10     review the transcript after it's completed
11     to make sure that everything was taken down
12     correctly. You won't be able to change
13     your answers, but if something -- if you
14     said one thing and something else was
15     written down, you can change that. Or you
16     can waive that if you don't want to deal
17     with it. It's up to you.
18     THE WITNESS:  I would like to review
19     it.
20     MR. KLEIN:  Okay. Then we'll reserve
21     signature.
22
23
24

65

```
1    STATE OF ILLINOIS  )
2    COUNTY OF KNOX     )

3

4              C E R T I F I C A T E

5        I, Amy S. Powers, CSP, PPP, a Notary Public
6    duly commissioned and qualified in the State of
7    Illinois, DO HEREBY CERTIFY that pursuant to
8    notice there came before me on the 6th day of
9    August 2007, at the Henry Hill Correction Center,
10   in the City of Galesburg, County of Knox, and
11   State of Illinois, the following named person, to
12   wit:
13

14            FRANK SHAW,

15

16   who was by me first duly sworn to testify to the
17   truth and nothing but the truth of his knowledge
18   touching and concerning the matters in
19   controversy in this cause and that he was
20   thereupon carefully examined upon his oath and
21   his examination immediately reduced to shorthand
22   by means of stenotype by me.
23       I ALSO CERTIFY that the deposition is a true
24
```

67

```
1              SIGNATURE PAGE
2    Steve Abron,                      )
3                      Plaintiff,      )
4              -vs-                    )  No. 06-1157
5    State of Illinois, Department     )
     of Corrections, Henry Hill        )
6    Correctional Center and Don       )
     Hulick, Warden, Individually,     )
7    Bill Smith, Business Admini-      )
     strator, individually, and        )
8    Frank Shaw, Assistant Warden,     )
     Individually and in their         )
9    official capacity,                )
10                   Defendants.       )

11       I hereby certify that I have read the
     foregoing transcript of my deposition, consisting
12   of pages _____ through _____ inclusive, and I do
     again subscribe and make oath that the same is a
13   true, correct, and complete transcript of my
     deposition given as aforesaid, with corrections,
14   if any, appearing on the attached correction
     sheet(s).
15
         Please check one:
16       _____ I have submitted correction(s).
17       _____ No corrections were noted.
18       Dated this _____ day of _____,
     A.D., 2007.
19
         SIGNED _____
20                         Frank Shaw
21       Subscribed and sworn to before me this
22   _____ day of _____, 2007.
23   _____
     Notary Public
24   My commission expires
     _____
```

66

```
1    record of the testimony given by the witness and
2    that the necessity of calling the court reporter
3    at time of trial for the purpose of
4    authenticating said transcript was also waived.
5        I FURTHER CERTIFY THAT I am neither attorney
6    or counsel for, nor related to or employed by,
7    any of the parties to the action in which this
8    deposition is taken, and further, that I am not a
9    relative or employee of any attorney or counsel
10   employed by the parties hereto, or financially
11   interested in the action.
12       IN WITNESS WHEREOF, I have hereunto set my
13   hand and affixed my notarial seal at Galesburg,
14   Illinois, this 10th day of August 2007.
15
16              s/Amy S. Powers
17       _____
         AMY S. POWERS
18       Certified Shorthand
         Reporter
19
20
21
22
23
24
```

"OFFICIAL SEAL"
Amy S. Powers
Notary Public, State of Illinois
My Commission Exp. 07/21/2009

E-FILED
Friday, 19 October, 2007  11:23:45 AM
Clerk, U.S. District Court, ILCD

Attachment #6

# CANDIDATE EVALUATION FORM

| | |
|---|---|
| | Date:  12-21-04 |

| | |
|---|---|
| Candidate Name: Larry Thompson | Soc. Sec. No.  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 |

| | |
|---|---|
| Agency:  **DEPARTMENT OF CORRECTIONS** | Division or Institution: Hill Correctional Center |

| | | |
|---|---|---|
| Position Title: Barber | Position Number: 04250-29-98-280-00-01 | Pin #  0104 |

*In using the Candidate Evaluation Form: (a) Prior to the interview, complete the "Hiring Criteria" and "% Weight" sections of the form; (b) Following the interview, use the "Comments" space to indicate experience or qualifications the candidate possesses related to each hiring criteria; (c) Average the "Points" from the interview questionnaire for each hiring criteria or indicate a numerical "Rating" for each hiring criteria; (d) Calculate the "Weighted Score" for each hiring criteria by multiplying the "% Weight by the Points/Rating"; and (e) Calculate the "Overall Score by summing the "Weighted Scores" for each of the hiring criteria.

| HIRING CRITERIA | COMMENTS | PERCENT WEIGHT | PTS / RTG | WTD SCORE |
|---|---|---|---|---|
| EDUCATION, TRAINING AND SKILLS:  Requires possession of a valid Illinois License as a barber. Requires training necessary to qualify as a barber, and the skills necessary to maintain and supervise barber facility and staff. Requires elementary knowledge of first aid. | The candidate has 40 years experience. He graduated from Lincoln Barber College in 1964. Mr. Thompson manages his own shop and performs all associated duties such as scheduling appointments, purchasing supplies, payment of invoices and maintaining safety and sanitation. | 30% | 3.7 | 1.11 |
| JOB KNOWLEDGE AND EXPERIENCE:  Requires experience necessary to qualify as a journeyman barber. Requires working knowledge of barbering techniques, methods, practices and the operation, maintenance and sterilization of barber shop tools and equipment. | As manager of his own shop that is subject to all rules pertaining to sanitation in order to keep his state license, the candidate has a working knowledge of current laws. The candidate expressed a thorough knowledge of equipment sanitation procedures. | 30% | 3.5 | 1.05 |
| INTERPERSONAL RELATIONS: Must be capable of supervising and instructing inmate workers in performing various barbering services. | Candidate indicated that his shop in is an economically depressed area, and he is use to serving a wide range of personnel. He has never had any problems and no harassment charges in his entire career. He believes in treating people as he would like to be treated. | 25% | 3.0 | .75 |
| WORK HISTORY:  Requires work history related to the total operation of a barbering facility, the safekeeping of barbering tools and the ability to perform all tasks usually associated with journeyman barbers. | In addition to managing his own shop, the candidate also works nights in a second shop in another town. This indicates a diversity and strong work ethic. The candidate has only missed 3 sick days in 22 years, has never been in the hospital, and reports to work on time. | 15% | 3.5 | .525 |

**EXHIBIT**

tabbies

H

| HIRING CRITERIA | COMMENTS | PERCENT WEIGHT | PTS / RTG | WTD SCORE |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**AFFIDAVIT:** "I certify that the hiring criteria and interview questions related to this employment decision were developed prior to initiating the candidate interview process. Furthermore, I certify that political party affiliation, support or lack thereof were not discussed or considered at any point in the interview process."

| Interviewing Officer(s) (Typed): Frank Shaw, Assistant Warden of Operations William Smith, Business Administrator II | | OVERALL SCORE: | 3.43 |
|---|---|---|---|
| Interviewing Officer(s) Signature(s): s/Frank Shaw s/William Smith | Title(s): Assistant Warden of Operations Business Administrator II | Date: 12/22/04 | |

Attachment #8

---

## FOLEY, MARGARET

**From:** NUNES, JESSICA
**Sent:** Wednesday, December 22, 2004 12:41 PM
**To:** FOLEY, MARGARET
**Subject:** RE: Hil Correctional Center, Barber Interviews.

Please proceed. I will submit the memo today.

-----Original Message-----
**From:** FOLEY, MARGARET
**Sent:** Wednesday, December 22, 2004 8:56 AM
**To:** NUNES, JESSICA; GUMBLE, LORI
**Cc:** HULICK, DON; SHAW, FRANK
**Subject:** Hil Correctional Center, Barber Interviews.

The following are the scores from our Barber Rutan interviews, held on 12/21/04:

| | |
|---|---|
| Larry Thompson | 3.43 |
| Steven Abron | 3.22 |
| Samuel Schaumleffel | 2.76 |
| Brian Wilkinson | 2.66 |
| Gaylen Elliott | 2.59 |
| James Anderson | 2.39 |
| John Dredge | 2.37 |
| Loren Conard | 2.24 |

We are asking permission to hire Larry Thompson, and are requesting the Governor's memo.

*Margaret Foley*
*Human Resources Assistant*
*Hill Correctional Center*

---

**EXHIBIT**

I

# EMPLOYMENT DECISION FORM

| | |
|---|---|
| Candidate Name:  Larry Thompson | Soc. Sec. No.:  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 |

| | |
|---|---|
| Agency:  Department Of Corrections | Division/Institution:  Hill Correctional Center |

| | | |
|---|---|---|
| Position Title:  BARBER | Position Number:  04250 - 29 - <br> 98 - 280 - 00 - 01 | Transaction Code: BA045 |
| Transaction Description:  Exempt Appointment | | Pin #  104 |

## CANDIDATE EVALUATION

| | | |
|---|---|---|
| Overall Score   3.435 | Selected Candidate's Ranking   1 | # Candidates Interviewed  8 |

## JUSTIFICATION

Explain the reasons for hiring the selected candidate with others that were interviewed.  If selection is out of rank order, include rationale.

This candidate has the necessary education, training and work history which placed him as the most qualified candidate for the barber position.

All of the candidates interviewed had extensive experience as a barber.  Mr. Thompson had additional skills demonstrated during the interview process, which made him an excellent selection.

**EXHIBIT**

J

**AFFIDAVIT:** "I certify that the hiring criteria and interview questions related to this employment decision were developed prior to initiating the candidate interview process.  Furthermore, I certify that hiring decisions documented on this form have not been decided on the basis of political party affiliation, support or lack thereof."

| | |
|---|---|
| Director's Name: (typed) <br> Robert E. Walker Jr. | Title: <br> Director |
| Director'  <br>          s/Roger E. Walker, Jr. | Date: <br> 01-19-05 |

DC 5654 (8/95)
IL 426-16071

3

1 IT IS HEREBY STIPULATED by and between the
2 parties hereto and their respective attorneys that
3 this is a deposition on oral interrogatories taken
4 pursuant to notice to the attorneys of record and
5 pursuant to the provisions of the Code of Civil
6 Procedure and the Rules of the Supreme Court of
7 Illinois.
8      That the deposition may be taken before
9 Connie L. Boyle, CSR, a Notary Public of Tazewell
10 County, Illinois, on the 9th day of August A.D.
11 2007, at Galesburg, Illinois.
12      IT IS FURTHER STIPULATED that the reading
13 and signing of the deposition by the witness is
14 hereby waived and that the transcript or any part
15 thereof may be produced at trial for any appropriate
16 purpose without the necessity of calling the said
17 Connie L. Boyle to testify as to the authenticity or
18 correctness of said transcript, except the attorneys
19 of record shall have thirty days from receipt of
20 said transcript in which to call to the attention of
21 said reporter any errors or omissions.
22
23

---

1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

4 Steve Abron,                    )
5              Plaintiff,         )
6        vs.                      ) 06 1157
7 State of Illinois,              )
  Department of Corrections,      )
8 Henry Hill Correctional         )
  Center and Don Hulick,          )
9 Warden, Individually, Bill      )
  Smith, Business                 )
10 Administrator, individually,   )
   and Frank Shaw, Assistant      )
11 Warden, Individually and in    )
   their official capacity,       )
12                                )
                  Defendants.     )
13
14
15
16     DEPOSITION OF DON HULICK, taken before
17 Connie L. Boyle, CSR, Illinois License No.
18 084-002383, a Notary Public, on the 9th day of
19 August A.D., 2007, at 10:00 a.m., at 5 East Simmons
20 Street, in the City of Galesburg, County of Knox,
21 and State of Illinois.
22
23

COPY

---

4

1      MR. REHN:  We are here today for the deposition
2 of Warden Hulick.  And before I start asking
3 questions, for the record, I want to make clear
4 that both sides have agreed to take this
5 deposition telephonically.  I am not appearing
6 in the same room as the Warden and neither is
7 the court reporter.  The court reporter has
8 sworn him, Mr. Hulick, in over the phone.  I
9 have no objection to the same, and it is my
10 understanding Mr. Klein has no objection also.
11 Is that correct?
12 MR. KLEIN:  That is correct.
13 MR. REHN:  Thank you.  All right.  And now I'll
14 start asking questions to Mr. Hulick.
15      First off, Mr. Hulick, we are here today
16 for a deposition.  I am going to ask you some
17 background questions about yourself and then a
18 few questions about the hiring process in
19 general and questions about the decision in
20 regards to the hiring of the barber position at
21 Henry Hill when Larry Thompson was hired for
22 the position and Steve Abron applied for the
23 position.

---

2

1    PRESENT:

2 JOHN C. REHN, ESQ.,
  ATTORNEY AT LAW
3 5 East Simmons Street
  Galesburg, Illinois  61401
4        On behalf of the Plaintiff.

5 Also Present:  John Abron

6    PRESENT VIA TELEPHONE:

7 THOMAS KLEIN, ESQ.,
  ATTORNEY AT LAW
8 500 South Second Street
  Springfield, Illinois  62706
9        On behalf of the Defendants.

10
11
12
13           INDEX
                          Page
14 DON HULICK
15 Direct Examination by Mr. Rehn      5
16 Certificate of Reporter            23
17
18
19
20
21
22
23

EXHIBIT

tabbies   K

---

Deposition of Don Hulick

08/09/2007

**5**

1      Have you been deposed before, Mr. Hulick?

2   THE WITNESS: Yes, sir, I have.

3   MR. REHN: The rules of depositions are pretty

4   simple, straightforward. First off, I want you

5   to answer out loud. That is especially true

6   since we are in a different room. If you give

7   me a head nod for a yes or a no, I won't know

8   what is going on.

9      The other thing is try to wait until I get

10   my entire question out before you answer. That

11   may be more difficult here because you won't

12   see whether my mouth is still attempting to

13   move. But if we are both talking at the same

14   time, it is impossible for the court reporter

15   to accurately get everything down, okay?

16   THE WITNESS: All right. Sir.

17   MR. REHN: Thank you very much.

18

19          DON HULICK,

20   having been first duly sworn, was examined and

21   testified upon his oath as follows:

22

23   DIRECT EXAMINATION BY MR. REHN:

**6**

1   Q. Why don't you tell me what your job is now,

2      what you do for a living.

3   A. I am the warden at Menard Correctional Center.

4   Q. And how long have you been the warden there?

5   A. Since April 1st of 2006.

6   Q. And what did you do before you became the

7      warden at Menard?

8   A. I was the warden of Illinois River Correctional

9      Center.

10   Q. Is that in Canton?

11   A. Yes, sir, that is correct.

12   Q. And how long were you the warden there?

13   A. Approximately a year.

14   Q. What did you do before you did that?

15   A. I was the warden at Hill Correctional Center.

16   Q. And it is my understanding that you were the

17      warden at the Hill Correctional Center when

18      Larry Thompson was hired as a barber. Does

19      that sound correct to you?

20   A. I believe that is correct, sir, yes.

21   Q. Okay. What background, if any, do you have in

22      regard to the Rutan hiring process?

23   A. I am Rutan certified.

**7**

1   Q. And is it my understanding that you go down

2      maybe to Springfield for some training on that,

3      is that correct?

4   A. That is correct, yes, sir.

5   Q. Would you have been Rutan certified when you

6      were the warden of Henry Hill?

7   A. Yes, sir.

8   Q. Have you yourself participated in the Rutan

9      interview process?

10   A. No, sir.

11   Q. As warden of Henry Hill, what would your

12      involvement be in the discussion to hire an

13      applicant for the barber position when you were

14      the warden at Henry Hill?

15   A. I am sorry, my responsibility, you say, or -- I

16      missed that part.

17   Q. I think I said involvement or responsibility.

18      I'll ask it as responsibility. What would your

19      responsibility have been in regards to the

20      hiring of a barber at the Henry Hill facility

21      while you were the warden there?

22   A. Okay. I don't have any real part in the

23      process, of the hiring process. The interviews

**8**

1      occur, the scores are tallied, they are

2      forwarded, the final scores are forwarded to

3      Personnel or Human Resources, and from there

4      that gets forwarded to Springfield. And my

5      real involvement is simply that I sign the

6      personnel form prior to whoever is chosen to

7      work there, sign the personnel form before they

8      start.

9   Q. All right. Do you get involved at all in

10      regards to selecting who the people will be

11      that will conduct the interviews?

12   A. Sometimes, yes, sir.

13   Q. Do you know if you were involved in this

14      particular case in regards to picking Assistant

15      Warden Frank Shaw and Administrator William

16      Smith as the persons to conduct the interviews

17      for this position?

18   A. I believe I probably was.

19   Q. How do you go about choosing who it is that

20      will conduct the interviews?

21   A. You have, we know who is Rutan certified, and

22      we just kind of, depending on, you know, how

23      many people you are hiring that year, you don't

**9**

1  want the same ones to have to do every

2  interview, so you basically spread it around

3  between the Rutan interviewers.

4  **Q.**  In this case they were hiring for a barber

5  position.  Did you look for anybody with

6  specific knowledge as to barbering?

7  **A.**  No, to the best of my knowledge, I had no one

8  who was Rutan certified with that type of

9  knowledge.

10  **Q.**  As far as the Rutan hiring process goes, it is

11  my understanding that there is a specific list

12  of questions that are prepared or agreed upon

13  to be used before the interviews are conducted.

14  Is that your understanding of the process?

15  **A.**  That is correct.

16  **Q.**  Were you involved at all in the process of

17  choosing which questions to ask?

18  **A.**  No, sir.

19  **Q.**  What is your understanding in regards to how

20  those questions are selected?

21  **A.**  Oftentimes, especially if you have, as you

22  suggested a little bit ago, if you have an

23  interviewer who doesn't have any background in

**10**

1  that particular position, they'll contact

2  perhaps other barbers or other people that do

3  have a background to assist them with their

4  selection of questions.

5  **Q.**  And do you know how the questions were selected

6  in this particular case in regards to the

7  hiring of Mr. Thompson?

8  **A.**  No, sir, I do not.

9  **Q.**  As far as the weighing in the Rutan hiring

10  process, there is points that are given for the

11  answers to different questions, and then there

12  are weights given to the different points to

13  come up with a total point, I guess, a total

14  amount of points in regards to the hiring

15  process.  Were you involved at all in the

16  decision of how the different questions should

17  be weighted?

18  **A.**  No, sir.

19  **Q.**  Do you know if that is typically something,

20  that the decision as far as how the questions

21  are weighted, do you know if that is something

22  that is typically done at the prison where the

23  questions are being asked and where the

**11**

1  position is to be filled, or is that something

2  that is done somewhere else?

3  **A.**  I believe that it would be done at the prison,

4  yes, by the interviewers.

5  **Q.**  And I think that is consistent with my reading

6  of the Administrative Directive of the Illinois

7  Department of Corrections.  Would your

8  understanding of that be based upon

9  Administrative Directive, or would your

10  understanding be based upon in regard to your

11  belief that the people who are asking the

12  questions would be the ones who would make the

13  decisions in regards to weighting?

14  **A.**  That is based on a vague recollection of the

15  class that I took some years ago.

16  **Q.**  Okay.  That's fine.  How long ago was it that

17  you took that class?

18  **A.**  I would say I am having a hard time remembering

19  what I had for breakfast this morning these

20  days, but I believe it was probably six or

21  seven years ago.

22  **Q.**  Okay.  Do you ever recall --

23

**12**

1  (Off The Record Discussion)

2

3  **Q.**  Do you ever recall being involved in the hiring

4  of not, I am not, I am going more general than

5  just the hiring of Mr. Thompson in the barber

6  position here, but I am talking about all the

7  Rutan hiring at all of the prisons that you

8  have been a warden at, have you ever gotten

9  involved in trying to put forward an applicant

10  for a position that did not have the highest

11  Rutan scoring?

12  **A.**  No, sir.

13  **Q.**  Do you know whether a warden has the ability to

14  do that?

15  **A.**  I just recently reviewed something about that,

16  but I don't know that the warden has the

17  ability to do that.  I think I was thinking

18  that the director could do that, but --

19  **Q.**  When you say the director, who do you consider

20  the, who is the director?  What does that mean

21  to be?

22  **A.**  Director of the Department of Corrections.

23  **Q.**  Who is the Director of the Department of

13

1    Corrections?

2    A.   Roger Walker.

3    Q.   Where is he located?

4    A.   In Springfield, Concordia Court.

5    Q.   Did you know -- I am going to reword my

6         question.  Do you know Steve Abron?

7    A.   No, I don't.

8    Q.   Do you know Larry Thompson?

9    A.   I do now.

10   Q.   Did you know him prior to his hiring as a

11        barber at Henry Hill?

12   A.   No, sir.

13   Q.   Do you have any opinion as to whether it would

14        be a benefit when you are looking at hiring a

15        barber, that that barber has experience working

16        with inmates inside the Department of

17        Corrections?

18   A.   I think that there could be some benefit to

19        that, yes.

20   Q.   And do you think there is a significant

21        difference?  It sounds like you were the warden

22        actually at the Illinois River Correctional

23        Center and a warden at the Henry Hill

14

1         Correctional Center.  Is that correct?

2    A.   That is correct, sir.

3    Q.   Is there a significant difference between the

4         responsibilities of the barber at the Henry

5         Hill facility and the barber at the Illinois

6         River facility?

7    A.   In responsibilities, is that what you are

8         asking?

9    Q.   Yes.

10   A.   No, sir.

11   Q.   Broadening the questions beyond

12        responsibilities, is there any difference

13        between the two positions?

14   A.   Not to the best of my knowledge.

15   Q.   Would you know of any reason why experience

16        working with prisoners would be more important

17        at the Illinois Correctional Center in making a

18        hiring decision than at Henry Hill in making a

19        hiring decision for the barber position?

20   A.   I don't think there would be any difference

21        there.

22   Q.   Do you know anything about hiring preferences

23        in the Department of Corrections for veterans?

15

1    A.   In regards to Rutan?

2    Q.   No, just generally, and then I was going to

3         narrow it down to Rutan.

4    A.   All right, sir.  I do know for a correctional

5         officer trainee, that they are given veteran

6         preference points.

7    Q.   Is there veterans preference given for somebody

8         in the Rutan hiring process?

9    A.   Not that I am aware of, sir.

10   Q.   Can you explain, I guess there is a difference

11        between, what is the difference between

12        somebody that is a Rutan hiring, or going

13        through the Rutan hiring process and somebody

14        who is going through, I think you said

15        correctional officer trainee?

16   A.   That is not a Rutan interview process.

17   Q.   Okay.

18   A.   They do the testing, they do the actual written

19        test and they have to do a physical agility

20        test and then they do an oral interview, but it

21        is not Rutan.

22   Q.   Okay.  So it is your understanding that the

23        veterans preference would apply to people that

16

1         are not doing the Rutan process, but for Rutan,

2         the veteran preference would not come into

3         play?

4    A.   Not to my knowledge.

5    Q.   Who would be the best person who would actually

6         know that or know the most about that veterans

7         preference?

8    A.   Well, I would guess a representative from

9         personnel who would know personnel rules.

10   Q.   Okay.  As far as hiring for the barber

11        position, do you have any opinion as to the

12        significance of where the applicant's barber

13        shop was located in regards to the type of

14        neighborhood when trying to make a

15        determination as to whether a person would be

16        an appropriate candidate for the barber

17        position?

18   A.   I am going to have to read into what you mean

19        by kind of neighborhood.  I am guessing that

20        you mean culturally or --

21   Q.   Yeah, I am just trying to figure out, I think

22        there is, let me just put it this way.  I mean

23        if a person works in a rough neighborhood or a

Deposition of Don Hulick

08/09/2007

17

1    neighborhood that is not rough, does that make

2    any difference to you when you, in your mind

3    when are looking for an applicant for the

4    barber position?

5    A.  A rough neighborhood?

6    Q.  Yes.

7    A.  Would not necessarily make any difference to

8    me, no.

9    Q.  Do you have any understanding as to whether the

10   Rutan interviewers, people conducting the

11   interview are provided with copies of the

12   applications and/or resumes of the people that

13   are applying for the positions?

14   A.  I don't believe so.

15   Q.  Do you know why that is?

16   A.  No, I don't, sir.

17   Q.  Do you know if the, are you familiar at all

18   with the Juvenile Correctional Center in

19   Kewanee?

20   A.  Somewhat, yes, sir.

21   Q.  And what kind of people are held at that

22   facility?  I assume they are young.

23   A.  Yes, sir, yes.  I am, I couldn't really answer

18

1    that with any certainty.  I have an idea, I

2    think that they obviously have juveniles up

3    there.  I think they are from all different

4    criminal backgrounds.  I believe they also have

5    some mental health.

6    Q.  Do you believe experience working at a facility

7    that is a juvenile facility inside the

8    Department of Corrections would have any

9    bearing in regards to a candidate having

10   Department of Corrections experience when they

11   are seeking a job at Henry Hill for the barber

12   position?  Would this experience be helpful?  I

13   guess is a better way to ask that question.

14   A.  It is honestly hard for me to answer that.  Not

15   having worked in juvenile, in my mind, I know,

16   you know, we have to do different things with

17   juveniles than we do adults, and we have

18   different treatment with juveniles than we do

19   adults.  I wouldn't say it is necessarily

20   apples to apples.

21   Q.  What kind of differences are you talking about?

22   A.  Well, and again, I am talking in generalities

23   because I don't know anything about the

19

1    juvenile process.

2    Q.  Okay.

3    A.  But I do know they go through some type of

4    different training and now they have actually

5    separated themselves because they didn't want

6    to be the same as the adult division.

7    Q.  I think one of the things that is important for

8    the barbers inside the Department of

9    Corrections would be to make sure that the

10   barber instruments, such as the scissors and

11   other tools, are kept track of and inventoried

12   and the inmates don't get those.  Are you

13   familiar with that?

14   A.  Yes, sir.

15   Q.  Would you agree that would be equally important

16   at a juvenile facility like the Kewanee one?

17        MR. KLEIN:  I will make a foundation objection,

18   but you may answer.

19        THE WITNESS:  Yes.

20   BY MR. REHN:

21   Q.  As far as the hiring of Mr. Abron, or the

22   hiring of Mr. Thompson and Mr. Abron's

23   application for this position, after the hiring

20

1    decision was made, Mr. Abron filed a complaint

2    with the EEOC, and it appears as though in July

3    of 2005 you wrote a letter relating to that

4    complaint.  Are you familiar with that letter?

5    A.  Yes, sir.

6    Q.  And I don't know if you have a copy of that

7    with you or not.  It was bate marked 00013 and

8    00014.  Do you have that document in front of

9    you?

10   A.  I do, sir.

11   Q.  Thank you.  Is this a letter that you wrote?

12   A.  Yes, sir.

13   Q.  Okay.  I think you said in the start of the

14   letter that you believe the allegations about

15   the hiring decision being based on race were

16   false.  Do you see that?

17   A.  Yes, sir.

18   Q.  What kind of investigation did you do, if any,

19   in regards to the hiring decision before making

20   that statement?

21   A.  None, sir.

22   Q.  Okay.  It looks like you maybe had collected at

23   least the documents relating to the hiring.  Is

**21**

1    that right?

2   A.   That is correct, sir.

3   Q.   But other than that, that would be the, that

4    sounds like that is all you did in regards to

5    investigating it. Is that correct?

6   A.   That would be correct.

7   Q.   After writing that letter, did you do anything

8    in regards to investigating it any further?

9   A.   No, sir.

10   Q.   In the second page of that letter, you indicate

11    that Larry Thompson's qualifications look to be

12    excellent. Do you know what you were basing

13    that statement upon?

14   A.   Not at this point I don't, sir.

15   Q.   And I assume your answer would be the same in

16    regards to Steve Abron's qualifications, which

17    is your next sentence?

18   A.   Yes, sir.

19   Q.   And I think at the end of that paragraph you

20    stated, "I was not involved in the interviewing

21    process." And that is similar to what you have

22    said today, it sounds like your involvement was

23    limited to selecting the people who would do

**22**

1    the interviews. Is that right?

2   A.   That would, yes, sir, that would be correct.

3   Q.   Do you know, going back to your Rutan training,

4    and I know it was awhile ago since you had the

5    class, do you know whether an interviewer is

6    able to consider answers to one question when

7    grading the answer to another question?

8   A.   I don't know that, sir.

9   Q.   Okay. And I am assuming, I guess I'll ask you

10    this, do you know anything about the

11    disinfecting of barber shop tools in the

12    Department of Corrections?

13   A.   No, sir.

14   Q.   I am going to put you on hold real quick, I

15    think we may be very close to the end of this

16    deposition. I will be right back. Is that

17    okay?

18   A.   Yes, sir.

19

20    (Off The Record Discussion)

21

22   Q.   One other area of questions I forgot to ask you

23    about was the wages and benefits. Do you know,

**23**

1    this position, I want to say it was around

2    $54,000, $58,000, it was in the $50,000s as far

3    as the amount of salary. Do you know how that

4    salary would have changed, if at all, between

5    the time of hiring and today's date?

6   A.   No, I have no idea, sir.

7   Q.   Do you have any, in regards to how the value of

8    benefits of employees are calculated or

9    figured, do you know if there is a percentage

10    of salary that they are figuring what the

11    benefits are worth or what -- let me just ask

12    it that way first.

13   A.   No, I don't.

14   Q.   Do you, if we are trying to figure out the

15    benefits of the value, or the value of the

16    benefits, I can't say that right, the value of

17    the benefits for the barber position, where

18    would you go to try to figure that out?

19   A.   You would have to go through Personnel in

20    Springfield.

21   Q.   And do you know a person at Personnel in

22    Springfield who would be the right person to

23    contact for that type of question if you are

**24**

1    trying to figure that out?

2   A.   Rebecca Shuster is the head of Personnel.

3    MR. REHN: I think that is all I have, Tom.

4    Before we go, I know the court reporter wants

5    to know if you guys want to order the

6    transcript. But do you have any questions?

7    MR. KLEIN: I don't have any questions.

8    MR. REHN: Okay. I thank you. You want to

9    talk to him about signature?

10    MR. KLEIN: If you want to, you can review the

11    transcript after it is complete and make sure

12    everything is taken down correctly. Do you

13    want to do that?

14    THE WITNESS: I'll waive.

15    MR. KLEIN: We will waive signature.

16    MR. REHN: Do you want a copy of the

17    transcript, Tom?

18    MR. KLEIN: Yes.

19

20      FURTHER DEPONENT SAYETH NOT.

21      SIGNATURE WAIVED BY AGREEMENT.

22

23

25

1   STATE OF ILLINOIS )
                      ) SS.
2   COUNTY OF TAZEWELL)


3

4

5           C E R T I F I C A T E

6

7       I, Connie L. Boyle, CSR, a Notary Public duly

8   commissioned and qualified in and for the State of

9   Illinois, DO HEREBY CERTIFY that pursuant to notice,

10  there came before me on the 9th day of August, A.D.,

11  2007, at 5 East Simmons Street, in the City of

12  Galesburg, County of Knox, and State of Illinois,

13  the following named person to wit:

14          DON HULICK

15  who was by me first duly sworn to testify to the

16  truth and nothing but the truth of his knowledge

17  touching and concerning the matters in controversy

18  in this cause and that he was thereupon carefully

19  examined upon his oath and his examination

20  immediately reduced to shorthand by means of

21  stenotype by me.

22      I ALSO CERTIFY that the deposition is a true

23  record of the testimony given by the witness, that

26

1   the reading and signing of the deposition by said

2   witness were expressly waived, and that the

3   necessity of calling the court reporter at time of

4   trial for the purpose of authenticating said

5   transcript was waived.

6       I FURTHER CERTIFY that I am neither attorney or

7   counsel for, nor related to or employed by, any of

8   the parties to the action in which this deposition

9   is taken, and further, that I am not a relative or

10  employee of any attorney or counsel employed by the

11  parties hereto, or financially interested in the

12  action.

13      IN WITNESS WHEREOF, I have hereunto set my hand

14  and affixed by notarial seal this 11th day of

15  August, A.D., 2007.

16

17

18      _____

        CONNIE L. BOYLE,

19      Certified Shorthand Reporter

20

21

22

23

January 31, 2005

Attachment #4

Hill Correctional Center
ATTN' Margaret A. Foley
600 Linwood Road
P.O. Box 1327
Galesburg, IL 61401

Dear Ms. Foley:

I received a letter informing me that the position was filled with another candidate for the Barber position. As a State Vendor at Illinois Youth Center in Kewanee, please furnish me reason(s) for non-appointment.

Sincerely,

s/Steve Abron

State Abron
427 South Henderson Street
Galesburg, IL 61401

FEB 2005
Received
Personnel

EXHIBIT
tabbies'
L

(05/17/07)    00018



Attachment #5

**Illinois**
Department of
**Corrections**

**Rod R. Blagojevich**
Governor

**Roger E. Walker Jr.**
Director

Hill Correctional Center / 600 Linwood Road / P.O. Box 1327 / Galesburg, IL 61401 / Telephone: (309) 343-4212 / TDD: (800) 526-0844

February 2, 2005

Steve Abron
427 South Henderson Street
Galesburg, IL 61401

Dear Mr. Abron:

I am in receipt of your letter requesting the reason for your non-appointment to the Barber position at Hill Correctional Center. Please be advised that you were not selected based on scores from the interview process.

Sincerely,

s/Margaret A. Foley

Margaret A. Foley
Human Resources Representative

**EXHIBIT**

M

MAY-23-2008 15:39 HILL CC - WARDEN'S OFFICE

## BARBER INTERVIEW

NAME OF APPLICANT: _Steven Adkin_

DATE OF INTERVIEW: _12-21-1_

INTERVIEWER'S NAME: _F. Shaw_    s/Frank Shaw

**EXHIBIT**

N

JAN-13-03 MON  1:45 PM   LOGAN CORRECTIONAL CNTR.    FAX NO.  217 735 1077              P. 3

## BARBER INTERVIEW

|   |                                    | WEIGHT | POINTS |
|---|------------------------------------|--------|--------|
| I. | EDUCATION, TRAINING AND SKILLS    | 30%    |        |

1.  What special skills do you believe you
    Possess which would enable you to successfully
    Perform the duties of this job and why?                    **4**

    OWN & OPERATE MY OWN
    SHOP, ADLON'S HAIR DESIGN (SINCE 1976)
    2) (N) EXP.
    3) CORRECTIVE
    (2) YR. ON CALL AT Knox County JAIL

2.  Describe how the education and training you
    Possess will help you perform the responsibilities
    Of this job.                                               **3**

    S/A
    SPECIS NATIONAL BARBER
    COLLEGE (GRAD 1973)

3.  Explain how to sanitize and sterilize barber
    Equipment.                                                 **3**

    STEAM, DISINFECT TD,
    USE CHEMICAL. USE
    WARM WATER BARBUCIDE,
    THE ULTRA FAST

EDUCATION TRAINING AND SKILLS TOTAL POINTS _____**3.3**_____

| | WEIGHT | POINTS |
|---|---|---|

II.  JOB KNOWLEDGE AND EXPERIENCE          30%

1.  Describe the specific job duties and responsibilities
Of your previous barbering position.                                    _4_

> Check Alligment, oil,
> often Cutter for Flora Sure.
> I order my supplies on
> my Shop - I Purcual
> (3) oider BARBNR.
> termil Exp.

2.  An inmate receives a cut while receiving a
Haircut and is bleeding moderately. What
Would you do?                                                          _3_

> I would Dry And
> Treri And Send them
> Right to the Nurse.

JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS __3.5__

| | WEIGHT | POINTS |
|---|---|---|

III.  INTERPERSONAL RELATIONS          25%

1.  Describe the relationship you strive to establish
With your co-workers. Inmnte.                                          _2_

> I Try to be Nice Guy But
> You know when to say
> No.

2.   How do you deal with people who have different
     Backgrounds and interests from yours?                    *2*

     _See where they me_
     _can at firm. mem_
     _People he they want to_
     _Be_ _Treated_,

3.   What role do you see communication playing
     In this job and how would you approach this role?         *3*

     _Very important. I'm A_
     _Nature person and can_
     _talk w/ anybody. I_
     _deal w/ all people and_
     _communicate._

INTERPERSONAL RELATIONS TOTAL POINTS ___2.3___

| IV.  WORK HISTORY | WEIGHT 15% | POINTS |
|---|---|---|

1.   Describe your work history and how it will
     Enable you to perform the responsibilities
     Of this job?                                              *4*

     _(2 yrs) as a Barber_
     _(3 yr) Correctional Iy( Kewanee_

2. How would you rate your use of time? How many
   Sick days have you used within the last 12
   Months? Explain any extenuating circumstances.

   4

   I Suit mops Wonk.
   I Have Newa mots li A
   Day At Kewaree

WORK HISTORY TOTAL POINTS ___ 4.0

RATING SCALE
0 - UNSATISFACTORY
1 – MARGINALLY MET
2 – ACCEPTABLE
3 – VERY GOOD
4 - EXCELLENT

# BARBER INTERVIEW

**NAME OF APPLICANT:**  _Steve Abron_

**DATE OF INTERVIEW:**  _12/21/04_

**INTERVIEWER'S NAME:** _s/William Smith_

EXHIBIT

O

## BARBER INTERVIEW

| | | WEIGHT | POINTS |
|---|---|---|---|
| I. | EDUCATION, TRAINING AND SKILLS | 30% | |

    1.   What special skills do you believe you          **4**
Possess which would enable you to successfully
Perform the duties of this job and why?

    28 yrs Exp
    Corr  3 yrs
    12 yr Knox on call Jail
    Black - Hair Care
    Knowledg Exprenc Common sevsl

    2.   Describe how the education and training you        **3**
Possess will help you perform the responsibilities
Of this job.

    28 - year
    Military  Natl Barber
    in Springfield -

    3.   Explain how to sanitize and sterilize barber        **3**
Equipment.

    Boil - Steam - disifect
    Ultra Roy - Chemical
    Barbecid - mix + set -
    Hot Soap Then clean -
    rinc - ultra Roy -

**EDUCATION TRAINING AND SKILLS TOTAL POINTS** _____

        10 ÷

               3.3              

.99

|  | **WEIGHT** | **POINTS** |
|---|---|---|

**II.   JOB KNOWLEDGE AND EXPERIENCE**     30%

1.   Describe the specific job duties and responsibilities
Of your previous barbering position.                4

check machine - Tool +
agt Book - check chemical
cut -. Safety - in +
out of prison
geral - order supplies.
also retail -

2.   An inmate receives a cut while receiving a
Haircut and is bleeding moderately. What
Would you do?                                        3

Anticeptic + Sand To
Nurse —
        good —

        7 ÷ 2 = 3.5

JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS _____    1.05

|  | **WEIGHT** | **POINTS** |
|---|---|---|

**III.   INTERPERSONAL RELATIONS**     25%

1.   Describe the relationship you strive to establish
With your co-workers.                               2

Experience from working
in institutions --
Be Nice but can
Say No —
Profession with humor

2. How do you deal with people who have different
   Backgrounds and interests from yours?

   2

   *Evaluate position*
   *treat as would*
   *be treated —*
   *No sent - No count*
   *No problems with customers —*

3. What role do you see communication playing
   In this job and how would you approach this role?

   3

   *Can call anyone in*
   *Commun —  various*
   *counseled - Know who*
   *to contact —*

   ? ÷ 2.3  =  [1.58]

**INTERPERSONAL RELATIONS TOTAL POINTS** _____

| | WEIGHT | POINTS |
|---|---|---|
| **IV. WORK HISTORY** | 15% | 4 |

1. Describe your work history and how it will
   Enable you to perform the responsibilities
   Of this job?

   *28 years*
   *Cou 3 yrs - Iyc*
   *on call - Knox -*

2.  How would you rate your use of time?  How many
    Sick days have you used within the last 12
    Months?  Explain any extenuating circumstances.

                                                        4

No problem don't miss
Work — None at
Kewanee —

_____

_____

_____

**WORK HISTORY TOTAL POINTS** _____

          8 ÷ 2 = 4 0

                              4.0 X 15    1.6

**RATING SCALE**
0 - UNSATISFACTORY
1 – MARGINALLY MET
2 – ACCEPTABLE
3 – VERY GOOD
4 - EXCELLENT

E-FILED
Friday, 19 October, 2007  11:24:07 AM
Clerk, U.S. District Court, ILCD

## BARBER INTERVIEW

NAME OF APPLICANT: _LARRY THOMPSON_

DATE OF INTERVIEW: _12-21-04_

INTERVIEWER'S NAME: _FRANK SHAW_  s/Frank Shaw

**EXHIBIT**

P

## BARBER INTERVIEW

I.   **EDERATION, TRAINING AND SKILLS**          <u>WEIGHT</u>   <u>POINTS</u>
                                                    30%

    1.   **What special skills do you believe you**          _2_
        **Possess which would enable you to successfully**
        **Perform the duties of this job and why?**

        HAVE CUT HAIR FROM ALL RACE
        + HAS. BEEN CUTTE
        HAIR (40) YEAR. GRADUATED
        IN 1964 FROM BARBER COLLEGE

    2.   **Describe how the education and training you**          _4_
        **Possess will help you perform the responsibilities**
        **Of this job.**

        Graduated 1964 Barber
        School - 40 yr. Exp.
        cut right hair.
        DOES the APlication

    3.   **Explain how to sanitize and sterilize barber**          _4_
        **Equipment.**

        WET + DRY STERLIZER.
        DEP COMBS IN BARBEING.
        ALWAYS KEEP THINGP CLEAN
        AND WIPED OFF.

**EDUCATION TRAINING AND SKILLS TOTAL POINTS** _3.7_

|  | | **WEIGHT** | **POINTS** |

**II.    JOB KNOWLEDGE AND EXPERIENCE**                30%

3

1.    Describe the specific job duties and responsibilities
Of your previous barbering position.

*I own a manage my own
Barber shop. I manage
my shop and order supplies.
I work by myself/no
Employee w/me.*

4

2.    An inmate receives a cut while receiving a
Haircut and is bleeding moderately. What
Would you do?

*I would stop cut to the
Hair. Call an officer
For Assistance and
Have treated by
Health Care Staff*

**JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS** 3.5

|  | | **WEIGHT** | **POINTS** |

**III.    INTERPERSONAL RELATIONS**                25%

3

1.    Describe the relationship you strive to establish
With your co-workers.

*I can get along w/
All people. I treat others
As they treat me. I have
No problem dealing w/
Inmates and will treat
them fair.*

1:06-cv-01157-JBM-JAG   # 44-6   Page 4 of 19

MAY-23-2007  15:44   HILL CC - WARDEN'S OFFICE          309 343 4287   P.16
JAN-13-03 MON  1:46 PM   LOGAN CORRECTIONAL CNTR.   FAX NO.  217 735 1077      P. 5

2.  How do you deal with people who have different          3
    Backgrounds and interests from yours?

*(handwritten)* Treat them the same as others. Can deal w/ all types of people. Treat them all the same.

3.  What role do you see communication playing              3
    In this job and how would you approach this role?

*(handwritten)* Communicate to get the job accomplished but not to the extent of being friends. Remember they are inmates.

**INTERPERSONAL RELATIONS TOTAL POINTS __3__**

|  | WEIGHT | POINTS |
|---|---|---|
| **IV. WORK HISTORY** | 15% | |

1.  Describe your work history and how it will             3
    Enable you to perform the responsibilities
    Of this job?

*(handwritten)* I have 40 yr. exp. of being a barber and have worked w/ all types of people.

2. How would you rate your use of time? How many
Sick days have you used within the last 12
Months? Explain any extenuating circumstances.

4

I'm on time Everyday And
Have only misses a Few
Days in the last 12 days.
Should be at work Everyday.

**WORK HISTORY TOTAL POINTS** 3.5

**RATING SCALE**
0 - UNSATISFACTORY
1 - MARGINALLY MET
2 - ACCEPTABLE
3 - VERY GOOD
4 - EXCELLENT

# BARBER INTERVIEW

**NAME OF APPLICANT:** _Larry Thompson_

**DATE OF INTERVIEW:** _12/21/04_

**INTERVIEWER'S NAME:** _s/William Smith_

**EXHIBIT**

Q

tabbies

1:06-cv-01157-JBM-JAG    # 44-6    Page 9 of 19

## BARBER INTERVIEW

| | | **WEIGHT** | **POINTS** |
|---|---|---|---|
| I. | EDUCATION, TRAINING AND SKILLS | 30% | |

1. What special skills do you believe you
   Possess which would enable you to successfully
   Perform the duties of this job and why?          **3**

   CUT All NATIONALITYS
   Knows wet & Dry CuTTing

2. Describe how the education and training you
   Possess will help you perform the responsibilities
   Of this job.          **4**

   40 yrs. Exp grad 1964
   Active Behind chair

3. Explain how to sanitize and sterilize barber
   Equipment.          **4**

   WeT Sterlizer or Dry
   Dip in barbicide —
   Keep Things clean
   in goneral

                                    11.0 ÷    3.? 

                                         ( 1.11 )

**EDUCATION TRAINING AND SKILLS TOTAL POINTS** _____

|  |  | **WEIGHT** | **POINTS** |
|--|--|--|--|

**II.  JOB KNOWLEDGE AND EXPERIENCE**   30%

1. Describe the specific job duties and responsibilities   **3**
   Of your previous barbering position.

   MANAYE & OWN Shop
   Order Supplos
   Handle Towols
   SeT hours

2. An inmate receives a cut while receiving a   **4**
   Haircut and is bleeding moderately.  What
   Would you do?

   STOP doing cuT —
   Would noT STArT if
   opon cuT
   CAll officers
   TroaT By HeaTh cno

   2:2      3.5      1.05

**JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS** _____

|  |  | **WEIGHT** | **POINTS** |
|--|--|--|--|

**III.  INTERPERSONAL RELATIONS**   25%

1. Describe the relationship you strive to establish   **3**
   With your co-workers.

   CAn get Along w.th
   Anyone
       TroaT Like I
   WAnT To be TroaTed
   NoT SmarT AlTing —

1:06-cv-01157-JBM-JAG    # 44-6    Page 9 of 19

2. How do you deal with people who have different
Backgrounds and interests from yours?

_3_

Has shop in Rough
end of Town —
can deal with All Type
of People ——
No Harasmat—

3. What role do you see communication playing
In this job and how would you approach this role?

_3_

Not too far bot can
work Anyone —
Inmates Are here for
A reason - Not To be
friends ——

9.0 ÷ 3    3.0    .75

INTERPERSONAL RELATIONS TOTAL POINTS _____

| | **WEIGHT** | **POINTS** |
| --- | --- | --- |
| | 15% | |

IV. **WORK HISTORY**

1. Describe your work history and how it will
Enable you to perform the responsibilities
Of this job?

_3_

.5

forty years experience
own his own shop
Be honest with people
Straight fwd —

2.  How would you rate your use of time? How many
    Sick days have you used within the last 12
    Months?  Explain any extenuating circumstances.

                                                            4

Only had 3 sick
days in 22 years
Never in hospital
In on Time ——

WORK HISTORY TOTAL POINTS _____    7.0 ÷ 2   3.5

.525

RATING SCALE
0 - UNSATISFACTORY
1 - MARGINALLY MET
2 - ACCEPTABLE
3 - VERY GOOD
4 - EXCELLENT

MAY-17-2007 16:30 STATEWIDE LEGAL SERVICES 509 343 4287 P.20/40

## BARBER INTERVIEW

NAME OF APPLICANT: Samuel Schaumkizel

DATE OF INTERVIEW: 12-21-04

INTERVIEWER'S NAME: F. Shaw    s/Frank Shaw

**EXHIBIT**

R

## BARBER INTERVIEW

I. EDUCATION, TRAINING AND SKILLS | **WEIGHT** 30% | **POINTS**

1. What special skills do you believe you Possess which would enable you to successfully Perform the duties of this job and why?

   **4**

   20 yr. owned my own Barbershop. (7) yr. in Stewery at Stateson & Smaude. Work well w/ Staff + Inmates.

2. Describe how the education and training you Possess will help you perform the responsibilities Of this job.

   **3**

   S/A

3. Explain how to sanitize and sterilize barber Equipment.

   **3**

   Wash + keep your hand Clean. Sanetize your Combs + Instrument. Can also use A Dry Sterlizer

EDUCATION TRAINING AND SKILLS TOTAL POINTS   **3.3**

| | | WEIGHT | POINTS |
|---|---|---|---|

**II.   JOB KNOWLEDGE AND EXPERIENCE**      30%

1.   Describe the specific job duties and responsibilities      *2*
   Of your previous barbering position.

I own and Operated My
Or- Shop In Monmith.
Ordered My Supplel.

_____

_____

2.   An inmate receives a cut while receiving a      *3*
   Haircut and is bleeding moderately.  What
   Would you do?

Wind call the Health
Care Unit. Send Inmate
To Health Care For
Treatment. Complete
Injury Report.

**JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS   _2.5_**

| | | WEIGHT | POINTS |
|---|---|---|---|

**III.   INTERPERSONAL RELATIONS**      25%

1.   Describe the relationship you strive to establish      *3*
   With your co-workers. Inmate

Good Rel- w/Inmate.
Be Firm and Fair.
Give the Inmate What
They Have Comat.

_____

2.   How do you deal with people who have different
     Backgrounds and interests from yours?                    _3_

     In Doest A Job. I
     Don't Look At Them no
     Bear Lesset. Treat
     All of Them the Same.

3.   What role do you see communication playing
     In this job and how would you approach this role?        _2_

     It Il with Runs A Freedoy.

INTERPERSONAL RELATIONS TOTAL POINTS _2.6_

| | WEIGHT | POINTS |
|---|---|---|
| IV.   WORK HISTORY | 15% | |

1.   Describe your work history and how it will               _3_
     Enable you to perform the responsibilities
     Of this job?

     20 yr. of Barber Exp.
     (7) yrs. In Servie/My
     Siteville + Sprxville.

2.  How would you rate your use of time?  How many          _2_
    Sick days have you used within the last 12
    Months?  Explain any extenuating circumstances.

    (4) DAYS LAST 12 months
    I don't MISS work unless
    Im really Sick.

    _____

    _____

WORK HISTORY TOTAL POINTS ____ 2.5 _____


RATING SCALE
0 - UNSATISFACTORY
1 - MARGINALLY MET
2 - ACCEPTABLE
3 - VERY GOOD
4 - EXCELLENT

# BARBER INTERVIEW

NAME OF APPLICANT:  Samuel Schaumleffel

DATE OF INTERVIEW:  12/21/04

INTERVIEWER'S NAME:  s/William Smith

**EXHIBIT**

S

## BARBER INTERVIEW

|  |  | WEIGHT | POINTS |
|--|--|--------|--------|
| I. | EDUCATION, TRAINING AND SKILLS | 30% | |

1.  What special skills do you believe you
    Possess which would enable you to successfully
    Perform the duties of this job and why?                    **4**

    20 yrs own shop
    Seven yrs in
    security — relates to
    inmates & staff —

2.  Describe how the education and training you
    Possess will help you perform the responsibilities
    Of this job.                                               **3**

    Lincoln Barber College 1964 —
    Master License.
            Secty 7 yrs IDOC

3.  Explain how to sanitize and sterilize barber
    Equipment.                                                 **3**

    Barbicid solution —
    soak —
    also use dry sterilize
    with tablet

EDUCATION TRAINING AND SKILLS TOTAL POINTS  __3.3__

            10 - 3 =                              .99

| | | WEIGHT | POINTS |
|---|---|---|---|
| **II.** | **JOB KNOWLEDGE AND EXPERIENCE** | 30% | |

1. Describe the specific job duties and responsibilities
   Of your previous barbering position.        2

   *Own – Operated shop*
   *all customers –*
   *Ordering Supplies*
   *Paid bills*

2. An inmate receives a cut while receiving a
   Haircut and is bleeding moderately. What
   Would you do?        3

   *call HCU*
   *injury Report – Send*
   *to HCU –*

**JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS** ___3.5___

5 ÷ 2     .75

| | | WEIGHT | POINTS |
|---|---|---|---|
| **III.** | **INTERPERSONAL RELATIONS** | 25% | |

1. Describe the relationship you strive to establish
   With your co-workers.        2

   *Keeps good rapport with*
   *inmate – would be*
   *firm – Inmates have*
   *rights – would be*
   *fair – Would run shop*
   *as c2 Bldg Now*

2.   How would you rate your use of time? How many
     Sick days have you used within the last 12
     Months? Explain any extenuating circumstances.

     _2_

     4 day sick time —
     Keep 40 on Books —
     use if need don't abuse —
     — Excellent attendance —
     _____  2. 5

WORK HISTORY TOTAL POINTS _____

                    5. 2      .37

RATING SCALE
0 - UNSATISFACTORY
1 – MARGINALLY MET
2 – ACCEPTABLE
3 – VERY GOOD
4 - EXCELLENT

E-FILED
Friday, 19 October, 2007  11:24:30 AM
Clerk, U.S. District Court, ILCD

# BARBER INTERVIEW

NAME OF APPLICANT: John Dredge

DATE OF INTERVIEW: 12/21/04

INTERVIEWER'S NAME: s/William Smith

EXHIBIT
T

## BARBER INTERVIEW

|  |  | **WEIGHT** | **POINTS** |
|---|---|---|---|
|  |  | 30% | |

I. **EDUCATION, TRAINING AND SKILLS**

    1. What special skills do you believe you
Possess which would enable you to successfully
Perform the duties of this job and why?

    *43 years — EASTMoline Lincoln*
*Hair Shop —*
*Sandburg — BUSINESS*

    **POINTS: 3**

    2. Describe how the education and training you
Possess will help you perform the responsibilities
Of this job.

    *Lincoln Barber 1961*

    **POINTS: 2**

    3. Explain how to sanitize and sterilize barber
Equipment.

    *Barbicide*
*Soap — Water*
*Tablots — dry Process*

    **POINTS: 2**

    *7÷3  2.33*    *.7*

**EDUCATION TRAINING AND SKILLS TOTAL POINTS** _____

|  | | WEIGHT | POINTS |
|---|---|---|---|

**II.    JOB KNOWLEDGE AND EXPERIENCE**     30%

1.    Describe the specific job duties and responsibilities    _3_
Of your previous barbering position.

go to
Work — CUT HAIR
Order — PAY Bills
DO MAINT
Does All BookKeeping
SecreTAr-1  8-5  8-1 SaT-

2.    An inmate receives a cut while receiving a    _3_
Haircut and is bleeding moderately.  What
Would you do?

Rubber gloves    Ⓧ
SepTic Powder
Call Medical People

6:2   3.0 x 30%  [1.9]

JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS _____

|  | | WEIGHT | POINTS |
|---|---|---|---|

**III.   INTERPERSONAL RELATIONS**     25%

1.    Describe the relationship you strive to establish    _1_
With your co-workers.

STAd offish — DonT mess
with me + I WonT mess
with you — DonT Take
Anything from me —

## BARBER INTERVIEW

|  | WEIGHT 30% | POINTS |
|--|--|--|

I.    **EDUCATION, TRAINING AND SKILLS**

1.   What special skills do you believe you
     Possess which would enable you to successfully
     Perform the duties of this job and why?

     _BARBER 40+ YEAR_
     _OWN (4) CITIZEN BARBASHOP_

     **3**

2.   Describe how the education and training you
     Possess will help you perform the responsibilities
     Of this job.

     _LINCOLN BARBER COLLEGE 6/62_
     _SANIBURG COURSE_

     **2**

3.   Explain how to sanitize and sterilize barber
     Equipment.

     _Use Barbecela_
     _Soap + Water_
     _Dry Process Virat Tablet_

     **2**

EDUCATION TRAINING AND SKILLS TOTAL POINTS __2.3__

|                                      | WEIGHT | POINTS |
|--------------------------------------|--------|--------|

**II.    JOB KNOWLEDGE AND EXPERIENCE**        30%

3

1.    Describe the specific job duties and responsibilities
Of your previous barbering position.

Get Equipment Ready
Cut Hair
Order Supplies
Clean up
Bookkeeping

2.    An inmate receives a cut while receiving a
Haircut and is bleeding moderately.  What
Would you do?

3

Put on Gloves And
use towel And saline
And if not better
Will Call Medical
People.

**JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS** ___3.0___

|                                      | WEIGHT | POINTS |
|--------------------------------------|--------|--------|

**III.    INTERPERSONAL RELATIONS**        25%

1

1.    Describe the relationship you strive to establish
With your co-workers.  Trusted

them items of I
want to Be trusted.
Be somewhat self

2. How would you rate your use of time? How many
   Sick days have you used within the last 12
   Months? Explain any extenuating circumstances.

4

_I wae workabt everyday._

**WORK HISTORY TOTAL POINTS** _____ 3.0 _____

**RATING SCALE**
0 - UNSATISFACTORY
1 - MARGINALLY MET
2 - ACCEPTABLE
3 - VERY GOOD
4 - EXCELLENT

## BARBER INTERVIEW

NAME OF APPLICANT: _John Dresbe_

DATE OF INTERVIEW: _12-21-07_

INTERVIEWER'S NAME: _F Shaw_    s/Frank Shaw

**EXHIBIT**

U

## BARBER INTERVIEW

|   |   | WEIGHT | POINTS |
|---|---|--------|--------|
| I. | EDUCATION, TRAINING AND SKILLS | 30% | |

1.   What special skills do you believe you
     Possess which would enable you to successfully
     Perform the duties of this job and why?                    3

     BARBER 40 + YEAR
     OWN (4) Citizen BarberSHOP

2.   Describe how the education and training you
     Possess will help you perform the responsibilities
     Of this job.                                               2

     Lincoln BARBER College 6/62
     SandBurg Courred

3.   Explain how to sanitize and sterilize barber
     Equipment.                                                 2

     Use Barbicade
     Soap + Water
     Dry Pwrced ultrat Tablets

EDUCATION TRAINING AND SKILLS TOTAL POINTS   2.3

|  | | **WEIGHT** | **POINTS** |
|---|---|---|---|

**II.   JOB KNOWLEDGE AND EXPERIENCE**          30%

1.   Describe the specific job duties and responsibilities
Of your previous barbering position.                                    3

*Get Equipment Ready*
*Cut Hair*
*Order Supplies*
*Clean Up*
*Bookkeeping*

2.   An inmate receives a cut while receiving a
Haircut and is bleeding moderately.  What
Would you do?                                                             3

*Put on Gloves and*
*Use Local Anti-Septic*
*And if it Don't stop,*
*Will Call Medical*
*People.*

**JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS ___3.0___**

|  | | **WEIGHT** | **POINTS** |
|---|---|---|---|

**III.   INTERPERSONAL RELATIONS**          25%

1.   Describe the relationship you strive to establish
With your co-workers.   *Inmates*                                       1

*Treat Them like I*
*Want to Be Treated.*
*Be Considerate*

2.  How do you deal with people who have different
    Backgrounds and interests from yours?

    _Treat Them All The_

    _Same._

    ___

    ___

    ___

                                                    _1_

3.  What role do you see communication playing
    In this job and how would you approach this role?

    _We must Communicate in_

    _Order to get the_

    _Job Completed._

    ___

    ___

                                                    _2_

**INTERPERSONAL RELATIONS TOTAL POINTS** _(.)_


|                | WEIGHT | POINTS |
|----------------|--------|--------|
| IV.  **WORK HISTORY** | 15%    | _2_    |

1.  Describe your work history and how it will
    Enable you to perform the responsibilities
    Of this job?

    _Barber 43 yr._

    ___

    ___

    ___

2.    How would you rate your use of time? How many
      Sick days have you used within the last 12
      Months? Explain any extenuating circumstances.

      _I was working Everyday._

WORK HISTORY TOTAL POINTS _____3.0_____

RATING SCALE
0 - UNSATISFACTORY
1 – MARGINALLY MET
2 – ACCEPTABLE
3 – VERY GOOD
4 - EXCELLENT

## BARBER INTERVIEW

**NAME OF APPLICANT:** _Gaylew Elliott_

**DATE OF INTERVIEW:** _12/21/04_

**INTERVIEWER'S NAME:** s/William Smith

```
┌─────────────────────┐
│      EXHIBIT        │
│         V           │
│      _____       │
└─────────────────────┘
```

## BARBER INTERVIEW

| | | | WEIGHT | POINTS |
|---|---|---|---|---|
| I. | EDUCATION, TRAINING AND SKILLS | | 30% | 4 |

    1.    What special skills do you believe you
Possess which would enable you to successfully
Perform the duties of this job and why?

*Experience Corr - 20 yrs -*
*2 yrs here -*
*41 years Experience*

    2.    Describe how the education and training you
Possess will help you perform the responsibilities
Of this job.    **4**

*a lot of corr*
*exp -*
*Working at Jill*
*now*

    3.    Explain how to sanitize and sterilize barber
Equipment.    **1**

*Barbicide liquid*
*spray*
*Dry chemical*

EDUCATION TRAINING AND SKILLS TOTAL POINTS _____

*9 ÷ 3*    *.09*

|  | **WEIGHT** | **POINTS** |
|---|---|---|

**II.  JOB KNOWLEDGE AND EXPERIENCE**      30%

1. Describe the specific job duties and responsibilities
Of your previous barbering position.      *3*

*East Molin CC — Keep inmates*
*supervis Inmate  busy —*
*1100 inmates — 4 full*
*Time 2 vols / Keep record*
*of cuts — clerk —  Keep-Peace*
*aster — shears — clipper —*

2. An inmate receives a cut while receiving a
Haircut and is bleeding moderately. What
Would you do?      *3*

*Have him escorted*
*to med unit —*
*use gloves —*

$6 \div 2 \quad 3 \quad \boxed{.09}$

**JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS** _____

|  | **WEIGHT** | **POINTS** |
|---|---|---|

**III.  INTERPERSONAL RELATIONS**      25%

1. Describe the relationship you strive to establish
With your co-workers.      *2*

*treat people like I*
*want to be treated*
*Careful about*
*language —*

2.  How do you deal with people who have different
    Backgrounds and interests from yours?

_1_

*if language problem*
*get help*
*No favoritism to white*
*guys — Works well*
*with minorities*

3.  What role do you see communication playing
    In this job and how would you approach this role?

_2_

*Important — if you*
*can communicate it*
*is good for all —*
*Don't dwell on why locked*
*up — if treat ok — that is*
*how they are led to*

$\boxed{.42}$

$5.3 \boxed{1.67} \times 25\%$

INTERPERSONAL RELATIONS TOTAL POINTS _____

| | WEIGHT | POINTS |
|---|---|---|
| IV.  WORK HISTORY | 15% | |

1.  Describe your work history and how it will
    Enable you to perform the responsibilities
    Of this job?

_4_

*Lincoln — 1961.*
*Bus College —*
*See 1 1.*

$5. \div 2 \boxed{2.5} \times 15 \boxed{.37}$

2. How would you rate your use of time? How many
   Sick days have you used within the last 12
   Months? Explain any extenuating circumstances.

Two weeks — Dad died
flu 2 days —
doesn't call off

WORK HISTORY TOTAL POINTS _____

**RATING SCALE**
0 - UNSATISFACTORY
1 – MARGINALLY MET
2 – ACCEPTABLE
3 – VERY GOOD
4 - EXCELLENT

## BARBER INTERVIEW

NAME OF APPLICANT: _Gaylen Elliott_

DATE OF INTERVIEW: _12-21-4_

INTERVIEWER'S NAME: _E. Sitha_ /    s/Frank Shaw

```
EXHIBIT
W
```

## BARBER INTERVIEW

| | | WEIGHT | POINTS |
|---|---|---|---|
| I. | EDUCATION, TRAINING AND SKILLS | 30% | |

1. What special skills do you believe you
   Possess which would enable you to successfully
   Perform the duties of this job and why?

   _Corrections (20 yrs.)_
   _Barber 41 yr._

2. Describe how the education and training you
   Possess will help you perform the responsibilities
   Of this job.

   _Lincoln Barber College 10-6-1_
   _Refresher Since 12/64_
   _Corrections/East Molone C.C. 20 yr._
   _Hill C.C. 2 yr._

   **4**

3. Explain how to sanitize and sterilize barber
   Equipment.

   _Leaves Barbicide / or_
   _Dry without ie ultra._
   _Spray Disinfectant._

   **1**

EDUCATION TRAINING AND SKILLS TOTAL POINTS ___3___

| | WEIGHT | POINTS |
|---|---|---|

**II.   JOB KNOWLEDGE AND EXPERIENCE**            30%

1.   Describe the specific job duties and responsibilities
Of your previous barbering position.                    3

*Supervise Inmates (6)
at Ess. Molars. Keep track (file)
of who Gets a Haircut.
(1) Clerk who is to Type & Do
Me.*

2.   An inmate receives a cut while receiving a
Haircut and is bleeding moderately. What
Would you do?                                           3

*Send Item to Health Care
Unit - use Glove*

**JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS** _____3_____

| | WEIGHT | POINTS |
|---|---|---|

**III.   INTERPERSONAL RELATIONS**               25%

1.   Describe the relationship you strive to establish
With your co-workers: *inmate.*                       2

*I Treat Them Like
I want To be Treated.
Respectful.*

2.  How do you deal with people who have different
    Backgrounds and interests from yours?

    _I my The Best I can_
    _To Communcate. Don't show_
    _Fav-tism Betwen Inmates_
    _Never use the "N"_
    _words._

3.  What role do you see communication playing
    In this job and how would you approach this role?

    _If yo. Can Communcate_
    _They Will Go Good._
    _Tream Them The Same way._

INTERPERSONAL RELATIONS TOTAL POINTS __1.67__

| | WEIGHT | POINTS |
|---|---|---|
| IV.  WORK HISTORY | 15% | 4 |

1.  Describe your work history and how it will
    Enable you to perform the responsibilities
    Of this job?

    _Lincoln Collehe 10-61_
    _20 yrs. Correction._
    _41 yrs. Barber_

MAY-21-2007  17:03   STATEVILLE_LEGAL SERVICES                                P.40/40

JAN-13-03 MON  1:46 PM  LOGAN CORRECTIONAL CNTR.   FAX NO.  217 735 1077   P. 0

2.  How would you rate your use of time? How many
Sick days have you used within the last 12
Months? Explain any extenuating circumstances.

*[handwritten notes]* 1

WORK HISTORY TOTAL POINTS ____ 2.5 ____

**RATING SCALE**
0 - UNSATISFACTORY
1 - MARGINALLY MET
2 - ACCEPTABLE
3 - VERY GOOD
4 - EXCELLENT

(05/20/07)  :00343

# BARBER INTERVIEW

NAME OF APPLICANT: _Loren Conard_

DATE OF INTERVIEW: _12/21/04_

s/William Smith

INTERVIEWER'S NAME: _____

```
┌─────────────────────┐
│     EXHIBIT         │
│                     │
│        X            │
│  _____  │
└─────────────────────┘
```

## BARBER INTERVIEW

|  | WEIGHT | POINTS |
|---|---|---|
|  | 30% |  |

I.   **EDUCATION, TRAINING AND SKILLS**

3

1.   What special skills do you believe you
     Possess which would enable you to successfully
     Perform the duties of this job and why?

     33yrs - 2 licenses
     Cosmtologst -
     all aspects -

2.   Describe how the education and training you
     Possess will help you perform the responsibilities
     Of this job.

     33yr  1872 Babre College
     1500 Cosmetoly 4-71 Lincoln

2

3.   Explain how to sanitize and sterilize barber
     Equipment.

     Combs - Sky Shape Soap - Sosh
     Barbicade - weT
     Than dry Sterilizer
     Shears or clipper heads
     Not left in As long -

2

**EDUCATION TRAINING AND SKILLS TOTAL POINTS** _____

7 ÷ 3    2.33        ( .70 )



(05/20/07)   00300

|  | WEIGHT | POINTS |
|---|---|---|

**II.   JOB KNOWLEDGE AND EXPERIENCE**                    30%

   1.    Describe the specific job duties and responsibilities          3
         Of your previous barbering position.

Own Shop  8-5
Barber — cut —
Sweep & Vacuum —
closing — clean sanitize — Bleach —
Ordering — Pay bills — Laundry —

   2.    An inmate receives a cut while receiving a          2
         Haircut and is bleeding moderately.  What
         Would you do?

cold compress
or Liquid Septic —

                    5 : 2    2.5    .75

**JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS** _____

|  | WEIGHT | POINTS |
|---|---|---|

**III.  INTERPERSONAL RELATIONS**                    25%

   1.    Describe the relationship you strive to establish          1
         With your co-workers.  ( inmates )

Professional BASIS

2. How do you deal with people who have different
   Backgrounds and interests from yours?

_2_

Willing To Learn

Does NOT See Color –



3. What role do you see communication playing
   In this job and how would you approach this role?

_2_

Need good communication
To get anywhere or
anything accomplished

5 ÷ 3     1.67 × 25%     (.42)

INTERPERSONAL RELATIONS TOTAL POINTS _____

|  | WEIGHT | POINTS |
|---|---|---|
|  | 15% |  |

IV.   WORK HISTORY

_2_

1. Describe your work history and how it will
   Enable you to perform the responsibilities
   Of this job?

33up Barber –
2 years at Cottonwood
Shelter core in maint.

2.  How would you rate your use of time? How many
    Sick days have you used within the last 12
    Months? Explain any extenuating circumstances.

    2 in 12 months —



WORK HISTORY TOTAL POINTS _____

RATING SCALE
0 - UNSATISFACTORY
1 - MARGINALLY MET
2 - ACCEPTABLE
3 - VERY GOOD
4 - EXCELLENT

E-FILED
Friday, 19 October, 2007  11:24:56 AM
Clerk, U.S. District Court, ILCD

## BARBER INTERVIEW

**NAME OF APPLICANT:** LOREN CONAXIS

**DATE OF INTERVIEW:** 12-21-04

**INTERVIEWER'S NAME:** F. Shaw   s/Frank Shaw

**EXHIBIT**

tabbies

Y

## BARBER INTERVIEW

|     |                                    | WEIGHT | POINTS |
|-----|------------------------------------|--------|--------|
| I.  | EDUCATION, TRAINING AND SKILLS     | 30%    |        |

1. **What special skills do you believe you Possess which would enable you to successfully Perform the duties of this job and why?**

   _2_

   33 yrs. Barber
   *Lic. Barber + Cosmetology.

2. **Describe how the education and training you Possess will help you perform the responsibilities Of this job.**

   _2_

   Lincoln Barber Shop - 4/71
   Coal Sanburg - Cosmetology

3. **Explain how to sanitize and sterilize barber Equipment.**

   _2_

   Combs in a Soap Solution and
   Then Rinse. Then Place in
   Barbericle and Then
   Dry Proces.

EDUCATION TRAINING AND SKILLS TOTAL POINTS  _2 33_

|  | **WEIGHT** | **POINTS** |
|---|---|---|

**II.     JOB KNOWLEDGE AND EXPERIENCE**          30%

1.   Describe the specific job duties and responsibilities          *3*
Of your previous barbering position.

> Open shop cut/trim, sweep
> Floor. Clean + Sanitize
> All Equipment + Furniture.
> Other All my own Equipment.

2.   An inmate receives a cut while receiving a          *2*
Haircut and is bleeding moderately. What
Would you do?

> Apply Cold Pack and if
> No - Use A Leaves Styptic.

**JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS**   *2.5*

|  | **WEIGHT** | **POINTS** |
|---|---|---|

**III.    INTERPERSONAL RELATIONS**          25%

1.   Describe the relationship you strive to establish          *1*
With your ~~co-workers.~~ Inmate

> Be a Professional when
> Working.

2.  How do you deal with people who have different
Backgrounds and interests from yours?                  2

I would Be ok want to
learn About different
Backgrounds. Try not to
See Color.

3.  What role do you see communication playing
In this job and how would you approach this role?      2

Without good Communication
You cani get Anythin t
Accomplletes)

INTERPERSONAL RELATIONS TOTAL POINTS ___1.67___

|  |  | WEIGHT | POINTS |
|---|---|---|---|
| IV. | WORK HISTORY | 15% | 2 |

1.  Describe your work history and how it will
Enable you to perform the responsibilities
Of this job?

35 yo. Barber
2 yo. Cottonwood Dealant
w/ Mean C (Harcort Imseach w

2.  How would you rate your use of time? How many
    Sick days have you used within the last 12
    Months? Explain any extenuating circumstances.

    3

    _Maybe taken (2) Days_
    _Off_

**WORK HISTORY TOTAL POINTS** ___2.5___


**RATING SCALE**
0 - UNSATISFACTORY
1 - MARGINALLY MET
2 - ACCEPTABLE
3 - VERY GOOD
4 - EXCELLENT

# BARBER INTERVIEW

NAME OF APPLICANT: _Brian Wilkerson_

DATE OF INTERVIEW: _12/21/04_

INTERVIEWER'S NAME: s/William Smith



**EXHIBIT**

Z

## BARBER INTERVIEW

|   |   |
|---|---|
| | **WEIGHT** **POINTS** |
| I.  **EDUCATION, TRAINING AND SKILLS** | 30% |

1.  What special skills do you believe you
    Possess which would enable you to successfully
    Perform the duties of this job and why?                              **2**

    _Shop- 6 years —_
    _Reqs on Sanulation_
    _good at cutting —_

2.  Describe how the education and training you
    Possess will help you perform the responsibilities
    Of this job.                                                          **3**

    _Davenport Barbor College_
    _2100 Peoria — Briggs — —_

3.  Explain how to sanitize and sterilize barber
    Equipment.                                                            **3**

    _clean with Brush_
    _Wash with Sink_
    _Barbiside — Sanitize_
    _clean combs let sat between each_
    _cut — change every 3 days_
    _Spray clippers — Neck strips —_

**EDUCATION TRAINING AND SKILLS TOTAL POINTS** _2.7_

    8 · 3=

|  | WEIGHT | POINTS |
|---|---|---|

**II.    JOB KNOWLEDGE AND EXPERIENCE**    30%

1.    Describe the specific job duties and responsibilities    3
Of your previous barbering position. —

Take care of customers
Clean Shop —
good communication
Pationt — Order Product —
Pay bills — keep good
Rep in Community —

2.    An inmate receives a cut while receiving a    4
Haircut and is bleeding moderately.  What
Would you do?

Notify Security —
call Hcu —
Rubbor gloves —
Apply Prossure —

**JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS**    3.5
7 ÷ 2

|  | WEIGHT | POINTS |
|---|---|---|

**III.    INTERPERSONAL RELATIONS**    25%

1.    Describe the relationship you strive to establish    2
With your co-workers. —

Keep on Professional
level Not Friendships
Strictly Business

2.  How do you deal with people who have different
    Backgrounds and interests from yours?                           2

    _Each Person has thoir_
    _own Personality_
    _Has cuT various_
    _cuts — different_
    _People —_

3.  What role do you see communication playing
    In this job and how would you approach this role?               2

    _officers Around Everyone_
    _Needs To Know whAt_
    _is going ON — Comm with_
    _workers →_

INTERPERSONAL RELATIONS TOTAL POINTS __2.0__

                              6 - 3

|                       | WEIGHT | POINTS |
|-----------------------|--------|--------|
| IV.  WORK HISTORY     | 15%    |        |

1.  Describe your work history and how it will
    Enable you to perform the responsibilities
    Of this job?                                                    1

    _Been A Barber 6 years_
    _Two man Shop —_
    _Started own business —_

2. How would you rate your use of time? How many Sick days have you used within the last 12 Months? Explain any extenuating circumstances.



3 Sick fAmily — Wife
IS RN CAN STAY
with fAmily —

**WORK HISTORY TOTAL POINTS** ___ 2.0

4 - 2 -- 2.0

**RATING SCALE**
0 - UNSATISFACTORY
1 - MARGINALLY MET
2 - ACCEPTABLE
3 - VERY GOOD
4 - EXCELLENT

## BARBER INTERVIEW

NAME OF APPLICANT: _Brian Welkenson_

DATE OF INTERVIEW: _12·21·04_

INTERVIEWER'S NAME: _F. Shaw_  s/Frank Shaw

**EXHIBIT**

AA

## BARBER INTERVIEW

|  | WEIGHT | POINTS |
|---|---|---|
| I.   EDUCATION, TRAINING AND SKILLS | 30% | 2 |

1.   What special skills do you believe you
Possess which would enable you to successfully
Perform the duties of this job and why?

(6) yrs. Barber Shop Business,
aware of Sanitation Procedures

2.   Describe how the education and training you
Possess will help you perform the responsibilities
Of this job.

**POINTS: 3**

*1 Davenport Barber College  21.00/hour
Easton Barber College - (continued)
1998

3.   Explain how to sanitize and sterilize barber
Equipment.

**POINTS: 3**

Clean / Brush
Wash - (water, sanitize)
In Barbercide (15-20 minutes)
Change Barbercide Every 3 Days

EDUCATION TRAINING AND SKILLS TOTAL POINTS __8.0__ | __2.7__

|  | WEIGHT | POINTS |
|---|---|---|

**II.   JOB KNOWLEDGE AND EXPERIENCE**    30%

1.   Describe the specific job duties and responsibilities    **3**
Of your previous barbering position.

*Mtnb Come of Cutomel*
*Clean shop, sweeping,*
*Pozr t w/ Chair*
*order supplee*
*Pay Bille*

2.   An inmate receives a cut while receiving a    **4**
Haircut and is bleeding moderately.  What
Would you do?

*Notify the Officer*
*And contrat the*
*Infermary. Put on Glove*
*And Apply 1st Aid if*
*Neeberry.*

**JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS** _8.0 7.0/3.5_

|  | WEIGHT | POINTS |
|---|---|---|

**III.   INTERPERSONAL RELATIONS**    25%

1.   Describe the relationship you strive to establish    **2**
With your ~~co-worker~~ INMATE.

*Keep it Profesional*
*Not Here To Create*
*Frennschteps. Just*
*Take Come of Business*

2.  How do you deal with people who have different
    Backgrounds and interests from yours?                                    *2*

    Theor The Come and
    Have No Desire Went
    Tribuity,

    _____

    _____

3.  What role do you see communication playing
    In this job and how would you approach this role?                        *2*

    Communicate w/ Those
    And work with Everyone.

    _____

    _____

    _____

INTERPERSONAL RELATIONS TOTAL POINTS ___6/2.0___

|  | WEIGHT | POINTS |
|---|---|---|
| IV. **WORK HISTORY** | 15% | |

1.  Describe your work history and how it will                               *2*
    Enable you to perform the responsibilities
    Of this job?

    8 yp. As A Barber

    _____

    _____

    _____

    _____

2. How would you rate your use of time? How many
Sick days have you used within the last 12
Months? Explain any extenuating circumstances.

*2*

Major Euses (3) Sick Days
And Other were For my
Kids.

WORK HISTORY TOTAL POINTS ___ 4 / 2.0

**RATING SCALE**
0 – UNSATISFACTORY
1 – MARGINALLY MET
2 – ACCEPTABLE
3 – VERY GOOD
4 - EXCELLENT

## BARBER INTERVIEW

NAME OF APPLICANT: _James Anderson_

DATE OF INTERVIEW: _12/21/04_

INTERVIEWER'S NAME: s/William Smith

**EXHIBIT**

BB

## BARBER INTERVIEW

| | | WEIGHT | POINTS |
|---|---|---|---|
| I. | **EDUCATION, TRAINING AND SKILLS** | 30% | |

1. What special skills do you believe you
Possess which would enable you to successfully
Perform the duties of this job and why?                              **3**

   *4 years experience*
   *Get along with people*
   *successful business*
   *Know tools + Eg,00*
   *+ Sanitation*

2. Describe how the education and training you
Possess will help you perform the responsibilities
Of this job.                                                          **2**

   *1962 grad — Midwest*
   *in Peoria —*

3. Explain how to sanitize and sterilize barber
Equipment.                                                            **2**

   *Barbasol — Keep combs in*
   *then —*
   *Tablets to sanitize*
   *New tools —*
   *Paper —*

**EDUCATION TRAINING AND SKILLS TOTAL POINTS** _____

7-'3        2.3

7.1.9

|  | WEIGHT | POINTS |
|---|---|---|

**II. JOB KNOWLEDGE AND EXPERIENCE**   30%

1. Describe the specific job duties and responsibilities
Of your previous barbering position.          *3*

_Own own Shop 35 yr_
_cut hair - No shaves -_
_Order supplies -_

2. An inmate receives a cut while receiving a
Haircut and is bleeding moderately. What
Would you do?          *2*

_call Hcu_
_- Use sytic powder -_

**JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS** _____

.75   5 ÷ 2   2.5
.5

|  | WEIGHT | POINTS |
|---|---|---|

**III. INTERPERSONAL RELATIONS**   25%

1. Describe the relationship you strive to establish
With your co-workers.          *2*

_gets along well with_
_others - all human_
_but not civilian_
_well work with inmate_

2.  How do you deal with people who have different
    Backgrounds and interests from yours?

    _Cut all races — No_
    _problem —_

    _2_

3.  What role do you see communication playing
    In this job and how would you approach this role?

    _get along — trust_
    _between barbers —_
    _mgr —_
    _Not too close —_

    _2_

**INTERPERSONAL RELATIONS TOTAL POINTS** _____    **2.0**

.5          6 ÷ 3

| | **WEIGHT** | **POINTS** |
|---|---|---|
| | 15% | |

IV.   **WORK HISTORY**                                   _3_

1.  Describe your work history and how it will
    Enable you to perform the responsibilities
    Of this job?  42

    _Forty yrs Tues —_
    _35 wy own Shop —_

2.    How would you rate your use of time? How many
Sick days have you used within the last 12
Months? Explain any extenuating circumstances.

$\dfrac{2}{2}$

*One or two days*
*No Vacation since*
*1979*

*.45*

**WORK HISTORY TOTAL POINTS** _____

6.2  3.

**RATING SCALE**
0 - UNSATISFACTORY
1 – MARGINALLY MET
2 – ACCEPTABLE
3 – VERY GOOD
4 - EXCELLENT

## BARBER INTERVIEW

NAME OF APPLICANT: _James Anderson_

DATE OF INTERVIEW: _12-21-06_

INTERVIEWER'S NAME: _s/Frank Shaw_

**EXHIBIT**

CC

## BARBER INTERVIEW

|  |  | WEIGHT | POINTS |
|---|---|---|---|
| I. | EDUCATION, TRAINING AND SKILLS | 30% | |

1. What special skills do you believe you
   Possess which would enable you to successfully
   Perform the duties of this job and why?                    **3**

   (40) yrs. As a Barber.
   I get along w/ People
   And Run a successful
   Busness. I know How Handle
   Tools + Eaup.

2. Describe how the education and training you
   Possess will help you perform the responsibilities
   Of this job.                                              **2**

   1962 Barber School.

3. Explain how to sanitize and sterilize barber
   Equipment.                                                **2**

   Keep Combs in Barber oil
   Tools in Sancidize to
   Disenfect.

EDUCATION TRAINING AND SKILLS TOTAL POINTS **2.3**

|  | | | **WEIGHT** | **POINTS** |
|---|---|---|---|---|

**II.** **JOB KNOWLEDGE AND EXPERIENCE**     30%

1. Describe the specific job duties and responsibilities     **3**
   Of your previous barbering position.

   I Have my own Shop for
   25 yrs. Order my own
   Supplies

2. An inmate receives a cut while receiving a     **2**
   Haircut and is bleeding moderately. What
   Would you do?

   Attempt to treat and
   If to bad call a nurse.


**JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS**  **2.5**


|  | | | **WEIGHT** | **POINTS** |
|---|---|---|---|---|

**III.** **INTERPERSONAL RELATIONS**     25%

1. Describe the relationship you strive to establish     **2**
   With your co-workers. Inmates -

   Get along w/ Them, They
   Are Human People. If
   They work w/ me I well
   work w/ Them-

2. How do you deal with people who have different
   Backgrounds and interests from yours?

2

_Don't Have A Problem_
_who They Are._

3. What role do you see communication playing
   In this job and how would you approach this role?

2

_Get Along N Ensure we_
_Have Trust i An Each other._
_Don't want to Close to_
_Them But Be Friend's._

## INTERPERSONAL RELATIONS TOTAL POINTS 2.0

|  | WEIGHT | POINTS |
|---|---|---|
|  | 15% |  |

IV.  **WORK HISTORY**

3

1. Describe your work history and how it will
   Enable you to perform the responsibilities
   Of this job?

_(40 yr.) Exp._
_Have owned my own_
_Business (35 yr.)_

3

2.    How would you rate your use of time? How many
Sick days have you used within the last 12
Months? Explain any extenuating circumstances.

(1) or (2) days work
in last 12 year. No
Vac. Save 1979.

WORK HISTORY TOTAL POINTS ___ 3.0 _____

RATING SCALE
0 - UNSATISFACTORY
1 - MARGINALLY MET
2 - ACCEPTABLE
3 - VERY GOOD
4 - EXCELLENT

**1**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

PEORIA DIVISION

STEVE ABRON,

    Plaintiff,

-vs-          NO. 06-1157

STATE OF ILLINOIS,
DEPARTMENT OF CORRECTIONS,
HENRY HILL CORRECTIONAL
CENTER, ET AL.,

    Defendants.


    Deposition of DEBRA DAVIS, taken at the instance
of the Plaintiff, before Robin A. Adams, CSR, RPR, and
Notary Public, on the 12th day of September, 2007, at
the hour of 11:00 a.m., at 3000 Montvale Drive,
Springfield, Illinois.


        CAPITOL REPORTING SERVICE, INC.
          2021 TIMBERBROOK DRIVE
        SPRINGFIELD, ILLINOIS  62702
           217-787-6167

**2**

1 APPEARANCES:

2   REHN & SKINNER, LLC, by
    MR. JOHN REHN
3   Attorney at Law
    5 East Simmons Street
4   Galesburg, Illinois  61401

5     On behalf of Plaintiff;

6 OFFICE OF THE ATTORNEY GENERAL, by
    MR. THOMAS H. KLEIN
7   Assistant Attorney General
    500 South Second Street
8   Springfield, Illinois  62702

9     On behalf of Defendants.

**EXHIBIT**

DD

**3**

1                DEBRA DAVIS,

2 having been duly sworn, was examined and testified as

3 follows:

4              EXAMINATION

5     BY MR. REHN:

6   Q  Can you state and spell your name for the

7 record, please.

8   A  D-e-b-r-a  D-a-v-i-s.  Debra Davis.

9   Q  And we're here today, Ms. Davis, for a

10 deposition in regards to the case Steve Abron has made

11 against the Department of Corrections.  What I'm here

12 today to do is find out information from you.  I'll be

13 asking you questions, and it's maybe a little more

14 formal than a conversation around the dinner table in

15 that I'll want you to answer out loud.  If I say, "was

16 that a yes?" or "Was that a no?" that's probably

17 because you did a head nod or an uh-huh or huh-uh like

18 we all do, and don't take offense.  I'm just trying to

19 make a clear record.  Okay?

20   A  Yes.

21   Q  Perfect.  And then the other thing is, I'm

22 not trying to trick you.  If you answer a question,

23 I'm assuming you understand the question.  If you

24 don't understand the question, ask me to rephrase it.

**4**

1 I can ask bad questions.  I do that.  And if it's

2 something you don't understand, just ask me to try and

3 restate it.  Okay?

4   A  I will.

5   Q  Thank you.  And what do you do for a living,

6 Ms. Davis?

7   A  I work for the Department of Central

8 Management Services.  I'm the division manager for

9 transaction records and back-wage claims.

10   Q  And what does that job entail?

11   A  All the paperwork for all the agencies under

12 the jurisdiction of the personnel code file their

13 paperwork -- and we call them transactions -- for such

14 as hirings, promotions, voluntary reductions,

15 suspensions are filed through our department.

16   Q  And where is that office?

17   A  It's at the Stratton Building, Room 501.

18   Q  Is the Stratton Building here in Springfield?

19   A  Yes, it is.

20   Q  Okay.  And how long have you been doing that

21 job?

22   A  For around five years.

23   Q  And what did you do before that?

24   A  Prior to that, I was the assistant to the



**5**

1  bureau manager for the bureau of personnel at CMS.

2    Q  And when you say bureau, is the bureau you're

3  referring to CMS?

4    A  Correct.  Bureau of personnel.

5    Q  Okay.

6    A  This is a division under that.

7    Q  And CMS is Central Management Services?

8    A  Correct.

9    Q  And can you tell us CMS' relationship with

10  the Department of Corrections when it comes to hiring

11  people at different correctional facilities?

12    A  Once again, the hiring -- a person is not

13  considered hired until the director of Central

14  Management Services would approve the paperwork.

15    Q  Okay.  And the case that we're here about

16  involves somebody who is applying for the position of

17  barber at the Henry Hill correctional facility.  Is

18  that the type of hiring decision that would not be

19  official or finalized until CMS approves it?

20    A  That's correct.

21    Q  Okay.  And what is your role individually in

22  regards to the process of somebody being hired for a

23  position like a barber at a correctional facility?

24    A  The paperwork is processed by our staff.  A

**6**

1  transaction is reviewed to assure that it meets

2  adherence with the personnel rules, the personnel

3  code, and any bargaining unit contracts.

4    Q  And when you say personnel rules and

5  personnel code, what rules and code are you talking

6  about?

7    A  Well, it would be the code, which, in a sense

8  the personnel code was developed under statute, I --

9  and it gives -- it gives a directive to the director

10  of CMS what he's responsible for.  Under that, the

11  rules were developed that go along with the code --

12    Q  Okay.

13    A  -- that further define it, and it tells about

14  the hiring process in there.  Also, different trans --

15  well, I'll call them transactions, but it talks about,

16  oh, discipline.  It refers to what happens with

17  leaves, benefit time that people are entitled to,

18  layoff process.  There are many other things

19  incorporated in it.

20    Q  Okay.  And I don't know -- this was a booklet

21  that was given to us as part of --

22    A  Oh, that's Rutan.  That's not in the

23  personnel rules or code.

24    Q  Okay.  I was trying to figure out if this is

**7**

1  or isn't, and --

2    A  It's a process that we're required by law to

3  follow because of the hiring process.

4    Q  Okay.  The booklet that I'm holding in my

5  hand is labeled Interview and Selection Criteria and

6  Techniques.

7    A  Uh-huh.

8    Q  This booklet you're familiar with; is that

9  right?

10    A  Correct.

11    Q  And I think you called it the Rutan booklet;

12  is that right?

13    A  Right.

14    Q  How are you familiar with this booklet?

15    A  Anyone that takes -- or anyone that takes --

16  participates in an interview or holds the interview,

17  the interviewer is required to be Rutan certified.

18    Q  And that's for certain types of positions; is

19  that right?

20    A  For Rutan-included positions.  They're

21  determined -- I guess I would say a Rutan-included

22  position is some -- a position that's a nonpolicy

23  maker, rules maker, and I don't have any authority

24  over the determination.  That's done in

**8**

1  classifications.

2    Q  Okay.  You don't determine what is Rutan and

3  what is not Rutan; right?

4    A  No, I do not.

5    Q  Okay.  This is my under -- it is my

6  understanding that the barber position at the Henry

7  Hill would have been a Rutan job.  Is that your

8  understanding?

9    A  Correct.

10    Q  Okay.  And this book that I'm holding, the

11  Interview and Selection Criteria and Techniques book,

12  basically addresses the Rutan hiring process; is that

13  right?

14    A  That's correct.

15    Q  Okay.  And I don't know.  What is your

16  familiarly with the Rutan hiring process?

17    A  In my present position?  We are -- the forms

18  that are in a Rutan-covered position, the paperwork

19  that's submitted for the hiring of an individual

20  requires the documents to be submitted for the

21  individual that's hired.

22    Q  Okay.

23    A  They require the employment decision form and

24  the candidate evaluation.

9

1    Q  Okay.  And I think that's what we're
2  ultimately going to be talking about here today is
3  those documents, and can you tell me what those two
4  different documents are generally speaking?
5    A  The candidate evaluation is what would be
6  filled out after the employee is interviewed.  What it
7  has is a set of hiring criteria on it, and I'll give
8  some examples.  They're not set in concrete.  You can
9  pick various ones according to the position and the
10  requirements, but two of the most common ones and
11  recommended to use are knowledge and education --
12  excuse me.  Knowledge and experience, education and
13  training are two that are supposed to be utilized.
14  And then they -- various other ones are judgment,
15  skills.  I can't think of any more of them right now,
16  but --
17    Q  All right.  And is that for the -- which form
18  is that that you're talking about?
19    A  The candidate evaluation would have the
20  criteria based on the position.  Along with that,
21  there's an area for comments.  The comments area
22  pertains to what was extracted during the interview
23  process with the individual, the candidate, from --
24  and that would have been from the set of hiring

10

1  questions for the interview process.
2    Q  All right.  And as far as the other form
3  besides the evaluation, I think was like a decision
4  form?
5    A  Correct.  Once -- once the -- let's -- I'll
6  use an example.  You have four candidates.  After you
7  would interview the four candidates, then you would
8  determine, by going through and doing a rating, which
9  there's a place on the candidate evaluation form for,
10  overall rating, who was the highest candidate.  That
11  should indicate to the interviewer that that's the
12  most qualified person.
13    Q  Okay.  The interviewers will complete these
14  forms, and then they send it to CMS; is that right?
15    A  Not all of them, only for the hired
16  candidate.
17    Q  Okay.  And when that form is sent to CMS, is
18  that something that you would personally receive and
19  review then?
20    A  They have been submitted in the past.  Not
21  until 2003 did they totally review them for their
22  content.
23    Q  Okay.
24    A  We were told at that time -- and it was

11

1  approximately April or May.  May have been June.
2  Around that time.  I don't have an exact date, but we
3  were told to start reviewing the forms for adherence
4  to Rutan.
5    Q  And when you're saying you're reviewing them
6  for adherence for Rutan, what are you specifically
7  looking for?
8    A  We were looking to make sure that hiring
9  criteria was there, that it met the definition.  Such
10  as knowledge and experience didn't have education and
11  training in it, that they were -- the definition
12  pertained to the criteria they selected.  Also, that
13  the percentages totaled 100, that the information in
14  the comments area was defined and quantified.
15    Q  Okay.  Were you given some -- was it some
16  oral order or was it something in writing, or how was
17  this brought to you about that there's going to be a
18  change in policy, and we're going to review these
19  things --
20    A  It was by my supervisor, the bureau manager.
21    Q  Okay.  And it looks like -- you're going to
22  look at the hiring criteria, and you're going to make
23  sure the right hiring criteria is used, or are you
24  just evaluating --

12

1    A  I just evaluate it.
2    Q  When you evaluate, how do --
3    A  Meaning -- meaning that -- that it contains
4  hiring criteria, and that it is as defined.  Such as
5  my example before, that education and training doesn't
6  have things that require knowledge and experience in
7  it.  We mainly -- because those were supposed to be
8  developed before the interview process.  We would just
9  make recommendation at that point in time for the
10  agency to don't do that again.
11    Q  Okay.
12    A  Okay.  We would send them some type of
13  either -- we'd make a telephone call and discuss it
14  with them, or we'd send them a memo.  Regarding the
15  comments area, we have referred the incomplete ones
16  back to the agency for -- to be defined and quantified
17  if they could pull the information out from the
18  interview process.
19    Q  And when you say that you wanted them defined
20  and quantified, what is it that you're actually
21  looking for there?
22    A  They would make a general statement such as
23  the employee has high level experience in this area.
24  That basically doesn't say anything.  They need to

---

**13**

1  define what the experience was and the number of

2  years.

3    Q  Okay.

4    A  If that could be withdrawn from the interview

5  process.

6    Q  Okay.  Now, we've used -- in other

7  depositions we've talked about an administrative

8  directive of the Illinois Department of Corrections

9  addressing the hiring procedure, and I have no idea if

10  you're familiar with this or not.

11    A  No, I'm not.

12    Q  Okay.  Do you have any understanding as to

13  how -- you talked about the hiring -- well, let me

14  just, instead of abstract, go ahead and move forward

15  with something that you probably have seen before.

16  That's Plaintiff's Exhibit No. 5.  Have you seen that

17  document before?

18    A  I can't say that I've seen this one.

19    Q  Okay.  Are you familiar with the general form

20  that's --

21    A  Oh, the form, yes, uh-huh.

22    Q  Okay.

23    A  I am.

24    Q  And this is a candidate evaluation form; is

---

**14**

1  that correct?

2    A  That's correct.

3    Q  And this one actually has Larry Thompson's

4  name on it, and it should be dated, I'm guessing,

5  sometime in December of 2004; is that right?

6    A  12-21-04

7    Q  And there are a number of different columns

8  on this sheet.  One is hiring criteria.  One is

9  comments.  Then it talks about percentage weight, and

10  then there's a weighed score and rating on this form;

11  is that right?

12    A  That is correct.

13    Q  And you talked about a number of these things

14  generally, I think, before we got this form.  When you

15  were talking about hiring criteria and trying to

16  define and quantify comments, this is the form you're

17  talking about; is that right?

18    A  That is correct.

19    Q  Okay.  Now, are you familiar with -- you also

20  talked about making sure, I guess, things are in the

21  right category or right box, and that would be, I

22  guess, I'd call it the rows where they have education,

23  training, and skills, job knowledge, interpersonal

24  relations, work history are the different ones on the

---

**15**

1  front page of Exhibit No. 5; is that right?

2    A  It's not so much the order, it's the

3  definition of the hiring criteria.

4    Q  Okay.

5    A  To make sure that it pertains to -- and I'm

6  going to call it a category.

7    Q  Okay.  That's fine.  Now, are you familiar

8  with who chooses the different categories for the

9  different candidate evaluation forms?

10    A  The agency.

11    Q  Okay.  And do you know who it is that applies

12  a different weight to the different categories?

13    A  The agency does.

14    Q  Okay.  In your reviewing of these forms, do

15  you make any recommendations in regards to whether the

16  hiring criteria was appropriate or inappropriate?

17    A  Yes.  On occasion, there would be a situation

18  such as their definition, if that was appropriate or

19  not, if it needed to be further defined.  Sometimes

20  the hiring criteria that they utilize such as the

21  category doesn't match the definition, that could

22  happen.  Also, there's a category that we try to not

23  let them use too often just because it's usually parts

24  of the job, it's a requirement of the job, and

---

**16**

1  that's willingness.  Many times it's defined as

2  willingness -- must be willing to perform the duties

3  associated with this position.

4    Q  Hopefully, everybody is.

5    A  Yeah, and, you know, to rate that is kind of

6  ridiculous, so --

7    Q  Okay.  Now, in regards to the hiring decision

8  relating to Larry Thompson and the barber position at

9  Henry Hill, do you know Larry Thompson at all?

10    A  No.

11    Q  Do you know Steve Abron at all?

12    A  No.

13    Q  Okay.  There was, as part of the hiring

14  process, some correspondence from CMS to Henry Hill.

15  I'm going to hand you what's been marked Exhibit

16  No. 26, and see if you've ever seen that document

17  before.

18    A  I had seen it just in reference to this

19  interview today.

20    Q  Okay.  Can you tell me -- it says to, I

21  think --

22    A  Laura Norton.

23    Q  Yeah.  And who is she?

24    A  Laura Norton was the human resource manager

17

1 for the Department of Corrections.
2   Q  Okay. And it's from a Sue Park?
3   A  Sue Park is a staff member under the
4 transactions area in the division.
5   Q  Okay. And I think my understanding of this
6 document is that it was forwarded to Henry Hill,
7 asking them to basically redo or make some changes to
8 a candidate evaluation form. Is that your
9 understanding of what's going on here?
10   A  Correct, by the statement listed in number 23
11 of the remarks.
12   Q  Yeah, there's a little check mark --
13   A  Uh-huh.
14   Q  -- in box 23. And attached to Exhibit 26 on
15 the second page, I believe, was the initial eval --
16 candidate evaluation form that was forwarded to CMS?
17   A  That's correct.
18   Q  Is that your understanding, also?
19   A  (Nodded head up and down.)
20   Q  Okay. Why is it that -- can you look at this
21 document. Do you know why there was a request for
22 additional information?
23   A  Yes. The education and training. It
24 requires possession of a valid Illinois license as a

18

1 barber, requires training necessary to qualify as a
2 barber, and skills necessary to maintain and
3 supervisor a barber facility and staff. Requires
4 elementary knowledge of first aid. The comments
5 indicated complete all requirements for this position
6 with above average skills. We sent it back to have
7 the comments area -- to further define what they mean
8 by above average skills, and to give us more
9 information on stating things such as like a barber's
10 license to tell us exactly what it is this employee
11 has.
12   Q  Okay. Were there similar -- do you know if
13 it was problems with all the comments throughout all
14 the different categories, or was it just --
15   A  These are all very short. They're -- they
16 just give levels. They don't give any information on
17 what they're trying to state here. They don't give
18 any information as relates to the hiring criteria.
19 Just gives me a level of experience.
20   Q  Was there any concern beyond the way that the
21 form was filled out in regards to how the hiring
22 process had worked at Henry Hill on this?
23   A  No.
24   Q  Okay. Were you involved at all in the

19

1 sending of this memo or the requirement for having
2 Henry Hill resend another evaluation form?
3   A  I can't validate that it was me because there
4 are other people. There are supervisors in the area
5 that do review. However, I believe at this time I was
6 doing the major amount of review for transactions.
7 The terminology appears to be something that I
8 utilize. That it was my language. This happens
9 frequently. I can't say regarding this agency, this
10 position, but this terminology is utilized to get them
11 to clarify the area, give me more information, tell me
12 more about this person.
13   Q  Okay. Do you see anything else regarding
14 problems with the way the categories are filled out on
15 this form other than a lack of detail? For instance,
16 do you see some education and training under knowledge
17 and experience, or any other statements that you think
18 were put in the wrong category?
19   A  No, I do not.
20   Q  Okay. Do you have an opinion or idea as far
21 as if somebody has experience in the Department of
22 Corrections, where would that be appropriate to be
23 filled in on that form?
24   A  If they had prior experience in the

20

1 Department of Corrections, it could -- I mean, it
2 should fall under job knowledge and experience.
3   Q  Would that also fall under education and
4 training? Are you saying those are two different
5 things?
6   A  Those are two different things. Sometimes
7 you can receive your training through that you get
8 education, but it's mostly split out as define what
9 education means.
10   Q  And as far as your job at CMS, is there a
11 difference between -- well, how about if I ask it this
12 way. Let me try again. Do they use a candidate
13 evaluation form similar to this whether it's a
14 Department of Corrections facility for adults or a
15 Department of Corrections facility for juveniles?
16   A  For the State of Illinois it's utilized.
17   Q  It's the same for both?
18   A  It's the same form.
19   Q  And you'd probably be reviewing these type of
20 forms for hiring decisions for the Department of
21 Corrections whether it's a juvenile facility or an
22 adult facility, it wouldn't make a difference to you?
23   A  That's correct.
24   Q  Okay. And in addition to reviewing, I guess,

21

1  to see if the comment sections are filled out
2  appropriately, you're also dealing with the totaling
3  of the numbers to make sure they total what's
4  represented at the bottom?
5      A  We don't really go through and add them
6  unless -- it's one of those things that's a spot
7  check.  If I sat and read every one of these in
8  detail, I'd never get any -- we wouldn't get anything
9  done.  I mean, it's a cursory review, really, to go
10  through and look.  I mean, the difference between the
11  form that you gave me that I'd seen prior to this and
12  your Exhibit 5 here, just looking at this makes me
13  look towards it and want to read.  Well, what's
14  missing here?  The definition's really long.  So
15  that's what prompts me to look at these things.
16  It's -- I don't read every one over and scrutinize
17  each one.
18      Q  I assume you have other job duties besides
19  reviewing candidate evaluation forms; right?
20      A  Thousands of others.
21      Q  And so going back to '05, the beginning of
22  '05, if you had one of these come across your desk --
23  you have a lot of other things going across your desk
24  besides candidate evaluation forms.

23

1  information down there?
2      A  Well, I mean, I'll go through and read it,
3  number one.  Just looking at this, I can see there's
4  40 years.  So that's giving me some kind of education
5  and training.  They're giving me some kind of
6  definition there.  As far as verbatim, I don't read
7  everything that's in here.
8      Q  Okay.
9      A  Unless my eye is drawn towards it.
10      Q  Okay.  And how often would it be that you
11  would find a candidate evaluation form that you
12  thought that additional information was needed on?
13      A  In the early stages of the review process,
14  there were several.  To date, there's getting to be
15  less, but it's also depending on the agency, and how
16  often the person who was the interviewer has done
17  reviews.
18      Q  Okay.
19      A  Some people are very -- that's all they do
20  is -- would be doing is reviewing -- interviewing
21  people.  Other people, it's not very common for them
22  to do it, and same -- same way with the agency.  Maybe
23  there's no turn over, and they haven't had experience
24  in doing it.

22

1      A  Correct.
2      Q  And what you do is, you take a quick review
3  of the candidate evaluation form.  If something jumps
4  out at you that there's a problem, that's when you
5  would then contact your staff and have them contact
6  the facility to have them address whatever your
7  concerns were?
8      A  That's correct.
9      Q  And in this case, just looking at what's been
10  attached to Exhibit 26, the candidate evaluation form
11  there, it just seems like there's a lack of
12  information under the comments section?
13      A  That's correct.
14      Q  And that would have caught your eye, which
15  would then make you look a little closer at the
16  defini -- or the hiring criteria and compare to the
17  comment section?
18      A  That's correct.
19      Q  And looking at Exhibit 5, basically, the
20  boxes under comments are filled up a lot more; is that
21  right?
22      A  Correct.
23      Q  And that would not draw your attention as
24  much.  It looks like at least they put additional

24

1      Q  And are you familiar at all with the
2  procedure that the interviewers are supposed to use in
3  regards to filling these comments sections out, other
4  than -- well, you talked about sort of the end
5  product, what is there.  I mean, as far as how they
6  interview and when they're supposed to complete these
7  different forms?
8      A  Yes, I'm familiar with it.
9      Q  Okay.  And do you know, is it typically one
10  person of -- this interview involved a couple of
11  different people interviewing candidates.  Is that
12  unusual?  Is that typical?
13      A  It can go anywhere from one person to a
14  panel.
15      Q  Okay.  And if there's a panel or more than
16  one people, do you know how it's determined how the
17  comments section are filled out on the evaluation?
18      A  That varies, also, depending on -- you could
19  have four people, let's say, in a -- participate in an
20  interview.  Everyone could be sitting, taking notes to
21  the response to the questions.  In the end, usually,
22  the body would sit together and complete it in its
23  entirety and sign the -- or one person would type it,
24  but they'd all participate in the completion of the

25

1  comments area, and then all of them would sign the
2  back part of it in the area for the interviewing
3  officers.
4    Q  Okay.  And do you know what the -- what
5  procedure did you expect or anticipate when you
6  forwarded back, asking for additional information?
7  Who did you believe would be filling out the
8  additional comments section?
9    A  It would go back to the interviewer, I would
10  believe, and they would pull the Rutan file that
11  contained the documents, the questions, and they'd go
12  back and extract from the questions that they asked
13  the information to further define -- their questions
14  should adhere to the hiring criteria, and therefore,
15  they should be able to give me the information that
16  told me that they had above average skills.  What was
17  it that person said.
18    Q  And it looks like they did, obviously, redo
19  this.  It was sent back, but it sounds to me like
20  you've never actually looked at this full evaluation
21  form before today?
22    A  No, I haven't.
23    Q  Okay.
24    A  I mean, I may have seen it before, but I

27

1  justification part of this form?
2    A  They need to give us more information such
3  than the employee was selected -- rated number one in
4  the best interest of the agency.  They need to provide
5  information such as the employee meets the
6  qualifications, and is able to perform the duties and
7  responsibilities associated with this position.  The
8  candidate scored most -- they're all written up
9  differently.  The candidate -- if there's more than
10  one, they can do a comparison.  It's recommended that
11  they do that on the form.  Not all agencies do it.
12  But to talk about their skills, were they rated
13  highest, pinpoint some of the information that's come
14  out of the comments area in regards to the hiring
15  criteria.
16    Q  I think you said it was -- well, maybe -- did
17  you just say it was recommended that they do compare
18  the candidates?
19    A  It's recommended that -- well, it's stated on
20  the form that they should.
21    Q  Is that on this form?  Am I missing some of
22  the form?  I've just handed you what's been marked
23  Exhibit No. 12, and this is for a different position
24  than the one at Henry Hill.

26

1  can't --
2    Q  You don't remember it if you did?
3    A  I don't recall it.
4    Q  All right.  I want to talk a little bit more
5  about the employment decision form.  what is the
6  significance of that form?  Why is that used?
7    A  After your interview process is over, you
8  document your selection on the employment decision
9  form.
10    Q  Okay.  And is there certain things that
11  you're looking for in regards to a properly completed
12  employment decision form?
13    A  Yes.  You'd want to make sure that they
14  indicated the candidate's overall rating, what the
15  candidate's ranking is, the information as far as the
16  number of candidates interviewed.
17    Q  And --
18    A  We'd also want, in the justification area, an
19  explanation on why the candidate ranked the highest,
20  and why they were selected.  And that should be
21  obtained from the candidate evaluation.
22    Q  Are you also looking for some sort of
23  comments that are defined and quantified in regards to
24  the justification as opposed to generalities in the

28

1    A  It's missing on this one.
2    Q  When you say it's missing, is there another
3  page or is there --
4    A  Well, excuse me.  It's on here.  I'm sorry.
5  Explain the reasons for hiring the selected candidate
6  with others that were interviewed.  If selected out of
7  rank order, include rationale.
8    Q  Okay.  So what your understanding of that is,
9  is that what they're asking for is actually they want
10  an explanation of why they hired this person, and then
11  comparison of that person to the other candidates?
12    A  Correct.
13    Q  Is this something that you'll go through that
14  form, and if something is missing on this form, do you
15  send them back, also, for additional information?
16    A  If they have not given us any information, if
17  they haven't told us such as they're interviewing --
18  they interviewed five people, they had five positions.
19  Let's say this person was the fourth ranked person.
20  They have to tell us what happened to candidates one,
21  two, and three, if they hired them.  If they didn't
22  hire them out of correct order, they need to explain
23  that, and they have to have our approval to do that,
24  but --

29

1  Q  Do they -- I was going to ask about that.  It
2  sounds like there is the ability to hire people
3  outside of the order that they get their points that
4  they get through the process; is that right?
5  A  There is.
6  Q  And when is it that they -- that type of
7  decision can be made?
8  A  It's allowed when someone may have -- it goes
9  more towards a specific -- I'll take a doctor example.
10  A doctor may have some kind of experience in studying
11  a certain area of science, and he might have that
12  experience where someone could have gained more points
13  in the education area that he was up against.  If you
14  could justify that that person's experience is what
15  you're really looking for, then through -- there's a
16  letter that needs to be submitted and justified on why
17  you hired it, and explained in the hiring criteria.
18  Q  So if somebody would have a lot of experience
19  that's very related to that job, but maybe they didn't
20  score as many points on other sections, that might be
21  a situation where you would hire somebody that scored
22  less point-wise?
23  A  Correct.
24  Q  And I don't know if this is something in your

30

1  mind that would qualify for that type of circumstance
2  or not, but I think most of the inmates are black in
3  the inmate -- in the Department of Corrections at this
4  time.  I don't know what the percentage is, but if
5  somebody had extensive experience working with black
6  customers' hair, would that be some sort of criteria
7  that would sort of fall in what you're talking about
8  as far as extra experience that may be related to the
9  job itself?
10  A  I don't really believe I'm qualified to
11  answer that.  It's something that would have to go
12  further to the people that have more authority in
13  Rutan and determining if that would be allowed or not.
14  Q  And who are those people?
15  A  There's some -- there are people that work in
16  another division within the bureau of personnel.
17  Technical services is the area.  They do
18  classification and Rutan.
19  Q  Are you also familiar with any preferences
20  for hiring veterans?
21  A  Correct.  Yes, I am.
22  Q  Is that preference -- can you explain, I
23  guess, what the preference is for hiring veterans?
24  A  Okay.  Veterans hiring preference comes into

31

1  play with the open competitive eligible list.  We're
2  required to adhere to veterans preference when hiring
3  any individuals off of that list.
4  Q  Okay.  And is a barber position, would that
5  be included among that list?
6  A  No, it is not.
7  Q  Okay.  Is there any preference for veterans
8  for the barber position?
9  A  No, that's not an open competitive eligible
10  list as far as veterans preference is defined.
11  Q  Okay.  What kind of positions are on the open
12  competitive preference list?
13  A  There are titles such as human resource
14  associate assistant.  Titles -- they consider this to
15  be under the trades.  The trades, in a sense, are
16  exempt from the personnel code.  Other titles that are
17  under the personnel code such as chemist, office
18  associate, office assistant.  I mean, there's
19  thousands of them that are covered under the open
20  competitive eligible list.
21  Q  I'm going to go back, and I'm sorry, I'm
22  jumping around all over here.
23  A  That's all right.
24  Q  The employment decision form that we marked

32

1  as Exhibit 12.
2  A  Uh-huh.
3  Q  Like I said, this is not the form for Steve
4  for the Henry Hill position, but looking at that
5  document, under the justification section, can you
6  tell me what you see on that that is good and what is
7  bad from your perspective as far as your job goes.
8  When I say good or bad, I'm talking about how it was
9  filled out.
10  A  It's pretty generic.  What they should be
11  able to do is pull something from each one of these
12  areas in their criteria, and make a comment regarding
13  it on the candidate evaluation form, as opposed to --
14  and maybe they did with this.  I don't -- I don't know
15  what the hiring criteria was.  It's an overall view
16  that should tell why they hire this person.  I don't
17  have a comparison of the other candidates.  So I'm
18  taking their word that they were number one, which
19  they should have the backing for it with the other
20  paperwork.  It could be better written, but --
21  Q  And what you're -- and you're sort of making
22  hand motions while you're answering me.
23  A  To the hiring criteria.  I'm sorry.
24  Q  No, that's all right.  But what you're

33

1  referring to, I think, was in the justification. What
2  you would like to see is you'd like to see some
3  mention of the different categories under hiring
4  criteria identified and discussed under the
5  justification section?
6    A That's correct.
7    Q I'm going to hand you now what's been marked
8  Exhibit 14, which was the employment decision form for
9  the hiring at the Henry Hill Correctional Center. And
10  can you tell me what your opinion is of the
11  justification section of that hiring decision form?
12    A It's one that would be accepted. However, it
13  should have further definition of comparison such as
14  this Mr. Thompson, you could have given what his
15  additional skills were that made him higher. You
16  could have defined more information instead of
17  generalizing that he had additional skills. Well,
18  what were they? Compared against to the others, what
19  made him the more prominent candidate for this
20  position? What was it that made him score the
21  highest? This is very general.
22    Q Yeah. You'd agree it's a very general --
23    A It's general.
24    Q They basically say all the candidates had

34

1  extensive experience, but Mr. Thompson had additional
2  skills which made him an excellent selection. You'd
3  agree, looking at this, you don't know what those
4  additional skills are?
5    A Correct, or what extensive experiences here
6  either.
7    Q Okay. I guess, comparing Exhibit 14 and
8  Exhibit 12, Exhibit 12 there was at least some hint of
9  there as far as why that candidate was selected.
10  Would you agree that there's a little more there?
11    A There is more information here as far as it
12  specifically -- to me it's mentioning things that are
13  meaningful to them out of the interview process out of
14  their criteria. They mention they have an extensive
15  amount of knowledge and experience in barbering and
16  corrections. I suppose that means the Department of
17  Corrections, and not corrections to the barbering,
18  but --
19    Q Yeah.
20    A That they have -- something else that appears
21  meaningful to me, that they have a good attitude with
22  regard to staying on top of security issues. That
23  must have been meaningful out of the interview
24  process. And that there was another instance in here

35

1  that they had excellent working knowledge of
2  corrections and security procedures.
3    Q I mean, it looks like that candidate's had
4  experience working with the Department of Corrections
5  before, and that's part of their --
6    A As the decision form says --
7    Q -- justification?
8    A -- correct.
9    Q Do you believe that these forms, the
10  candidate evaluation forms, should you be able to read
11  the comment section, and based on the comment section
12  of one candidate and another candidate be able to
13  figure out why one got a higher score than the other
14  one in different categories?
15    A You should be able to.
16    Q Comparing Exhibit 6, which is the candidate
17  evaluation form for Steve Abron, with the second page
18  of Exhibit 26, which was the initial candidate
19  evaluation form for Mr. Thompson, can you look at the
20  comments section for Mr. Abron for the category of
21  education, training, and skills and compare it to the
22  comments section under Mr. Thompson for that same
23  category, and after you'd had a chance to read those,
24  if you can --

36

1    A They're nearly the same. I don't know what
2  they base their ratings on. The only thing that I can
3  really see that's different is in interpersonal
4  relations. This one comes up as demonstrated
5  excellent when they're using this level. This one was
6  good.
7    Q And I just wanted to stick initially with the
8  first category, which is education, training, and
9  skills. Mr. Abron's comments for that category were
10  completed all requirements for this position with
11  above average skills, and maintains correctional
12  experience; is that right?
13    A Correct, but they also derive this definition
14  off of the interview questions. The interview
15  questions are scored there. So they would transfer
16  their percentages over to that, and I don't know what
17  the individual questions are. That might have some
18  indication for the point differences. I don't know
19  how they rated those.
20    Q You would agree that the comments basically
21  are the same in regards to both Mr. Abron and
22  Thompson, except for the only difference is Mr. Abron
23  also has correctional experience; is that right?
24    A It mentions it there.

37

1  Q But it looks like Mr. Thompson got a higher

2  rating; is that right?

3  A That's correct.

4  Q And you would agree that by looking at this

5  form you can't really figure out why?

6  A Not by looking at the form.

7  MR. REHN: Okay. Give me a second. I want

8  to talk to my client outside real quick.

9  (Short recess.)

10  MR. REHN: Q One other thing I forgot to ask

11  you about, and I'm not sure if you're familiar with

12  this or not. But the candidates, before they're

13  interviewed, filled out application forms and

14  forwarded -- some forwarded resumes or work experience

15  documents to the interviewers. Are you familiar with

16  the practice as to whether the interviewers should

17  review those documents?

18  A It's my -- I have been taught that they

19  should not -- the interviewers are not to review them.

20  They're only to use the information that's utilized in

21  the interview process.

22  Q Okay.

23  A What's extracted during the questioning

24  period.

39

1  MR. KLEIN: I don't have any questions.

2  MR. REHN: All right. Thank you. It was

3  nice to meet you.

4  A Nice to meet you, too.

5  MR. KLEIN: Would you like to have the

6  opportunity to review the transcript of the deposition

7  to make sure that everything was taken down correctly?

8  You have that right.

9  A Yes, I'd like to.

10  MR. KLEIN: Okay. So we'll reserve.

11  MR. REHN: Sounds perfect.

12  (witness was excused.)

13

14

15

16

17

18

19

20

21

22

23

24

38

1  Q And do you know if the interviewers are

2  supposed to inform the people being interviewed that

3  the evalua -- that the resumes will not be --

4  A I don't know of any requirement to inform

5  them.

6  Q Okay. Have you reviewed the notes of the

7  interviewers in regards to the interviews for this

8  position that we're here about today?

9  A No.

10  Q Okay.

11  A None of those doc -- the only document that's

12  submitted to CMS that -- and the one that I looked at

13  was the one that pertained to the candidate that was

14  hired. We don't see the other materials. If we

15  happen, by chance, to get copy, they're -- the staff

16  are instructed to immediately send the questions back.

17  Q Do you know why that is?

18  A well, you get questions circulating all over

19  the state, and I don't want to be a party of that,

20  knowing what questions were asked at an interview. I

21  wouldn't want any of the staff to be responsible or

22  accused of knowing it either.

23  MR. REHN: I don't have anything further for

24  her.

40

1 STATE OF ILLINOIS )
                    ) SS
2 COUNTY OF SANGAMON )

3                    CERTIFICATE

4   I, Robin A. Adams, affiliated with Capitol

5 Reporting Service, Inc., do hereby certify that I

6 reported in shorthand the foregoing proceedings; that

7 the witness was duly sworn by me; and that the

8 foregoing is a true and correct transcript of my

9 shorthand notes so taken as aforesaid.

10   I further certify that I am in no way associated

11 with or related to any of the parties or attorneys

12 involved herein, nor am I financially interested in

13 the action.

14

15        s/Robin A. Adams

16

17   Certified Shorthand Reporter
     License No. 084-002046
18   Registered Professional Reporter
     and Notary Public

19

20

21 Dated this 25th day of        OFFICIAL SEAL
                                 ROBIN A. ADAMS
22 September, A.D., 2007,    NOTARY PUBLIC, STATE OF ILLINOIS
23 at Springfield, Illinois  MY COMMISSION EXPIRES 5-21-2008

24

41

1                    ERRATA SHEET

2  ABRON V. STATE OF ILLINOIS, DEPARTMENT OF CORRECTIONS

3     I hereby verify that the foregoing is a true and
   accurate transcription of my deposition taken on
4  9-12-07, except for those changes noted below:

5  Page____ Line____ Change_____

6  Reason_____

7  Page____ Line____ Change_____

8  Reason_____

9  Page____ Line____ Change_____

10 Reason_____

11 Page____ Line____ Change_____

12 Reason_____

13 Page____ Line____ Change_____

14 Reason_____

15 Page____ Line____ Change_____

16 Reason_____

17 Page____ Line____ Change_____

18 Reason_____

19 Page____ Line____ Change_____

20 Reason_____

21  _____
                              DEBRA DAVIS
22 Dated this ____ day of _____, 2007.

23 _____

24 Notary Public