## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| Steve Abron | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No. 06-1157 |
| | ) | |
| State of Illinois, Department of | ) | |
| Corrections, Henry Hill Correctional | ) | |
| Center and Don Hulick, Warden, | ) | |
| Individually, Bill Smith, Business | ) | |
| Administrator, individually, and | ) | |
| Frank Shaw, Assistant Warden, | ) | |
| Individually and in their official capacity | ) | |

### ABRON'S RESPONSE TO THE MOTION FOR SUMMARY JUDGMENT

NOW COMES the plaintiff, Steve Abron, by and through his attorneys, Rehn &

Skinner LLC, and for his response to the motion for summary judgment pursuant to

CDIL-LR 7.1 (D)(2) states as follows:

**A.     INTRODUCTION**

1.     Steve Abron applied for the barber position at the Henry Hill Correctional

Center in Galesburg, Illinois.  Abron is a black male and was interviewed by two white

males who ultimately hired a white applicant, Thompson.  The interviewers agreed that

experience working with inmates would be a benefit for an applicant for the position.

Abron had experience barbering for inmates and Thompson did not.  The barber position

is a supervisory position.  Abron had experience supervising barbers and Thompson did

not.  Abron's answers to technical barber questions were more accurate than Thompson's

but Thompson received a higher score.  One interviewer explained he gave a higher score

to Thompson because of where Thompson's barber shop was located.  The other

interviewer admitted that the location of the barber shop should not be a factor in the hiring decision.

2.     A review of the comments in the candidate evaluation forms should show why a candidate received a higher score.  A review of the initial evaluation sheets for Abron and Thompson suggest Abron should have received a higher score on the categories that carried the most weight for applicants.  Abron did not receive the higher score.  The interviewers admittedly did not follow the hiring procedures in preparing the questions.   The initial candidate evaluation form for Thompson was rejected by CMS and had to be redone.  The department claims in their brief that Thompson got the job because he scored highest on the interview ratings.  However, a review of the ratings and the statements of the interviewers would allow a reasonable jury to find the defendant's proffered reasons are pretextual.  Even if Thompson should have scored the highest on the ratings, Abron's experience supervising and working in the department of corrections could support hiring him with a lower rating.

3.     Additionally, Abron was treated different than white candidates with correctional experience.  When Abron previously interviewed for a barber position he was denied the position despite having significantly more barber experience than the white candidate that was hired based on the white candidate having correctional experience.  In contrast when Abron interviewed and had correctional experience and Thompson did not the defendant hired Thompson based on Thompson allegedly having more years of experience and the location of Thompson's shop.

4.     For purposes of the state's motion for summary judgment, the state concedes that Abron can present a prima facie case of discrimination. However, the

2

Department of Corrections argues that the Department of Corrections did not make its hiring decision based on race and claims the interview scoring was legitimate and non-discriminatory.

5.    The motion for summary judgment should be denied because the facts would allow a reasonable jury to find the reliance on the test score was pretextual.  A jury could find the reasons for hiring Thompson and the scores given to Thompson were based on race and not on credentials.  The conflicting explanations for its employment decisions further support a finding of a question of material fact on the issue of pretext. Additionally, the department's failure to follow its own hiring procedures allows the court to find pretext.  In light of the same, the motion for summary judgment must be denied.

**B.    RESPONSE TO THE UNDISPUTED MATERIAL FACTS**

**(1)    UNDISPUTED MATERIAL FACTS**

1.    Plaintiff concedes that the following paragraphs in defendant's statement of material facts (which was included in the Memorandum of Law in Support of the Motion for Summary Judgment) are undisputed and material.

a.    ¶1, ¶2, ¶3, ¶4, ¶5, ¶6, ¶7, ¶8, ¶9, ¶11, ¶12, ¶13, ¶14, ¶15, ¶16, ¶17, ¶18, ¶19, ¶20, ¶21, ¶23, ¶24, ¶25.

b.    Plaintiff also admits the first paragraph #22 (the department's brief has two paragraphs numbered 22 and the second paragraph 22 is denied).

**(2)    DISPUTED MATERIAL FACTS**

1.    Plaintiff disputes the statement of material facts in ¶10.  While Shaw and Smith were provided interview sheets, this was not "part of the Rutan Process."  In fact,

3

the Rutan Process would call for Shaw and Smith to actually be involved in the process of selecting the questions based upon the qualifications of the office. See January 1, 2002 administrative directive providing that prior to interviewing a person for a Rutan position, the interviewing officer shall identify the major job responsibilities and essential functions, identify hiring criteria, assign percentage weights to each hiring criteria and develop the interview questions to be asked of each applicant.  (See §I (1)(a)(2-6) on page 5 of 7 of Exhibit 1).

2.      Plaintiff disputes ¶20.  While the interviewers claim they did not review the applications the personnel department provided the interviewers with copies of the applications and resumes at the time of the interviews (Exhibit 8 page 5 lines 13-16).  A fair inference would be that the applications and resumes were provided for the interviewers use.  Defendant also denies that the scores were based strictly on the interviews and asserts that the scores were based on race.  (See the additional material facts below).

3.      Plaintiff denies the second ¶22.  Defendant denies that the scores were based strictly on the interviews and asserts that the scores were based on race.  (See the additional material facts below).

(3)      **IMMATERIAL FACTS**

1.      Paragraph 26 is immaterial.  Shaw's claim about prior interviews is immaterial, because in this particular case the scoring was based upon race.  (See the additional material facts below).

2.      Paragraph 27 is immaterial as Hulick's experience in prior hiring decisions does not affect the fact that Abron's scoring in the interview process was based on his race.  (See additional material facts below).

3.      Paragraph 28 is immaterial as plaintiff's request for information after the hiring decision was made is not relevant as to whether the Department of Corrections hired Thompson based upon his race.

4.      Paragraph 29 is immaterial as the letter was written after the hiring decision and does not address whether the reasons given by the interviewers were pretextual and whether Abron's qualifications exceeded the qualifications of Thompson.

**(4)      ADDITIONAL MATERIAL FACTS**

**a.      Experience as a barber in a correctional setting is an asset for applicants for the barber position**

1.      Smith explained that when he is interviewing candidates for any position at the corrections facility in Galesburg, Smith would take into consideration whether the applicant had experience working in a correctional facility (Exhibit 2 page 38 line 20 through page 39 line 4).

2.      Both Smith and Shaw explained that it would be an asset to an applicant for the barber position that the applicant has experience working in a correctional environment (Exhibit 2 page 39 lines 20-24 and Exhibit 3 page 20 lines 1-17).

3.      In his interview Abron told Smith that Abron had been a contract barber at a juvenile correctional facility (Exhibit 2 page 40 lines 7-13).

4.      Shaw explained that Abron's experience working with people that were incarcerated would help an applicant out working in the setting of the Henry Hill Correctional Center (Exhibit 3 page 51 lines 6-17).

5.      Don Hulick was the warden at the Henry Hill Correctional Center when Larry Thompson was hired as the barber (Exhibit 4 page 6 line 20).

6.      Hulick, stated there could be benefit to hiring a barber for the Department of Corrections that has experience working with inmates inside the Department of Corrections (Exhibit 4 page 13 lines 13-19).

7.      Hulick was familiar with it being important for barbers inside the Department of Corrections to make sure that barber instruments, such as scissors and other tools are kept track of and inventoried (Exhibit 4 page 19 lines 7-14).

8.      Hulick agreed that keeping track of such tools would be equally important at a juvenile facility such as the Kewanee juvenile facility (Exhibit 4 page 19 lines 15-19).

9.      Debra Davis works for the Department of Central Management Services (Exhibit 5 page 4 lines 5-9).

10.     Davis explained that the hiring decision for the barber position at Henry Hill would not be official or finalized until it was approved by CMS (Exhibit 5 page 5 lines 15-20).

11.     Davis explains that the CMS staff would process the paperwork from a hiring decision to make sure it meets adherence with the personnel rules, the personnel code and any bargaining unit contracts (Exhibit 5 page 5 line 21 through page 6 line 3).

12.     Debra Davis explained that if someone had experience in the Department of Corrections that would be appropriate information to be filled in on the candidate evaluation form under the job knowledge and experience category (Exhibit 5 page 19 line 20 through page 20 line 2).

13.     Terry Polk, a warden in the Department of Corrections who previously interviewed Abron for a correctional barber position, explained that all barbers in the Department of Corrections would have responsibility and/or training in regards to making sure materials and tools do not get taken by inmates (Exhibit 6 page 7 lines 16-19).

14.     Polk explained that he believed that experience working in the Department of Corrections would be a benefit for someone who is trying to get a barber position at a correctional facility (Exhibit 6 page 8 lines 11-15).

15.     Polk explained that experience working in the Department of Corrections would assist an applicant because the applicant would be familiar with department rules and regulations (Exhibit 6 page 8 lines 16-18).

16.     Polk explained that experience cutting adult hair of inmates in the county jail would be (1) beneficial for a candidate for a Department of Corrections job (Exhibit 6 page 29 lines 2-6) and (2) be close to the same as cutting hair or being a barber at the Department of Corrections (Exhibit 6 page 29 lines 12-14).

**b.      Abron had experience barbering in a correctional setting and Thompson did not**

1.     Smith knew Abron was currently working at the Illinois Youth Center Corrections facility in Kewanee at the time of the interview (Exhibit 2 page 93 line 23).

2.     During Abron's answer to the first question of the interview Abron told the interviewers that Abron had 28 years experience including three years of correction experience and 12 years of Knox County Jail experience (Exhibit 2 page 95 lines 11-21).

3.     Smith considered Knox County Jail experience as correctional experience (Exhibit 2 page 112 lines 7-9).

4.      Smith admitted that Thompson did not indicate in his interview that Thompson had any experience cutting hair for persons being held in custody (Exhibit 2 page 48 lines 1-6).

5.      Thompson admitted that before working for Henry Hill, Thompson had never been employed in a position where he was cutting hair for people who were incarcerated (Exhibit 7 page 17 lines 1-6).

**c.  The candidate evaluation forms support a finding of pretext**

1.      The candidate evaluation form is filled out after an employee is interviewed (Davis deposition transcript Exhibit 5 page 9 lines 1-9).

2.      The candidate evaluation form is something that was initially filled out by the interviewers and then typed up by Foley (Foley deposition Exhibit 8 page 16 lines 12-22).

3.      The candidate evaluation forms for each candidate show that 30% of each applicant's score was based upon the hiring criteria labeled "education, training and skills" (See candidate evaluation form for Steve Abron attached as Exhibit 9).

4.      The comments section of the candidate evaluation form for Thompson in the education, training and skills hiring criteria category states:

          "completed all requirements for this position with above average skills." (See evaluation form attached at Exhibit 10).

5.      The comments section of Steve Abron's candidate evaluation form for education training and skills also states:

          "completed all requirements for this position with above average skills."

8

However, the comments for Abron also included that Abron "maintained correctional experience" (Exhibit 9).

6.      Abron received a lower score for education, training and skills than Thompson (See forms attached as Exhibit 9 and Exhibit 10 showing the interviewers gave Abron a 3.3 score and Thompson a 3.7 score.)

7.      The candidate evaluation form also shows that candidates receive 30% of their total points for the interview process based upon "job knowledge and experience' (See form attached as Exhibit 9).

8.      The comments completed by the interviewers after the interviews for "job knowledge and experience" for Thompson state that Thompson "maintains excellent knowledge and job experience for the position" (See form attached as Exhibit 10).

9.      Abron's comments for "job knowledge and experience" indicated that Abron "maintains excellent knowledge regarding barbering duties."  Abron's form also stated that Abron "has correctional experience."  Thompson's form does not mention correctional experience (see forms attached and Exhibit 9 and 10).

10.     Thompson and Abron received the same score for "job knowledge and experience." (See Exhibit 9 and Exhibit 10).

11.     Davis explained that a review of the comments section on the candidate evaluation forms should show why one applicant received a higher score than another in each category (Exhibit 5 page 35 lines 9-15).

12.     Debra Davis admitted she could not tell by looking at the candidate evaluation forms for Abron and Thompson why Thompson received a higher rating that Abron (Exhibit 5 page 36 line 7 through page 37 line 6).

### d. The Barber position involves mostly supervising others cut hair and supervisory experience was supposedly an asset for applicants

1.      The position description for the barber position at Henry Hill is attached as Exhibit 11.

2.      The position description addresses the amount of time spent in different job duties for the barber position and explains that 40% of time is supervising, instructing and training inmate barbers, 10% of the time is maintaining records of inmates schedules and individual inmate work performance and 5% of the time is spent supervising the employee barber and shoe shine services (See Exhibit 11).

3.      At the interviews Smith, knew that the barber position at Henry Hill involved supervising inmates (Exhibit 2 page 20 lines 7-9 and page 108 lines 3-10).

4.      Smith stated approximately 40% of the time of the barber's job would be spent supervising, instructing and training all inmate barbers in cutting other inmates hair (Exhibit 2 page 20 lines 10-20 and page 79 line 19 through page 80 line 11).

5.      Smith explained that when he was conducting the relevant interviews experience as a supervisor was important to Smith (Exhibit 2 page 21 line 22).

6.      Smith stated that supervising others would be beneficial for a candidate (Exhibit 2 page 24 line 3).

7.      Smith agreed that it would be important that Abron had experience supervising other barbers (Exhibit 2 page 93 line 17).

8.      Thompson explained that as the current prison barber, he supervises others.  He cuts hair if inmates cutting hair under his supervision need help.  However, the inmates do not need help cutting hair very often (Exhibit 7 page 11 line 3-12).

**e.    Abron's supervisory experience at the time of the interview supports a finding of pretext**

1.    Margaret Foley was a human resources representative at Henry Hill Correctional Center (Exhibit 8 page 5 lines 13-16).

2.    Foley explained that the resume and application of Abron would have been provided to Shaw and Smith at the time of the interviews (Exhibit 8 page 41 lines 2-7).

3.    Abron's application stated that Abron had supervised three licenses operators (Exhibit 2 page 92 line 22).

4.    Abron's resume also shows he supervised three licensed operators (Exhibit 12).

5.    Abron went through his resume during the interview (Exhibit 14 page 43 lines 2-15).

6.    Thompson's application did not include any reference to Thompson supervising other persons in a barber shop (Exhibit 13).

7.    Thompson admitted that he had never supervised other barbers prior to coming to the Department of Corrections (Exhibit 7 page 6 line 22 through page 7 line 1).

**f.    The scoring of Abron and Thompson's answers about sterilizing barber equipment supports a finding of pretext**

1.    One of the three questions for applicants addressing "education, training and skills" called for the applicant to explain how to sanitize and sterilize barber equipment.  (See barber interview form attached as Exhibit 15).

2.    Smith admitted that he gave Thompson a score of 4 for excellent answer to the question of how to sterilize and sanitize barber equipment while he gave Abron a

score of 3 for his answer. Smith did not know why he gave Abron a 3 from Abron's sterilization answer as opposed to a finding that would justify a 4 (Exhibit 2 page 98 line 13 through page 99 line 9).

3. Abron's answer to this question discussed different techniques for cleaning the equipment including the use of ultraviolet equipment for sterilization. (See interview notes for Abron written by Shaw Exhibit 15 and Smith's notes attached as Exhibit 16 and affidavit of Abron attached as Exhibit 17).

4. Thompson explained that the ultraviolet sterilizing technique is used everyday at the prison barber shop (Exhibit 7 page 13 lines 22-24).

5. The interviewer's notes for Thompson's interview do not include an reference to ultraviolet sterilization (Exhibit 18 and Exhibit 19).

**g.    The claim Thompson was hired based on the location of his barber shop supports a finding of pretext**

1. Smith stated that the location of Thompson's shop was a factor of why Thompson was selected (Exhibit 2 page 47 lines 19-24).

2. Smith thought it was significant that Thompson had worked in a rough neighborhood (Exhibit 2 page 49 line 11).

3. Smith stated that the fact Thompson had a shop in the rough end of town was a determining factor in why he thought Thompson was more qualified than Abron (Exhibit 2 page 85 lines 11-21).

4. Warden Hulick did not believe it would make any difference for an applicant for the barber position whether the applicant's barber shop was located in a rough neighborhood or not (Exhibit 4 page 16 line 21 through page 17 line 8).

5.      Warden Polk explained that the type of neighborhood that a person worked in would not have any influence on the decision of hiring a barber (Exhibit 6 page 23 lines 8-24).

6.      Thompson agreed that his barber shop was located a few blocks from Abron's barber shop (Exhibit 7 page 17 lines 19-20).

7.      Thompson agreed that the neighborhood for Thompson's shop and the neighborhood for Abron's shop are about the same in regards to the economic distress or the condition of the neighborhoods (Exhibit 7 page 17 line 21 through page 18 line 1).

8.      Shaw did not have anything in his interview notes for either Abron or Thompson that talked about the neighborhood that Thompson's or Abron's barber shops were located (Exhibit 3 page 59 line 21 through page 60 line 20).

**h.      The employment justification form supports a finding of pretext**

1.      After the interview process is over, the persons completing the interview should document their selection on the employment decision form (Exhibit 5 page 26 lines 4-9).

2.      Davis explained it is recommended and stated on the employment decision form that the persons completing the form compare the candidates on the form (Exhibit 5 page 27 lines 16-20).

3.      Shaw was involved in the completion of the employment decision form for the hiring of the barber position at Henry Hill (See form attached as Exhibit 20 and see Exhibit 3 page 21 lines 4-9).

4.      The justification section for the employment decision form stated:

> "This candidate [Thompson] has the necessary education, training and work history which placed him as the most qualified candidate for the barber position.
>
> All of the candidates interviewed had extensive experience as a barber. Mr. Thompson had additional skills demonstrated during the interview process, which made him an excellent selection." (See form attached as Exhibit 20).

5.    The employment decision form does not explain how Thompson's non–correctional and non supervisory work history placed him as the most qualified candidate (Exhibit 20).

6.    The employment decision form does not mention Thompson's barber shop location (Exhibit 20).

7.    Shaw stated that Abron's correctional experience and the Knox County jail experience would provide beneficial training for a candidate for the Department of Correction barber position (Exhibit 3 page 50 line 17 through page 51 line 5).

8.    The employment decision form does not explain how any of Thompson's experience makes Thompson the most qualified (Exhibit 20).

9.    Thompson's application did not mention any education or training in management (Exhibit 13).

10.    Abron's application showed he had 25 hours of courses at Carl Sandburg College majoring in mid-management (Exhibit 13).

11.    Smith stated that it would not have significance that Abron had taken management experience at Carl Sandburg College (Exhibit 2 page 94 line 11).

12.     During his deposition, Smith initially stated that he did not have an opinion as to whether Mr. Thompson was more qualified than Mr. Abron for the barber position (Exhibit 2 page 43 line 7).

i.     **The failure to follow hiring procedures supports a finding of pretext**

1.     The Illinois Department of Corrections issues administrative directives which are developed in Springfield by the Department of Corrections.  (Exhibit 2 page 13 lines 1-20).

2.     The administrative directive #03.02.016 represents the governing rules for filling vacancies in the Department of Corrections and addresses how interviewing is done. (See administrative directive attached as Exhibit 1 and page 14 lines 14-17 of Exhibit 2).

3.     The administrative directive required that prior to conducting interviews the interviewing officers such as Shaw and Smith shall identify the major job responsibilities and essential functions by reviewing job specifications.  (See page 5 of 7 of administrative directive attached as Exhibit 1).

4.     The administrative directive also required the interviewing officers to assign percentage weights to each hiring criteria, develop the interview questions, develop a rating system to be used and develop the candidate evaluation form (Page 5 of 7 of Exhibit 1).

5.     Smith did not think he reviewed the position description for the barber position prior to interviewing Abron.  (Exhibit 2 page 19 lines 13-15).

6.     Smith acknowledged that he did not, (1) develop the interview questions to be asked to the applicants for the barber position (Exhibit 2 page 26 line 16);

(2) develop the rating system to be used (Exhibit 2 page 26 line 21); or (3) develop the candidate evaluation form (Exhibit 2 page 26 line 22 through page 27 line 10).

7.      Smith admitted that there was a lot of stuff that the interviewing officer was supposed to do per the administrative directive that Smith did not do (Exhibit 2 page 30 line 10).

8.      Shaw admitted that he did not identify hiring criteria such as education, skills, etc. by reviewing the job specifications (Exhibit 3 page 9 line 24 through page 10 line 4).

9.      Shaw also admitted that he did not assign percentage weights to each hiring criteria (Exhibit 3 page 10 line 7).

10.     Shaw was not involved in the decision as to how much weight was to be given to different job characteristic categories (Exhibit 3 page 27 lines 11-13).

11.     Warden Hulick stated that the interviewers would be the people who would be involved in deciding how the different questions would be weighted (Exhibit 4 page 10 line 9 through page 11 line 2).

**j.      The rejection of the initial candidate evaluation form for Thompson supports a finding of pretext**

1.      The completion of the candidate evaluation form was a combined effort of Shaw and Smith (Shaw deposition Exhibit 3 page 18 lines 14-18).

2.      Foley said that the interviewing officers would have completed the employment decision form by penciling it in and Foley would have typed in the information the interviewers provided for the form (Foley deposition Exhibit 8 page 14 lines 11-18)

3.      Foley explained that Springfield sent back the initial candidate evaluation form for Larry Thompson's hiring (Exhibit 8 page 18 lines 11-23).

4.      Foley explained that there were two candidate evaluation forms and identified the evaluation form that was initially sent to CMS as Exhibit 10 (See Exhibit 8 page 26 lines 10-14).

5.      Foley also identified the candidate evaluation form that was revised by Mr. Shaw after CMS asked for corrections as Exhibit 21 (Exhibit 8 page 19 lines 12-16).

**k.      A comparison of the Illinois River hiring decision supports a finding of pretext**

1.      Warden Hulick did not think that the experience working with prisoners would be more important at the Illinois Correctional Center in making a hiring decision than at the Henry Hill Correctional Center in making a hiring decision for a barber (Exhibit 4 page 14 lines 15-21).

2.      In 2003, Warden Polk interviewed applicants for the barber position at the Illinois River Correctional Center (Exhibit 6 page 5 lines 14-19).

3.      Polk stated that before he was the warden at the Jacksonville Correctional Center he was the warden at the Western Correctional Center in Mount Sterling, Illinois (Exhibit 6 page 4 lines 16-22).

4.      Polk explained that he was not aware of any difference in the barber positions at the different correctional facilities in Illinois (Exhibit 6 page 7 lines 2-9).

5.      Polk explained that the percentage of time spent on different functions with the barber job would be consistent at the Department of Corrections facility in Canton[Illinois River], the one in Mount Sterling and the one in Galesburg [Henry Hill] (Exhibit 6 page 9 line 22 through page 10 line 7).

6.      Polk interviewed the applicants for the barber position at the Illinois River Correctional Center and he was the one who selected the candidate (Exhibit 6 page 11 lines 3-10).

7.      Polk stated that experience as a barber would probably be the most important thing when Polk would be analyzing the applicants for the barber position (Exhibit 6 page 13 line 23 through page 14 line 5).

8.      Polk identified the employee decision form for the hiring of Mr. Huggins in December 2003 as Exhibit 22 (Exhibit 6 page 22 lines 17-20).

9.      Polk explained that Polk would have provided the information for the justification portion of the form explaining why Huggins was hired (Exhibit 6 page 22 line 21 through page 23 line 1).

10.     Polk explained that a review of the justification section of the employment decision form showed that Polk put a significant weight on Mr. Huggins experience in the Department of Corrections (Exhibit 6 page 23 lines 2-7).

11.     When asked if Huggins experience in the Department of Corrections put Huggins over the edge to get the job compared to Mr. Abron and the other candidates, Polk explained "it had something to do with it yes. Yeah." (Exhibit 6 page 43 lines 17-22).

12.     Polk gave Huggins, a white candidate, a 4.0 point total to Huggins answer about describing the specific job duties and responsibilities of Huggins previous barbering position.  (Huggins interview notes Exhibit 23 and affidavit of Abron Exhibit 17).

13.    Huggins answer to describing specific duties of his previous barbering position show Huggins owned a styling salon since 2004, when he graduated from barbering school in 1972 and that he had eight years experience at the Parkview Barbershop in Cuba along with 13 years experience in corrections.  His answer did not describe any specific duties. (See barber interview questions attached as Exhibit 23).

14.    Polk's notes for Abron's answers to the same question on Abron's interview for the same position showed that the job duties Abron listed for previous barbering positions included cutting hair, sterilizing equipment, maintenance of equipment and counting tools for safety.  Abron also identified 29 years total experience as a barber (See notes from Abron's interview attached as Exhibit 24).

15.    The employment decision form where Lawrence Huggins was hired as the barber over Steve Abron at the Illinois River Correctional Center explains the hiring decision of Huggins over Abron and the other candidates:

> "Overall, candidate #1 answered questions on interview in an outstanding manner.  Candidate outscored or evenly scored all other candidates in all other categories. Candidate has an extensive amount of knowledge and experience in barbering in corrections.  Candidate #1 has a committed attitude with regard to staying on top of security issues (i.e. tool control, toxic control, etc.).  During interview, candidate #1 had an excellent working knowledge of corrections and security procedures." (See employment decision form attached as Exhibit 22).

16.    The interview notes and the applications for the Illinois River position show that Steve Abron had 29 years of experience as a barber at the time of the hiring decision and Huggins had eight years of experience as a barber (See application for Abron attached as Exhibit 25, application for Huggins attached as Exhibit 26, notes from question #1 about barbering experience for Huggins' answer to interview questions

attached as Exhibit 23 and Abron's answers to interview questions attached as Exhibit 24).

17.    Smith explained that Henry Hill was a level 4 secure facility while Illinois River is a security 3 facility.  Smith further explained that this meant that the inmates at Henry Hill are more of a security risk than the inmates at the Illinois River Correctional facility (Exhibit 2 page 53 lines 6-11).

18.    Smith thought it would be more important to have correctional experience for a barber at a level 4 facility than a level 3 facility (Exhibit 2 page 53 line 12-15).

19.    Smith explained that the correctional experience would be more important at a level 4 facility than a level 3 facility because there is more risk with the inmates (Exhibit 2 page 53 line 19 through page 54 line 1).

20.    Davis agreed that the employment decision form relating to the hiring of the barber at the Illinois Correctional Center (Exhibit 20) included as part of the justification for hiring the barber selected at that time was the fact that the candidate has experience working with the Department of Corrections (Exhibit 5 page 34 line 7 through page 35 line 8).

         **l.**     **The fact a candidate with relevant experience can be hired over a candidate with a higher interview score supports a finding of pretext**

1.    Davis explained that the department can hire people outside the order that the applicants get their points (Exhibit 5 page 29 lines 1-5).

2.    Davis gave an example of when a person could be hired even though they did not score as many points as another candidate would be when a person had specific experience relating to the type of work the position covered (Exhibit  page 29 lines 6-17).

3.      Davis further explained that if an applicant has a lot of experience very related to the job but maybe they did not score as many points on other sections, this might be a situation where the applicant that scored less points would be hired (Exhibit page 29 lines 18-23).

### m.      Contradicting positions about years of experience supports a finding of pretext

1.      Smith and Shaw explained that the fact Thompson had 40 years of experience and Abron had 29 years of experience was a significant factor in hiring Abron (Exhibit 2 page 86 line 20 and Exhibit3 page 52 line 13).

2.      Polk explained that there would not be a difference in candidates for a barber position as to whether a person had 12 years of barber experience, 20 years of barber experience or 30 years of barber experience (Exhibit 6 page 24 lines 2-7).

3.      Thompson stated in his deposition that he had been self employed as a barber for about 22 years (Exhibit 7 page 5 lines 8-11).

### n      Abron's experience cutting black person's hair supports a finding of pretext

1.      Smith stated that approximately 70% of the inmates at the Henry Hill facility were black (Exhibit 2 page 77 line 12).

2.      Smith was not aware of any difference in the way black inmates have their hair cut compared to white inmates (Exhibit 2 page 77 line 16).

3.      Smith did not take into consideration an applicant's experience in regards to cutting black people's hair compared to cutting white people's hair when interviewing candidates for the job (Exhibit 2 page 77 line 22).

4.      Smith stated that he thought it was significant that Thompson had cut all nationalities hair explaining that it was significant because Henry Hill has a minority population and Smith wanted to be sure that Thompson had an appreciation of the variation of hair at Henry Hill (Exhibit 2 page 88 lines 7-18).

5.      Davis stated that she did not believe she was qualified to answer whether a barber that had extensive experience working with black customers hair would qualify as special or extra experience related to the barber job in light of the fact that most of the inmates are black (Exhibit 5 page 29 line 24 through page 30 line 13).

6.      Polk agreed that a high percentage of the inmates in the Illinois Department of Corrections were black (Exhibit 6 page 25 lines 14-17).

7.      Polk believed that experience cutting black hair as opposed to cutting white hair would be something that should be considered when looking at experience for the Department of Corrections positions (Exhibit 6 page 25 line 23 through page 26 line 5).

8.      Polk indicated that he had worked in five correctional facilities in the State of Illinois and he had never worked in a correctional facility that had a black barber (Exhibit 6 page 25 lines 5-9).

**o.      The interviewers were white and Abron is black**

1.      The interviewers Frank Shaw and William Smith are white and Steve Abron is black (See 2/21/06 memo attached as Exhibit 27).

### C.    ARGUMENT

**Summary Judgment Standard**

1.      When a court addresses a summary judgment request, the court must consider all evidence in the record and all reasonable inferences from the record in the light most favorable to the non-moving party, *U.S.E.E.O.C. v. Target Corp.* (7th Cir. 2006), 460 F. 3d 946, 956.

2.      The court's function is not to weigh the evidence but merely to determine if there is a genuine issue for trial, *Thanongsinh v. Board of Educ.* (7th Cir. 2006), 462 F. 3d 762, 771-2.  If a plaintiff provides sufficient evidence to create a triable issue as to whether an employment decision was motivated by unlawful discrimination then summary judgment is inappropriate, *Rudin v. Lincoln Land Community College* (7th Cir. 2005), 420 F. 3d 712, 724.

**Summary Judgment is Inappropriate Because a Reasonable Jury Could Find Discriminatory Animus in the Scoring of the Applicant Evaluations**

1.      A court does not sit as a super personnel department, *Gordon v. United Airlines, Incorporated*, (7th Cir. 2001), 246 F. 3d 878,889.  However, the court does not need to abandon good reason and common sense in assessing an employer's actions. Indeed, a determination of whether an employer's belief is honest is conflated with analysis of reasonableness, id 246 F. 3d at 889.

2.      If the court were to find that the Department of Corrections has demonstrated a legitimate non-discriminatory reason for the adverse employment action then the plaintiff bears the burden of producing sufficient evidence from which a reasonable fact-finder could conclude that the defendant's proffered reason is pretextual, *Thanongsinh v. Board of Educ.* (7th Cir. 2006), 462 F. 3d 762, 772.

3.      When a defendant relies upon the scoring of an exam as its "legitimate non-discriminatory reason" for the employment decision, an employee can avoid summary judgment by providing evidence that there was discriminatory animus in the scoring of the exam, *Thanongsinh* 462 F. 3d at 780.

4.      A comparison of the initial candidate evaluation forms completed by the interviewers is relevant and probative of the defendant's intent, *Thanongsinh* 462 F. 3d at 780.  The candidate evaluation forms provided that 30% of the applicant's interview score was based upon the hiring criteria labeled "education, training and skills."  Mrs. Davis explained that by reviewing the comments section of the candidate evaluation forms you should be able to determine why one applicant received a higher score than another applicant in each category.  Davis could not tell why Thompson scored higher when she reviewed the forms.

5.      The comments section of the candidate evaluation forms for Abron and Thompson both included the statement that each candidate "completed all requirements for this position with above average skills."  However, the comments for Abron went on with an additional comment stating that Abron also maintained correctional experience.  All of the interviewers agreed that correctional experience would be an asset for a person interviewing for the barber position at the correctional facility.  Despite Abron having a better evaluation than Thompson when comparing their candidate evaluation forms, the candidate evaluation forms showed that Thompson received 3.7 points out of a possible 4 while Abron received a score 3.3.  From this evidence, a reasonable jury could infer that the interviewers scored their candidate evaluation forms differently for minority and non-minority candidates based on their race.

6.      Additionally, one of the three questions addressing education, training and skills asked the candidates to explain how to sanitize and sterilize barber equipment. The notes from Abron's answer show that he talked about using an ultra violet ray system to sterilize the equipment. Thompson's notes from the interview do not include any mention of using an ultra violet ray to sanitize the equipment. Thompson admitted in his interview that while he has been the barber at the Henry Hill Correction Center, he uses ultra violet rays to clean the equipment on a regular basis. Abron answered the question by explaining the type of sanitary equipment used at the prison. Thompson did not mention the ultraviolet system. However, Thompson received a higher score for explaining how to sterilize and sanitize the barber equipment. The scoring on this question would allow a reasonable juror to find reliance on the interview scores was pretextual.

7.      The barber position at the Henry Hill facility involves supervising inmates who cut people's hair. The position description explains that 55% of the barber's job is supervisory duties. The interviewers knew that the barber position at Henry Hill involves supervising inmates and the interviewers were provided with applications for both candidates prior to the interviews. The interviewers had Abron's application and resume at the interview. A review of the applications shows that Abron was a supervisor of three licensed barbers. Thompson did not have supervisory experience. The interviewers were also provided with Abron's resume prior to the interview and the resume explained that Abron supervised other barbers. Additionally, Abron explained in his deposition that during the interviews he would have provided the interviewers with information from his

resume.  Smith agreed that supervising others would be beneficial to a candidate and he would give weight to a candidate if they had supervisory experience.

8.    The interviewers agreed that working in a correctional facility would be an asset to an applicant.  Abron had experience working with the Department of Corrections juvenile center in Kewanee and also had experience working with adult inmates at the Knox County jail.  Despite the fact Abron had experience working in correctional facilities and had supervisory experience, the employment decision form indicated that Thompson's work history placed him as the most qualified candidate.  Abron's correctional experience along with supervisory experience when compared with the duties of the job and the statements of the officers would allow a reasonable jury to find that the hiring decision was not based on training and working history but instead was based upon race.

9.    Smith's claim that Thompson was more qualified than Abron based upon the location of Thompson's barber shop also supports a finding of pretext.  Smith stated that the location of Thompson's shop was a factor of why Thompson was selected as the barber.  Smith thought it was significant that Thompson worked in a rough neighborhood. Neither Warden Hulick nor Warden Polk believed it would make any difference for an applicant for the barber position whether the applicant's barber shop was located in a rough neighborhood.  Interestingly, Thompson also agreed that his barber shop was only a few blocks from Abron's barber shop and that the neighborhoods.  Moreover, despite one interviewer claiming that the location of the barber shop had a lot to do with the hiring decision.  The other interviewer did not even put in his notes that Thompson's barber shop was located in a rough neighborhood.  This claimed explanation of the hiring

decision would allow a reasonable jury to find that race was a factor in the hiring decision. When an employer gives conflicting explanations for an employment decision, a court can look at a comparison of the qualifications of the candidates to determine if a decision was pretextual, *Harvey v. Office of Banks Real Estate, (7th Cir. 2004), 377 698, 712.*

10.    Besides the factor that Thompson was working in a depressed neighborhood, the other reason given for hiring Thompson over Abron was that Abron had 29 years of experience while Thompson had 40 years of experience. During his deposition Thompson conceded that during 10 of these 40 years Thompson was actually an over the road driver and would cut hair on the side for friends and family. The experience as an over the road driver was readily available to the interviewers if they reviewed the applications. The personnel department gave the interviewers the application before the interviews. Moreover, even if Thompson had 40 years experience, Warden Polk's testimony provided that the difference in Abron and Thompson's years of experience should not make a difference.

11.    An applicant can raise a genuine issue of material fact for the purposes of summary judgment about an employers credibility by presenting evidence that the employers explanation was contrary to the facts, insufficient to justify the action or not truly the employers motivation, *USEEOC v. Target Corp.* (7th Cir. 2006), 460 F. 3d 946, 960. See also *Rudin v. Lincoln Land Community College* (7th Cir. 2005), 420 F. 3d 712, 726. A review of the facts in this case would allow a reasonable jury to find the test scores were based on rare and reliance on the scores of the interviewing was pretextual.

**The Failure to Follow Hiring Procedures Supports a Finding of Pretext**

    **1.**     An additional basis for finding that the reason offered by an employer was

pretextual can be that the employer did not follow its normal hiring process, *Rudin v.*

*Lincoln Land Community College* (7th Cir. 2005), 420 F. 3d 712, 723. In the present

case, the hiring practices for the Department of Corrections dictates that the interviewers

review the job description and come up with the questions and determine how the

different qualifications and questions should be weighted in analyzing the applicants.

Here none of the interviewers followed the Illinois Administrative Directive and the

interviewers did not put any thought into how the different categories or questions should

be weighted. Moreover, the interviewers suggest that they had to hire the applicant with

the highest score. However, the forms used by the Department of Corrections along with

the personnel at CMS explained that in particular circumstances, if a person has relevant

experience they can be hired despite receiving a lower score than other applicants. Abron

had supervisory experience, correctional experience and a more accurate answer to the

one technical barbering question. All of these factors could allow the department to hire

Abron even if his score was less than Thompson's. Finally, the initial evaluation form

from Thompson was rejected because it was not factually sufficient. These facts create

an issue of fact as to whether blind reliance on the interview scores is pretext.

**A Review of the Candidate Evaluations and Applicant Scores Supports a Finding of Pretext**

    1.     A side by side comparison of the initial candidate evaluation forms

completed by the interviewers also supports the denial of summary judgment. If the

employer's own documentation, makes the decision appear suspicious and/or contradicts

the employer's reasoning for the employment decision, a jury can find the employer's

offered reason to be pretextual, *Harvey v. Office of Banks and Real Estate* (7th Cir. 2004), 370 F. 3d 698, 709.

### The Treatment of Abron Differently than White Applicants Supports a Finding of Pretext

1.     The Department of Corrections inconsistency can also support a denial of the summary judgment.  When an employer gives inconsistent justification for a hiring decision, this is circumstantial evidence of discrimination, *Rudin v. Lincoln Land Community College* (7th Cir. 2005), 420 F. 3d 712, 723-24.  Additionally, when an employer treats similarly situated individuals who are not in a protected class differently than those in a protected class, the court can find the employer's stated reasons to be pretextual, *Elkhatib v. Dunkin Donuts, Inc.* (7th Cir. 2007), 493 F. 3d 827, 831-32.  In the present case, Steve Abron did not get hired despite having correctional experience, supervisory experience and extensive barbering experience.  When Abron applied for the barber position at the Illinois River Correctional Center in Canton he was not hired due to the fact a white applicant (who had been working in the prison bakery for the previous 13 years) had correctional experience.  The interviewer discounted the fact Abron had more barbering experience.  However, when Abron had correctional experience and he interviewed at the Henry Hill facility, he lost the job to a white applicant who did not have correctional experience but had (allegedly) more barber shop experience.  The dissimilarity between the way white applicants and the black applicant were treated creates a material issue of fact on the issue of pretext and prevents the court from granting summary judgment.

**The Defendant's Blanket Statement They Hired the Person with the Highest Score Fails to Shift the Burden Back to the Plaintiff**

1.     If an employer presents an ostensively objective non-discriminatory reason for its employment decision but fails to articulate the criteria that informed this reason, the employer's proffered reason is insufficient to satisfy its burden and plaintiff can survive summary judgment without refuting the proffered reasons, *U.S.E.E.O.C. v. Target Corp.* (7th Cir 2006), 958. The Department of Corrections claims that because Thompson scored highest on his interview and because the Department hires the person with the highest score, the Department stated a legitimate non-discriminatory reason for its decision.

2.     Contrary to defendants argument the defendant's policy allows the hiring of candidates that do not score the highest on the exam. The general statement that the department hired the person with the highest interview score is similar to the statement rejected by the 7th Circuit in *U.S.E.E.O.C.U. v. Target Corp.*. Target claimed that based on the interview the applicant did not meet the requirements and therefore, they elected not to hire him. The court in *Target* found that the general "based on our interview" basis for not hiring failed to shift the burden back to the plaintiff. Essentially, the Department of Corrections position in their motion for summary judgment is indistinguishable in that they do not give any specific reasons other than the candidate we gave the highest score to is who we hired. Thus, the Department of Corrections has failed to shift the burden back on Abron to show that the "non-discriminatory" reason proffered was pretextual.

**E.     THE CASES RELIED UPON BY DEFENDANT DO NOT SUPPORT THE GRANTING OF SUMMARY JUDGMENT**

1.     Defendant relies heavily on *Blise v. Antaramian* (7th Cir. 2005), 409 F. 3d 861.  In *Blise*, the plaintiff failed to show any inconsistencies in the reasons given by the employer for its hiring decision.  *Blise* failed to show evidence of pretext.  Abron presented evidence that the interviewers own documents do not support their scoring.  Additionally, Abron has shown that the suggestion they must hire the applicant with the highest score is not true.  Abron has pointed out the contradictions regarding why Abron was hired.  Additionally, *Blise* did not point out how similarly situated applicants were treated differently than Blise.  *Blise* did not highlight how Blise was the better candidate and despite such qualifications received a lower score than the candidate hired.  Moreover, *Blise* did not point out the employer's failure to follow its own hiring practices.  All of these factors distinguish *Blise* from the present case which is more similar to *Thanongsinh v. Board of Education* (7th Cir. 2006), 462 F. 3d 762,  *Rudin v. Lincoln Land Community College* (7th Cir. 2005), 428 F. 3d 712, *Elkhatib v. Dunkin Donuts, Inc.* (7th Cir. 2007), 493 F. 3d 827 and *USEEOC v. Target Corp.* (7th Cir. 2006), 460 F. 3d 946.

2.     The Department of Corrections reliance on *Ghosh v. Indiana Department of Environmental Management* (7th Cir. 1999), 192 F. 3d 1087 is also misplaced.  In *Ghosh*, the employer explained that the plaintiff was not interviewed for the position because the plaintiff's resume did not score in the top 20% of those received for the position.  The plaintiff did not dispute the employer's explanation and did not show that the employer's explanation concerning this issue was pretextual.  Here while Thompson scored higher than Abron, Abron has provided sufficient evidence to question whether

the scores were based on race.  Both *Ghose* and *Blise* are factually distinguishable from Abron's case.

3.    When a plaintiff offers specific evidence from which the jury may reasonably infer that the proffered reasons are not truthful, the case turns on the credibility of the witnesses, *Harvey v. Office of Banks and Real Estate* (7th Cir. 2004), 377 F. 3d 698.  Defendant's reliance on *Millbrook v. IBP* (7th Cir. 2002), 280 F. 3d 1169 for suggesting the candidates qualifications cannot be compared is misplaced. See *David v. Caterpillar, Inc.* (7th Cir. 2003), 324 F. 3d 851, 862, distinguishing *Millbrook* and stating that  when an employer gives conflicting reasons for why they made an employment decision, the jury can compare the qualifications of the witnesses to determine if an employer's reasons are pretextual.  Additionally, a review of the facts of this case would allow a court to find no reasonable person could have chosen Thompson over Abron.

**F.    CONCLUSION**

1.    The Department of Corrections motion claims Thompson should get the job because he received a higher score on the interview forms.  One interviewer claims Thompson got the job because of the location of his barber shop.  The other interviewer and the warden state the shop's location should not be an issue.

2.    The fact that a large portion of the job involves supervision and Abron had supervisory experience and Thompson did not calls into question the scoring procedure. The scoring procedure is also called into question by Abron's experience working in a correctional facility which was admitted to be an asset for an applicant. The failure to follow hiring procedures also allows a court to find pretext and deny a motion for

summary judgment.  The fact that Abron had more barbering experience for the Illinois River job but did not get the job because he did not have correctional experience shows similarly situated applicants of different races were not treated the same.  A look at the evaluation forms initially filled out for the candidates show that Abron should have received a higher score than Thompson.  However, Thompson received a higher score than Abron.  All of the above support a finding of pretext and support the denial of the motion for summary judgment.

WHEREFORE, Steve Abron asks the court to deny the state's motion for summary judgment.

Respectfully submitted,

REHN & SKINNER LLC


s/John Rehn
John Rehn

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2007 a Response to Defendant's Motion for Summary Judgment was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

Thomas Klein
Assistant Attorney General
500 S. Second Street
Springfield, Illinois 62706

s/John R. Rehn
John R. Rehn

REHN & SKINNER LLC
Attorneys at Law
John Rehn
ARDC#06230108
5 E. Simmons St.
Galesburg, Illinois 61401
309-343-3600
309343-9966 fax

**E-FILED**
Friday, 09 November, 2007  03:26:41 PM
Clerk, U.S. District Court, ILCD

| **Illinois** Department of **Corrections** | *ADMINISTRATIVE DIRECTIVE* | Number | 03.02.106 |
|---|---|---|---|
| | | Page | 1 of 7 |
| | | Effective | 1/1/2002 |

| Section | 03 | Personnel and Labor Relations |
|---|---|---|
| Subsection | 02 | Personnel Standards |
| Subject | 106 | Filling Vacancies |

## I.  POLICY

### A.  Authority

730 ILCS 5/3 2-2

### B.  Policy Statement

Employment decisions of the Department of Corrections shall be made in accordance with applicable State and federal statutes and rules and collective bargaining agreements.

## II.  PROCEDURE

### A.  Purpose

The purpose of this directive is to establish written instructions to staff regarding interviewing and selection of staff.

### B.  Applicability

This directive is applicable to employment decisions within the Department.

### C.  Internal Audits

An internal audit of this directive shall be conducted at least annually.

**EXHIBIT**

tabbies

### D.  Designees

Individuals specified in this directive may delegate stated responsibilities to another person or persons unless otherwise directed.

### E.  Definitions

Chief Administrator - for purposes of this directive, the Director, Associate Director, Bureau Chief, Deputy Director, Chief, Deputy Chief or District Deputy Director.

Close associate - any person other than a relative with whom the individual is currently residing or has previously resided, or with whom the individual has or has had a close personal relationship.

Employment decisions - initial hires, promotions, transfers, and recalls.

Illinois Department of Corrections

| ADMINISTRATIVE DIRECTIVE | Effective 1/1/2002 | Page 2 of 7 | Number 03.02.106 |
|---|---|---|---|

Essential functions - job tasks that are fundamental and not marginal.

Exempt positions - those positions determined through the Department of Central Management Services (CMS) to be exempt from the interview and selection process outlined in Paragraph II.

Interviewing Officers - persons authorized by the Department to interview and make recommendations regarding employment decisions.

Relative - spouse, parent, sibling, child, grandchild, grandparent, aunt, uncle, niece, nephew, and cousin, including first line blood, step, half, foster, or in law relations.

Screening - includes, among other matters, review of applications, employment history, interviews, and background investigations.

F.  **General Provisions**

1. The approval of the Director and either the Associate Director or respective Deputy Director shall be obtained prior to posting vacancies or interviewing applicants, except for interviews conducted through the Central Screening Unit in accordance with Administrative Directive 03.02.105.

2. Employment decisions, except for exempt positions, shall be based on impartial selection criteria and shall not be decided on the basis of party affiliation or support. This does not preclude existing procedures for Veteran's preference, bargaining units, or Affirmative Action.

3. Employment decisions shall be subject to administrative approval in accordance with Administrative Directive 03.02.100 and shall be documented.

4. Each Chief Administrator shall identify at least one administrative staff person who will coordinate interview and selection activities for the facility. A list of the current names of such individuals shall be provided to the Associate Director or respective Deputy Director and the Central Personnel Office.

5. Interview Coordinators shall receive specialized training approved by the Manager of Central Personnel in regard to interview and selection requirements and guidelines.

6. Interviews shall be conducted by persons authorized to be Interview Officers.

7. Preference shall be given to Illinois residents. Approval of the Director and of Central Management Services is required prior to hiring a non resident.

8. Any person responsible for making employment decisions shall disqualify himself or herself from any decision making where any of the persons considered are the individual's relatives or close associates.

9. External procedures and forms mentioned in this directive are subject to change without notice. Any such changes will be communicated by the Department's Manager of Central Personnel and should be implemented immediately.

G.  **Requests to Fill Vacancies**

*Illinois Department of Corrections*

| ADMINISTRATIVE DIRECTIVE | Effective 1/1/2002 | Page 3 of 7 | Number 03.02.106 |
|---|---|---|---|

1.  To request to fill a vacancy, the Chief Administrator shall submit the following applicable forms to the Associate Director or respective Deputy Director:

    a.  A Vacancy Request Form, DOC 0040, and for facilities, a personal services budget schedule 4.

    b.  A Position Justification Form, DOC 0077, unless otherwise instructed.

    c.  A current Position Description, CMS 104, when requesting to establish or change a position.

2.  The request shall be reviewed and approved by the Director, either the Associate Director or respective Deputy Director, and the Deputy Director of Finance. The requests shall be forwarded to the Central Personnel Office.

3.  The Central Personnel Office shall:

    a.  Retain the original and forward a copy of the approved Vacancy Request Form to the Chief Administrator; and

    b.  Where applicable, prepare the Position Review/Determination Form and submit it to the Department of Central Management Services for a position determination.

    c.  Upon receipt of any position determination, advise the Chief Administrator.

4.  Upon receipt of the approved Vacancy Request Form, the Chief Administrator shall post any bargaining unit position and may post any other position. The posting shall include essential functions of the position.

H.    Minimum Qualification and Interview Requirements

1.  An applicant must:

    a.  Be at least 18 years of age.

    b.  Be a United States citizen or national or a registered alien who is authorized to work in the United States.

    c.  Meet the educational and experience requirements of the position for which applying.

    d.  Consent to submit to a drug test prior to hire.

    e.  Be registered with the Federal Selective Service, if applicable. (Males between the ages of 18   26 who are U.S. citizens must register.)

    f.  Provide proof of identity and employment eligibility upon request.

    g.  For any position which may require the prospective employee to possess,

*Illinois Department of* **Corrections**

| *ADMINISTRATIVE DIRECTIVE* | Effective 1/1/2002 | Page 4 of 7 | Number 03.02.106 |
|---|---|---|---|

receive, or transfer a weapon or ammunition, the applicant must never have been dishonorably discharged from the Armed Forces of the United States or convicted by any court of any crime punishable by imprisonment for a term exceeding one year, or convicted of a misdemeanor crime of domestic violence. A misdemeanor crime of domestic violence is one that has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim. This definition is intended to encompass any domestic violence crime as defined under the Federal Gun Control Act and it includes all offenses that involve the use or attempted use of physical force if the offense is committed by one of the defined parties, regardless of whether or not the offense is labeled "domestic violence."

2. The Interviewing Officer(s) shall:

    a. Verify the applicant's identity and employment eligibility.

    b. Obtain the following applicable documentation from each applicant interviewed except for applicants who are current Department employees:

        (1) A completed Applicant Information Sheet, DOC 0031;

        (2) An Employment Release and Consent form, DOC 0035;

        (3) A Tax information Authorization, IRS Form 8821, authorizing release of employment and employer information from 1040's and W-2's for the specific years of past employment; and

        (4) A Request Pertaining to Military Record, standard Form 180, if the applicant has military experience.

    c. Where applicable, advise the applicant that as a condition of employment or continued employment, the applicant must never have been convicted of domestic violence as defined in Paragraph II.H.1.g.

    d. Where applicable, advise the applicant that as a condition of employment arrangements must be made prior to the end of his or her probationary period for repayment of any State educational loan for which the applicant is in default.

3. Interviewing and selection of applicants for exempt positions shall be conducted as determined necessary by the Chief Administrator. Appointments to exempt positions are subject to approval of the Governor's Office of Personnel.

4. Correctional Officer/Youth Supervisor Trainees shall be screened and selected in accordance with Administrative Directive 03.02.105.

5. Applicants for positions covered under collective bargaining agreements shall submit a

*Illinois Department of Corrections*

| ADMINISTRATIVE DIRECTIVE | Effective 1/1/2002 | Page 5 of 7 | Number 03.02.106 |
|---|---|---|---|

bid form, where applicable, and be selected in accordance with the appropriate collective bargaining agreements. The Employee Bid Form, DOC 0079, shall be used for Department employees. Bids shall be recorded on the Employment Bid Record, DOC 0100. Whenever the collective bargaining process articulated in the appropriate contract has been exhausted, applicants shall be interviewed and selected in accordance with Paragraph II.I., unless the position has been determined to be exempt.

6.  All other positions shall have applicants selected in accordance with Paragraph II.I.

7.  A background investigation of applicants recommended for hire shall be conducted in accordance with Administrative Directive 01.02.107.

8.  Where required by Administrative Directive 03.02.109, a medical examination shall be conducted after a conditional offer of employment has been made.

I.  **Interview and Selection Process for Positions Filled Under Rutan Guidelines**

1.  Prior to interviewing any persons for a Rutan position:

    a.  The Interviewing Officer shall:

        (1)  Have completed Rutan Training provided through the Department of Central Management Services.

        (2)  Identify the major job responsibilities and essential functions by reviewing the current Position Description, CMS 104.

        (3)  Identify hiring criteria such as, education, experience, skills, etc. by reviewing the job specifications.

        (4)  Assign percentage weights to each hiring criteria.

        (5)  Develop the interview questions to be asked of each applicant for each hiring criteria.

        (6)  Develop the rating system to be used and indicate the numerical rating assigned. Facilities may:

            (a)  Assign a numerical rating to each hiring criteria; or

            (b)  Assign a numerical rating to each interview question.

        (7)  Develop the Candidate Evaluation Form, DC 5653, including the hiring criteria and the % of weight.

        (8)  Forward the Candidate Evaluation Form, interview questions, job posting (if applicable), major responsibilities, rating system, Position Description, and class specifications to the Interview Coordinator.

    b.  The Interview Coordinator shall review the information submitted and coordinate any necessary changes to ensure hiring criteria and interview

Illinois Department of Corrections

| ADMINISTRATIVE DIRECTIVE | Effective 1/1/2002 | Page 6 of 7 | Number 03.02.106 |
|---|---|---|---|

questions are job related and impartial, and forward the Candidate Evaluation Form and interview questions to the Chief Administrator for review and approval.

NOTE:  Candidate Evaluation Forms and Interview Questions previously approved for the position being filled may be used provided they accurately reflect the current position description, major responsibilities, and job specifications.  A review of this material by the Interview Coordinator and Chief Administrator shall be required.

2.     Upon approval by the Chief Administrator of interview questions and the Candidate Evaluation Form, the Interviewing Officer shall:

a.     Schedule and conduct interviews, completing an interview questionnaire and one Candidate Evaluation Form for each applicant interviewed.  Applicants shall be requested to complete an Applicant Information Sheet, DOC 0031, and an Employment Release and Consent form, DOC 0035.

b.     Rank the applicants in the order of highest score.

c.     Ensure background investigations are conducted as appropriate and make an employment recommendation.

d.     Complete the Employment Decision Form, DC 5654.

3.     Employment recommendations shall be reviewed and approved by the Chief Administrator and, if approved be submitted on the appropriate personnel form (CMS 2 or DOC 0044) for the Director's approval   A copy of the Candidate Evaluation Form and the Employment Decision Form shall be attached to the appropriate personnel form when submitted for processing.

J.     **Filing Requirements   All Positions**

When employment decisions are made, documentation shall be filed as follows.

1.     Fingerprint cards of applicants hired shall be filed:  at the Bureau of Identification Office, if applicable; at the Training Academy for Central Office staff; or at an office designated by the Chief Administrator.  In adult correctional centers, fingerprint cards of applicants hired shall also be maintained in the Hostage File.

2.     The application or bid form or both (CMS 100, DOC 0079, etc.) of any applicant hired shall be filed in the employee's personnel file along with the Employment Bid Record, if applicable.  A copy of the application form shall also be filed with other interview documentation in the Rutan file, if applicable, in accordance with Paragraph II.J.5.

3.     Material relating to Correctional Officer or Youth Supervisor Trainees shall be filed in accordance with Administrative Directive 03.02.105

4.     Information gathered during the screening process for background investigations, such as, applicant information sheets, summary of background investigations, Administrative Reviews, and  reference checks, shall be filed in the Background Investigations Unit.

*Illinois Department of Corrections*

| ADMINISTRATIVE DIRECTIVE | Effective 1/1/2002 | Page 7 of 7 | Number 03.02.106 |
|---|---|---|---|

5.  Interview documentation for employment decisions regarding positions filled under Rutan guidelines, except for confidential medical records, shall be maintained on file in the Personnel Office in a Rutan file. Each file shall be labeled with the position number, title, and date of the employment decision and shall be filed in chronological order by date of hire. The contents of each file shall be filed alphabetically by applicant's name. Each file shall include copies of the following information:

   a.  The approved Vacancy Request Form, and if required, a Position Justification Form;

   b.  The Position Description;

   c.  Class specifications;

   d.  Job posting, if applicable;

   e.  The Employment Decision Form for the candidate selected;

   f.  A copy of the eligibility list used, if applicable;

   g.  Employment applications (CMS 100s) and, if applicable, bid forms received for all applicants;

   h.  Completed interview questionnaires for all applicants interviewed;

   i.  One Candidate Evaluation Form for each applicant interviewed;

   j.  Applicant Information Sheets, if applicable; and

   k.  Copies of regret letters to non-selected candidates.

6.  Employment decision files shall be maintained in the Personnel Office in accordance with the approved record retention schedule.

**Authorized by:**

Donald N. Snyder Jr.
Director

Supersedes:
03.02.106          AD          12/1/1995

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

Steve Abron,

                          Plaintiff,

            -vs-                          No. 06-115

State of Illinois, Department
of Corrections, Henry Hill
Correctional Center and Don
Hulick, Warden, Individually,
Bill Smith, Business Admini-
strator, Individually, and
Frank Shaw, Assistant Warden,
Individually and in their
official capacity,

                          Defendants.

THE DEPOSITION OF WILLIAM G. SMITH, taken
before Amy C. Powers, Illinois CSR 084-003142,
RPR 034142, a Notary Public, on Thursday, the
24th day of May 2007, commencing at the hour of
11:10 a.m., at 600 South Linwood Road, in the
City of Galesburg, County of Knox, and State of
Illinois.

CIRCUIT WIDE REPORTING
Suite 316 Hill Arcade Building
Galesburg, Illinois 61401
(309) 343-3376 • 1-800-342-DEPO

---

E-FILED
Friday, 09 November, 2007  03:27:37 PM
Clerk, U.S. District Court, ILCD

WITNESS                                      PAGE
  WILLIAM G. SMITH,
    Direct Examination by Mr. Rehn        4 - 121
    Cross-Examination by Mr. Klein       12 - 12
    Redirect Examination by Mr. Rehn     12 - 12
    Recross Examination by Mr. Klein     12 - 12
    Certificate of Reporter              12 - 127

EXHIBITS
  Exhibit 1 so marked for i.d.
  Exhibit 2 so marked for i.d.
  Exhibit 3 so marked for i.d.
  Exhibit 4 so marked for i.d.
  Exhibits 5-6 so marked for i.d.
  Exhibit 7 so marked for i.d.
  Exhibit 8 so marked for i.d.
  Exhibit 9 so marked for i.d.
  Exhibit 10 so marked for i.d.
  Exhibit 11 so marked for i.d.
  Exhibit 12 so marked for i.d.
  Exhibit 13 so marked for i.d.
  Exhibit 14 so marked for i.d.
  Exhibit 15 so marked for i.d.
  Exhibit 16 so marked for i.d.
  Exhibit 17 so marked for i.d.
  Exhibit 18 so marked for i.d.
  Exhibit 19 so marked for i.d.
  Exhibit 1A re-marked for i.d.
  Exhibit 20 so marked for i.d.
  Exhibit 21 so marked for i.d.
  Exhibit 22 so marked for i.d.
  Exhibit 23 so marked for i.d.

---

2

PRESENT:

    JOHN REHN, ESQ.,
    311 East Main Street, Suite 41,
    Galesburg, Illinois 61401
        on behalf of the Plaintiff;

    THOMAS KLEIN, ESQ.,
    500 South Second Street
    Springfield, Illinois 62706
        on behalf of the Defendant.

ALSO PRESENT:
    MR. STEVE ABRON

---

4

(Witness sworn.)

                    WILLIAM G. SMITH,

having been first duly sworn, was examined and
testified on his oath as follows:

**DIRECT EXAMINATION BY MR. REHN:**

Q.   Why don't you state and spell your name for
     the record, please.

A.   Sure.  William G. Smith, W-I-L-L-I-A-M, G.,
     Smith, S-M-I-T-H.

         MR. REHN:  We are here today for a
     deposition in a case involving Steve Abron
     and the Department of Corrections.  Have
     you been deposed before?

         THE WITNESS:  Yes.

         MR. REHN:  All right.  I don't think
     it will be anything new or tricky in
     regards to the rules today.  We're just
     having a formal conversation, which means
     that the things we all do at the dinner
     table, sometimes we might say, that's not
     right today.  Don't get offended if I say,
     "Is that a yes" or "Is that a no?"  We want
     you to answer out loud to all questions,


EXHIBIT

13

| | | |
|---|---|---|
| 1 | Q. | What is an Administrative Directive? |
| 2 | A. | Within the department you have Department |
| 3 | | Rules and you have Administrative |
| 4 | | Directives. Administrative Directives are |
| 5 | | developed in Springfield by Department of |
| 6 | | Corrections. Department Rules that we have |
| 7 | | here may be developed in certain cases for |
| 8 | | our use only. Now, those would be like how |
| 9 | | we count inmates at the end of the day, or |
| 10 | | how they may run a dairy plant, where there |
| 11 | | is only a dairy here and not one in 15 |
| 12 | | prisons. |
| 13 | | So basically the AD's are the big |
| 14 | | ones. That's the Bible. Everything else |
| 15 | | comes under them. Internal documents can be |
| 16 | | up to the strength of the AD, but cannot go |
| 17 | | over, meaning they don't have to be as |
| 18 | | tough. But you wouldn't have a local |
| 19 | | program that was more stringent than the |
| 20 | | Administrative Directive. |
| 21 | Q. | And so in the Department of Corrections, |
| 22 | | there's a hierarchy of rules, and the |
| 23 | | Administrative Directive is the top level? |
| 24 | A. | Yes. To the best of my knowledge. |

14

| | | |
|---|---|---|
| 1 | Q. | And it sounds like this Administrative |
| 2 | | Directive is still in effect today? |
| 3 | A. | I believe so. And the reason why I'm just |
| 4 | | going by memory, because they were right |
| 5 | | around the corner there when I pulled it, |
| 6 | | and I believe it was 2002. |
| 7 | Q. | And it -- |
| 8 | A. | I know they're not updated yearly. They're |
| 9 | | reviewed, but they're not changed. |
| 10 | Q. | It sounds like you took a look at this |
| 11 | | document recently in preparation for this |
| 12 | | deposition? |
| 13 | A. | Yes, right. |
| 14 | Q. | And you did that as -- because this sort of |
| 15 | | controls the general rules for how |
| 16 | | interviewing is done? |
| 17 | A. | Right. Just -- it was just a refresher. |
| 18 | Q. | And if you go to the second page of |
| 19 | | Exhibit 1, there's General Provisions. And |
| 20 | | if you go to No. 6 on there, it says, |
| 21 | | Interviews shall be conducted by persons |
| 22 | | authorized to interview officers; is that |
| 23 | | right? |
| 24 | A. | Yes. |

15

| | | |
|---|---|---|
| 1 | Q. | And is that consistent with your |
| 2 | | understanding as far as you have been Rutan |
| 3 | | certified? |
| 4 | A. | Yes, that's -- that's the litmus test there. |
| 5 | Q. | And so you would be authorized to interview |
| 6 | | officers? |
| 7 | A. | Yes. |
| 8 | Q. | And if you go to page 5 of 7, which is Bates |
| 9 | | stamped 5, you go to Subsection I, it |
| 10 | | addresses the interview and selection |
| 11 | | process for positions filled under Rutan |
| 12 | | guidelines, right? |
| 13 | A. | Yes. |
| 14 | Q. | And the barber position is one that's filled |
| 15 | | under Rutan guidelines, or do you know? |
| 16 | A. | You know, I apologize, I don't know. |
| 17 | Q. | Okay. |
| 18 | A. | I mean, I would say it would be, because I |
| 19 | | was requested to do it. So, you know, if it |
| 20 | | wasn't a Rutan position, then it probably |
| 21 | | wouldn't have mattered. But it would have |
| 22 | | to be, because they had us in. But I cannot |
| 23 | | specifically say that the barber is a Rutan |
| 24 | | position. |

16

| | | |
|---|---|---|
| 1 | Q. | If you were going to try to figure that out, |
| 2 | | who would you ask? |
| 3 | A. | I would -- I would -- I hate to assume, but |
| 4 | | Personnel in Springfield probably. My |
| 5 | | feeling was if the warden said, you know, |
| 6 | | you're certified to do the interview, that |
| 7 | | it is a Rutan. |
| 8 | Q. | Okay. Underneath that section on the same |
| 9 | | page, it says, Prior to interviewing, the |
| 10 | | interviewing officer shall, and then there's |
| 11 | | a list of eight numbered things on that |
| 12 | | page. Do you see that? |
| 13 | A. | Yes. |
| 14 | Q. | Would you consider yourself to have been the |
| 15 | | interviewing officer? |
| 16 | A. | Well, there were two of us. |
| 17 | Q. | Okay. I understand there was two. |
| 18 | A. | Yes. |
| 19 | Q. | One of the two? |
| 20 | A. | Yes. I mean. . . |
| 21 | Q. | And No. 1 is you should have completed |
| 22 | | Rutan. We've already been through that, and |
| 23 | | you did that. |
| 24 | | No. 2 says identify the major job |

17

```
1         responsibilities and essential functions by
2         reviewing the current position description.
3         Do you see that?
4    A.   Yes.
5
6                   (Exhibit 2 so marked for
7                   identification.)
8
9    BY MR. REHN:
10   Q.   I'm handing you now a document that's been
11        labeled Exhibit No. 2. And I believe at the
12        top of that it says Position Description?
13   A.   Yes.
14   Q.   Is that the same document that is referred
15        to in subparagraph 2 on page 5 of Exhibit
16        No. 1?
17   A.   Yes. I was looking for the actual form
18        number on the document. But that is a 104,
19        CMS 104, and that describes -- every
20        position in the facility has a position
21        description, and it's basically a CMS 104,
22        and that's what this is.
23   Q.   Okay.
24   A.   I'm a little surprised I don't see the
```

18

```
1         actual form number on it, but that's what
2         that is.
3    Q.   And we get all sorts of things that are
4         copied, and it's possible it's at the top or
5         the bottom and it's been cut off somewhere.
6    A.   I'm confident that's a CMS 104 form for the
7         barber position.
8
9                   (Exhibit 3 so marked for
10                  identification.)
11
12   BY MR. REHN:
13   Q.   And we get documents and we don't know what
14        they are sometimes. This is a separate
15        document, I believe, or maybe it's all part
16        of the same document. I've labeled it
17        Exhibit No. 3. And this is a document that
18        has the word "Barber" at the top of it and
19        then it has an SPEC code to the right of it.
20        Do you know what that document is that's
21        Exhibit No. 3?
22   A.   No.
23   Q.   And it may very well be part of Exhibit 2,
24        I'm not sure. It came to us in numerical
```

19

```
1         sequence following it, but I'm not sure if
2         it's one document or if they're different
3         documents.
4    A.   I'm just not familiar with it.
5    Q.   Going to Exhibit No. 2, is this something
6         that you would have reviewed prior to doing
7         the depositions (sic) in December of 2004?
8              MR. KLEIN:   You mean the interviews?
9              MR. REHN:   Yes. Did I say
10        "depositions"?
11             MR. KLEIN:   Yes.
12             MR. REHN:   Thank you.
13             THE WITNESS:   Interviews. As a rule,
14        I review them. In this particular case, I
15        don't think I did.
16
17   BY MR. REHN:
18   Q.   Why don't you tell me why.
19   A.   By having the layman's knowledge of a barber
20        as opposed to a steam fitter or an
21        electrician or a very technical position, I
22        probably did not.
23   Q.   Okay. Well, do you know as you sit here
24        today, does the barber just cut hair, or
```

20

```
1         does a barber at this facility also have a
2         supervisory role or position?
3    A.   The barber here supervises inmates, not
4         civilians.
5    Q.   Yes.
6    A.   Okay.
7    Q.   But they supervise inmates who actually cut
8         hair?
9    A.   Yes, yes.
10   Q.   And if you look at this CMS form, Exhibit 2,
11        it lists 40 percent of the time of this
12        position is supervising, instructing, and
13        training all inmate barbers in cutting other
14        inmates' hair in the inmate barbershop. Do
15        you see that?
16   A.   Yes.
17   Q.   And is that your understanding,
18        approximately, of the amount of time that
19        the barber would spend doing that?
20   A.   Yes.
21   Q.   And would that have been your understanding
22        back in December of 2004 also?
23   A.   Yes.
24   Q.   And this form, it sounds like it's one that
```

21

| | | |
|---|---|---|
| 1 | | maybe you did not look at right before the |
| 2 | | interview. Have you looked at this before |
| 3 | | today's deposition? |
| 4 | A. | No. |
| 5 | Q. | I'll give you a couple minutes to read the |
| 6 | | breakdown of percentage of time under the |
| 7 | | bottom half of the first page of this |
| 8 | | document, and just let me know after you've |
| 9 | | had a chance to read it. |
| 10 | A. | (Complies.) All right. |
| 11 | Q. | And after having a chance to read that, is |
| 12 | | your understanding of the barbershop |
| 13 | | position similar to the percentage breakdown |
| 14 | | of time that is spelled out in Exhibit 2? |
| 15 | A. | Yes. |
| 16 | Q. | And was your understanding in 2004 the same? |
| 17 | A. | Yes. |
| 18 | Q. | When you were conducting the interviews in |
| 19 | | December of 2004 for the barber position, |
| 20 | | was experience as a supervisor important to |
| 21 | | you? |
| 22 | A. | Yes. |
| 23 | Q. | And why is that? |
| 24 | A. | In my estimation, and I do not remember how |

23

| | | |
|---|---|---|
| 1 | | looks like it might be more important in |
| 2 | | managing a shop than it would other people? |
| 3 | A. | That's kind of what it would appear. That's |
| 4 | | what I look for. |
| 5 | Q. | Is the fact that somebody is managing other |
| 6 | | people, did that have any effect one way or |
| 7 | | another in your evaluation of them as a |
| 8 | | candidate for the barber position? |
| 9 | A. | I don't remember. I apologize. You know, |
| 10 | | because that was not a level I was truly |
| 11 | | looking at at that time. |
| 12 | Q. | Well, it sounds like you do agree that at |
| 13 | | that time about 40 percent of the time on |
| 14 | | the job was supervising inmates doing the |
| 15 | | hair cutting and training those inmates, |
| 16 | | right? |
| 17 | A. | Yes. |
| 18 | Q. | Okay. And with that fact in mind, it sounds |
| 19 | | like -- I'm just trying to figure out if |
| 20 | | there is -- that you gave any weight to a |
| 21 | | candidate if they had supervisory experience |
| 22 | | or experience supervising others when you |
| 23 | | were doing the interviews? |
| 24 | A. | Yes. |

22

| | | |
|---|---|---|
| 1 | | many we interviewed, but we follow the |
| 2 | | questionnaire. But in my mind a person that |
| 3 | | owned his own shop and managed his own shop, |
| 4 | | as opposed to renting a chair in a shop, |
| 5 | | showing up, cut hair, leave. If a person |
| 6 | | was responsible enough to be able to order |
| 7 | | parts, maintain inventory, maintain |
| 8 | | sanitation and that type of thing. So in |
| 9 | | that -- and back there, as a supervisor |
| 10 | | supervising inmates, to me that would be |
| 11 | | important to have some supervisory skills. |
| 12 | Q. | And when you say "supervisory skills" -- and |
| 13 | | I think maybe I was thinking of the word a |
| 14 | | little differently than you were. |
| 15 | A. | Okay. |
| 16 | Q. | That's fine. No, that's good. Was the |
| 17 | | consideration of experience of -- when I'm |
| 18 | | saying "supervisory" I'm talking about |
| 19 | | supervising other people working underneath |
| 20 | | them. Was that something that was of |
| 21 | | significance to you? |
| 22 | A. | Not as significant as the management of a |
| 23 | | shop. Does that make sense? |
| 24 | Q. | Yes, that makes sense. In the hierarchy it |

24

| | | |
|---|---|---|
| 1 | Q. | Okay. And would that be something that |
| 2 | | would be beneficial? |
| 3 | A. | Yes. |
| 4 | Q. | You would be looking for that attribute? |
| 5 | A. | I think I more or less see them both hand in |
| 6 | | hand, where apparently the question looks |
| 7 | | like supervising a shop and actually |
| 8 | | supervising inmates. To me if a person |
| 9 | | owned his own shop or managed his own shop, |
| 10 | | as this gentleman, he is supervising his |
| 11 | | barbers that work for him, which would be |
| 12 | | the same as supervising the inmate barbers. |
| 13 | Q. | Okay. |
| 14 | A. | That's how I would have approached that. |
| 15 | Q. | This document also, going back to Exhibit |
| 16 | | No. 1, page 5, the section addressing prior |
| 17 | | to interviewing a person for a Rutan |
| 18 | | position says the interviewing officer shall |
| 19 | | identify hiring criteria such as education, |
| 20 | | experience, skills, by reviewing the job |
| 21 | | specifications. Did you actually identify |
| 22 | | hiring criteria for this position? |
| 23 | A. | I picked that up off the questionnaire. |
| 24 | Q. | That was something somebody else had done |

**25**

```
1              that?
2    A.   Yes. We -- I have -- we have nothing to do
3         with the questionnaire. It came to me. But
4         that's where I. . .
5    Q.   Who is it that developed that questionnaire?
6    A.   I believe -- I'm shaky ground. I believe
7         that's a canned set of questions that come
8         from Springfield. You know, I don't see
9         them before they come to me. Because I
10        wouldn't think -- and I -- I keep relating
11        back to a more technical position. Somebody
12        would have to know what they were doing if
13        they wanted to know pressure valve pop-offs
14        or steam-fitters or phases of switch gear
15        for electricians, so it wouldn't be an
16        in-house type thing. I believe those come
17        from Springfield. I don't want to speak for
18        somebody else. That's just what I believe.
19   Q.   Okay. As far as going back to Document No.
20        1, it looks like the interviewing officer
21        should assign percentage weights to each
22        hiring criteria. Do you see that?
23   A.   Yes.
24   Q.   Is that something you did, or is that
```

**26**

```
1              something that somebody else did?
2    A.   Those are on the form. No, I didn't say,
3         well, this is worth this percent, this is
4         worth that, no.
5    Q.   And it also says the interviewing officer
6         shall develop the interview questions, but
7         it sounds like somebody else --
8    A.   No.
9    Q.   And I talk slow and you know where I'm
10        going --
11   A.   Yeah, she's got to write it all down. I
12        apologize.
13   Q.   Just try and hold back. Just so the record
14        is clear, it sounds like you did not develop
15        the interview questions; is that right?
16   A.   I did not develop them.
17   Q.   And it says the interviewing officer shall
18        develop the rating system to be used and
19        indicate the numerical rating assigned. And
20        that's something you did not do, right?
21   A.   No, I did not do that.
22   Q.   And it also says -- as far as the next,
23        No. 7 in Exhibit 1, on page 5, it indicates
24        that the interviewing officer shall develop
```

**27**

```
1              the Candidate Evaluation Form. And that's
2         something you did not do, right? Is that a
3         bad question or --
4    A.   No, I'm trying to think on a Candidate
5         Evaluation Form, that's a preprinted form.
6         I would say no.
7    Q.   "No" that somebody else did it as opposed
8         to --
9    A.   Yes, yes, it was done on a different level
10        than the interview.
11   Q.   Okay. And then the last thing that the
12        interviewing officer shall do is forward the
13        Candidate Evaluation Form interview
14        questions, job posting, position
15        description, and class specifications to the
16        interview coordinator. Do you see that?
17   A.   Yes.
18   Q.   Do you think it's possible maybe you weren't
19        the interviewing officer, maybe you were the
20        interviewing coordinator here?
21   A.   Yes, it's possible.
22   Q.   I mean, I would have thought you would have
23        been an interviewing officer --
24   A.   I would have thought two guys were doing the
```

**28**

```
1              interviews. I didn't see where one would be
2         the coordinator and the other would be the
3         officer or whatever.
4    Q.   You interviewed these with a guy by the name
5         of Shaw; is that right?
6    A.   Yes.
7    Q.   Did you think you and Mr. Shaw basically did
8         the same thing in regards to these
9         interviews?
10   A.   Yes.
11   Q.   It's not like you think he's the one who
12        came up with the forms?
13   A.   No, I'm sure he didn't come up with the
14        forms.
15   Q.   You think they were both forwarded -- the
16        forms were forwarded to both you and
17        Mr. Shaw?
18   A.   Uh-huh.
19   Q.   Is that yes?
20   A.   Yes.
21   Q.   And the percentage weights for the different
22        attributes of the candidates, that's
23        something that was determined by somebody
24        else other than you Mr. Shaw, right?
```

29

1  A.  Yes.
2  Q.  Okay.  Continuing to the next page on
3      Exhibit 1, page 6 of 7.  If you go to
4      paragraph number 2, there's a subpart C
5      under paragraph 2 that says, Ensure
6      background investigations are conducted as
7      appropriate.  Do you know when it would be
8      appropriate to do background investigations?
9  A.  No.
10 Q.  Okay.  Do you know who would make that
11     decision?
12 A.  The Human Resource coordinator.
13 Q.  And as far as this last part on this No. 2,
14     subpart D, it says, Complete the Employment
15     Decision Form DC 5654.  Do you see that?
16 A.  Yes.
17 Q.  Do you know if there was an Employment
18     Decision Form completed in this case?
19 A.  That's a form that the Human Resource
20     representative or coordinator completes.
21     And I don't know if it was done.  In all
22     honesty, I can't imagine it wouldn't be, but
23     I did not have -- I was not privy to the
24     document.

30

1              (Whereby a discussion was held
2               off the record.)
3
4  BY MR. REHN:
5  Q.  Going back on the record, as we've gone
6      through this form, it looks like there was a
7      lot of stuff that the correctional -- or the
8      interviewing officer was supposed to do that
9      you did not do; is that right?
10 A.  Yes.
11 Q.  And, I mean, that's -- it sounds like -- we
12     were just talking a little off the record,
13     it's somewhat, I think maybe doing with word
14     processing or whatever.  You were forwarded
15     a lot of the stuff it looks like the
16     interviewing officer, according to this 2002
17     form, should have been doing; is that right?
18 A.  I believe the documents that we were
19     forwarded came from the Human Resource
20     representative and not necessarily an
21     interview coordinator per se.
22 Q.  Okay.  And if you go to No. 5, paragraph no.
23     5, which is on page 7 of 7 of No. 1, it
24     indicates that interview documentation for

31

1      employment decisions regarding positions
2      filled under Rutan guidelines, except for
3      confidential medical records, shall be
4      maintained on file in the Personnel office
5      in a Rutan file.  Do you see that?
6  A.  Yes.
7  Q.  Do you know what Personnel office they're
8      talking about?  Is that something at Henry
9      Hill, or is that something at Springfield?
10 A.  I believe that's at Henry Hill.
11 Q.  Okay.  Who would be the person in charge of
12     the documentation for these interviews at
13     Henry Hill currently?
14 A.  Her name is Margaret Foley, F-O-L-E-Y.  And
15     she's the Human Resource representative.
16 Q.  And it looks like she was in that role in
17     2004 also, right?
18 A.  Yes.
19 Q.  Have you, in preparing for this deposition,
20     gone through and tried to look at the Rutan
21     file or a file for Mr. Abron here at Henry
22     Hill?
23 A.  No.
24 Q.  And if you go to subpart E of that paragraph

32

1      5, you'll see that it looks like the
2      Employment Decision Form for the candidate
3      selection should be in the Rutan file; is
4      that right?
5  A.  It should be.
6  Q.  It looks like at some point in time a Janet
7      Richmond, who's an administrator at the
8      Office of Affirmative Action, started to get
9      some correspondence related to the hiring
10     position of the barber position in 2004.
11     Did you ever have any contact with Janet
12     Richmond?
13 A.  No, I've never talked to her.  I believe at
14     one time -- well, at one time, I think she
15     was the Affirmative Action person for
16     Department of Corrections.  I'm not sure
17     she's even there anymore.  I just -- I have
18     not had any correspondence or contact with
19     her at all ever.
20
21              (Exhibit 4 so marked for
22               identification.)
23
24

37

1    documents here in a little bit, but there's
2    handwritten notes and then there's -- it
3    looks like somebody types up an Evaluation
4    Form for each one of the applicants?
5  A.  Yes.
6  Q.  Who is it that actually types up the
7    application?
8  A.  The Human Resource person.
9  Q.  Okay. Do you tell the Human Resource person
10    as one of the interviewing officers, do you
11    tell that person what to type into the
12    evaluation?
13  A.  Boy, you're going to think I'm a dummy. Oh,
14    no. I can't remember. No, I don't sit down
15    with her and say do this and this and this.
16    I believe, and I haven't done this since
17    2004, that that -- that document is put
18    together from the questionnaires, the typed.
19    I know I don't sit down and type in. And I
20    honestly do not remember. I do not think
21    so.
22  Q.  As far as the process goes, did you -- did
23    you do all the interviews in one day here;
24    is that right?

38

1  A.  Yes.
2  Q.  Okay. Was it the same room we're in today?
3  A.  Yes. I had to check with him.
4  Q.  And as far as when the interviews were
5    completed, did you know who it was that had
6    the job?
7  A.  No. I mean, we have to add -- you assign a
8    number and you add it and you divide it by
9    2. And then from there it goes to the
10    warden and he makes the final decisions.
11    All we are are information gatherers and
12    number calculators.
13  Q.  Did you know who had the highest number when
14    you were done with the interviews that day?
15  A.  I would say yes. I'm sorry. Just from
16    adding whatever interview you're doing for
17    whatever position. Generally if you know
18    your numbers, you can pretty well tell, you
19    know, if somebody's consistent or whatever.
20  Q.  When you are interviewing candidates for --
21    and this would be any position first, and
22    then I'll follow up one specifically for
23    barbers, but any position at the
24    correctional facility here in Galesburg, do

39

1    you consider or take into consideration
2    whether they have experience working in
3    correctional facilities?
4  A.  Yes.
5  Q.  And what kind of consideration do you give
6    that fact?
7  A.  I would give consideration strictly from a
8    security standpoint, meaning if an
9    individual worked in a facility, even say a
10    contractual or an employee. If they're
11    familiar with key control, that type of
12    thing.
13  Q.  And what is key control?
14  A.  Meaning everybody's assigned a key chip, you
15    draw your keys, you put the chip on the
16    board. You're trained not to leave your
17    keys, because it would create a security
18    situation. It may not be the determining
19    factor, but it is a factor.
20  Q.  And it would be a benefit -- it's an
21    attribute you're looking for in candidates
22    is to have experience in a correctional
23    environment?
24  A.  It's not specific, but it would be an asset.

40

1  Q.  If two candidates were equal but one of them
2    had correctional experience, that may be
3    something that tips in favor of the person
4    that has correctional experience.
5  A.  It would carry some weight. It may not tip
6    the balance, but it would be considered.
7  Q.  As you're sitting here today, do you know
8    whether Mr. Abron had any experience working
9    in a correctional facility prior to the time
10    he interviewed in December of 2004?
11  A.  At the interview, as I recall, Mr. Abron
12    advised us he had been a contract barber at
13    the juvenile facility.
14  Q.  Do you know if he discussed during the
15    interview having any experience at the Mary
16    Davis Home in Galesburg?
17  A.  I do not remember.
18  Q.  It's possible he did, but you're not sure?
19  A.  Yes. It's quite possible. I truly don't
20    remember.
21  Q.  Do you remember if he discussed working at
22    the Knox County Jail during the interview?
23  A.  I do not think so. But in all fairness, I
24    do not remember that. He very well could

41

```
 1        have.  You know, when you're interviewing
 2        eight or ten guys, they all tend to, I don't
 3        want to say run together, but I do not
 4        remember that conversation.  The thing that
 5        stuck out in my mind was his experience with
 6        the juvenile facility.
 7   Q.   Okay.  And why did that stick out in your
 8        mind?
 9   A.   Because there's a difference between a
10        juvenile facility and a Level 2 secure
11        facility that is one step below a maximum
12        security facility.
13   Q.   What is the difference there?
14   A.   The difference is juvenile facilities are
15        juveniles that don't -- I mean, I do not see
16        the security risk in a juvenile facility
17        that there is from a Level 2 secure
18        facility.
19   Q.   Is there -- before I get into all this
20        stuff, I guess, let me step back.
21   A.   Sure.
22   Q.   Ultimately Larry Thompson was hired for the
23        barber position in December of 2004.
24        Without going through all the forms, do you
```

42

```
 1        have an opinion one way or another as to
 2        whether Larry Thompson was a better
 3        candidate than Steve Abron for the barber
 4        position?
 5   A.   As I recall, they were both at the top of
 6        the list.  I do not remember how many we
 7        interviewed.  I think maybe eight.  They
 8        were both well-qualified candidates.
 9   Q.   And my question was whether you have an
10        opinion as to whether Larry Thompson should
11        have been hired or Steve Abron should have
12        been hired?
13   A.   The delay, pardon me, you know, I want to be
14        fair and honest, and I need to formulate my
15        thought, because to me they were one, two
16        out of eight, and the choice of who to hire
17        was not mine to make.  My -- my concern
18        through Rutan was to ask the questions and
19        try to score it.  I felt both were good
20        candidates.
21               I know that's not an answer.  Do
22        you need a yes or a no or something on that?
23        I'm sorry.  Help me out here.  I'm not used
24        to this stuff, guys.
```

43

```
 2        all I'm here to do is try to find out
 3        information.  And what I'm trying to figure
 4        out is whether you have an opinion as to
 5        whether Mr. Thompson was more qualified than
 6        Mr. Abron for the barber position.
 7   A.   No.  I mean --
 8               MR. KLEIN:  Are you saying you don't
 9        have an opinion?
10               THE WITNESS:  Well, I guess I'm
11        struggling with this.  I mean, obviously --
12        no, I can't say he scored out higher,
13        because I'm not sure I scored him higher or
14        lower as an individual.
15               My feelings were Mr. Thompson in
16        the interview stated that his shop was in a
17        rather rough area of town and he was used to
18        dealing with adults, that he would not be
19        intimidated by an adult population.  In the
20        final analysis to me, having a shop in an
21        area of town where you're used to adults and
22        you will not be intimidated was every bit or
23        even a little bit more than having
24        experience in a juvenile facility.  So --
```

44

```
 1   BY MR. REHN:
 2   Q.   So you thought the location of the shop was
 3        a very significant factor for you?
 4   A.   Yes, to me.
 5   Q.   Where do you live?
 6   A.   I live?  Monmouth.
 7   Q.   Monmouth's about 15 miles west of Galesburg,
 8        20?
 9   A.   Yes.
10   Q.   I was there yesterday morning.  You would
11        think I'd know the miles.  You also come to
12        Galesburg pretty regularly -- well, for work
13        obviously, you work here in Galesburg?
14   A.   Yes.
15   Q.   And how long have you worked in Galesburg?
16   A.   Nineteen and a half years.
17   Q.   And you probably come to Galesburg
18        occasionally to shop or go to restaurants?
19   A.   Yes.
20   Q.   Are you familiar with Henderson Street in
21        Galesburg?
22   A.   Yes.
23   Q.   It's one of the main streets in Galesburg,
24        probably the main north-south street in
```

45

```
1          Galesburg, right?
2    A.    Right. Yes.
3    Q.    And are you familiar with South Henderson
4          Street?
5    A.    Yes.
6    Q.    And most the businesses and commercial
7          properties, I guess, for retail and
8          restaurants are on North Henderson Street.
9          There's some industrial businesses on South
10         Henderson Street, right?
11   A.    Yes.
12   Q.    There's a barbershop on South Henderson
13         Street that Mr. Abron owns. Are you
14         familiar with the location of that shop?
15   A.    I think it's on the east side of South
16         Henderson Street.
17   Q.    You're absolutely right, yes.
18   A.    Yes, then I am.
19   Q.    And that's just a little bit south of the
20         railroad tracks that cross within about a
21         half a block of the intersection of Main
22         Street and Henderson Street in Galesburg.
23         Those are where the railroad tracks are.
24   A.    Yes, I think we're talking about. . .
```

46

```
1    Q.    And you go a little bit further south of
2          that a few blocks, and you're at the
3          building Abron's Hair Design, the building
4          where he works. Are you familiar with
5          that --
6    A.    Yes, I believe so. I couldn't pick the
7          building out, but I believe I saw a sign at
8          one time.
9    Q.    And how would you describe that
10         neighborhood?
11   A.    Commercial. I go down to the Al's Sporting
12         Goods store and buy things, and it's down
13         the road, you know, a few blocks.
14   Q.    Al's Sporting Goods is also on South
15         Henderson Street?
16   A.    Yes. That's why I was familiar with
17         Mr. Abron's shop. I'm sure at some point in
18         time I've gone to Al's Sporting Goods and,
19         you know, as you observe, you see a shop or
20         whatever.
21   Q.    Do you know where Mr. Thompson's shop was?
22   A.    No.
23   Q.    Would you be surprised to know it's within a
24         few blocks of Mr. Abron's shop?
```

47

```
1    A.    I would not be surprised.
2    Q.    Would you have known that back in 2004 when
3          these interviews were done?
4    A.    No, because I didn't know where Mr. Abron's
5          shop was actually physically located at that
6          point in time. I -- I may have driven by
7          it, but I couldn't -- couldn't picture it.
8    Q.    If the location of the shop was an important
9          factor, did you ask Mr. Abron where his shop
10         was?
11   A.    I don't remember.
12   Q.    Do you remember asking any of the applicants
13         where their shop was located?
14   A.    I believe in the interviews the candidates
15         would state if their shop was in their home
16         and that type of thing. So, no, we didn't
17         specifically ask the address of every shop
18         of every candidate.
19   Q.    But it sounds like the location of
20         Mr. Thompson's shop is the main factor as to
21         why you selected him?
22   A.    It was a factor based on his description of
23         his shop and the fact that I believe he was
24         open some odd hours and things like that.
```

48

```
1    Q.    Did Mr. Thompson indicate he had any
2          experience cutting either juvenile or adult
3          clients or customers that were being held in
4          custody for violations of state law or
5          federal law?
6    A.    No.
7    Q.    If Mr. Abron had told you during the
8          interview that he had worked at the Knox
9          County Jail, which holds adult offenders,
10         would that have changed your mind in regards
11         to this -- I think before you thought it was
12         a significant factor he just dealt with
13         juveniles as opposed to adults. Would that
14         have changed your opinion in regards to his
15         work experience and his application to the
16         job here at Henry Hill?
17   A.    It would have carried a significant amount
18         of influence in it. It would not have been
19         the determining factor, but whether it's a
20         state prison or a county jail, those are
21         still adult inmates with a certain
22         intimidation factor.
23   Q.    And how does that compare as you're trying
24         to evaluate candidates for the position, the
```

49

```
1        fact that somebody has experience working
2        with adult inmates as compared to experience
3        working in a rough neighborhood?
4    A.  I'm sorry, would you give me that --
5    Q.  That's probably a bad question. I'll try
6        and rephrase it.
7    A.  No, I just need to know.
8    Q.  All right. I think you thought it was
9        significant that Mr. Thompson had worked in,
10       I think, a rough neighborhood?
11   A.  Yes.
12   Q.  And I'm trying to figure out how that
13       compares to somebody who's worked with
14       clientele that are inmates that are adults.
15   A.  I'd say it would be almost even.
16   Q.  Okay. When you say "almost even" --
17   A.  Okay. Equitable. Equitable. But you see
18       what I mean, I'm just trying to be honest
19       and fair.
20   Q.  I appreciate you being honest. This is why
21       lawyers get a bad name. You used that word
22       "almost" which gives you wiggle room, and we
23       hate wiggle room.
24   A.  I understand.
```

50

```
1    Q.  You said it's "almost even" or "almost
2        equitable." Whichever factor, "even" or
3        "equitable" term you want to use, is there
4        one of them that has an edge, because when
5        you say "almost" it suggests that one of
6        them would be more preferable than the other
7        in regards to experience for this position.
8    A.  No, I wouldn't give either one an edge.
9
10              (Exhibits 5-6 so marked for
11              identification.)
12
13   BY MR. REHN:
14   Q.  I'm going to hand you what's been marked
15       Exhibit No. 5. It's a Candidate Evaluation
16       Form for Mr. Thompson. Have you seen that
17       form before?
18   A.  Yes.
19   Q.  When is it that you would have first seen
20       that form?
21   A.  Pardon the delay. When the Human Resource
22       person typed it and asked me to sign it.
23   Q.  Okay. And do you know -- it looks like it's
24       dated December 22, 2004. Is that when you
```

51

```
1        would have signed it?
2    A.  Yes.
3    Q.  And handing you what's been marked as
4        Exhibit No. 6, is that the same type of form
5        and you would have received and signed it
6        the same day?
7    A.  Yes.
8    Q.  And No. 6 is for Mr. Abron; is that right?
9    A.  Yes.
10   Q.  All right. If you can slide those aside for
11       now, we'll ask you more about them later.
12
13              (Exhibit 7 so marked for
14              identification.)
15
16   BY MR. REHN:
17   Q.  Handing you what's been Bates marked 28 and
18       we've marked it as Exhibit 7 here, this is a
19       Rutan Interview Package Checklist. Now,
20       this is not for Henry Hill. This is for
21       Illinois River Correctional Center. But I'm
22       trying to see if you're familiar with a form
23       like that being used at Henry Hill.
24   A.  I'm not.
```

52

```
1              (Exhibit 8 so marked for
2              identification.)
3
4    BY MR. REHN:
5    Q.  Handing you what's been marked as Exhibit
6        No. 8, this again, I believe, was something
7        from the Illinois River Correctional Center.
8        Looking at that document, would you agree
9        that that looks to be the same document as
10       what we previously marked as Exhibit No. 3?
11   A.  It looks like it was developed off the CMS
12       104 basically. Exhibit 3 to me looks more
13       like a working document that you might hand
14       the individual and say these -- you know,
15       these are your jobs, as opposed to the
16       document that states their pin number and
17       their county and that type of thing.
18   Q.  So the document that's labeled Exhibit 3 --
19   A.  And the one that looks like 8, they're the
20       same document.
21   Q.  Yes, I believe they're the same document.
22       And do you have any reason to believe why
23       the barber position in Illinois River
24       Correctional Center would have different
```

E-FILED
Friday, 09 November, 2007  03:29:18 PM
Clerk, U.S. District Court, ILCD

53

1  responsibilities than the barber position at
2  Henry Hill?
3  A.  Only because of the difference in level of
4  security.
5  Q.  Okay.  And which place --
6  A.  They're both adults.  Henry Hill is a Level
7  4 secure facility.  Illinois River is a
8  Level 3.  Meaning our guys are more of a
9  security risk than theirs.  But basically
10  the barber position would appear to be
11  close.
12  Q.  Do you think it would be more important to
13  have correctional experience for the barber
14  position at a Level 4 or at a Level 3?
15  A.  A Level 4.
16  Q.  And that's because this is more --
17  A.  Of a secure environment.  I didn't mean to
18  put words in your mouth.  I apologize.
19  Q.  That's fine.  And we were talking sort of --
20  you were finishing off my sentence.
21          Just so the record is clear, you
22  believe the correctional experience would be
23  more important at a Level 4 because there's
24  more risk with the inmates; is that right?

55

1  indicated the type of action if you were to
2  get the job would be a transfer.  And I'm
3  just trying to get in your mind would you
4  consider Mr. Abron coming here from the
5  correctional center in Kewanee a transfer,
6  would you consider that new hire, promotion,
7  or would you consider it something else?
8  A.  I would consider it new hire, because he was
9  
10  barber.  Where a transfer would be a state
11  employee that's already in state service.
12  Q.  Okay.
13  
14          (Exhibit 11 so marked for
15          identification.)
16  
17  BY MR. REHN:
18  Q.  And part of this deposition is just trying
19  to see what you're familiar with, what
20  you're not familiar with.  This again is
21  from the Illinois Correctional Center as
22  opposed to Henry Hill.  But have you ever
23  seen a document similar to this at Henry
24  Hill in regards to job applications or job

54

1  A.  Yes.
2  
3          (Exhibit 9 so marked for
4          identification.)
5  
6  BY MR. REHN:
7  Q.  A document that we've labeled Exhibit 9 and
8  is Bates stamped 34, I just don't know what
9  this document is.  I'm not sure if you're
10  familiar with what this document is or not.
11  If you are, let me know.  If you're not, let
12  me know.
13  A.  No.
14  
15          (Exhibit 10 so marked for
16          identification.)
17  
18  BY MR. REHN:
19  Q.  Handing you what's marked Exhibit 10 and
20  Bates stamped 35.  This looks like to be an
21  Employee Bid Record from Henry Hill, and
22  since you weren't familiar with the form for
23  Henry Hill, I doubt you're familiar with
24  this for Illinois River.  By Mr. Abron

56

1  hiring?
2  A.  No.
3  Q.  And what you were just holding and what I
4  just asked you about was Exhibit 11, right?
5  A.  Right.
6  
7          (Exhibit 12 so marked for
8          identification.)
9  
10  BY MR. REHN:
11  Q.  Handing you what's been marked Exhibit
12  No. 12, and is Bates stamped 41, this
13  document is labeled at the top "Employment
14  Decision Form."  Have you ever seen this
15  type of form before?
16  A.  Yes.
17  Q.  And this one -- this decision form deals
18  with the decision about hiring a barber at
19  Illinois River Correctional Center, not at
20  Henry Hill.
21          Have you ever seen an employment
22  decision form at Henry Hill for an
23  application or a hiring decision for Henry
24  Hill?

**77**

```
1        dry cutting.
2    A.  Yes.
3    Q.  Do you know what wet and dry cutting are?
4    A.  Yes.
5    Q.  Just cutting hair wet and cutting hair dry?
6    A.  No, I go to a barber, he cuts me dry. If I
7        go to a beauty shop, they wet me and cut it.
8        Does that sound reasonable?
9    Q.  Do you know what percentage of the inmates
10       here are black and what percentage are not
11       black?
12   A.  Approximately 70 percent black.
13   Q.  Are you aware of any difference in the way
14       black inmates have their hair cut compared
15       to people that are white?
16   A.  No, I do not.
17   Q.  Did you take into consideration at all an
18       applicant's experience in regards to cutting
19       black people's hair compared to white
20       people's hair when you were interviewing
21       candidates for this job?
22   A.  No.
23   Q.  Are you aware at all of black hair treatment
24       involving chemicals?
```

**78**

```
1    A.  Yes.
2    Q.  What are you aware of in regards to that?
3    A.  I'm responsible for the inmate commissary
4        operation. There are certain hair products
5        that are designed for minorities, and we try
6        to stock items that work for minorities.
7        And that's my extent. But being responsible
8        for everything that's sold in the
9        commissary, if there's a product that works
10       better, and I -- I think I'm more familiar
11       with shave cream, bump guard and things like
12       that, than a true hair product. But I know
13       that there is a difference, and I'm
14       responsible for ordering the supplies that
15       are used in the barbershop, but I do not see
16       the orders.
17   Q.  Okay.
18   A.  Meaning the barber places the order and I
19       bless the deal and send it on. But they're
20       for hair products. There may be a
21       difference.
22   Q.  Do you think that experience cutting a black
23       person's hair as opposed to a white person's
24       hair should be considered when making a
```

**79**

```
1        decision about hiring a person in the barber
2        position at the Department of Corrections?
3    A.  No, based on the fact that the barber does
4        not cut the hair.
5    Q.  The barber does train the people that cut
6        the hair; is that right?
7    A.  The barber's required to be there because he
8        has a license to oversee it, maintain the
9        sanitation. It's not a barber school. So I
10       do not put a lot of stock in being able to
11       cut one type of hair over another,
12       because -- based on the fact that he doesn't
13       cut; he oversees the operation. And he
14       doesn't train.
15   Q.  Go back to is it --
16   A.  And, you know, I might not be qualified to
17       state whether he trains or not, you know. I
18       could be speaking out of turn there.
19   Q.  Going back to Exhibit 2, I think you agreed
20       earlier that 40 percent of the time would
21       be -- barber would be supervising,
22       instructing, and training barbers in cutting
23       other inmates' hair. Do you think that's
24       still accurate, or do you think they don't
```

**80**

```
1        instruct and train? Is it just supervising?
2    A.  I believe it's virtually supervising. But
3        I'm not qualified to say they instruct and
4        train back there. I know they supervise.
5    Q.  Do you have any reason to believe they don't
6        instruct or train?
7    A.  No.
8    Q.  You're just aware that they supervise and
9        you're not sure about instructing and
10       training?
11   A.  Right.
12   Q.  Okay. Going to Question No. 2, can you just
13       read your answer for me -- not your answer,
14       but your notes for Question No. 2 on the
15       first page of the barber interview?
16   A.  You mean the 40 years experience?
17   Q.  Yes.
18   A.  Graduated in 1964. Active behind the chair.
19   Q.  Do you know what you meant by "active behind
20       the chair"?
21   A.  Yes, he was actually cutting and not just
22       managing a shop.
23   Q.  All right. Now, the -- and again we're
24       dealing with -- going back to Exhibit 18,
```

85

```
 1        next page, can you tell me what your notes
          say here?
          Has a shop in the rough end of town.  Can
          deal with all types of people.  No --
 5    Q.  My guess is harassment, but I'm not sure.
 6    A.  Okay.  Yes.
 7    Q.  I'm not sure if that's right or not.
 8    A.  I -- I'm sure.
 9    Q.  You do believe that says "no harassment"?
10    A.  Yes, I believe that's "no harassment."
11    Q.  Okay.  It says, Has shop in rough end of
12        town.  What does the rough end of town mean
13        to you?
14    A.  Monmouth Boulevard.
15    Q.  As far as -- before I think when we talked
16        earlier today in your deposition, I think
17        you said this is one of the more significant
18        factors in your decision why you would think
19        Mr. Thompson is more qualified; is that
20        right?
21    A.  It was a determining factor, yes.
22    Q.  Okay.  And as far as the answer goes, you
23        gave him a 3 for this answer; is that right?
24    A.  Yes.
```

86

```
 1    Q.  Which I forget, excellent is 4, 3 is very
 2        good, or something like that?
 3    A.  Yeah.  It's on the -- there you go.
 4    Q.  Very good.  What do your notes for the next
 5        question say?
 6    A.  The point that I see that is you have to
 7        work with the inmates and treat them with
 8        respect.  You can't be their friend, but you
 9        also need to be respectful of them.  You
10        don't want to go too far and be too
11        friendly, and you've got to be able to work
12        with them, but they're not here to be your
13        friend.
14    Q.  And it looks like that was in response to
15        what role he sees communication playing in
16        the job?
17    A.  Yes.
18    Q.  And what's your notes for the Work History,
19        Question No. 1?
20    A.  Forty years experience, owns his own shop,
21        be honest with people and straightforward.
22    Q.  Why don't we go to the last question on the
23        next page, Question No. 2.  What do your
24        notes say?
```

87

```
          Only had three sick days in 22 years.  Never
          had hospital.  In on time.
 3    Q.  And do you do anything as an interviewer to
 4        verify or check out the statements that
 5        people tell you when they're doing the
 6        interview?
 7    A.  No.
 8    Q.  Do you remember whether Mr. Thompson
 9        interviewed before or after Mr. Abron?
10    A.  No.
11    Q.  Do you remember comparing Mr. Thompson to
12        Mr. Abron at all that day in any discussions
13        with the other interviewer?
14    A.  No.
15    Q.  Do you remember having any discussions with
16        the other interviewer about Mr. Thompson's
17        lack of experience working with people in
18        correctional facilities?
19    A.  No.
20    Q.  Do you remember having any discussions with
21        the other interviewer or Mr. Thompson about
22        his experience or lack of experience
23        relating to cutting black people's hair?
24    A.  At one point the interview questions, I
```

88

```
 1        believe he mentioned that he cut various
 2        types of hair.  That would have been the
 3        extent of it.
 4    Q.  And I think --
 5    A.  And I may not have it spelled out exactly in
 6        here, but that was the gist of. . .
 7    Q.  Your first answer on the first question, I
 8        think it says, Cut all nationalities.
 9    A.  Okay.
10    Q.  Is that what you're talking about?
11    A.  Yes, yes.
12    Q.  Did you think that it was significant that
13        he did cut all nationalities?
14    A.  Yes.  I gave it a 3.
15    Q.  And why did you think that was significant?
16    A.  Because we have a minority population here,
17        and I wanted to be sure that he had an
18        appreciation in the variation in hair here.
19    Q.  When Mr. Thompson was done with the
20        interview, would you have filled out these
21        numbers and done the calculations before the
22        next person comes in for their interview on
23        that day?
24    A.  I don't remember.
```

**89**

1    Q. .  Is that your handwriting that puts in the
2        numbers also though?
3    A.  Down at the bottom you mean?
4    Q.  Well, throughout the whole form.
5    A.  Yes, yes.
6    Q.  Both the totals and --
7    A.  Yes.
8
9         **(Exhibit 19 so marked for**
10          identification.)
11
12 BY MR. REHN:
13   Q.  Handing you what's been marked Exhibit
14       No. 19, would this have been the
15       interview -- I've got to make sure I gave
16       you the same thing I marked 19. I didn't
17       want to give you -- I scrambled the deck
18       somewhere here.
19   A.  What I thought was ironic, sometimes I
20       write, sometimes I print. The further into
21       the interview process, the shorter my
22       answers tend to be.
23   Q.  Can you give me back 18? Maybe that might
24       be the problem.

**90**

1    A.  Sure. That was mine.
2        MR. REHN:  Off the record.
3
4         **(Whereby a discussion was held**
5          off the record.)
6
7         **(Whereby Exhi**bit 19 is re-marked.)
8
9 BY MR. REHN:
10   Q.  I've handed you what's been marked as
11       Exhibit 19. And this appears to be the
12       interview notes for Mr. Thompson that were
13       done by Mr. Shaw on December 21, 2004; is
14       that right?
15   A.  Okay.
16   Q.  And would you have reviewed Mr. Shaw's notes
17       about the Thompson interview at all prior to
18       today?
19   A.  No.
20   Q.  Okay.
21   A.  I can't even read his writing.
22   Q.  That's okay. That's all we're going to ask
23       him on that one, so. . .
24

**91**

1         (Exhibit 20 so marked for
2          identification.)
3
4 BY MR. REHN:
5   Q.  **Handing** you what's been marked Exhibit
6       No. 20, this is an Employment Application
7       that was completed by Mr. Abron. Have you
8       seen this before?
9   A.  I don't know.
10   Q.  One of the things that's interesting, you
11       do --
12   A.  They're different now. I was trying to
13       compare them, and they're a different form.
14   Q.  You're right, Mr. Thompson does have a
15       different form than Mr. Abron on the
16       application, and I don't know if that's of
17       any significance to you or not.
18   A.  No. No. It's just when we talked about
19       these areas, I thought, boy, we've got one
20       here, I can make sure I didn't lead you
21       astray when I said there was nothing there.
22   Q.  It's a different -- the form looks
23       different.
24   A.  One is dated --

**92**

1        MR. KLEIN:  Looks like the form
2       Mr. Abron used is revised in 1995 and the
3       one that Mr. Thompson used was revised in
4       2001.
5        THE WITNESS:  Yes.
6
7 BY MR. REHN:
8   Q.  As far as Mr. Abron's form, he indicated
9       that he did have experience with the Army on
10       the application. Were you aware of him
11       having any experience in the Armed
12       Services --
13   A.  No.
14   Q.  -- prior to me bringing that up?
15   A.  I was not aware.
16   Q.  Okay. Mr. Abron's application, if you look
17       at the second page of this exhibit where he
18       describes the duties and responsibilities of
19       his current employment, it indicates on the
20       first line he's supervisor of three licensed
21       operators. Do you see that?
22   A.  Yes.
23   Q.  Were you aware that he did supervise three
24       licensed operators when he was doing his

93

```
 1        interview?
 2    A.  No.  Without reviewing the interview
 3        questions, because I was going off the
 4        questionnaire and not the application, so i
 5        will say no.
 6    Q.  If he would have brought that up, would that
 7        have been significant to you, that he did
 8        have experience supervising other barbers or
 9        people that were cutting hair?
10    A.  It would have been important.
11    Q.  And that's because that's consistent with
12        what this job is, right?
13    A.  Supervisory.
14    Q.  So just so the record's clear, you would
15        agree that it would be important that he had
16        experience supervising other barbers, right?
17    A.  Yes.
18    Q.  And this form also indicates that he was
19        currently working at the Illinois Youth
20        Center Corrections in Kewanee, and you were
21        aware of that at the time of the interview,
22        right?
23    A.  Yes.
24    Q.  The second to the last page, and actually
```

94

```
 1        this looks like it's -- the second to the
 2        last page and the last page are the same
 3        thing, I think.  It indicates Mr. Abron had
 4        studied at Carl Sandburg College.  Were you
 5        aware of that during his interview?
 6    A.  No.
 7    Q.  Would that have had any significance to you
 8        that he had had some college education in
 9        regards to management classes at Carl
10        Sandburg?
11    A.  No.
12
13            (Exhibit 21 so marked for
14             identification.)
15
16    BY MR. REHN:
17    Q.  Okay.  I've handed you what we've marked
18        Exhibit No. 21.  That's the resume of
19        Mr. Abron.  Do you know if you would have
20        reviewed this at all at the time of or prior
21        to his interview?
22    A.  No.
23    Q.  No, you don't know?
24    A.  No, I did not review it.
```

95

```
 1    Q.  Okay.
 2
 3            (Exhibit 22 so marked for
 4             identification.)
 5
 6    BY MR. REHN:
 7    Q.  Okay.  I've handed you what's been marked
 8        Exhibit 22.  These would be your notes from
 9        the interview of Mr. Abron; is that right?
10    A.  Yes.
11    Q.  All right.  Going back to Exhibit No. 22.
12        We're going to do similar to what we do with
13        Mr. Thompson.  Going to Question No. 1, What
14        special skills do you believe you possess,
15        why don't you tell me what the answer --
16        what your notes were to that Question 1.
17    A.  My interpretation of his answer was 28 years
18        experience, three years Corrections
19        experience, 12 years Knox County on call at
20        the jail.  Black hair care.  Knowledge,
21        experience, and common sense.
22    Q.  So after you look at the notes, do you think
23        he probably told you that he was working at
24        the Knox County Jail in regards to barber
```

96

```
 1        work?
 2    A.  Yes.
 3    Q.  Although it says on call as opposed to a
 4        full-time position; is that right?
 5    A.  Yes.
 6    Q.  Black hair care, do you know why you would
 7        have put that down in your notes?
 8    A.  No, I don't know why I put it down.
 9    Q.  And as far as Corrections three years, it
10        doesn't say juvenile corrections; is that
11        right?
12    A.  No.
13    Q.  Do you -- how do you remember it was
14        juvenile, or what was the significance of
15        the juvenile?  I guess let me go back.  I
16        asked you two questions there at once.
17    A.  Sure.
18    Q.  I think earlier you said it was significant
19        that it was juvenile corrections as opposed
20        to adult corrections in Kewanee.  The
21        corrections three years, is that the Kewanee
22        Corrections?
23    A.  That was my understanding, that the
24        correction experience was at the juvenile.
```

97

```
 1   Q.   Okay.  Going to the next question, No. 2,
 2        what do your notes say in regards to his
 3        answer to No. 2 there.
 4   A.   Twenty-eight years experience.  Looks like
 5        Military National Barber in Springfield.  I
 6        don't have an explanation for my notes
 7        there.
 8   Q.   Okay.
 9             MR. KLEIN:   Could we go off the record
10        a second?
11
12             (Whereby a discussion was held
13              off the record.)
14
15   BY MR. REHN:
16   Q.   All right.  We're going to the next
17        question.  Explain how to sanitize
18        sterilize barber equipment.  What do your
19        notes say here on this one?
20   A.   Boil, steam, disinfect, ultraray chemical,
21        Barbicide, mix and set, hot soap, then
22        rinse, ultraray.
23   Q.   All right.  Do you know what that ultraray
24        means, or do you know what it's referring
```

98

```
 1        to?
 2   A.   No.
 3   Q.   Do you as you're sitting here today have any
 4        recollection as to whether Mr. Abron
 5        provided you more information or less
 6        information than Mr. Thompson in regards to
 7        explaining how to sanitize and sterilize
 8        barber equipment?
 9   A.   I don't remember.
10   Q.   Do you know what Barbicide is?
11   A.   It's a germicidal chemical to sterilize the
12        equipment.
13   Q.   And do you have -- I think on Mr. Thompson
14        you indicated in his notes that you really
15        weren't familiar with the sterilization and
16        sanitation of equipment, but you gave him a
17        4 based in large part on his delivery of the
18        answer; is that right?
19   A.   Yes.  There's only five lines on an
20        explanation.  And I don't write every line
21        that's said on every interview.  I just try
22        to pick out highlights.
23   Q.   I understand.
24   A.   And consequently, as in No. 2 where I've
```

99

```
 1        only listed three items on Mr. Abron, he may
 2        have put more information in there and I did
 3        not put it on the interview question.
 4   Q.   And as far as why you gave Mr. Abron a 3, do
 5        you know why he got a 3 for that
 6        sterilization answer as opposed to -- a
 7        finding of very good as opposed to
 8        excellent?
 9   A.   No, I don't.
10   Q.   Do you know what the difference would be
11        between a very good and an excellent answer
12        to that question except for the delivery?
13   A.   No.
14   Q.   What was the answer -- or your notes in
15        regards to the answer for Question No. 1 on
16        the next page under Job Knowledge and
17        Experience?
18   A.   Looks like check machines, tools, and
19        appointment books.  Check clerical cut.
20   Q.   Maybe chemical?  I'm not sure.  It's your
21        writing.
22   A.   I know.  Chemical cut, safety in and out of
23        prison.  Order supplies.  Also retail.
24   Q.   Do you believe that -- in and out of prison
```

100

```
 1        refers to his prior job experience where he
 2        has been -- he's familiar with security at
 3        other detention facilities?
 4   A.   Yes.
 5   Q.   And as far as general order supplies, also
 6        retail, it looks like he's ordering stuff to
 7        sell to others and also to use at his shop?
 8   A.   Yes.
 9   Q.   And as far as the notes about chemical cut,
10        do you know what that would be referring to?
11             MR. KLEIN:   Could it say chemical out?
12             MR. REHN:   Maybe it's chemical out.
13             THE WITNESS:   No, it looks like a
14        chemical cut, which may be a process.  I
15        don't know.  I apologize.
16
17   BY MR. REHN:
18   Q.   Could that be related to a special treatment
19        for black people's hair in cutting their
20        hair?
21   A.   Yes.
22   Q.   Could be, but you don't know?
23   A.   I'm sorry, yeah, I do not know.
24   Q.   Going to your answer to Question No. 2, can
```

109

| | | |
|---|---|---|
| 1 | | years of experience, right? |
| 2 | A. | Yes. |
| 3 | Q. | But he did not have any correctional |
| 4 | | experience, right? |
| 5 | A. | Yes. Is that a yes or a no? No, he had no |
| 6 | | correctional experience. |
| 7 | Q. | Thank you for clearing that up. |
| 8 | A. | I'm sorry. I could see Amy starting to |
| 9 | | look. |
| 10 | Q. | As far as going to Exhibit No. 6, which is |
| 11 | | the evaluation form for Mr. Abron, do you |
| 12 | | see that? |
| 13 | A. | Yes. |
| 14 | Q. | Do you know why there's nothing in |
| 15 | | Mr. Abron's section that talks about him |
| 16 | | managing his own shop, performing associated |
| 17 | | duties, and scheduling appointments, |
| 18 | | purchasing supplies? |
| 19 | A. | No. |
| 20 | Q. | And in Mr. Thompson's evaluation form, it |
| 21 | | lists that Mr. Thompson graduated from |
| 22 | | barber college. Do you see that? |
| 23 | A. | Yes. |
| 24 | Q. | There's no mention about Mr. Abron on his |

110

| | | |
|---|---|---|
| 1 | | form, which is Exhibit 6, graduating from a |
| 2 | | barber school. Do you know why that is? |
| 3 | A. | I would have to go back to the |
| 4 | | questionnaire, I presume, and go through the |
| 5 | | questions to see if it was specifically |
| 6 | | mentioned in the question. |
| 7 | Q. | Actually -- |
| 8 | A. | You know, as we questioned. You know, not |
| 9 | | off the app. |
| 10 | Q. | Actually, off your questions, and you can |
| 11 | | look at it, I think it's 18 and 22. If I |
| 12 | | remember correctly, for your notes it |
| 13 | | indicated that Mr. Abron had something to do |
| 14 | | with Military National Barber in |
| 15 | | Springfield. |
| 16 | A. | Would that be the name of a barber school? |
| 17 | Q. | I believe so. You don't know? |
| 18 | A. | No, I do not know. |
| 19 | Q. | That's all right. There is nothing in your |
| 20 | | notes, going to Exhibit 18, that shows what |
| 21 | | school Mr. Thompson went to; is that |
| 22 | | correct? |
| 23 | A. | I have to look. No, there's nothing to |
| 24 | | indicate it. |

111

| | | |
|---|---|---|
| 1 | Q. | And for both going to Exhibit 6, which is |
| 2 | | the Evaluation Form for Mr. Abron, on both |
| 3 | | the first two categories, Education, |
| 4 | | Training, and Skills, along with a second |
| 5 | | category, Job Knowledge and Experience, it's |
| 6 | | noted that he has -- Mr. Abron has |
| 7 | | correctional experience; is that right? |
| 8 | A. | Yes. |
| 9 | Q. | And do you think it's significant for both |
| 10 | | those categories that he has correctional |
| 11 | | experience? |
| 12 | A. | I struggle with the terminology. |
| 13 | | Correctional experience in a juvenile |
| 14 | | facility and correctional experience in an |
| 15 | | adult facility are not the same. So I |
| 16 | | wouldn't put as much weight with |
| 17 | | correctional experience in a juvenile |
| 18 | | facility. |
| 19 | Q. | You would agree that the evaluation form, |
| 20 | | Exhibit 6, does not include the word |
| 21 | | "juvenile" on there; is that right? |
| 22 | A. | Yes. |
| 23 | Q. | And you also agree that he, Mr. Abron, did |
| 24 | | inform you during the depositions (sic) that |

112

| | | |
|---|---|---|
| 1 | | he had experience both at Kewanee |
| 2 | | Correctional Center, plus the Knox County |
| 3 | | Jail? |
| 4 | A. | After reading. |
| 5 | Q. | Okay. Yeah. You saw it in your notes? |
| 6 | A. | I saw it in my notes, yes. |
| 7 | Q. | Would you consider Knox County Jail |
| 8 | | experience correctional experience? |
| 9 | A. | Yes. |
| 10 | Q. | Going to Exhibit No. 5, under the Comments |
| 11 | | section for Job Knowledge on Mr. Thompson, |
| 12 | | the first sentence says, "As manager of his |
| 13 | | own shop that is subject to all rules |
| 14 | | pertaining to sanitation, in order to keep |
| 15 | | his state license, the candidate has a |
| 16 | | working knowledge of current laws." That's |
| 17 | | the end of the first sentence. Would you |
| 18 | | agree that the same thing is true for |
| 19 | | Mr. Abron? |
| 20 | A. | Yes. |
| 21 | Q. | And for Mr. Thompson, the next sentence in |
| 22 | | the comments on that section of the hiring |
| 23 | | criteria is "The candidate expressed a |
| 24 | | thorough knowledge of equipment sanitation |

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

Steve Abron,

             Plaintiff, )

      -vs-         )   No. 06-1157

State of Illinois, Department )
of Corrections, Henry Hill )
Correctional Center and Don )
Hulick, Warden, Individually, )
Bill Smith, Business Admini- )
strator, Individually, and )
Frank Shaw, Assistant Warden, )
Individually, and in their )
official capacity, )

           Defendants. )

THE DEPOSITION OF FRANK SHAW, taken before Amy
S. Powers, Illinois CSR 084-003052, RPR 039540, a
Notary Public, on Monday, the 6th day of August
2007, commencing at the hour of 11:45 a.m., at
Henry Hill Correctional Center, 600 South Linwood
Road, in the City of Galesburg, County of Knox,
and State of Illinois.

CIRCUIT WIDE REPORTING
Suite 316 Hill Arcade Building
Galesburg, Illinois 61401
(309) 343-3376 * 1-800-342-DEPO

---

E-FILED
Friday, 09 November, 2007  03:29:58 PM
Clerk, U.S. District Court, ILCD

1    (Witness sworn.)
2             FRANK SHAW,
3    having been first duly sworn, was examined and
4    testified on his oath as follows:
5
6    **DIRECT EXAMINATION BY MR. REHN:**
7    Q.  Why don't you state and spell your name for
8    the record, please.
9    A.  Frank Shaw, S-H-A-W.
10       MR. REHN:  All right.  We're here
11    today for a deposition pursuant to the
12    Federal Rules of Civil Procedure in a case
13    brought by a Mr. Steve Abron concerning a
14    hiring decision at the Department of
15    Corrections.
16       Have you ever been deposed before?
17    THE WITNESS:  Yes, sir.
18    MR. REHN:  You're doing great.  The
19    first rule is I want you to try and wait
20    until I'm done with my question, however
21    long and convoluted it is, until you answer
22    so we only have one person speaking when
23    Amy's trying to type up what happened here.
24       And the other is to make sure you

---

2

PRESENT:

JOHN REHN, ESQ.,
311 East Main Street, Suite 411
Galesburg, Illinois 61401
    on behalf of the Plaintiff;

THOMAS KLEIN, ESQ.,
500 South Second Street
Springfield, Illinois 62706
    on behalf of the Defendant

ALSO PRESENT:
  MR. STEVE ABRON

I N D E X

WITNESS                         PAGE
FRANK SHAW,
  Direct Examination by Mr. Rehn    3 - 62
  Cross-Examination by Mr. Klein   62 - 63
  Redirect Examination by Mr. Rehn  63 - 64
  Certificate of Reporter        65 - 66
  Signature Page                67

EXHIBITS
  Exhibit 33 so marked for identification  44

---

4

1    answer out loud, okay?
2    THE WITNESS:  Yes, no problem.
3    MR. REHN:  Perfect.  If you don't
4    understand a question, that's probably
5    because I asked a confusing question, and
6    just ask me to rephrase it, okay?
7    THE WITNESS:  I will.  And I'm going
8    to ask you some general questions about
9    your background and then we'll talk a
10    little bit about the interviewing process
11    in general and then specifically the
12    interviewing for the barber position at the
13    Henry Hill facility which is the subject of
14    this lawsuit.
15
16    BY MR. REHN:
17    Q.  Where do you work now?
18    A.  Thomson Correctional Center.
19    Q.  And what do you do there?
20    A.  Warden.
21    Q.  Okay.  And is that the one that was empty
22    for awhile that they just filled up
23    recently; is that right?
24    A.  That's right.  That's correct.

EXHIBIT
3

9

1  Q.  Subpart A under that #1 under I indicates
2      that, The interviewing officer shall, and
3      then it has eight numbered subparagraphs.
4      Do you see that?
5  A.  Yes.
6  Q.  If you go down to No. 3, it says, Identify
7      hiring criteria such as education,
8      experience, skills, et cetera, by reviewing
9      the job specifications.
10         And then paragraph no. 4 says,
11     Assign percentage weights to each hiring
12     criteria. Is that something that you would
13     have done in regards to the hiring of the
14     barber position when you interviewed
15     Mr. Thompson and Mr. Abron?
16 A.  No.
17         MR. KLEIN:  I'll object to the form
18     because you're asking about two
19     different -- really two questions.
20         MR. REHN:  That's fine. As I was
21     asking it, I objected in my head to it.
22
23 BY MR. REHN:
24 Q.  Going to paragraph no. 3, did you do that,

10

1      which is identify hiring criteria such as
2      education, skills, et cetera, by reviewing
3      the job specifications?
4  A.  No.
5  Q.  And paragraph 4, did you assign percentage
6      weights to each hiring criteria?
7  A.  No.
8  Q.  Do you know who did that?
9  A.  The instrument was received from another
10     facility.
11 Q.  Okay. If you go down to paragraph no. 8, it
12     says, Forward the Job Candidate Evaluation
13     Form, interview questions, job posting,
14     major responsibilities, rating system,
15     position description, and class
16     specifications to the interview coordinator.
17     Is that something you would have done?
18 A.  We conduct the interviews and then all the
19     materials and stuff are gathered by
20     Personnel.
21 Q.  Would you have reviewed resumes or
22     applications that were sent in by the
23     different candidates?
24 A.  No.

11

1  Q.  Had you done any Rutan interviewing prior to
2      this barber position?
3  A.  Yes.
4  Q.  How often have you done that?
5         MR. KLEIN:  I'll object to the form.
6      How much before this one, or did you
7      total has he done Rutans?
8         MR. REHN:  I'll try and clear up the
9      question. How often total do you believe
10     you've done Rutan interviewing?
11        THE WITNESS:  I've probably conducted
12     over 500 interviews --
13        MR. REHN:  Okay.
14        THE WITNESS:  -- for different
15     positions.
16
17 BY MR. REHN:
18 Q.  Would those all be the Rutan interviews
19     you're talking about?
20 A.  Yes.
21 Q.  Okay. And as far as prior to the time that
22     the interviews were conducted for Mr. Abron
23     and Mr. Thompson, how many interviews do you
24     believe you've done for Rutan interviewing?

12

1  A.  I'm sorry, can I -- I must have
2      misunderstood your first question. Did you
3      ask me how many I've done prior, or did you
4      ask me how many I've done afterwards?
5  Q.  Okay. My first question I tried to ask,
6      although who knows it came out, I wanted to
7      know total how many prior, and after how
8      many have you done.
9  A.  I'll stay with the same number, around 500
10     probably.
11 Q.  And the question I'm trying to ask now is
12     how many had you done prior to the time that
13     you interviewed Mr. Thompson and Mr. Abron?
14 A.  Probably 450, in that general area.
15 Q.  And what you're talking about is the number
16     of applicants, not the number of positions,
17     correct?
18 A.  Correct.
19 Q.  I'm going to hand you now what's been marked
20     Exhibit No. 2. Are you familiar with this
21     form?
22 A.  Yes.
23 Q.  And it's my understanding this is the form
24     that assigns the percentage weights to each

**17**

```
1          been?
2    A.    No, I don't know.
3    Q.    Okay.  Do you know who would be the person
4          that would know that?
5    A.    Personnel would be able to find out whatever
6          the prevailing rate is now for that
7          position.
8    Q.    How does that work as far as is there a
9          prevailing rate for each type of position
10         and then the prison is informed on a -- is
11         it a yearly basis, every few years?  How
12         often --
13   A.    Well, it depends on what, you know, each --
14         prevailing rate normally means positions
15         such as skilled positions, electricians,
16         plumbers, those types of positions.  And
17         whatever the prevailing rate is through
18         their union, typically that's what then we
19         pay that employee.  So they would, yes,
20         provide us with the information we need for
21         that.
22   Q.    I'm going to hand you what's been marked as
23         Exhibit No. 5, which is a Candidate
24         Evaluation Form for Larry Thompson.  Were
```

**18**

```
1          you involved at all in the actual
2          preparation of this document?
3    A.    Yes.
4    Q.    How were you involved in the preparation of
5          this document?
6    A.    This is completed after the interview
7          process, and I write in comments, and then
8          the comments are typed by someone else.
9    Q.    Okay.  Now, for the interviewing of
10         Mr. Thompson and Mr. Abron and the other
11         candidates for that position, there was two
12         interviewers; is that right?
13   A.    Correct.
14   Q.    Do you and the other interviewer hand write
15         the candidate evaluation form, do each of
16         you do your own form, or is it a combined
17         effort?
18   A.    It's a combined effort.
19   Q.    Is that done after all of the candidates are
20         interviewed, or is that done -- do the
21         Evaluation Forms --
22   A.    After all the candidates are interviewed.
23   Q.    Now, there has been some testimony in a
24         prior deposition about the Initial
```

**19**

```
1          Evaluation Form for Mr. Thompson being
2          inadequate, or needing additional
3          information.  Are you aware of any of that?
4    A.    No.
5    Q.    Do you ever remember anybody coming back to
6          you and asking you to refill out an
7          Evaluation Form or to do anything further in
8          regards to an Evaluation Form on this -- on
9          the hiring of Mr. Thompson?
10   A.    No.
11   Q.    Handing you Exhibit No. 6, this is a
12         Candidate Evaluation Form for Mr. Abron; is
13         that correct?
14   A.    Yes.
15   Q.    And this is again something you would not
16         have typed up, but you would have prepared
17         the information, along with the other
18         interviewer, to give to somebody else to
19         fill in with a typewriter; is that correct?
20   A.    Correct.
21   Q.    I'm not trying to mess you up, but I don't
22         think I'll give you No. 7 because I think
23         that's from another facility, so I don't
24         think I need to ask you about that one.
```

**20**

```
1              Did you think when you were doing
2          the interviewing for this barber position
3          that experience barbering in a correction
4          facility would or should be a significant
5          factor in making the decision as to whether
6          a person should be employed for this
7          position?
8    A.    Would be a factor.
9    Q.    Okay.  I'm assuming that somebody that did
10         have experience in barbering in a
11         correctional facility, that would be a
12         benefit to that person when they're doing
13         the interview; is that right?
14   A.    A benefit to the candidate?
15   Q.    Yes, I mean, that would be something that
16         you would be looking for?
17   A.    Yes.
18   Q.    That was a badly worded question.  Are you
19         familiar at all with any preference in the
20         hiring procedure for a person who has
21         experience in the military, who is a
22         veteran?
23   A.    No.
24   Q.    Are you familiar at all as to whether there
```

21

```
1         is any Affirmative Action program in regards
2         to the hiring for the barber position here?
3     A.  No.
4     Q.  Skipping up to Exhibit No. 14, are you
5         familiar with that form?
6     A.  Yes.
7     Q.  Is this something that you would have been
8         involved with in regards to completing?
9     A.  Yes.
10    Q.  What was your involvement in regards to
11        completing Exhibit 14?
12    A.  It's an Employee Decision Form.  Comments
13        are placed on this form based on the
14        candidate's overall ranking after the
15        interview process.
16    Q.  Under the Justification section under the
17        bottom -- the bottom box -- I guess it's
18        middle box.  The middle box it says
19        Justification right above it.  It says,
20        Explain the reasons for hiring the selected
21        candidate.  And then it says, If selection
22        is out of rank order, include the rationale.
23              First off, in regards to
24        explaining the reasons for hiring the
```

22

```
1         selected candidate, is that your reasoning
2         that's underneath here, is that you and the
3         other interviewer, or is this somebody else
4         who would have --
5     A.  Yes, these are our comments.
6     Q.  Okay.  You and the other interviewer?
7     A.  Correct.
8     Q.  Going to the, I'll call it a second
9         paragraph where it says, All the candidates
10        interviewed had extensive experience as a
11        barber.  The next sentence says,
12        Mr. Thompson had additional skills
13        demonstrated during the interview process
14        which made him an excellent selection.  Do
15        you know what the additional skills were?
16    A.  Not specifically.
17    Q.  If you were trying to figure that out, would
18        there be any way that you would be able to
19        identify that at this time?
20    A.  If I reviewed the Interview Form again.
21    Q.  Okay.  And we'll get through that before we
22        get out of here.  Going back up to that --
23        the top part of that Justification box, it
24        says, If selection is out of rank order,
```

23

```
1         include rationale, are they talking about
2         the selection being -- when they say rank
3         order, you give a number to the different
4         candidates when you do the Rutan hiring; is
5         that right?
6     A.  In regards to how they score?
7     Q.  Yes, what you're doing is there's a
8         percentage for different categories and then
9         inside that category you rank by number, I
10        think, 0 through 5 or 0 through 4 inside of
11        each category, and then there is a total for
12        each candidate, a numerical total for their
13        interview score I guess I will call that.
14        What do you call that number, or what am
15        I -- I guess I'll put it on the record a
16        little clearer here.
17    A.  It's the actual number the candidate comes
18        out with after the interview process.
19    Q.  Okay.  When they're talking about, If
20        selection is out of rank order, include the
21        rationale, are they indicating there that
22        you can pick a person for the position who
23        maybe does not have the highest number in
24        that ranking of the interview?
```

24

```
1     A.  That's correct.
2     Q.  Who is it that would make the decision that,
3         boy, this person got a lower number than
4         another applicant, but we're going to hire
5         that one?
6     A.  That's not my -- not my decision to make.
7     Q.  Okay.  Who would be the person that would
8         make that decision?
9     A.  The chief administrator could make that
10        recommendation.
11    Q.  Is the chief administrator the warden?
12    A.  Yes.
13    Q.  Which at the time of this interview would
14        have been Mr. Hulick; is that right?
15    A.  Correct.
16    Q.  Would you have spoken with Mr. Hulick at all
17        about whether that type of decision should
18        be made, taking the people out of numeric
19        order in the case of the hiring of the
20        barber that Mr. Thompson got?
21    A.  No.
22    Q.  Do you remember -- it sounds like you've
23        done a decent number of Rutan hiring for the
24        Department of Corrections.  Do you ever
```

25

| | |
|---|---|
| 1 | remember hiring somebody that did not have |
| 2 | the highest score? |
| 3 A. | No. |
| 4 Q. | Do you remember in Rutan training or in your |
| 5 | experience as an assistant warden and as a |
| 6 | warden anyone at the Department of |
| 7 | Corrections ever talking about when it would |
| 8 | be appropriate to take a selection out of |
| 9 | rank order? |
| 10 A. | No. |
| 11 Q. | Do you have any resource or information that |
| 12 | was provided to you as to what type of |
| 13 | information should be in this justification |
| 14 | box? Is there some sort of a manual or |
| 15 | guideline that's give to you to how to |
| 16 | complete these forms? |
| 17 A. | No. |
| 18 Q. | Do you remember anyone ever coming to you |
| 19 | after this Exhibit 14 was completed and |
| 20 | telling you that additional information |
| 21 | should be included in that form? |
| 22 A. | No. |
| 23 Q. | Going to page 2 of Exhibit 14, under |
| 24 | paragraph no. 2 it says, Is there documented |

26

| | |
|---|---|
| 1 | underutilization of an affirmation action |
| 2 | group in the EEO category. Do you know what |
| 3 | they're talking about there at all? |
| 4 A. | No. |
| 5 Q. | Are you involved at all in completing the |
| 6 | second page of this document? |
| 7 A. | No. |
| 8 Q. | That would be something that probably the |
| 9 | Personnel Department would do? |
| 10 A. | Correct. |
| 11 Q. | Moving on to Exhibit 15, this is a Barber |
| 12 | Interview Form, and I believe this is a |
| 13 | blank form that you would have used in the |
| 14 | Rutan hiring of the barber position that |
| 15 | we're here for today; does that sound right? |
| 16 A. | Yes. |
| 17 Q. | And I think this form was prepared somewhere |
| 18 | besides Hill; is that right? |
| 19 A. | Yes. |
| 20 Q. | And do you know where the history of this |
| 21 | form came from? |
| 22 A. | No. |
| 23 Q. | It's got Logan Correctional Center. I don't |
| 24 | know if it's on your copy or not at the top |

27

| | |
|---|---|
| 1 | on the fax, but I'm -- do you remember ever |
| 2 | talking to anybody at Logan Correctional |
| 3 | Center about this form? |
| 4 A. | No. |
| 5 Q. | The different categories on this Interview |
| 6 | Form are provided different weights |
| 7 | throughout the form, for instance, |
| 8 | education, training, and skills was weighted |
| 9 | at 30 percent. Do you see that? |
| 10 A. | Yes. |
| 11 Q. | Were you involved at all in the decision as |
| 12 | to how to weight these different categories? |
| 13 A. | No. |
| 14 Q. | Did you talk about the weight given to the |
| 15 | different categories with the other |
| 16 | interviewer prior to doing these interviews? |
| 17 A. | No. |
| 18 Q. | Procedurally while you're doing the |
| 19 | interviews, as you're talking to the |
| 20 | candidates, are you filling out the lines |
| 21 | underneath the different questions? |
| 22 A. | Yes. |
| 23 Q. | And do you ask each one of the questions to |
| 24 | each of the candidates? |

28

| | |
|---|---|
| 1 A. | Yes. |
| 2 Q. | And how did you break that up? Were you |
| 3 | asking all the questions? Was the other |
| 4 | interviewer asking all the questions? Did |
| 5 | you rotate back and forth, or what do you |
| 6 | guys do? |
| 7 A. | We rotate back and forth. |
| 8 Q. | Okay. There's also a points box beside each |
| 9 | question. Is that something that you would |
| 10 | fill out for each question? |
| 11 A. | Yes. |
| 12 Q. | And when you would fill that out, would you |
| 13 | talk to the other interviewer before you |
| 14 | filled in the point on your form? |
| 15 A. | No. |
| 16 Q. | When would you put the point in for each |
| 17 | question? |
| 18 A. | I put the points in after each interview. |
| 19 Q. | Would you do it while the question is being |
| 20 | answered, or do you wait until the candidate |
| 21 | has left the room and then you go back, look |
| 22 | at your notes, and then put the points in? |
| 23 A. | That's correct. |
| 24 Q. | I sort of gave you two options there. I |

49

| | | |
|---|---|---|
| 1 | | the inmates?  Is that something that you |
| 2 | | would have written? |
| 3 | A. | That is my handwriting, yes. |
| 4 | Q. | Okay.  And I asked you a couple questions at |
| 5 | | once there.  It is your handwriting.  Do you |
| 6 | | know what it means or why you wrote it |
| 7 | | there? |
| 8 | A. | The question would be specific to inmates |
| 9 | | and not coworkers. |
| 10 | Q. | So are you saying that you would have read |
| 11 | | the question, or Mr. Smith read the question |
| 12 | | that describes the relationship you started |
| 13 | | to establish with your coworkers that are |
| 14 | | inmates?  Are you saying you would have |
| 15 | | changed the question a little bit? |
| 16 | A. | I don't recall. |
| 17 | Q. | All right.  Going to Question No. 2 in that |
| 18 | | Section 3, what were your notes in regards |
| 19 | | to Mr. Abron's answer on that question? |
| 20 | A. | See where they -- I'm sorry, See where they |
| 21 | | coming from.  I don't -- or, I'm sorry, See |
| 22 | | where they are coming from.  Treat people as |
| 23 | | they want to be treated.  I should be able |
| 24 | | to read my own handwriting. |

50

| | | |
|---|---|---|
| 1 | Q. | I have the same problem.  Let's go to answer |
| 2 | | to Question No. 3.  What was your answer on |
| 3 | | that? |
| 4 | A. | Very important.  I'm a decent person and can |
| 5 | | talk with anybody.  I deal with all people |
| 6 | | and communicate. |
| 7 | Q. | Okay.  And then go to Work History.  What |
| 8 | | was your notes in regards to Mr. Abron's |
| 9 | | answer to Question No. 1 under Work History? |
| 10 | A. | Twenty-eight years as a barber, three years |
| 11 | | corrections IYC Kewanee. |
| 12 | Q. | And what are your notes in regards to |
| 13 | | Mr. Abron's answer to Question No. 2 in that |
| 14 | | last section? |
| 15 | A. | I don't miss work.  I have never missed a |
| 16 | | day at Kewanee. |
| 17 | Q. | Going back to Question No. 2 in Section |
| 18 | | Number 1, assume in that SA for Mr. Abron |
| 19 | | meant same as above and he was telling you |
| 20 | | about his experience which included both |
| 21 | | experience in the correctional -- or the |
| 22 | | Department of Corrections and also |
| 23 | | experience at the Knox County Jail.  Would |
| 24 | | you find that that correctional experience |

51

| | | |
|---|---|---|
| 1 | | and experience in the Knox County Jail would |
| 2 | | provide beneficial training for a candidate |
| 3 | | with the Department of Correction barber |
| 4 | | job? |
| 5 | A. | Yes. |
| 6 | Q. | What's the benefit of having somebody with |
| 7 | | experience working with the inmates either |
| 8 | | in jails or at a youth correctional center? |
| 9 | | Why is that a benefit? |
| 10 | A. | Well, I don't know about youth centers. |
| 11 | | I've never worked in a youth center, so I |
| 12 | | would think there would be a big difference, |
| 13 | | so that's not as much as a benefit.  But I |
| 14 | | would think at Knox County, you're dealing |
| 15 | | with individuals that are incarcerated, so |
| 16 | | I obviously that experience would help you out |
| 17 | | in this setting. |
| 18 | Q. | And I guess I was just trying to get you to |
| 19 | | explain that as to why would that help you |
| 20 | | out?  What kind of benefit would you get |
| 21 | | from that kind of experience? |
| 22 | A. | Again, I mean, dealing with those types of |
| 23 | | individuals and then coming here and dealing |
| 24 | | with somewhat similar individuals would give |

52

| | | |
|---|---|---|
| 1 | | you some experience that you would need -- |
| 2 | | or that would help you out if you, in fact, |
| 3 | | were working there. |
| 4 | Q. | If you take out the -- both Exhibit 19 and |
| 5 | | 33 and put them side by side, you can look |
| 6 | | at your notes for the answer to Question No. |
| 7 | | 2 for Mr. Shaw (sic) and Question No. 2 for |
| 8 | | Mr. Abron and you'll see you gave Mr. Shaw |
| 9 | | (sic) a 4 and Mr. Abron a 3 on that specific |
| 10 | | question.  Can you tell me what was it that |
| 11 | | made you give a higher score to Mr. Thompson |
| 12 | | in that category? |
| 13 | A. | Probably the 40 years experience. |
| 14 | Q. | In looking, comparing the answers to |
| 15 | | Question No. 3 for Mr. Abron and |
| 16 | | Mr. Thompson, can you tell me why again in |
| 17 | | Section 1 you would have given a higher |
| 18 | | score to Mr. Thompson in regards to the |
| 19 | | sanitation and sterilization of barbershop |
| 20 | | equipment? |
| 21 | A. | They're both good answers.  Wet and dry |
| 22 | | sterilizers is what I'm familiar with in |
| 23 | | regards to what barbers do to sterilize |
| 24 | | equipment. |

57

1  Q.  Do you know if Mr. Thompson was a veteran?
2  A.  No, I don't recall.
3  Q.  And you don't need to read this one out
4     loud, but I want you to review that
5     paragraph 20 on the same page. Just give
6     me -- tell me when you're done reading that
7     paragraph.
8  A.  (Complies.) Okay.
9  Q.  Way back at Exhibit 14 we talked about when
10    a selection could be taken out of rank
11    order, including rationale. In reading
12    that, it appears to me that maybe
13    Affirmative Action might be a basis for
14    taking something out of rank order based on
15    an agency's wish to pass a higher rank
16    candidate. Does that refresh your
17    recollection at all in regards to the prior
18    document about taking people out of rank
19    order?
20 A.  I'm not sure what you're asking.
21 Q.  I don't think it does -- it looks like an
22    agency, and I assume by reading this that
23    this probably is something prepared by
24    Central Management, it's not just for the

58

1     Department of Corrections, is that right, if
2     you know?
3  A.  I don't know.
4  Q.  Okay. I'm just going to -- after you've
5     read the paragraph 20 about Affirmative
6     Action, does that provide you with anything
7     in regards to additional information from
8     any of your previous answers about
9     Affirmative -- I mean, does this help you
10    out in regards to whether Affirmative Action
11    applied to this barber position, and if it
12    did, how it would be applied to this hiring?
13 A.  It -- I don't know if it applied to this
14    hiring.
15 Q.  Okay. That's fine.
16       MR. REHN:  I'm going to take just a
17    minute with Steve outside and be right
18    back.
19
20       (Whereby a short recess was
21    taken.)
22
23       MR. REHN:  Just a couple of other
24    follow-up questions.



59

1  BY MR. REHN:
2  Q.  In going through your notes from both
3     Mr. Thompson and Mr. Abron, I don't think I
4     saw anything about the type of neighborhood
5     Mr. Abron's practice was in -- business was
6     in or Mr. Thompson's business was in. Do
7     you remember there being anything discussed
8     about where the different barbershops were
9     located in Galesburg?
10 A.  I would have to reference back to my
11    interview sheets to see if there was any
12    information provided.
13 Q.  Why don't you go ahead and take a look
14    through those interview information sheets.
15 A.  (Complies.) No, I don't see anything about
16    neighborhoods.
17 Q.  You've just gone through both your interview
18    sheets for both Mr. Abron and Mr. Thompson,
19    right?
20 A.  Correct.
21 Q.  And in looking through those, would it be
22    fair to say there's nothing in your notes
23    for either Mr. Abron or Mr. Thompson that
24    talks about the neighborhood that their

60

1     business is in, right?
2  A.  Correct.
3  Q.  If that would have been an important factor
4     in your scoring of this interview, is that
5     something that you would have included in
6     your notes?
7  A.  I would include in my notes whatever the
8     question -- the response would be.
9  Q.  You're not able to write everything somebody
10    says down when they're answering the
11    question?
12 A.  I try to get most everything someone says.
13 Q.  Do you know where Mr. Abron's shop is
14    located in Galesburg?
15 A.  I have an idea. I think I've seen it.
16 Q.  He's got a shop on Henderson Street.
17 A.  Yeah, I think I've seen it on Henderson
18    Street when I've gone by. I think his name
19    is on the shop.
20 Q.  He has a sign outside that says Abron's Hair
21    Design that is right by Henderson Street,
22    which is one of the main streets in
23    Galesburg. Is that where you remember
24    seeing it?

E-FILED 08/09/
Friday, 09 November, 2007 03:30:41 PM
Clerk, U.S. District Court, ILCD

1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

Steve Abron,                        )
                Plaintiff,          )
                                    )   06 1157
State of Illinois,                  )
Department of Corrections,          )
Henry Hill Correctional             )
Center and Don Hulick,              )
Warden, Individually, Bill          )
Smith, Business                     )
Administrator, individually,        )
and Frank Shaw, Assistant           )
Warden, Individually and in         )
their official capacity,            )
                                    )
                Defendants.         )


        DEPOSITION OF DON HULICK, taken before
Connie L. Boyle, CSR, Illinois License No.
084-002383, a Notary Public, on the 9th day of
August A.D., 2007, at 10:00 a.m., at 5 East Simmons
Street, in the City of Galesburg, County of Knox,
and State of Illinois.

---

PRESENT:

JOHN C. REHN, ESQ.,
ATTORNEY AT LAW
5 East Simmons Street
Galesburg, Illinois 61401
        On behalf of the Plaintiff

Also Present:  John Abron

PRESENT VIA TELEPHONE:

THOMAS KLEIN, ESQ.,
ATTORNEY AT LAW
500 South Second Street
Springfield, Illinois 62706
        On behalf of the Defendants.


                INDEX
                                    Page
DON HULICK

Direct Examination by Mr. Rehn       5

Certificate of Reporter             25

EXHIBIT
4

---

3

1   IT IS HEREBY STIPULATED by and between th
2   parties hereto and their respective attorneys that
3   this is a deposition on oral interrogatories taken
4   pursuant to notice to the attorneys of record and
5   pursuant to the provisions of the Code of Civil
6   Procedure and the Rules of the Supreme Court of
7   Illinois.
8       That the deposition may be taken before
9   Connie L. Boyle, CSR, a Notary Public of Tazewell
10  County, Illinois, on the 9th day of August A.D.
11  2007, at Galesburg, Illinois.
12      IT IS FURTHER STIPULATED that the reading
13  and signing of the deposition by the witness is
14  hereby waived and that the transcript or any part
15  thereof may be produced at trial for any appropriate
16  purpose without the necessity of calling the said
17  Connie L. Boyle to testify as to the authenticity or
18  correctness of said transcript, except the attorneys
19  of record shall have thirty days from receipt of
20  said transcript in which to call to the attention of
21  said reporter any errors or omissions.
22
23

---

4

1   MR. REHN:  We are here today for the depositio
2   of Warden Hulick.  And before I start asking
3   questions, for the record, I want to make clear
4   that both sides have agreed to take this
5   deposition telephonically.  I am not appearing
6   in the same room as the Warden and neither is
7   the court reporter.  The court reporter has
8   sworn him, Mr. Hulick, in over the phone.  I
9   have no objection to the same, and it is my
10  understanding Mr. Klein has no objection also.
11  Is that correct?
12  MR. KLEIN:  That is correct.
13  MR. REHN:  Thank you.  All right.  And now I'll
14  start asking questions to Mr. Hulick.
15      First off, Mr. Hulick, we are here today
16  for a deposition.  I am going to ask you some
17  background questions about yourself and then a
18  few questions about the hiring process in
19  general and questions about the decision in
20  regards to the hiring of the barber position at
21  Henry Hill when Larry Thompson was hired for
22  the position and Steve Abron applied for the
23  position.

**5**

1      Have you been deposed before, Mr. Hulick?
2   THE WITNESS:  Yes, sir, I have.
3   MR. REHN:  The rules of depositions are pretty
4   simple, straightforward.  First off, I want you
5   to answer out loud.  That is especially true
6   since we are in a different room.  If you give
7   me a head nod for a yes or a no, I won't know
8   what is going on.
9      The other thing is try to wait until I get
10   my entire question out before you answer.  That
11   may be more difficult here because you won't
12   see whether my mouth is still attempting to
13   move.  But if we are both talking at the same
14   time, it is impossible for the court reporter
15   to accurately get everything down, okay?
16   THE WITNESS:  All right.  Sir.
17   MR. REHN:  Thank you very much.
18
19      DON HULICK,
20   having been first duly sworn, was examined and
21   testified upon his oath as follows:
22
23   DIRECT EXAMINATION BY MR. REHN:

**6**

1   Q.  Why don't you tell me what your job is now,
2       what you do for a living.
3   A.  I am the warden at Menard Correctional Center.
4   Q.  And how long have you been the warden there?
5   A.  Since April 1st of 2006.
6   Q.  And what did you do before you became the
7       warden at Menard?
8   A.  I was the warden of Illinois River Correctional
9       Center.
10   Q.  Is that in Canton?
11   A.  Yes, sir, that is correct.
12   Q.  And how long were you the warden there?
13   A.  Approximately a year.
14   Q.  What did you do before you did that?
15   A.  I was the warden at Hill Correctional Center.
16   Q.  And it is my understanding that you were the
17       warden at the Hill Correctional Center when
18       Larry Thompson was hired as a barber.  Does
19       that sound correct to you?
20   A.  I believe that is correct, sir, yes.
21   Q.  Okay.  What background, if any, do you have in
22       regard to the Rutan hiring process?
23   A.  I am Rutan certified.

**7**

1   Q.  And is it my understanding that you go down
2       maybe to Springfield for some training on that
3       is that correct?
4   A.  That is correct, yes, sir.
5   Q.  Would you have been Rutan certified when yo
6       were the warden of Henry Hill?
7   A.  Yes, sir.
8   Q.  Have you yourself participated in the Rutan
9       interview process?
10   A.  No, sir.
11   Q.  As warden of Henry Hill, what would your
12       involvement be in the discussion to hire an
13       applicant for the barber position when you we
14       the warden at Henry Hill?
15   A.  I am sorry, my responsibility, you say, or -- I
16       missed that part.
17   Q.  I think I said involvement or responsibility.
18       I'll ask it as responsibility.  What would your
19       responsibility have been in regards to the
20       hiring of a barber at the Henry Hill facility
21       while you were the warden there?
22   A.  Okay.  I don't have any real part in the
23       process, of the hiring process.  The interviews

**8**

1       occur, the scores are tallied, they are
2       forwarded, the final scores are forwarded to
3       Personnel or Human Resources, and from ther
4       that gets forwarded to Springfield.  And my
5       real involvement is simply that I sign the
6       personnel form prior to whoever is chosen to
7       work there, sign the personnel form before th
8       start.
9   Q.  All right.  Do you get involved at all in
10       regards to selecting who the people will be
11       that will conduct the interviews?
12   A.  Sometimes, yes, sir.
13   Q.  Do you know if you were involved in this
14       particular case in regards to picking Assistant
15       Warden Frank Shaw and Administrator William
16       Smith as the persons to conduct the interview
17       for this position?
18   A.  I believe I probably was.
19   Q.  How do you go about choosing who it is that
20       will conduct the interviews?
21   A.  You have, we know who is Rutan certified, and
22       we just kind of, depending on, you know, how
23       many people you are hiring that year, you do

## 9

1    want the same ones to have to do every

2    interview, so you basically spread it around

3    between the Rutan interviewers.

4  **Q.** In this case they were hiring for a barber

5    position. Did you look for anybody with

6    **specific knowledge as to barbering?**

7  **A.** No, to the best of my knowledge, I had no one

8    who was Rutan certified with that type of

9    knowledge.

10  **Q.** As far as the Rutan hiring process goes, it is

11    my understanding that there is a specific list

12    of questions that are prepared or agreed upon

13    to be used before the interviews are conducted.

14    Is that your understanding of the process?

15  **A.** That is correct.

16  **Q.** Were you involved at all in the process of

17    choosing which questions to ask?

18  **A.** No, sir.

19  **Q.** What is your understanding in regards to how

20    those questions are selected?

21  **A.** Oftentimes, especially if you have, as you

22    **suggested a little bit ago, if you have an**

23    interviewer who doesn't have any background in

## 10

1    that particular position, they'll contact

2    perhaps other barbers or other people that do

3    have a background to assist them with their

4    selection of questions.

5  **Q.** And do you know how the questions were selected

6    in this particular case in regards to the

7    hiring of Mr. Thompson?

8  **A.** No, sir, I do not.

9  **Q.** As far as the weighing in the Rutan hiring

10    process, there is points that are given for the

11    answers to different questions, and then there

12    are weights given to the different points to

13    come up with a total point, I guess, a total

14    amount of points in regards to the hiring

15    process. Were you involved at all in the

16    **decision of how the different questions should**

17    be weighted?

18  **A.** No, sir.

19  **Q.** Do you know if that is typically something,

20    that the decision as far as how the questions

21    are weighted, do you know if that is something

22    that is typically done at the prison where the

23    questions are being asked and where the

## 11

1    position is to be filled, or is that something

2    that is done somewhere else?

3  **A.** I believe that it would be done at the prison,

4    yes, by the interviewers.

5  **Q.** And that is consistent with my reading

6    of the Administrative Directive of the Illinois

7    Department of Corrections. Would your

8    understanding of that be based upon

9    Administrative Directive, or would your

10    understanding be based upon in regard to your

11    belief that the people who are asking the

12    questions would be the ones who would make th

13    decisions in regards to weighting?

14  **A.** That is based on a vague recollection of the

15    class that I took some years ago.

16  **Q.** Okay. That's fine. How long ago was it that

17    you took that class?

18  **A.** I would say I am having a hard time rememberi

19    what I had for breakfast this morning these

20    days, but I believe it was probably six or

21    seven years ago.

22  **Q.** Okay. Do you ever recall --

23

## 12

1    (Off The Record Discussion)

2

3  **Q.** Do you ever recall being involved in the hiring

4    of not, I am not, I am going more general than

5    just the hiring of Mr. Thompson in the barber

6    position here, but I am talking about all the

7    Rutan hiring at all of the prisons that you

8    have been a warden at, have you ever gotten

9    involved in trying to put forward an applicant

10    for a position that did not have the highest

11    Rutan scoring?

12  **A.** No, sir.

13  **Q.** Do you know whether a warden has the ability t

14    do that?

15  **A.** I just recently reviewed something about that,

16    but I don't know that the warden has the

17    ability to do that. I think I was thinking

18    that the director could do that, but --

19  **Q.** When you say the director, who do you conside

20    the, who is the director? What does that mean

21    to be?

22  **A.** Director of the Department of Corrections.

23  **Q.** Who is the Director of the Department of

13

1      Corrections?
2   A.  Roger Walker.
3   Q.  Where is he located?
4   A.  In Springfield, Concordia Court.
5   Q.  Did you know -- I am going to reword my
6      question. Do you know Steve Abron?
7   A.  No, I don't.
8   Q.  Do you know Larry Thompson?
9   A.  I do now.
10  Q.  Did you know him prior to his hiring as a
11     barber at Henry Hill?
12  A.  No, sir.
13  Q.  Do you have any opinion as to whether it would
14     be a benefit when you are looking at hiring a
15     barber, that that barber has experience working
16     with inmates inside the Department of
17     Corrections?
18  A.  I think that there could be some benefit to
19     that, yes.
20  Q.  And do you think there is a significant
21     difference? It sounds like you were the warden
22     actually at the Illinois River Correctional
23     ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

14

1      Correctional Center. Is that correct?
2   A.  That is correct, sir.
3   Q.  Is there a significant difference between the
4      responsibilities of the barber at the Henry
5      Hill facility and the barber at the Illinois
6      River facility?
7   A.  In responsibilities, is that what you are
8      asking?
9   Q.  Yes.
10  A.  No, sir.
11  Q.  Broadening the questions beyond
12     responsibilities, is there any difference
13     between the two positions?
14  A.  Not to the best of my knowledge.
15  Q.  Would you know of any reason why experience
16     working with prisoners would be more important
17     at the Illinois Correctional Center in making a
18     hiring decision than at Henry Hill in making a
19     hiring decision for the barber position?
20  A.  I don't think there would be any difference
21     there.
22  Q.  Do you know anything about hiring preferences
23     in the Department of Corrections for veterans?

15

1   A.  In regards to Rutan?
2   Q.  No, just generally, and then I was going to
3      narrow it down to Rutan.
4   A.  All right, sir. I do know for a correctional
5      officer trainee, that they are given veteran
6      preference points.
7   Q.  Is there veterans preference given for somebod
8      in the Rutan hiring process?
9   A.  Not that I am aware of, sir
10  Q.  Can you explain, I guess there is a difference
11     between, what is the difference between
12     somebody that is a Rutan hiring, or going
13     through the Rutan hiring process and somebody
14     who is going through, I think you said
15     correctional officer trainee?
16  A.  That is not a Rutan interview process.
17  Q.  Okay.
18  A.  They do the testing, they do the actual written
19     test and they have to do a physical agility
20     test and then they do an oral interview, but it
21     is not Rutan.
22  Q.  Okay. So it is your understanding that the
23     veterans preference would apply to people that

16

1      are not doing the Rutan process, but for Rutan,
2      the veteran preference would not come into
3      play?
4   A.  Not to my knowledge.
5   Q.  Who would be the best person who would actua
6      know that or know the most about that veteran:
7      preference?
8   A.  Well, I would guess a representative from
9      personnel who would know personnel rules.
10  Q.  Okay. As far as hiring for the barber
11     position, do you have any opinion as to the
12     significance of where the applicant's barber
13     shop was located in regards to the type of
14     neighborhood when trying to make a
15     determination as to whether a person would be
16     an appropriate candidate for the barber
17     position?
18  A.  I am going to have to read into what you mean
19     by kind of neighborhood. I am guessing that
20     you mean culturally or --
21  Q.  Yeah, I am just trying to figure out, I think
22     there is, let me just put it this way. I mean
23     if a person works in a rough neighborhood or a

Deposition of Don Hulick

08/09/2

**17**

1    neighborhood that is not rough, does that make
2    any difference to you when you, in your mind
3    when are looking for an applicant for the
4    barber position?
5  A.  A rough neighborhood?
6  Q.  Yes.
7  A.  Would not necessarily make any difference to
8    me, no.
9  Q.  Do you have any understanding as to whether the
10    Rutan interviewers, people conducting the
11    interview are provided with copies of the
12    applications and/or resumes of the people that
13    are applying for the positions?
14  A.  I don't believe so.
15  Q.  Do you know why that is?
16  A.  No, I don't, sir.
17  Q.  Do you know if the, are you familiar at all
18    with the Juvenile Correctional Center in
19    Kewanee?
20  A.  Somewhat, yes, sir.
21  Q.  And what kind of people are held at that
22    facility?  I assume they are young.
23  A.  Yes, sir, yes.  I am, I couldn't really answer

**18**

1    that with any certainty.  I have an idea, I
2    think that they obviously have juveniles up
3    there.  I think they are from all different
4    criminal backgrounds.  I believe they also have
5    some mental health.
6  Q.  Do you believe experience working at a facility
7    that is a juvenile facility inside the
8    Department of Corrections would have any
9    bearing in regards to a candidate having
10    Department of Corrections experience when they
11    are seeking a job at Henry Hill for the barber
12    position?  Would this experience be helpful?  I
13    guess is a better way to ask that question.
14  A.  It is honestly hard for me to answer that.  Not
15    having worked in juvenile, in my mind, I know,
16    you know, we have to do different things with
17    juveniles than we do adults, and we have
18    different treatment with juveniles than we do
19    adults.  I wouldn't say it is necessarily
20    apples to apples.
21  Q.  What kind of differences are you talking about?
22  A.  Well, and again, I am talking in generalities
23    because I don't know anything about the

**19**

1    juvenile process.
2  Q.  Okay.
3  A.  But I do know they go through some type of
4    different training and now they have actually
5    separated themselves because they didn't want
6    to be the same as the adult division.
7  Q.  I think one of the things that is important for
8    the barbers inside the Department of
9    Corrections would be to make sure that the
10    barber instruments, such as the scissors and
11    other tools, are kept track of and inventoried
12    and the inmates don't get those.  Are you
13    familiar with that?
14  A.  Yes, sir.
15  Q.  Would you agree that would be equally importan
16    at a juvenile facility like the Kewanee one?
17    MR. KLEIN:  I will make a foundation objection,
18    but you may answer.
19    THE WITNESS:  Yes.
20  BY MR. REHN:
21  Q.  As far as the hiring of Mr. Abron, or the
22    hiring of Mr. Thompson and Mr. Abron's
23    application for this position, after the hiring

**20**

1    decision was made, Mr. Abron filed a complaint
2    with the EEOC, and it appears as though in July
3    of 2005 you wrote a letter relating to that
4    complaint.  Are you familiar with that letter?
5  A.  Yes, sir.
6  Q.  And I don't know if you have a copy of that
7    with you or not.  It was bate marked 00013 and
8    00014.  Do you have that document in front of
9    you?
10  A.  I do, sir
11  Q.  Thank you.  Is this a letter that you wrote?
12  A.  Yes, sir.
13  Q.  Okay.  I think you said in the start of the
14    letter that you believe the allegations about
15    the hiring decision being based on race were
16    false.  Do you see that?
17  A.  Yes, sir.
18  Q.  What kind of investigation did you do, if any,
19    in regards to the hiring decision before making
20    that statement?
21  A.  None, sir.
22  Q.  Okay.  It looks like you maybe had collected at
23    least the documents relating to the hiring.  Is

E-FILED
Friday, 09 November, 2007  03:31:18 PM
Clerk, U.S. District Court, ILCD

---

**Page 1**

```
1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF ILLINOIS

3                      PEORIA DIVISION

4

5   STEVE ABRON,

6         Plaintiff,

7    -vs-                    NO. 06-1157

8   STATE OF ILLINOIS,
    DEPARTMENT OF CORRECTIONS,
9   HENRY HILL CORRECTIONAL
    CENTER, ET AL.,
10
          Defendants.
11

12

13

14     Deposition of DEBRA DAVIS, taken at the instance

15  of the Plaintiff, before Robin A. Adams, CSR, RPR, and

16  Notary Public, on the 12th day of September, 2007, at

17  the hour of 11:00 a.m., at 3000 Montvale Drive,

18  Springfield, Illinois.

19

20

21

22

23            CAPITOL REPORTING SERVICE, INC.
                 2021 TIMBERBROOK DRIVE
24            SPRINGFIELD, ILLINOIS  62702
                   217-787-6167
```

---

**Page 2**

```
1   APPEARANCES:

2     REHN & SKINNER, LLC, by
      MR. JOHN REHN
3     Attorney at Law
      5 East Simmons Street
4     Galesburg, Illinois  61401

5       On behalf of Plaintiff;

6
      OFFICE OF THE ATTORNEY GENERAL, by
7     MR. THOMAS H. KLEIN
      Assistant Attorney General
8     500 South Second Street
      Springfield, Illinois  62702
9
        On behalf of Defendants.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

EXHIBIT
5

---

**Page 3**

```
1                   DEBRA DAVIS,

2   having been duly sworn, was examined and testified as

3   follows:

4                    EXAMINATION

5                   BY MR. REHN:

6     Q   Can you state and spell your name for the

7   record, please.

8     A   D-e-b-r-a  D-a-v-i-s.  Debra Davis.

9     Q   And we're here today, Ms. Davis, for a

10  deposition in regards to the case Steve Abron has made

11  against the Department of Corrections.  What I'm here

12  today to do is find out information from you.  I'll be

13  asking you questions, and it's maybe a little more

14  formal than a conversation around the dinner table in

15  that I'll want you to answer out loud.  If I say, "Was

16  that a yes?" or "Was that a no?" that's probably

17  because you did a head nod or an uh-huh or huh-uh like

18  we all do, and don't take offense.  I'm just trying to

19  make a clear record.  Okay?

20    A   Yes.

21    Q   Perfect.  And then the other thing is, I'm

22  not trying to trick you.  If you answer a question,

23  I'm assuming you understand the question.  If you

24  don't understand the question, ask me to rephrase it.
```

---

**Page 4**

```
1   I can ask bad questions.  I do that.  And if it's

2   something you don't understand, just ask me to try and

3   restate it.  Okay?

4     A   I will.

5     Q   Thank you.  And what do you do for a living,

6   Ms. Davis?

7     A   I work for the Department of Central

8   Management Services.  I'm the division manager for

9   transaction records and back-wage claims.

10    Q   And what does that job entail?

11    A   All the paperwork for all the agencies under

12  the jurisdiction of the personnel code file their

13  paperwork -- and we call them transactions -- for such

14  as hirings, promotions, voluntary reductions,

15  suspensions are filed through our department.

16    Q   And where is that office?

17    A   It's at the Stratton Building, Room 501.

18    Q   Is the Stratton Building here in Springfield?

19    A   Yes, it is.

20    Q   Okay.  And how long have you been doing that

21  job?

22    A   For around five years.

23    Q   And what did you do before that?

24    A   Prior to that, I was the assistant to the
```

5

1  bureau manager for the bureau of personnel at CMS.
2     Q  And when you say bureau, is the bureau you're
3  referring to CMS?
4     A  Correct.  Bureau of personnel.
5     Q  Okay.
6     A  This is a division under that.
7     Q  And CMS is Central Management Services?
8     A  Correct.
9     Q  And can you tell us CMS' relationship with
10  the Department of Corrections when it comes to hiring
11  people at different correctional facilities?
12     A  Once again, the hiring -- a person is not
13  considered hired until the director of Central
14  Management Services would approve the paperwork.
15     Q  Okay.  And the case that we're here about
16  involves somebody who is applying for the position of
17  barber at the Henry Hill correctional facility.  Is
18  that the type of hiring decision that would not be
19  official or finalized until CMS approves it?
20     A  That's correct.
21     Q  Okay.  And what is your role individually in
22  regards to the process of somebody being hired for a
23  position like a barber at a correctional facility?
24     A  The paperwork is processed by our staff.  A

6

1  transaction is reviewed to assure that it meets
2  adherence with the personnel rules, the personnel
3  code, and any bargaining unit contracts.
4     Q  And when you say personnel rules and
5  personnel code, what rules and code are you talking
6  about?
7     A  Well, it would be the code, which, in a sense
8  the personnel code was developed under statute, I --
9  and it gives -- it gives a directive to the director
10  of CMS what he's responsible for.  Under that, the
11  rules were developed that go along with the code --
12     Q  Okay.
13     A  -- that further define it, and it tells about
14  the hiring process in there.  Also, different trans --
15  well, I'll call them transactions, but it talks about,
16  oh, discipline.  It refers to what happens with
17  leaves, benefit time that people are entitled to,
18  layoff process.  There are many other things
19  incorporated in it.
20     Q  Okay.  And I don't know -- this was a booklet
21  that was given to us as part of --
22     A  Oh, that's Rutan.  That's not in the
23  personnel rules or code.
24     Q  Okay.  I was trying to figure out if this is

7

1  or isn't, and --
2     A  It's a process that we're required by law to
3  follow because of the hiring process.
4     Q  Okay.  The booklet that I'm holding in my
5  hand is labeled Interview and Selection Criteria and
6  Techniques.
7     A  Uh-huh.
8     Q  This booklet you're familiar with; is that
9  right?
10     A  Correct.
11     Q  And I think you called it the Rutan booklet;
12  is that right?
13     A  Right.
14     Q  How are you familiar with this booklet?
15     A  Anyone that takes -- or anyone that takes --
16  participates in an interview or holds the interview,
17  the interviewer is required to be Rutan certified.
18     Q  And that's for certain types of positions; is
19  that right?
20     A  For Rutan-included positions.  They're
21  determined -- I guess I would say a Rutan-included
22  position is some -- a position that's a nonpolicy
23  maker, rules maker, and I don't have any authority
24  over the determination.  That's done in

8

1  classifications.
2     Q  Okay.  You don't determine what is Rutan and
3  what is not Rutan; right?
4     A  No, I do not.
5     Q  Okay.  This is my under -- it is my
6  understanding that the barber position at the Henry
7  Hill would have been a Rutan job.  Is that your
8  understanding?
9     A  Correct.
10     Q  Okay.  And this book that I'm holding, the
11  Interview and Selection Criteria and Techniques book,
12  basically addresses the Rutan hiring process; is that
13  right?
14     A  That's correct.
15     Q  Okay.  And I don't know.  What is your
16  familiarly with the Rutan hiring process?
17     A  In my present position?  We are -- the forms
18  that are in a Rutan-covered position, the paperwork
19  that's submitted for the hiring of an individual
20  requires the documents to be submitted for the
21  individual that's hired.
22     Q  Okay.
23     A  They require the employment decision form and
24  the candidate evaluation.

9

1  Q  Okay. And I think that's what we're
2  ultimately going to be talking about here today is
3  those documents, and can you tell me what those two
4  different documents are generally speaking?
5  A  The candidate evaluation is what would be
6  filled out after the employee is interviewed. What it
7  has is a set of hiring criteria on it, and I'll give
8  some examples. They're not set in concrete. You can
9  pick various ones according to the position and the
10  requirements, but two of the most common ones and
11  recommended to use are knowledge and education --
12  excuse me. Knowledge and experience, education and
13  training are two that are supposed to be utilized.
14  And then they -- various other ones are judgment,
15  skills. **I can't think of any more of them right now,**
16  but --
17  Q  All right. And is that for the -- which form
18  is that that you're talking about?
19  A  The candidate evaluation would have the
20  criteria based on the position. Along with that,
21  there's an area for comments. The comments area
22  pertains to what was extracted during the interview
23  process with the individual, the candidate, from --
24  and that would have been from the set of hiring

11

1  approximately April or May. May have been June.
2  Around that time. I don't have an exact date, but we
3  were told to start reviewing the forms for adherence
4  to Rutan.
5  Q  And when you're saying you're reviewing them
6  for adherence for Rutan, what are you specifically
7  looking for?
8  A  We were looking to make sure that hiring
9  criteria was there, that it met the definition. Such
10  as knowledge and experience didn't have education and
11  training in it, that they were -- the definition
12  pertained to the criteria they selected. Also, that
13  the percentages totaled 100, that the information in
14  the comments area was defined and quantified.
15  Q  Okay. Were you given some -- was it some
16  oral order or was it something in writing, or how was
17  this brought to you about that there's going to be a
18  change in policy, and we're going to review these
19  things --
20  A  It was by my supervisor, the bureau manager.
21  Q  Okay. And it looks like -- you're going to
22  look at the hiring criteria, and you're going to make
23  sure the right hiring criteria is used, or are you
24  just evaluating --

10

1  questions for the interview process.
2  Q  All right. And as far as the other form
3  besides the evaluation, I think was like a decision
4  form?
5  A  Correct. Once -- once the -- let's -- I'll
6  use an example. You have four candidates. After you
7  would interview the four candidates, then you would
8  determine, by going through and doing a rating, which
9  there's a place on the candidate evaluation form for,
10  overall rating, who was the highest candidate. That
11  should indicate to the interviewer that that's the
12  most qualified person.
13  Q  Okay. The interviewers will complete these
14  forms, and then they send it to CMS; is that right?
15  A  Not all of them, only for the hired
16  candidate.
17  Q  Okay. And when that form is sent to CMS, is
18  that something that you would personally receive and
19  review then?
20  A  They have been submitted in the past. Not
21  until 2003 did they totally review them for their
22  content.
23  Q  Okay.
24  A  We were told at that time -- and it was

12

1  A  I just evaluate it.
2  Q  When you evaluate, how do --
3  A  Meaning -- meaning that -- that it contains
4  hiring criteria, and that it is as defined. Such as
5  my example before, that education and training doesn't
6  have things that require knowledge and experience in
7  it. **We mainly -- because those were supposed to be**
8  developed before the interview process. We would just
9  make recommendation at that point in time for the
10  agency to don't do that again.
11  Q  Okay.
12  A  Okay. We would send them some type of
13  either -- we'd make a telephone call and discuss it
14  with them, or we'd send them a memo. Regarding the
15  comments area, we have referred the incomplete ones
16  back to the agency for -- to be defined and quantified
17  if they could pull the information out from the
18  interview process.
19  **Q  And when you say that you wanted them defined**
20  and quantified, what is it that you're actually
21  looking for there?
22  A  They would make a general statement such as
23  the employee has high level experience in this area.
24  That basically doesn't say anything. They need to

17

1 for the Department of Corrections.
2   Q Okay. And it's from a Sue Park?
3   A Sue Park is a staff member under the
4 transactions area in the division.
5   Q Okay. And I think my understanding of this
6 document is that it was forwarded to Henry Hill,
7 asking them to basically redo or make some changes to
8 a candidate evaluation form. Is that your
9 understanding of what's going on here?
10   A Correct, by the statement listed in number 23
11 of the remarks.
12   Q Yeah, there's a little check mark --
13   A Uh-huh.
14   Q -- in box 23. And attached to Exhibit 26 on
15 the second page, I believe, was the initial eval --
16 candidate evaluation form that was forwarded to CMS?
17   A That's correct.
18   Q Is that your understanding, also?
19   A (Nodded head up and down.)
20   Q Okay. Why is it that -- can you look at this
21 document. Do you know why there was a request for
22 additional information?
23   A Yes. The education and training. It
24 requires possession of a valid Illinois license as a

18

1 barber, requires training necessary to qualify as a
2 barber, and skills necessary to maintain and
3 supervisor a barber facility and staff. Requires
4 elementary knowledge of first aid. The comments
5 indicated complete all requirements for this position
6 with above average skills. we sent it back to have
7 the comments area -- to further define what they mean
8 by above average skills, and to give us more
9 information on stating things such as like a barber's
10 license to tell us exactly what it is this employee
11 has.
12   Q Okay. were there similar -- do you know if
13 it was problems with all the comments throughout all
14 the different categories, or was it just --
15   A These are all very short. They're -- they
16 just give levels. They don't give any information on
17 what they're trying to state here. They don't give
18 any information as relates to the hiring criteria.
19 Just gives me a level of experience.
20   Q was there any concern beyond the way that the
21 form was filled out in regards to how the hiring
22 process had worked at Henry Hill on this?
23   A No.
24   Q Okay. were you involved at all in the

19

1 sending of this memo or the requirement for having
2 Henry Hill resend another evaluation form?
3   A I can't validate that it was me because there
4 are other people. There are supervisors in the area
5 that do review. However, I believe at this time I was
6 doing the major amount of review for transactions.
7 The terminology appears to be something that I
8 utilize. That it was my language. This happens
9 frequently. I can't say regarding this agency, this
10 position, but this terminology is utilized to get them
11 to clarify the area, give me more information, tell me
12 more about this person.
13   Q Okay. Do you see anything else regarding
14 problems with the way the categories are filled out on
15 this form other than a lack of detail? For instance,
16 do you see some education and training under knowledge
17 and experience, or any other statements that you think
18 were put in the wrong category?
19   A No, I do not.
20   Q Okay. Do you have an opinion or idea as far
21 as if somebody has experience in the Department of
22 Corrections, where would that be appropriate to be
23 filled in on that form?
24   A If they had prior experience in the

20

1 Department of Corrections, it could -- I mean, it
2 should fall under job knowledge and experience.
3   Q Would that also fall under education and
4 training? Are you saying those are two different
5 things?
6   A Those are two different things. Sometimes
7 you can receive your training through that you get
8 education, but it's mostly split out as define what
9 education means.
10   Q And as far as your job at CMS, is there a
11 difference between -- well, how about if I ask it this
12 way. Let me try again. Do they use a candidate
13 evaluation form similar to this whether it's a
14 Department of Corrections facility for adults or a
15 Department of Corrections facility for juveniles?
16   A For the State of Illinois it's utilized.
17   Q It's the same for both?
18   A It's the same form.
19   Q And you'd probably be reviewing these type of
20 forms for hiring decisions for the Department of
21 Corrections whether it's a juvenile facility or an
22 adult facility, it wouldn't make a difference to you?
23   A That's correct.
24   Q Okay. And in addition to reviewing, I guess,

25

1  comments area, and then all of them would sign the
2  back part of it in the area for the interviewing
3  officers.
4    Q  Okay.  And do you know what the -- what
5  procedure did you expect or anticipate when you
6  forwarded back, asking for additional information?
7  who did you believe would be filling out the
8  additional comments section?
9    A  It would go back to the interviewer, I would
10  believe, and they would pull the Rutan file that
11  contained the documents, the questions, and they'd go
12  back and extract from the questions that they asked
13  the information to further define -- their questions
14  should adhere to the hiring criteria, and therefore,
15  they should be able to give me the information that
16  told me that they had above average skills.  **what was**
17  it that person said.
18    Q  And it looks like they did, obviously, redo
19  this.  It was sent back, but it sounds to me like
20  you've never actually looked at this full evaluation
21  form before today?
22    A  No, I haven't.
23    Q  Okay.
24    A  I mean, I may have seen it before, but I

26

1  can't --
2    Q  You don't remember it if you did?
3    A  I don't recall it.
4    Q  All right.  I want to talk a little bit more
5  about the employment decision form.  What is the
6  significance of that form?  Why is that used?
7    A  After your interview process is over, you
8  document your selection on the employment decision
9  form.
10    Q  Okay.  And is there certain things that
11  you're looking for in regards to a properly completed
12  employment decision form?
13    A  Yes.  You'd want to make sure that they
14  indicated the candidate's overall rating, what the
15  candidate's ranking is, the information as far as the
16  number of candidates interviewed.
17    Q  And --
18    A  We'd also want, in the justification area, an
19  explanation on why the candidate ranked the highest,
20  and why they were selected.  And that should be
21  obtained from the candidate evaluation.
22    Q  Are you also looking for some sort of
23  comments that are defined and quantified in regards to
24  the justification as opposed to generalities in the

27

1  justification part of this form?
2    A  They need to give us more information such
3  than the employee was selected -- rated number one in
4  the best interest of the agency.  **They need to provide**
5  information such as the employee meets the
6  qualifications, and is able to perform the duties and
7  responsibilities associated with this position.  The
8  candidate scored most -- they're all written up
9  differently.  **The candidate -- if there's more than**
10  **one,** they can do a comparison.  It's recommended that
11  they do that on the form.  Not all agencies do it.
12  But to talk about their skills, were they rated
13  highest, pinpoint some of the information that's come
14  **out of th**e comments area in regards to the hiring
15  criteria.
16    Q  I think you said it was -- well, maybe -- did
17  you just say it was recommended that they do compare
18  the candidates?
19    A  **It's recommended that -- well, it's stated on**
20  the form that they should.
21    Q  Is that on this form?  Am I missing some of
22  the form?  I've just handed you what's been marked
23  Exhibit No. 12, and this is for a different position
24  than the one at Henry Hill.

28

1    A  It's missing on this one.
2    Q  When you say it's missing, is there another
3  page or is there --
4    A  well, excuse me.  It's on here.  I'm sorry.
5  Explain the reasons for hiring the selected candidate
6  with others that were interviewed.  **If selected out of**
7  rank order, include rationale.
8    Q  Okay.  So what your understanding of that is,
9  is that what they're asking for is actually they want
10  an explanation of why they hired this person, and then
11  comparison of that person to the other candidates?
12    A  Correct.
13    Q  **Is this something that you'll go through that**
14  form, and if something is missing on this form, do you
15  send them back, also, for additional information?
16    A  If they have not given us any information, if
17  they haven't told us such as they're interviewing --
18  they interviewed five people, they had five positions.
19  Let's say this person was the fourth ranked person.
20  They have to tell us what happened to candidates one,
21  two, and three, if they hired them.  If they didn't
22  hire them out of correct order, they need to explain
23  that, and they have to have our approval to do that,
24  but --

29

1  Q  Do they -- I was going to ask about that.  It
2  sounds like there is the ability to hire people
3  outside of the order that they get their points that
4  they get through the process; is that right?
5     A  There is.
6     Q  And when is it that they -- that type of
7  decision can be made?
8     A  It's allowed when someone may have -- it goes
9  more towards a specific -- I'll take a doctor example.
10  A doctor may have some kind of experience in studying
11  a certain area of science, and he might have that
12  experience where someone could have gained more points
13  in the education area that he was up against.  If you
14  could justify that that person's experience is what
15  you're really looking for, then through -- there's a
16  letter that needs to be submitted and justified on why
17  you hired it, and explained in the hiring criteria.
18     Q  So if somebody would have a lot of experience
19  that's very related to that job, but maybe they didn't
20  score as many points on other sections, that might be
21  a situation where you would hire somebody that scored
22  less point-wise?
23     A  Correct.
24     Q  And I don't know if this is something in your

30

1  mind that would qualify for that type of circumstance
2  or not, but I think most of the inmates are black in
3  the inmate -- in the Department of Corrections at this
4  time.  I don't know what the percentage is, but if
5  somebody had extensive experience working with black
6  customers' hair, would that be some sort of criteria
7  that would sort of fall in what you're talking about
8  as far as extra experience that may be related to the
9  job itself?
10     A  I don't really believe I'm qualified to
11  answer that.  It's something that would have to go
12  further to the people that have more authority in
13  Rutan and determining if that would be allowed or not.
14     Q  And who are those people?
15     A  There's some -- there are people that work in
16  another division within the bureau of personnel.
17  Technical services is the area.  They do
18  classification and Rutan.
19     Q  Are you also familiar with any preferences
20  for hiring veterans?
21     A  Correct.  Yes, I am.
22     Q  Is that preference -- can you explain, I
23  guess, what the preference is for hiring veterans?
24     A  Okay.  Veterans hiring preference comes into

31

1  play with the open competitive eligible list.  We're
2  required to adhere to veterans preference when hiring
3  any individuals off of that list.
4     Q  Okay.  And is a barber position, would that
5  be included among that list?
6     A  No, it is not.
7     Q  Okay.  Is there any preference for veterans
8  for the barber position?
9     A  No, that's not an open competitive eligible
10  list as far as veterans preference is defined.
11     Q  Okay.  What kind of positions are on the open
12  competitive preference list?
13     A  There are titles such as human resource
14  associate assistant.  Titles -- they consider this to
15  be under the trades.  The trades, in a sense, are
16  exempt from the personnel code.  Other titles that are
17  under the personnel code such as chemist, office
18  associate, office assistant.  I mean, there's
19  thousands of them that are covered under the open
20  competitive eligible list.
21     Q  I'm going to go back, and I'm sorry, I'm
22  jumping around all over here.
23     A  That's all right.
24     Q  The employment decision form that we marked

32

1  as Exhibit 12.
2     A  Uh-huh.
3     Q  Like I said, this is not the form for Steve
4  for the Henry Hill position, but looking at that
5  document, under the justification section, can you
6  tell me what you see on that that is good and what is
7  bad from your perspective as far as your job goes.
8  When I say good or bad, I'm talking about how it was
9  filled out.
10     A  It's pretty generic.  What they should be
11  able to do is pull something from each one of these
12  areas in their criteria, and make a comment regarding
13  it on the candidate evaluation form, as opposed to --
14  and maybe they did with this.  I don't -- I don't know
15  what the hiring criteria was.  It's an overall view
16  that should tell why they hire this person.  I don't
17  have a comparison of the other candidates.  So I'm
18  taking their word that they were number one, which
19  they should have the backing for it with the other
20  paperwork.  It could be better written, but --
21     Q  And what you're -- and you're sort of making
22  hand motions while you're answering me.
23     A  To the hiring criteria.  I'm sorry.
24     Q  No, that's all right.  But what you're

33

1 referring to, I think, was in the justification. What
2 you would like to see is you'd like to see some
3 mention of the different categories under hiring
4 criteria identified and discussed under the
5 justification section?
6    A That's correct.
7    Q I'm going to hand you now what's been marked
8 Exhibit 14, which is the employment decision form for
9 the hiring at the Henry Hill Correctional Center.  And
10 can you tell me what your opinion is of the
11 justification section of that hiring decision form?
12    A It's one that would be accepted.  However, it
13 should have further definition of comparison such as
14 this Mr. Thompson, you could have given what his
15 additional skills were that made him higher.  You
16 could have defined more information instead of
17 generalizing that he had additional skills.  Well,
18 what were they?  Compared against to the others, what
19 made him the more prominent candidate for this
20 position?  What was it that made him score the
21 highest?  This is very general.
22    Q Yeah.  You'd agree it's a very general --
23    A It's general.
24    Q They basically say all the candidates had

34

1 extensive experience, but Mr. Thompson had additional
2 skills which made him an excellent selection.  You'd
3 agree, looking at this, you don't know what those
4 additional skills are?
5    A Correct, or what extensive experiences
6 either.
7    Q Okay.  I guess, comparing Exhibit 14 and
8 Exhibit 12, Exhibit 12 there was at least some hint of
9 there as far as why that candidate was selected.
10 Would you agree that there's a little more there?
11    A There is more information here as far as it
12 specifically -- to me it's mentioning things that are
13 meaningful to them out of the interview process out of
14 their criteria.  They mention they have a extensive
15 amount of knowledge and experience in barbering and
16 corrections.  I suppose that means the Department of
17 Corrections, and not corrections to the barbering,
18 but --
19    Q Yeah.
20    A That they have -- something else that appears
21 meaningful to me, that they have a good attitude with
22 regard to staying on top of security issues.  That
23 must have been meaningful out of the interview
24 process.  And that there was another instance in here

35

1 that they had excellent working knowledge of
2 corrections and security procedures.
3    Q I mean, it looks like that candidate's had
4 experience working with the Department of Corrections
5 before, and that's part of their --
6    A As the decision form says --
7    Q -- justification?
8    A -- correct.
9    Q Do you believe that these forms, the
10 candidate evaluation forms, should you be able to read
11 the comment section, and based on the comment section
12 of one candidate and another candidate be able to
13 figure out why one got a higher score than the other
14 one in different categories?
15    A You should be able to.
16    Q Comparing Exhibit 6, which is the candidate
17 evaluation form for Steve Abron, with the second page
18 of Exhibit 26, which was the initial candidate
19 evaluation form for Mr. Thompson, can you look at the
20 comments section for Mr. Abron for the category of
21 education, training, and skills and compare it to the
22 comments section under Mr. Thompson for that same
23 category, and after you'd had a chance to read those,
24 if you can --

36

1    A They're nearly the same.  I don't know what
2 they base their ratings on.  **The only thing that** I can
3 really see that's different is in interpersonal
4 relations.  This one comes up as demonstrated
5 excellent when they're using this level.  This one was
6 good.
7    Q And I just wanted to stick initially with the
8 first category, which is education, training, and
9 skills.  Mr. Abron's comments for that category were
10 completed all requirements for this position with
11 above average skills, and maintains correctional
12 experience; is that right?
13    A Correct, but they also derive this definition
14 off of the interview questions.  The interview
15 questions are scored there.  So they would transfer
16 their percentages over to that, and I don't know what
17 the individual questions are.  That might have some
18 indication for the point differences.  I don't know
19 how they rated those.
20    Q You would agree that the comments basically
21 are the same in regards to both Mr. Abron and
22 Thompson, except for the only difference is Mr. Abron
23 also has correctional experience; is that right?
24    A It mentions it there.

37

1    Q But it looks like Mr. Thompson got a higher
2  rating; is that right?
3    A That's correct.
4    Q And you would agree that by looking at this
5  form you can't really figure out why?
6    A Not by looking at the form.
7    MR. REHN: Okay. Give me a second. I want
8  to talk to my client outside real quick.
9       (Short recess.)
10    MR. REHN: Q One other thing I forgot to ask
11  you about, and I'm not sure if you're familiar with
12  this or not. But the candidates, before they're
13  interviewed, filled out application forms and
14  forwarded -- some forwarded resumes or work experience
15  documents to the interviewers. Are you familiar with
16  the practice as to whether the interviewers should
17  review those documents?
18    A It's my -- I have been taught that they
19  should not -- the interviewers are not to review them.
20  They're only to use the information that's utilized in
21  the interview process.
22    Q Okay.
23    A What's extracted during the questioning
24  period.

38

1    Q And do you know if the interviewers are
2  supposed to inform the people being interviewed that
3  the evalua -- that the resumes will not be --
4    A I don't know of any requirement to inform
5  them.
6    Q Okay. Have you reviewed the notes of the
7  interviewers in regards to the interviews for this
8  position that we're here about today?
9    A No.
10    Q Okay.
11    A None of those doc -- the only document that's
12  submitted to CMS that -- and the one that I looked at
13  was the one that pertained to the candidate that was
14  hired. We don't see the other materials. If we
15  happen, by chance, to get copy, they're -- the staff
16  are instructed to immediately send the questions back.
17    Q Do you know why that is?
18    A Well, you get questions circulating all over
19  the state, and I don't want to be a party of that,
20  knowing what questions were asked at an interview. I
21  wouldn't want any of the staff to be responsible or
22  accused of knowing it either.
23    MR. REHN: I don't have anything further for
24  her.

39

1    MR. KLEIN: I don't have any questions.
2    MR. REHN: All right. Thank you. It was
3  nice to meet you.
4    A Nice to meet you, too.
5    MR. KLEIN: Would you like to have the
6  opportunity to review the transcript of the deposition
7  to make sure that everything was taken down correctly?
8  You have that right.
9    A Yes, I'd like to.
10    MR. KLEIN: Okay. So we'll reserve.
11    MR. REHN: Sounds perfect.
12       (Witness was excused.)
13
14
15
16
17
18
19
20
21
22
23
24

40

1  STATE OF ILLINOIS  )
                       ) SS
2  COUNTY OF SANGAMON )
3             CERTIFICATE
4    I, Robin A. Adams, affiliated with Capitol
5  Reporting Service, Inc., do hereby certify that I
6  reported in shorthand the foregoing proceedings; that
7  the witness was duly sworn by me; and that the
8  foregoing is a true and correct transcript of my
9  shorthand notes so taken as aforesaid.
10    I further certify that I am in no way associated
11  with or related to any of the parties or attorneys
12  involved herein, nor am I financially interested in
13  the action.
14
15
16
17    Certified Shorthand Reporter
     License No. 084-002046,
18    Registered Professional Reporter
     and Notary Public
19
20
21  Dated this 25th day of
22  September, A.D., 2007,
23  at Springfield, Illinois.
24

OFFICIAL SEAL
ROBIN A. ADAMS
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5-21-2008

**1**

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE CENTRAL DISTRICT OF ILLINOIS

3    PEORIA DIVISION

4

5  STEVE ABRON,

6        Plaintiff,

7  -vs-            NO. 06-1157

8  STATE OF ILLINOIS,
   DEPARTMENT OF CORRECTIONS,
9  HENRY HILL CORRECTIONAL
   CENTER, ET AL.,
10        Defendants.

11

12

13

14    Deposition of TERRY POLK, taken at the instance of

15  the Plaintiff, before Robin A. Adams, CSR, RPR, and

16  Notary Public, on the 12th day of September, 2007, at

17  the hour of 1:00 p.m., at 3000 Montvale Drive,

18  Springfield, Illinois.

19

20

21

22

23        CAPITOL REPORTING SERVICE, INC.
             2021 TIMBERBROOK DRIVE
             SPRINGFIELD, ILLINOIS  62702
24              217-787-6167

---

**2**

1  APPEARANCES:

2    REHN & SKINNER, LLC, by
     MR. JOHN REHN
3    Attorney at Law
     5 East Simmons Street
4    Galesburg, Illinois  61401

5      On behalf of Plaintiff;

6
     OFFICE OF THE ATTORNEY GENERAL, by
7    MR. THOMAS H. KLEIN
     Assistant Attorney General
8    500 South Second Street
     Springfield, Illinois  62702

9      On behalf of Defendants.

10

11

12        I N D E X

13  WITNESS                    PAGE

14  TERRY POLK
       Examination by Mr. Rehn      3
15     Examination by Mr. Klein    45

16  EXHIBITS                   PAGE

17  Polk Exhibit No. 1            8
18  Polk Exhibit No. 2           11
    Polk Exhibit No. 3           14
    Polk Exhibit No. 4           26
19  Polk Exhibit No. 5           12
    Polk Exhibit No. 6           33
20  Polk Exhibit No. 7           36

21

22

23

24



EXHIBIT
6

---

**3**

1    (Polk Exhibits No. 1 - 4 were

2    marked for identification.)

3        TERRY POLK,

4  having been duly sworn, was examined and testified as

5  follows:

6        EXAMINATION

7  BY MR. REHN:

8    Q  Can you state and spell your name for the

9  record, please.

10   A  Terry Polk.  T-e-r-r-y P-o-l-k.

11   Q  All right.  Mr. Polk, we're here for a

12  deposition today.  Have you ever been deposed before?

13   A  Yes.

14   Q  Okay.  The rules pretty much stay the same.

15  I'm just going to ask you some questions about

16  yourself a little bit, and a little bit about this

17  case that we're here about today.  I want you to

18  answer questions out loud with words, if possible.

19  Don't get offended if I say, "was that a yes?" --

20   A  Okay.

21   Q  -- or "Did you mean no?"  Lot of times we'll

22  informally answer questions with head nods or uh-huhs

23  or huh-uhs, and I'll try and clear that up if I catch

24  you.

---

**4**

1    A  Okay.  Okay.

2    Q  Perfect.  The other thing is, try and wait.

3  Sometimes I'm slow on questions.  Try and wait till I

4  get the whole question out before you answer.  I'll

5  try and wait till you get your whole answer out before

6  I ask you questions.  It's difficult for her to type

7  everything up if we're both talking at the same time.

8  Okay?

9    A  Yes.

10   Q  All right.  What do you do for a living?

11   A  I work for the Department of Corrections, the

12  warden at Jacksonville Correctional Center.

13   Q  And how long have you been the warden at

14  Jacksonville Correctional Center?

15   A  Since October 16 of '05.

16   Q  And what did you do before you became the

17  warden at Jacksonville?

18   A  No.  Excuse me.  12-16-05.

19   Q  Okay.

20   A  I was the warden at Western.

21   Q  And where is Western?

22   A  Correctional Center.  Mt. Sterling, Illinois.

23   Q  Okay.  And how long were you at Western?

24   A  14 months.

5

1 Q And what did you do before you went to
2 Western?
3 A I was assistant warden at Decatur
4 Correctional Center.
5 Q And how long were you there?
6 A About two years, I believe. Something like
7 that.
8 Q Okay. Were you ever at the Illinois River
9 Correctional Center?
10 A No.
11 Q Okay. Did you ever do any interviews at the
12 Illinois River Correctional Center?
13 A Yes.
14 Q Okay. Got nervous there for a second. How
15 long -- well, can you tell me how you came about doing
16 interviews at the Illinois River Correctional Center?
17 A I did one interview up there for barber. I
18 don't even remember exactly when. Probably four or
19 five -- 2003, I believe.
20 Q Yeah, that's what the document shows.
21 A Yeah. Yeah.
22 Q December of 2003, does that sound right?
23 A Yes.
24 Q And how did you get chosen to come up to do

6

1 interviews at the Canton facility for the barber
2 position?
3 A I think the -- my warden asked me if I wanted
4 to go up there and do it at the time. I was an
5 assistant warden. Asked me if I'd go up there and do
6 them.
7 Q And what was your involvement in the hiring
8 of the barber position in Canton back in December of
9 2003? What all did you do?
10 A Did the interviews.
11 Q Okay.
12 A Conduct the interviews.
13 Q Did you do anything in regards to determining
14 what questions would be asked for the interviews?
15 A No, sir.
16 Q Okay. And this would be a Rutan interview;
17 is that right?
18 A Yes.
19 Q And I'm assuming you're Rutan qualified or
20 certified?
21 A Yes, I was.
22 Q Okay. And it's my understanding from looking
23 at these documents that you were the only person who
24 did the interviews?

7

1 A Yes.
2 Q Okay. And do you have any specific knowledge
3 of the barber position at the Canton or in any other
4 correctional facility? And what I'm looking for is --
5 first, is there any difference in the barber positions
6 at the different correctional facilities?
7 A Not that I'm aware of. Usually, they all
8 have the same -- pretty much the same
9 responsibilities.
10 Q It's not -- there may be some differences, I
11 guess, in how things are done a little bit at
12 different facilities, but for the most part, it's my
13 understanding that the barbers actually supervise
14 other people who cut the hair?
15 A Yes.
16 Q And they all would have some responsibility
17 and/or training in regards to making sure tools and
18 materials don't get taken by inmates?
19 A Yes.
20 Q And they'd all have to go through some
21 security background before they'd become the barber?
22 A Yes.
23 Q Before the interview, I introduced myself.
24 Mr. Abron introduced himself. Do you remember

8

1 Mr. Abron at all from the interviews?
2 A I believe so. You know, been a long time,
3 but yeah.
4 Q Yeah. And did you know Mr. Abron before the
5 interview in Canton?
6 A No.
7 Q Okay. Did you know any of the other
8 candidates for the barber position in Canton that you
9 interviewed?
10 A No.
11 Q Okay. Do you believe that experience working
12 in the Department of Corrections would be a benefit
13 for somebody who is trying to get the barber position
14 at a correctional facility?
15 A It would assist.
16 Q Can you explain why or how?
17 A Just familiarity with the rules and
18 regulations, basically.
19 Q And have you ever worked at any Department of
20 Correction facilities for juveniles?
21 A No.
22 Q All right. I'm going to hand you what's been
23 marked Polk Exhibit 1. Are you familiar with that
24 document at all?

9

1  A Familiar. It's a position description for
2 barber.
3  Q And is that the position description for the
4 barber position that you interviewed for -- or you
5 interviewed candidates for, I guess?
6  A Let's see. Trying to see on here if it's --
7 yeah, that would be Illinois River Correctional
8 Center. Yes, that would be it.
9  Q Okay.
10  A Should be. Date -- yeah, that's probably it.
11  Q Okay. And there's a number of --
12  A Date.
13  Q Percent of time for the job. It sort of
14 breaks down the different functions of the barber at
15 that facility.
16  A Uh-huh.
17  Q Would you have reviewed this form or been
18 familiar with this form --
19  A Yes.
20  Q -- when you did the interviews?
21  A Uh-huh.
22  Q And again, it's not -- I realize that you
23 probably don't stand and watch the barber at each one
24 of your facilities that you've been at, but would you

10

1 believe that the percentage of time spent on different
2 functions with that job would be consistent at both
3 the Department of Corrections facility in Canton, the
4 one in Mt. Sterling, the one in Galesburg?
5  A They would be real close. Yeah, I would
6 assume. They're all -- I'm pretty sure they're pretty
7 much the same.
8  Q Okay. And are you familiar -- I'm going to
9 go with -- hand you what's been marked Exhibit 8.
10 It's not a polk one, but it's an Exhibit 8.
11  A Okay.
12  Q Are you familiar with that document at all?
13  A No.
14  Q Okay.
15  A It's a position description, is that what
16 that -- I don't know what that is.
17  Q Okay. Well, if you don't know, that's --
18  A I would assume it's some type of job
19 description. I don't --
20  Q Okay. I'm going to hand you what's been
21 marked Exhibit 9. Are you familiar with that document
22 at all?
23  A This looks like a -- some type of posting, I
24 believe, that they had for the position. Looks like

11

1 it's a PAR. Personnel request. I don't know what the
2 "A" stands for.
3  Q Okay. Why don't you tell me, if you can, how
4 the hiring process works in regards to what you did
5 when you were interviewing candidates at the Illinois
6 River Correctional Center for the barber position.
7  A What I did?
8  Q Yeah.
9  A I just interviewed everyone, and selected the
10 candidate. I mean --
11  Q Would you have basic questions that you
12 followed for each candidate?
13  A Yeah. They were all -- same questions were
14 asked of everyone, in the same order, in the same
15 fashion.
16  Q Did you fill out -- or take notes during the
17 interview?
18  A Yes.
19  Q And were you ranking them by different
20 categories as you were going through the interview?
21 Let me ask you a little better here. **Let me** just hand
22 you Polk Exhibit 2. Are you familiar with that form?
23  A Yes.
24  Q Okay. Can you tell me what that form is?

12

1  A That's the evaluation form.
2  Q Okay. And it's got different categories on
3 the evaluation form; is that right?
4  A Yes.
5  Q And the evaluation form on Polk Exhibit 2 is
6 for a Mr. Huggins; is that right?
7  A Yes.
8  Q If a person had experience working in the
9 Department of Corrections, and provided that to you in
10 response to interview questions, which of the
11 categories would that experience in the Department of
12 Corrections help a candidate out in?
13  A I would say job knowledge and training,
14 education/training, and possibly judgment. Help
15 them -- yeah, it would help them some.
16  Q And how would it help them with judgment?
17  **A Just -- I would say with the handling of**
18 inmates. That's just my opinion, but --
19  Q Okay. I think I told you five. Go off the
20 record.
21      (Polk Exhibit No. 5 was
22      marked for identification.)
23      MR. REHN:  Q Handing you what's been marked
24 Polk Exhibit 5, would those be the questions that you

13

1  used when you did the interviews at the Department of
2  Corrections in Canton for the barber position?
3      A  To the best of my knowledge.  I can't
4  remember specifically, but --
5      Q  And looking at Polk Exhibit 5 and comparing
6  it to Polk Exhibit 2 -- well, I don't see -- I was
7  trying to see if the headings match the categories,
8  and it doesn't look like they do, do they?
9      A  Well, job knowledge, experience -- well, job
10  knowledge, education/training skills, planning, oral
11  communications, judgment, and interpersonal relations,
12  yeah.
13      Q  They track with each other?
14      A  Uh-huh.
15      Q  Is that a yes?
16      A  Yes.
17      Q  Okay.  Before you interviewed the different
18  candidates, did you look at their applications and/or
19  resumes?
20      A  I can't remember.  I can't remember.  I know
21  I -- sometime during the process I would have, but I
22  don't remember when.
23      Q  Okay.  Do you remember the experience --
24  well, let me ask it this way:  would experience

14

1  actually working as a barber be significant when
2  you're doing the application -- or when you're
3  analyzing the different applicants for this position?
4      A  That -- the experience as a barber would
5  probably be the most important thing.
6      Q  Do you know how much experience Mr. Huggins,
7  who was hired for the position, had in regards to
8  years working as a barber?
9      A  I don't recall.  I put on here, it looks
10  like, extensive amount.  I didn't put the amount of
11  years.
12      Q  I'm going to hand you what's been marked Polk
13  Exhibit 3, and I believe these are documents from the
14  Illinois River Correctional Center, the Canton
15  facility, in regards to Mr. Huggins' application for
16  the barber job.
17      A  Okay.
18      Q  The first few pages of that document would be
19  an application that he would have provided to the
20  Department of Corrections, I believe, before he
21  interviewed for this position.  Is that your
22  understanding of what that document would be?
23      A  I believe so.  He would have submitted this
24  at the time he put in for it, I believe.

15

1      Q  Okay.  And if you look at his job history, it
2  looks like he was a barber -- or worked as a barber
3  maybe in the late '70s and in the '80s.  Can you see
4  that --
5      A  Yes.
6      Q  -- on the --
7      A  Uh-huh.
8      Q  And what years does that say he worked at the
9  barber places?
10      A  '80 to '82, and '72 to '80.
11      Q  Okay.  And does that application indicate
12  what he did after 1982 and before the interview for
13  the barber position at Canton?
14      A  Oh, I guess that -- is that here?
15      Q  Yeah.  It's sort of a job history --
16      A  Okay.  Looks like he was -- worked for
17  Department of Corrections, and --
18      Q  From when -- when did he work for the
19  Department of Corrections?
20      A  '91 to '03, it looks like.
21      Q  Okay.
22      A  To the present time when the interview was
23  done.
24      Q  And do you know what he was doing from '91 to

16

1  '03 for the Department of Corrections?
2      A  Looks like he was a supervising -- looks like
3  he was a vocational instructor, corrections vocational
4  instructor.
5      Q  Do you know what a correctional vocation --
6  what was that, vocations correctional instructor?
7      A  Yeah, vocational -- vocational instructor.
8      Q  Do you know what that job would entail?
9      A  I believe -- I believe that's industries,
10  working in industries.
11      Q  Teaching the inmates different skills?
12      A  Trades.  Some type of a trade, I would
13  believe, and plus, they probably -- it's some type of
14  production they were doing.  If it's Illinois River,
15  it's probably the bakery.  They have a bakery up
16  there.
17      Q  Okay.
18      A  Baking, yep, that's what it is.
19      Q  So looking at his application, it looks like
20  he was working in the Department of Corrections in the
21  baking part of that facility from '91 until the time
22  of --
23      A  Looks like about 12 or 13 years, yeah.
24  Between 12 and 13.

21

1 familiar with the procedures and practices of the
2 Department of Corrections?
3    A Yes. He was very, very knowledgeable on
4 them, if I remember correctly.
5    Q And that would be based, probably, on his 13
6 years of working for Department of Corrections?
7    A Oh, yeah. He was very -- he was very --
8 almost -- he almost, if I remember correctly, quoted
9 some of them because I was very fam -- I'm very
10 familiar with them, too, and I was very impressed that
11 he -- tool control and things like that he was -- he
12 was almost word for word on the directives. So
13 apparently, he had enough initiative to pick up the
14 directives and read them and know what was going on.
15    Q And what is the tool control directive, can
16 you tell me what that is?
17    A It's where you -- where they have control
18 tools. Control tools in a penal facility, you know,
19 or --
20    Q It's basically making sure the inmates don't
21 take the scissors?
22    A Exactly, yeah.
23    Q Going to Mr. Huggins for planning, it says,
24 "During interview, candidate had an excellent plan for

22

1 ensuring his day-to-day activities would be done." Do
2 you know what you're referring to there?
3    A Probably from the questions asked. I think
4 there -- if I remember when I looked at these, "How do
5 you ensure your day-to-day activities are done." He
6 must have answered the question real well.
7    Q Do you remember as you're sitting here what
8 it was that made Mr. Huggins the candidate that you
9 chose for this barber position?
10    A Do what? Now, what was that again? I'm
11 sorry.
12    Q Why is it that Mr. Huggins was selected to be
13 the barber at Canton?
14    A I think he was -- well, he did very well in
15 the interview. He had a lot of knowledge in a lot of
16 areas. Did exceptionally well.
17    Q I'm going to hand you what's been marked
18 Exhibit 12. Are you familiar with that document?
19    A This is an employee decision form for
20 Mr. Huggins.
21    Q Okay. And is this something that would have
22 been filled out based -- would you have provided the
23 answer for justification or the information for that
24 form?

23

1    A Correct.
2    Q Okay. Would you be -- would it be fair to
3 say, looking at this justification, that you put
4 significant weight on Mr. Huggins' experience in the
5 Department of Corrections in making the decision to
6 hire him as the Department of Corrections barber?
7    A Yes, both. Both barbering and Corrections.
8    Q Would you -- in making the decision as to
9 whether to hire one candidate or another for a barber
10 position, would you think the type of neighborhood
11 that a person works in would have any influence on
12 your decision as to hire one candidate as opposed to
13 another?
14    A Now, what -- what do you mean?
15    Q Like if somebody worked in an economically
16 depressed neighborhood compared to somebody that was
17 working in a nicer neighborhood.
18    A Uh-huh.
19    Q Would that have any bearing in your mind in
20 regards to whether that person would be a better or
21 worse candidate for a barber at the Department of
22 Corrections?
23    A None -- none that I would be concerned with.
24 I wouldn't -- probably wouldn't even be aware of that,

24

1 so --
2    Q Would there be a difference in your mind,
3 when you're looking at candidates, as to whether a
4 person has 12 years of barber experience or 20 years
5 or 30 years? Is there a difference in your mind as
6 far as those numbers go?
7    A Not exactly, no.
8    Q And why is that?
9    A Right. As long as they meet the require --
10 you know, the minimal -- the minimum requirements,
11 that's my main concern.
12    Q And do you have any specific knowledge about
13 how the barbers in the Department of Corrections
14 sterilize their tools and instrument?
15    A I couldn't -- I couldn't tell you right now,
16 no.
17    Q Do you think that's something that you would
18 have known at the time you performed these interviews?
19    A Yes, I believe I asked somebody, or I would
20 have.
21    Q Do you know who you would have asked?
22    A Probably -- probably would ask the barber at
23 facility I was at. Of course, I was at a female
24 place, so that would have been the beautician or

25

1  whatever you want to call them, but I don't remember.
2  I don't remember exactly.
3    Q  You've worked in a number of correctional
4  facilities; is that right?
5    A  Yeah, five.
6    Q  Have you ever worked in a correctional
7  facility that had a black barber?
8    A  Let me think.  Lincoln, no.  Taylorville, no.
9  Decatur, no.  No, I have not.
10    Q  Are you aware of any black barbers working in
11  the Illinois Department of Corrections system as a
12  barber?
13    A  No.
14    Q  Would you agree that a high percentage of the
15  inmates in the Illinois Department of Corrections are
16  black?
17    A  Yes.
18    Q  I don't know if you know the number 70 to 80
19  percent.  Does that sound like in the ballpark or --
20    A  At our place, I believe it's about 60 to 65.
21    Q  Okay.
22    A  Yeah.
23    Q  Do you think experience cutting black hair as
24  opposed to white hair would be something that should

26

1  be considered when looking at experience for the
2  Department of Corrections barber positions?
3    MR. KLEIN:  I'll object to foundation, but
4  you can answer.
5    A  Yeah, I mean, it could be considered, yeah.
6    MR. REHN:  Q  Do you know what type of
7  experience Mr. Huggins had in regards to the clients
8  he had as a barber?
9    A  Have no idea.  Yeah.
10    Q  All right.  I'm going to hand you what's been
11  marked Polk Exhibit 4.
12    A  Okay.
13    Q  And I believe these are the documents that we
14  received from Illinois River Correctional Center
15  relating to Steve Abron for the job interview in
16  Canton for the barber position.
17    A  Okay.
18    Q  If you look at the first two -- well, I guess
19  it would be the second and third page of that exhibit,
20  Bates marked with the number 121 on the bottom and
21  122.
22    A  Okay.
23    Q  Would those be the questions that Mr. Abron
24  would have been asked?

27

1    A  Yes.
2    Q  And those would have been his answers to
3  those questions?  Or your notes?
4    A  Those would have been my notes, yeah.
5    Q  Okay.  And there's also attached to these
6  documents a copy of his application?
7    A  Okay.
8    Q  And there's some job history on there, also.
9    A  Okay.
10    Q  See if we can find it.
11    A  Should be on there.  There it is.  Is that
12  it?
13    Q  What history do you see for Mr. Abron in
14  regards to barber work?
15    A  He was a barber -- self-employed barber --
16  boy -- '74 to '03 in Galesburg.
17    Q  And --
18    A  And then he also -- looks like he was at --
19  for 24 months from '01 to '03 at the Youth Center.
20  Looks like that was part time.
21    Q  And that's part of the Department of
22  Corrections, is that right, but it's a juvenile center
23  in Kewanee?
24    A  It's a juvenile -- I believe it is, yes.

28

1    Q  And would you believe that they would have
2  similar rules and regulations for barbers in regards
3  to the equipment, the tools --
4    A  Yes.
5    Q  -- not letting the --
6    MR. KLEIN:  I'm going to object to the
7  foundation, but you can answer if you know.
8    A  Yes, it would be similar.
9    MR. REHN:  Q  I mean, there would be probably
10  some sort of a -- you'd have to check in, have a
11  security guard or something to get in, have the prison --
12  or a number to get in?
13    MR. KLEIN:  Same objection.
14    MR. REHN:  Okay.
15    A  Yeah.
16    MR. REHN:  Q  That's all right, don't -- he
17  also had experience working at the jail.  Is that on
18  there, too?  Knox County jail cutting hair?
19    A  I see U.S. -- I see something on here from
20  the Army.  I don't see anything else.
21    Q  Okay.
22    A  Unless I'm missing it.
23    Q  Well, that might not be on the documents you
24  have there, so --

29

1    A  Okay.
2    Q  Would experience cutting adult hair of
3  inmates in the county jail, would that be something
4  that would be beneficial for a candidate for a
5  Department of Corrections job?
6    A  Yes.
7    Q  And why is that beneficial?  Why would that
8  be beneficial?
9    A  Relatively close to the same.
10   Q  Close to the same.  You'd say it would be --
11   A  Close to the same --
12   Q  It would be close to the same as cutting hair
13 or being a barber at a Department of Corrections?
14   A  Correct.
15   Q  There's differences, but it's -- it would be
16 relevant experience?
17   A  Yes.
18   Q  And do you remember how Mr. Abron placed in
19 regards to his score from the interviews at the Canton
20 correctional facility?
21   A  I don't remember exactly, but I know he did
22 real well.
23   Q  I believe he was second behind Mr. Huggins,
24 although I'm having trouble finding that document,

30

1  also.  Are you familiar with this document that's been
2  labeled Exhibit 23?
3    A  No, I do not believe I've seen this.
4    Q  Okay.
5    A  If I -- maybe.  What is it?  I don't believe
6  I've seen this.
7    Q  Okay.  I'm going to -- you can give it back
8  to me then.
9    A  Okay.  Looks kind of nice, but --
10   Q  I'm going to hand you what's been marked
11 Exhibit No. 1.  Are familiar with that document?
12   A  Somewhat.
13   Q  It's an administrative directive of the
14 Illinois Department of Corrections; is that right?
15   A  Yes.
16   Q  And this is sort of the rules from the
17 Department of Corrections in regards to certain hiring
18 practices?
19   A  Yes.
20   Q  And if you go to page five of that
21 document --
22   A  Page five?  Okay.
23   Q  -- there's a section labeled Interview and
24 Selection Process for Positions Filled Under Rutan

31

1  Guidelines.  Do you see that?
2    A  Yes.
3    Q  And the barber position at Canton was a Rutan
4  position; is that right?
5    A  Yes.  I believe so.
6    Q  Under subpart A, it says, "The interviewing
7  officer shall," and then it lists eight different
8  things, including identifying the hiring criteria, and
9  assigning percentage weights to each hiring criteria,
10 and that's from number three and four.  Did you do
11 that in regards to the Canton job, or was that
12 somebody else that did that?
13   A  That -- that would not have been me.
14   Q  Okay.  Do you know who it was that did that?
15   A  No.
16   Q  As you read this document, would you have
17 been the interviewing officer, or do you interpret it
18 as being somebody else would be the interviewing
19 officer?
20   A  I believe -- I believe that that's -- some of
21 that's delegated, you know, personnel does some of it.
22   Q  Okay.  Take these back for a second.
23   A  Okay.
24   Q  Would you agree that Mr. Abron had more

32

1  barbering experience than Mr. Huggins did prior to the
2  Canton job -- prior to the --
3      MR. KLEIN:  I'll object to foundation.  You
4  can answer if you know.
5    A  I'd have to look at the other interview
6  questionnaire because I don't remember.
7      MR. REHN:  Q  Okay.  Did you bring that stuff
8  with you today?
9    A  Huh-uh.  No.
10     MR. KLEIN:  Do you want me to go get it?
11     MR. REHN:  If you have it.
12     MR. KLEIN:  Do you want the questions for
13 Huggins?
14     MR. REHN:  For Huggins, yes.
15     MR. KLEIN:  Yeah, I believe that they're in
16 there.
17     (Discussion off the record.)
18     (Polk Exhibits No. 6 and 7 were
19     marked for identification.)
20     MR. REHN:  Q  Okay.  Before we went off the
21 record, we were -- I think I'd asked you a question
22 about the relative amount of experience between
23 Mr. Abron and Mr. Huggins, and I showed you a
24 document, and you indicated that there might be

41

1  to the shift commander.
2  Q  Okay.  And he would do that after -- I guess
3  after he calls healthcare and gets things taken care?
4  A  Right, right.  He would write down on such
5  and such a date this -- you know, this happened, and
6  he'd turn it over, and that would be security's
7  notification of it.
8  MR. REHN:  All right.  Give me a second.
9  I'll talk to Steve outside.
10  (Short recess.)
11  MR. REHN:  Q  In Mr. Huggins' interview, your
12  notes from the interview --
13  A  Right.
14  Q  -- you mentioned throughout all the different
15  categories his experience working with the Department
16  of Corrections.
17  A  Right.
18  Q  Sometimes it's outright real clear, 13 years'
19  experience in Corrections like in your note for answer
20  one; right?
21  A  Uh-huh.
22  Q  Is that yes?
23  A  Yes, yes.
24  Q  And then other times it's sort of hinted at,

42

1  like in answer number three where you talk about call
2  HCU and 434, the accident report.  Those are terms
3  that would be used in the Department of Corrections?
4  A  Yes.
5  Q  And he was probably using them with his
6  experience there?
7  A  Yes.
8  Q  And again, 13 years of training in
9  Corrections is part of his answer one and part of his
10  answer two; is that right?
11  A  Yes.
12  Q  In the second section under educational
13  training; is that right?
14  A  Yes.
15  Q  And as far as how do you ensure your
16  day-to-day activities are done, he talks about speak
17  with the shift supervisor about outstanding issues.
18  That's probably -- he's got some help in his answer
19  based on his understanding of how the Department of
20  Corrections works?
21  A  Yes.
22  Q  And going on into judgment, the answer you
23  wrote very good, it talks about a report to DC434 --
24  A  Yes.

43

1  Q  -- which is a Department of Corrections
2  report?
3  A  Incident report, yes.
4  Q  And his answer -- the second one in there
5  talks about scheduling inmates.  He says no, and would
6  document in evaluation log, which, again, I assume, is
7  a Department of Corrections report?
8  A  Let's see that.
9  Q  I'm sorry.
10  A  I don't -- I've never heard of an evaluation
11  log, but I think he's referring to on the -- something
12  on the inmate where he's -- he's going to document it
13  on the inmate.
14  Q  Okay.
15  A  That's probably what he used in his
16  vocational job or his industries job.
17  Q  Do you feel it was Mr. Huggins' experience in
18  the Department of Corrections which sort of put him
19  over the edge to get this job compared to Mr. Abron
20  and the other candidates?
21  A  It had -- it had something to do with it,
22  yes.  Yeah.
23  Q  Okay.  Is there anything else that jumps out
24  at you after you've had a chance to review your

44

1  answers -- your notes from his interview and the
2  employment decision form that makes -- sticks out to
3  you in your head as, boy, Mr. Huggins is a better
4  candidate because of something other than his
5  Department of Corrections experience?
6  A  A lot of it was just the way he interviewed.
7  He did real well, and he was very confident with his
8  answers, and, you know, definitely showed a lot of --
9  what do you call it? -- initiative over the -- you
10  know, in his years in -- to learn things.
11  Q  He had done --
12  A  It was very obvious.
13  Q  He had done some research on the position and
14  some research on, I guess, the directives inside the
15  prison system?
16  A  Correct, and he had knowledge in a lot of
17  things.
18  Q  And a lot of that knowledge came from his
19  experience in the Department of Corrections?
20  A  Some, yeah.
21  Q  As far as knowledge of other things, what
22  other knowledge do you think he had sort of an
23  advantage on from something other than the Department
24  of Corrections experience?

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

Steve Abron,                        )
                                    )
              Plaintiff,            )
                                    )
      -vs-                          )   No. 06-1157
                                    )
State of Illinois, Department       )
of Corrections, Henry Hill          )
Correctional Center and Don         )
Hulick, Warden, Individually,       )
Bil Smith, Business Admini-         )
strator, individually, and          )
Frank Shaw, Assistant Warden,       )
individually and in their           )
official capacity,                  )
                                    )
              Defendants.           )

THE DEPOSITION OF LARRY THOMPSON, taken before
Amy S. Powers, Illinois CSR 084-003053, RPR
038540, a Notary Public, on Thursday, the **13th**
day of **September 2007**, commencing at the hour of
1:00 p.m., at 600 South Linwood Road, in the City
of Galesburg, County of Knox, and State of
Illinois.

CIRCUIT WIDE REPORTING
Suite 316 Hill Arcade Building
Galesburg, Illinois 61401
(309) 343-3376 * 1-800-342-DEPO

---

2

PRESENT:

JOHN REHN, ESQ.,
5 East Simmons Street
Galesburg, Illinois 61401
      on behalf of the Plaintiff;

THOMAS KLEIN, ESQ.,
500 South Second Street
Springfield, Illinois 62706
      on behalf of the Defendant

ALSO PRESENT:
      MR. STEVE ABRON

I N D E X

WITNESS:                               PAGE
LARRY THOMPSON,
      Direct Examination by Mr. Rehn   3 - 33
      Certificate of Reporter          34 - 35

EXHIBITS
      No Exhibits

**EXHIBIT**
7

---

3

(Witness sworn.)
LARRY THOMPSON,
having been first duly sworn, was examined and
testified on his oath as follows:

**DIRECT EXAMINATION BY MR. REHN:**

Q.   Can you state and spell your name for the
record, please.

A.   Larry R. Thompson, L-A-R-R-Y, R. as in Ray,
A-Y, R-A-Y, Thompson, T-H-O-M-P-S-O-N.

      MR. REHN:  All right.  Mr. Thompson,
we're here today for a deposition, which is
my opportunity to ask you some questions
about yourself and about a current lawsuit.

      What I'm going to want you to do
is answer the questions and try and answer
them out loud.

      Amy is transcribing or typing up
everything that we're saying, and it will
be a more formal conversation than if we're
just around the dinner table in that if you
say "uh-huh" or "huh-uh" or give me a head
nod, I might say "Is that a yes" or "Is that
a no" just to make a clear record, okay?

---

4

      THE WITNESS:  Uh-huh.  Yes.
      MR. REHN:  That's all right.  We all
do it.

      The other thing is I want to make
sure you understand my questions, and if you
give me an answer, I'm going to assume that
you understood the question.

      I have the ability to ask very bad
questions or confusing questions, and if I
do, just say I don't understand, can you
rephrase, I'm not sure what you want, and
let me try and restate it for you, okay?

      THE WITNESS:  Okay.

BY MR. REHN:

Q.   Where do you live?

A.   Galesburg.

Q.   All right.  What's your address?

A.   2136 Chapel Avenue.

Q.   And you're working at the Department of
Corrections now?

A.   Yes.

Q.   And you're a barber at Henry Hill?

A.   Yes.

5

1  Q.  How long have you had the position?
2  A.  It will be three years in February.
3  Q.  Why don't you tell me what you did before
4      you became a barber at the Henry Hill.
5  A.  I was a self-employed barber.
6  Q.  And how long were you a self-employed
7      barber?
8  A.  About 22 years here in Galesburg, 20 years
9      here in Galesburg.
10  Q.  What about before your 22 years in
11      Galesburg?
12  A.  I drove a semi for nine years, but I still
13      did hair, kept my hands in it.
14  Q.  When you were driving the semi and still cut
15      hair, did you have a barbershop at that
16      time?
17  A.  No, but I cut all my family's hair.  And I
18      was running local eight states, but I was
19      home every night and weekends.
20  Q.  Who were you driving for?
21  A.  Archer Daniels Midland Company.
22  Q.  And you have a barbershop here in town,
23      right?
24  A.  Yes.

---

1  A.  No.  I always worked for myself.
2  Q.  And can you tell me what your job is at
3      Henry Hill?  Just tell me on a typical day.
4      You come in around 7:00 in the morning to
5      start work?
6  A.  I come in and I start at 7:00.
7  Q.  And what do you do as far as the job?
8  A.  I sign in right down the hall here.  I go
9      back to my barbershop.  I pick out -- I get
10      in my desk, I get the next day's work out,
11      which is usually somewhere between 50 and 60
12      call passes a day.  I go down to the
13      computer, and I have to put those in before
14      11:00, because that's for the next day, and
15      they have to be entered into the computer by
16      11:00 a.m.  So I usually by 8:00, I've got
17      those in, shortly after.  Then I go back to
18      my barbershop.  My barbers show up about a
19      quarter after 8:00, somewhere between a
20      quarter after 8:00 and 8:30.  We immediately
21      start cutting hair.
22  Q.  How many barbers are there?
23  A.  Six.
24  Q.  And has it been that way ever since you

---

6

1  Q.  And that's over by Knox College?
2  A.  Yes.
3  Q.  And is that where you had your shop for the
4      22 years that you're talking about?
5  A.  Yes.
6  Q.  And are you still cutting hair over there
7      now?
8  A.  Not now.
9  Q.  Did you stop when you first got this job, or
10      have you --
11  A.  No, I kept it open a couple nights a week
12      just more or less to kind of wean my
13      customers away from telling bye.
14  Q.  Was that a couple years that you kept it
15      open?
16  A.  Yes, uh-huh.
17  Q.  What are the hours that you're working now
18      as the barber at Henry Hill?
19  A.  7:00 to 3:30.
20  Q.  And is that a Monday through Friday job?
21  A.  Tuesday through Saturday.
22  Q.  And as far as your experience before coming
23      to the Department of Corrections, had you
24      ever supervised other barbers?

---

8

1      first started?
2  A.  Yes.
3  Q.  And as far as -- I think you said there was
4      50 to 60 call passes you put in a day?
5  A.  A day.
6  Q.  Does that mean that you have 50 to 60 people
7      that get their hair cut a day?
8  A.  Yes, yes.
9  Q.  Of the inmates that are here -- well, first
10      let's start off with your six barbers.  How
11      many of them are black?
12  A.  Right now five, and one Hispanic.
13  Q.  Has it been that way the whole time you've
14      been here, or has that changed?
15  A.  No, I've had Hispanic barbers, I've had
16      white barbers, and I've had black barbers.
17      Every six months -- they work this job for
18      six months, and then I have to find six more
19      barbers.  They're not all hired at one time.
20      They have a seniority date, and we go by
21      that.  When that six months is up, out he
22      goes and I bring another one in.
23  Q.  So if they can last about six months, it's
24      probably about one a month that you're

**9**

1      getting a new one in?

2  A.  Every two months probably.

3  Q.  Okay.

4  A.  I try to keep them spaced out a little bit

5      so I don't run out. Then I -- I seek -- of

6      course you'll always have someone come in

7      and say I know how to cut hair. I try to

8      look for them that have a license, a

9      certificate, because in the penal system

10     there is barber colleges, and there's a lot

11     of fellas out here that's been through

12     barber college. So I try to get those.

13           But if I can't get those, then

14     I'll try a guy out that says he can cut

15     hair. But he has to know how to cut black

16     hair, Hispanic hair, and straight hair,

17     white people's hair, because I have all

18     nationalities coming to me.

19  Q.  And what -- it sounds like there is a

20     difference between cutting black hair and

21     Hispanic hair and white hair.

22  A.  Yes.

23  Q.  Can you tell me what the difference is?

24  A.  Well, a black man's hair is curly, most

**10**

1      generally kept -- I'm not going to say most

2      generally. Out here it's most generally cut

3      short. There's a direction you cut a black

4      man's hair. Most generally forward. It can

5      go in circles. It can go straight down. It

6      can go back. It can go -- straight hair,

7      white man's hair, is usually done with

8      scissors, but we don't use scissors out

9      here; we use clippers and comb. So,

10     therefore, it's cut clipper over comb, or

11     run the blade up a little ways up alongside

12     the man's head and taper it out and comb it

13     out with a comb. Hispanics is the same way,

14     except their hair is wavy and sometimes

15     curly.

16  Q.  Is there chemical treatments that the black

17     clients use sometimes on their hair?

18  A.  In the open world there is, but not out

19     here.

20  Q.  Do you have any idea what percent of the

21     people that are the inmates that you're

22     cutting the hair, as far as is it half black

23     or half white, I guess maybe Hispanic too,

24     maybe a third, a third, a third?

**11**

1  A.  Three-quarters black and the rest Hispanic

2      and white.

3  Q.  Do you actually cut hair as part of your

4      job, or are you just supervising others?

5  A.  I supervise others, but I do cut hair if

6      they need help.

7  Q.  How often do you cut hair?

8  A.  Not very often. If they run into something

9      they don't know what to do with, I'll

10     straighten it out for them or help them

11     straighten it out. I have a few staff

12     members that I cut their hair.

13  Q.  How long does the hair cutting last? Do you

14     go all the way up 'til 3:00, or is it just

15     in the morning?

16  A.  We start cutting about say 8:30, and we cut

17     until the requests or call passes, whatever.

18     9:30 we're supposed to -- that's the last

19     one. But by the time we get them all out of

20     there, it's usually 10:30 before we get

21     everybody cut out. Then they go -- then

22     they sit until about -- they clean up. And

23     a little after 11:00 they're called for

24     chow.

**12**

1  Q.  Oh, the barbers come back after chow?

2  A.  They come back right after chow and we start

3      in at 12:30, and we cut until 2:00 -- I'm

4      sorry, 1:30.

5  Q.  Okay. Cut from 1:30?

6  A.  12:30 to 1:30. And then they clean the

7      barbershop thoroughly from 1:30 until 2:00.

8      And then shortly after 2:00, usually about

9      ten minutes after 2:00, then they send them

10     back to their housing.

11  Q.  And is there certain procedures for cleaning

12     or sterilizing the equipment?

13  A.  Well, yeah, we have -- we have our infra,

14     infra -- it's a box with a light in it.

15     Infrared light.

16  Q.  Is it ultraviolet?

17  A.  Ultraviolet, yeah. And then we have our wet

18     sterilizers that has the barbicide in it and

19     formaldehyde.

20  Q.  Do you use the wet sterilizer?

21  A.  We use wet and dry. And we have a clipper

22     blade wash that we use. And we have tons of

23     spray that we spray our clippers down with

24     for infections and stuff, protection.

13

1  Q.  Is that something that -- I think you said
2      wet sterilizer, dry sterilizer, and then an
3      ultraviolet light.  Are those three
4      different things, or does it overlap there?
5  A.  No, there's two.
6  Q.  Okay.
7  A.  There's a wet sterilizer and the dry
8      sterilizer.  That's -- the dry sterilizer is
9      the one that has the light in it.
10 Q.  And do you know, do you use both dry and wet
11     for everything?  Are there certain things
12     that you use dry for --
13 A.  We put -- we put blades in there, plastic
14     guard blades in to dry.  There's combs kept
15     in there too.
16 Q.  And what do you use the wet sterilizer for?
17 A.  Combs.  Scissors back when we did have them,
18     but we don't have them anymore.
19 Q.  When did you stop having the scissors?
20 A.  The day I started out here, that's whenever
21     they took the scissors away.
22 Q.  And is that something that gets done every
23     day is they use that ultraviolet light?
24 A.  Yeah.  Yes.

14

1  Q.  And as far as the wet sterilizer, that gets
2      used every day also?
3  A.  Yes.
4  Q.  Is that something that you do, or is that
5      the barbers that do that?
6  A.  The barbers do that, and then I watch and
7      make sure they do also.
8  Q.  As far as the -- they wrap up, they clean
9      up, I think you said at 2:00 they're sent
10     back to housing.  What do you do after the
11     barbers leave?
12 A.  I sit down and get my paperwork ready for
13     the next day, put my -- some more request
14     sheets together and get them all lined up
15     between then and the time it comes time for
16     me to get off work, 3:30, and then the next
17     day when I come to work, I start that
18     procedure that I told you there, back down
19     with the computer and put those in for the
20     next day.  I'm always a day ahead of myself,
21     because I'm having to put in before
22     11:00 every day.
23 Q.  How does it work as far as do the inmates
24     make requests, they send a note that says I

15

1      need a hair cut?
2  A.  Yes.  They've got a sheet about this long,
3      about this wide (indicating).  Information
4      on it, inmate so and so, his name, his
5      number, his I.D. number, requests a hair
6      cut.  And, oh, if he has -- like a call pass
7      to the library or something like this, he
8      puts on there he has to be at the library
9      between 8:30 and 10:00, so call me after
10     10:30, which I would have to put him in at
11     12:30.  Or he's got a job in the afternoon,
12     he would like to be called in the morning.
13     Or he has a job in the morning, he would
14     like to be called in the afternoon.  If he
15     puts all that in there, I know where to put
16     him in the computer.  And I do all that, and
17     that's in the computer.  And then the office
18     down here, then they do the rest of it and
19     then they send them a notification when to
20     go to the barbershop.  We have our R-2 on
21     Tuesdays, R-3 on Wednesdays, R-4 on
22     Thursdays, R-1 Fridays, O.R. and Seg. on
23     Saturday.
24 Q.  And all of those letter numbers are

16

1      different blocks in the prison?
2  A.  Yes.
3  Q.  And what you're saying is on certain dates
4      you take certain prisoners from certain
5      blocks?
6  A.  House 1, House 2, House 3, House 4.
7  Q.  And as far as procedures in the barbershop,
8      is there certain procedures you're supposed
9      to follow if somebody gets cut or hurt at
10     the barbershop?
11 A.  Well, yes.  We've never had that happen,
12     but, yes, there would be a procedure for it.
13 Q.  And do you know what that would be?
14 A.  Well, if somebody should get cut, we --
15     you're just going to have to put a towel on
16     it.  It's got to stop the bleeding.  Depends
17     on how bad you get cut.  But there's really
18     not any way you can get cut with a pair of
19     clippers, because that's all we have.  But
20     you would immediately get ahold of an
21     officer and have him sent to the Healthcare
22     right off the bat, and then sterilize
23     everything that you was using, including
24     yourself.

**17**

1  Q.  And as far as experience that you had before
2  you became employed at Henry Hill, were you
   ever employed in a position where you were
   cutting hair of people that were
5  incarcerated?
6  A.  No.
7  Q.  Did you ever do any work for a jail?
8  A.  No.
9  Q.  Do any work for any juvenile facility?
10 A.  No.
11 Q.  Any work for any prison?
12 A.  No.
13 Q.  And you obviously know where your shop is,
14 you've been there 22 years.  You know Steve
15 Abron, don't you?
16 A.  Yes, I do, yeah.
17 Q.  You know where his shop is?
18 A.  Yes.
19 Q.  It's actually just a few blocks from yours?
20 A.  Uh-huh.  Yes.  That's hard to do.
21 Q.  It is.  Would you agree that his
22 neighborhood and your neighborhood are about
23 the same in regards to the economic distress
   or condition of the neighborhoods?

**18**

1  A.  Yes.
2  Q.  What is your salary at this time?
3  A.  At this time it's -- they've changed it so
4  many times.  $34.89 an hour.
5  Q.  And are you paid based on a 40-hour work
6  week?
7  A.  Yes.
8  Q.  And what benefits do you have?
9  A.  State benefits.
10 Q.  And what are the state benefits?
11 A.  Well, the health insurance.  I have life
12 insurance, vacation, personal days, sick
13 days, and holidays paid, of course.
14 Q.  What kind of training do you have in regards
15 to barbering?
16 A.  I went to Lincoln Barber College in East
17 Moline, Illinois.
18 Q.  When did you -- is it graduate from there?
19 A.  Yes.
20 Q.  When did you graduate from there?
21 A.  I can't come right down to the exact month,
22 but in 1964.
23 Q.  Did you have any continuing barber education
24 after that time?

**19**

1  A.  No.  I was done.  I took my test and got my
2  license and went to work.
3  Q.  I'm going to hand you what has previously
4  been marked as Exhibit No. 2.  Have you ever
5  seen this form before?
6  A.  Yes, I have.
7  Q.  Do you know when you would have seen this
8  before?
9  A.  No, I don't.  It wasn't on an application or
10 anything, I don't believe, but I have seen
11 it.
12 Q.  Okay.  And what this document is, and I
13 would have no idea if you had seen it before
14 or not, but it's an explanation, I believe,
15 of the position, the barber position at
16 Henry Hill that was prepared by -- I'm not
17 sure who prepared it.  But my question for
18 you is if you look at the Complete, Current
19 and Accurate Statement of Position,
20 Essential Functions, which is a heading
21 about halfway down the page, underneath that
22 heading there are eight numbered paragraphs
23 that talk about the job responsibilities and
24 duties, and then there's a percentage

**20**

1  breakdown of the time spent on those
2  different duties, and I would ask that you
3  read that, and then what I'm trying to
4  figure out is if you agree with these, or if
5  you think these percentages are incorrect.
6  Take a second, read it, and then let me know
7  when you've read the --
8  A.  No. 1, I agree with.
9  Q.  Okay.
10 A.  I agree with part of it.  You don't train
11 all inmate barbers, because some of them are
12 already trained when they come in.
13 Q.  Okay.
14 A.  No. 2, most definitely I agree with.
15      No. 3 is right.  That's counted
16 every day.
17      No. 4, yes, but there's really --
18 it says maintain records of inmate scheduled
19 and inmate work performance.  There isn't
20 really any record of it.  It's up to me.  If
21 he's doing it right, he's doing it right.
22 If he's doing it wrong, we've either got to
23 make him do it right or change barbers.
24 Q.  Okay.

**E-FILED**
Friday, 09 November, 2007  03:33:40 PM
Clerk, U.S. District Court, ILCD

```
1              IN THE UNITED STATES DISTRICT COURT

        FOR THE CENTRAL DISTRICT OF ILLINOIS

2

3    STEVE ABRON,                    )
                                     )
4                    Plaintiff,      )
                                     )
5           VS.                      ) No. 06-1157
                                     )
6    STATE OF ILLINOIS,              )
     DEPARTMENT OF CORRECTIONS,      )
7    HENRY HILL CORRECTIONAL         )
     CENTER and DON HULICK,          )
8    WARDEN, Individually, BILL      )
     SMITH, BUSINESS                 )
9    ADMINISTRATOR, and FRANK        )
     SHAW, ASSISTANT WARDEN,         )
10   Individually and in their       )
     official capacity,             )
11                                   )
                     Defendants.     )
12

13

14           The deposition of MARGARET FOLEY, called

15   for examination pursuant to the provisions of the

16   Federal Rules of Civil Procedure of the United

17   States District Courts as they apply to the taking

18   of depositions, taken before Paula A. Morsch,

19   C.S.R. License No. 84-002965, a Certified

20   Shorthand Reporter in the State of Illinois, on

21   the 13th day of June, 2007, at the hour of

22   10:00 a.m., at 600 S. Linwood Road, in the City of

23   Galesburg, County of Knox, State of Illinois.
```

**EXHIBIT**
8

ORIGINAL

2

PRESENT:
   MR. JOHN R. REHN, ESQ.
   Attorney at Law
   311 E. Main St., Suite 412
   Galesburg, Illinois 61401
   for Plaintiff Steven Abron;
   MR. THOMAS KLEIN, ESQ.
   Assistant Attorney General
   500 South Second St.
   Springfield, Illinois 62706
   for Defendants State of Illinois,
   Department of Corrections, Henry Hill
   Correctional Center, Don Hulick,
   Frank Shaw, Bill Smith;

---

         MARGARET FOLEY
   called by the Plaintiff,
   being first duly sworn,
   was examined and testified
   as follows:

         DIRECT EXAMINATION
BY MR. REHN:
   Q   Can you state and spell your name for
the record, please?
   A   Margaret Ann Foley, M-A-R-G-A-R-E-T,
A-N-N, F-O-L-E-Y.
   Q   And we're here today for a deposition
involving a claim made by Steve Abron against the
Department of Corrections. I'm here to ask you
some general questions about yourself, about the
hiring procedures in general, and then some
specific questions concerning the hiring decision
for the barber position that Mr. Abron applied
for. Have you ever been deposed before?
   A   Yes.
   Q   Okay. I'm going to be asking you some
questions that I'll ask you to answer out loud. I

---

3

         I N D E X
WITNESS                          PAGE
MARGARET FOLEY
   Direct By Mr. Rehn .............. 4
   Cross By Mr. Klein ............. 49

         E X H I B I T S
                              MARKED
NUMBER                       FOR ID
Deposition Exhibit
   Nos. 24-25 ..................... 18
   No. 26 ......................... 20
   No. 27 ......................... 34
   No. 28 ......................... 42
   No. 29 ......................... 43
   No. 30 ......................... 44
   No. 31 ......................... 44

---

5

do have the ability to ask very bad questions. If
you don't understand, just ask me to rephrase or
ask it in another manner, okay?
   A   Okay.
   Q   And don't get offended if I say is that
a yes or is that a no. We're trying to make a
record in writing and a lot of times we slip to
informal conversation with head nods and uh-huhs
and huh-uhs, and I'm just trying to make a clear
record if I hit you with a is that a yes, is that
a no; okay?
   A   All right.
   Q   Why don't you tell me what you do for a
living?
   A   I'm a human resource rep at Hill
Correctional Center.
   Q   How long have you been the human
resource rep at Hill?
   A   I was hired, I believe, February 2004.
   Q   What did you do before that?
   A   I was the human resource assistant
working out in the warden's office before that.
   Q   Here at Henry Hill?

14

```
1   Springfield?
2       A   Probably somebody in Springfield.
3       Q   Going to number two of that Subsection I
4   which is on page six of Exhibit No. 1, it says
5   "Upon approval by the chief administrator of
6   interview questions and the candidate evaluation
7   form." I just want to figure out who these
8   different people are. Do you know who the chief
9   administrator would be?
10      A   That would be the warden.
11      Q   Okay. And there's mention under
12  paragraph number two on that same page of
13  completing the Employment Decision Form DC5654.
14  Is that something that you would have done or is
15  that something the interviewing officers would
16  have done or do you know who does that?
17      A   They pencil it in and then I type it for
18  them.
19      Q   Going to Subpart J, it talks about
20  filing requirements. It's still in Exhibit No. 1.
21  If you go to paragraph number five under Subpart
22  J, it talks about the maintaining of a rutan file.
23  Do you know if a rutan file was maintained in
```

15

```
1   regards to the barber position that Mr. Abron and
2   Mr. Thompson applied for?
3       A   Yes.
4       Q   Okay. I'm handing you Exhibit No. 3.
5   Can you just tell me what that document is?
6       A   That's a classification spec which is a
7   broad description of the job.
8       Q   And this is something that is prepared
9   by the state or by Henry Hill?
10      A   State.
11      Q   By state, we're talking Springfield?
12      A   Yes.
13      Q   Do you know who prepares these in
14  Springfield?
15      A   No.
16      Q   Handing you Exhibit No. 4, can you tell
17  me what that document is?
18      A   That's the posting for the position.
19      Q   And this is something that you would
20  have done was post this document?
21      A   Yes.
22      Q   Where do you post it when you're posting
23  it?
```

16

```
1       A   On the bulletin board.
2       Q   Here at the prison?
3       A   Yes.
4       Q   Is it posted anywhere else?
5       A   I believe it's posted at the labor
6   unions. Springfield handles that.
7       Q   And Exhibit No. 4 indicates that under
8   the where to apply, that they should basically
9   send it to you as the human resource assistant at
10  Hill Correctional, is that right?
11      A   Yes.
12      Q   I'm handing you now what's been marked
13  Exhibit No. 5. Can you tell me what that document
14  is?
15      A   Candidate Evaluation Form.
16      Q   And is this something that you fill out
17  or who fills this out?
18      A   I type it.
19      Q   Okay. When you type it, what do you
20  base it on when you're typing it?
21      A   It's been filled out by the
22  interviewers.
23      Q   Do you have the ones that are filled out
```

17

```
1   by the interviewers?
2       A   Yes.
3       Q   When you say it's been filled out by the
4   interviewers, are you talking about do they
5   actually fill out a form that looks just like
6   this?
7       A   Yes, they pencil it in. I type exactly
8   what they have written.
9       Q   I'm going to hand you what's been
10  marked, we're going out in number now to Exhibit
11  No. 19. I gave you my copy.
12      A   That's all right.
13      Q   Do you know what that document is?
14      A   It's an interview.
15      Q   Okay. It's my understanding this is the
16  form that the interviewers filled out while
17  they're interviewing the applicants?
18      A   Yes.
19      Q   Is this what you're talking about as far
20  as you go through here and put the information
21  from Exhibit 19 into Exhibit No. 5, or do they
22  actually do a form just like this that they fill
23  in?
```

18

1    A    I give them a blank Exhibit No. 5, the
2  exact form, and they just pencil it in exactly.
3    Q    Do you still have that document?
4    A    I believe so, yes.
5    Q    Would that be in the rutan file here?
6    A    Yes.
7       (Whereupon Deposition
8       Exhibits Nos. 24-25 were
9       marked for identification.)
10  BY MR. REHN:
11    Q    I put a -- actually you put an Exhibit
12  24 marker on Larry Thompson's handwritten
13  evaluation form and Exhibit 25 on Steve Abron's
14  handwritten evaluation form.  Before you left the
15  room, you indicated that you typed up Exhibit 5
16  and 6 based on handwritten Candidate Evaluation
17  Forms.  Would Exhibit 24 and 25 be the two
18  handwritten evaluation forms you would have based
19  the typed up versions for Mr. Abron and Thompson
20  on?
21    A    Yes, the initial ones, and then
22  Springfield came back and said they weren't
23  complete enough.

19

1    Q    Okay.  And did Springfield do that by
2  telephone or by something in writing?
3    A    I believe it was by telephone.
4    Q    Okay.  Do you remember what problem they
5  had in regards to them not being complete enough?
6    A    At that time they were cracking down
7  on -- they wanted more wordage for all jobs.
8    Q    I've handed you Exhibit No. 5 over there
9  somewhere which should be the typed up Candidate
10  Evaluation Form for Mr. Thompson.
11    A    Yes.
12    Q    Is the version that you have there, is
13  Exhibit 5 the version after you made some
14  modifications after Springfield contacted you?
15    A    I believe Frank Shaw made the
16  modifications.
17    Q    Okay.  Do you know why Frank Shaw made
18  the modifications?
19    A    Springfield wanted more verbiage.
20    Q    Did Springfield contact you and then you
21  contacted Frank Shaw?
22    A    Yes.
23    Q    And what I've given you as Exhibit No.

20

1  5, is that after Frank Shaw added the additional
2  verbiage?
3    A    Yes.
4    Q    Do you have anywhere a copy of the
5  initial typed up form that I guess was completed
6  that led to Springfield's contact asking for
7  additional verbiage?
8    A    Let me look.
9
10    (Whereupon a five-minute break was taken.)
11
12       (Whereupon Deposition
13       Exhibit No. 26 was marked
14       for identification.)
15  BY MR. REHN:
16    Q    You brought out a document that we've
17  now labeled Exhibit 26.  Can you just tell me what
18  this document is?  Do you have a copy of it over
19  by you too?
20       MR. KLEIN:  Yeah.
21    A    That's a memo from CMS asking for more
22  verbiage on the Candidate Evaluation Form.
23    Q    It looks like a check is in box No. 23

21

1  where it says other remarks, candidate evaluation
2  comments area, need to define and quantify
3  candidate's qualifications as they relate to
4  hiring criteria; is that right?
5    A    Yes.
6    Q    And this is something that was sent to
7  Lauren Norton, and who is Lauren Norton?
8    A    She was the head of personnel at the
9  time in Springfield.
10    Q    And it's from a Sue Park.  Do you know
11  who that was?
12    A    No.
13    Q    And this document has four pages on it
14  that we labeled Exhibit No. 26.  The first looks
15  like it's a fax, or I don't know if it's a fax.
16  It's a memorandum I guess.  Do you know how it
17  would have got to you?
18    A    In the mail.
19    Q    Okay.  And would it have been mailed to
20  you or would it have been mailed to Mr. Shaw or
21  Mr. Smith, or do you know?
22    A    I don't know.
23    Q    Do you know if it would have come with a

26

1 initially -- I guess a better way to say it is as
2 you're typing up Exhibit 26, page number two, were
3 you concerned that there was not enough
4 information in there?
5     A   No.
6     Q   Handing you what's been marked as
7 Exhibit No. 6, this is a Candidate Evaluation Form
8 for Mr. Abron, is that correct?
9     A   Yes.
10    Q   And that was something that you would
11 have typed up based upon what was provided to you
12 as part of Exhibit No. 25, right?
13    A   Yes.
14    Q   Handing you Exhibit No. 7, can you tell
15 me what that document is?
16    A   It looks like a document from Illinois
17 River.
18    Q   And I think that, I don't think -- let's
19 go off the record for a second.
20
21        (Whereupon an off the record
22         discussion was held.)
23

27

1 BY MR. REHN:
2     Q   Exhibit No. 7 is labeled a Rutan
3 Interview Package Checklist and it is relating to
4 Illinois River in the hiring of a barber position
5 at the Illinois River facility.  Do you keep a
6 similar type of document in your file that you
7 might label a Rutan Interview Documentation
8 Checklist?
9     A   Yes.
10    Q   We'll get a copy of that before we get
11 out of here.  I'm handing you Exhibit No. 10,
12 which is also from Illinois River, and it looks
13 like you have a similar type of document in your
14 file.  It's called an Employment Bid Record.  Are
15 you familiar with that form?
16    A   Yes.
17    Q   Maybe not that particular form from
18 Illinois River, but you use a similar form at
19 Henry Hill, right?
20    A   Yes.
21    Q   Who is it that fills out the form for
22 you?  It looks like it's you?
23    A   Me, yes.

28

1     Q   The Employment Bid Record for the barber
2 position in 2004 indicated in the box on the right
3 hand side, it says type of action and it says
4 "other means" underneath that?
5     A   Yes.
6     Q   Do you know what that means when you put
7 the "other means"?
8     A   It means it's outside of the
9 institution.
10    Q   As opposed to a promotion or a transfer?
11    A   Correct.
12    Q   Mr. Abron was working at the Juvenile
13 Correctional Center in Kewanee prior to his
14 interview at the Henry Hill center.  Would that be
15 considered a transfer or is that -- I don't know
16 how you consider transfers.  I guess how do you
17 qualify a transfer when you're filling out those
18 forms?
19    A   I get transfer lists from Springfield.
20    Q   Okay.  And a transfer list is employees
21 of the Department of Corrections already.  Is that
22 what that is?
23    A   Yes.

29

1     Q   Okay.  And again I'm going to hand you
2 what's marked as Exhibit No. 11, and this is not
3 from your facility.  It's the Illinois
4 Correctional Center.  Do you have a similar type
5 of form that you use here at Henry Hill?
6     A   No.
7     Q   Okay.  And I can't remember frankly if
8 Exhibit 13 is from Henry Hill or another facility,
9 but do you know what that document is generally,
10 that form, Exhibit 13?
11    A   For the affirmative action.
12    Q   Okay.  Is that something that you fill
13 out or complete or who does that?
14    A   I do that.
15    Q   Okay.  And was this the form that was
16 used in regards to the hiring of the barber at
17 Henry Hill when Mr. Thompson was hired?
18    A   Yes.
19    Q   Okay.
20        MR. KLEIN:  Are you asking if this
21 particular form, this exact form with these same
22 boxes checked?
23    Q   Yeah, and I don't know if it is or

Pages 26 to 29

38

1  somebody at Henry Hill was going to change the
2  weighting of the different categories, would that
3  be you or who would be doing that?
4     A   I don't know.
5     Q   Do you ever, as you're hiring somebody,
6  do you guys ever do your own weighting and do your
7  own forms or is it typically just using the forms
8  from other facilities?
9     A   Typically just using standard forms.
10    Q   Would you have reviewed the questions at
11 all with Mr. Shaw or Mr. Smith before they did the
12 interviews?
13    A   No.
14    Q   Would Mr. Smith or Mr. Shaw have been
15 provided with any information as to what a good
16 answer would be in regards to different barbers'
17 specific questions?
18    A   No.
19    Q   Do you have any opinion as to whether
20 prior experience working in a Department of
21 Corrections environment would be beneficial when
22 you're looking for an applicant for this position?
23    A   I don't know.

39

1     Q   Handing you what's been marked as
2  Exhibit 17, do you know what that document is?
3     A   Application for Larry Thompson.
4     Q   And on this application it looks like in
5  box ten it says veterans preference.  It sounds
6  like you're sort of familiar with the concept of
7  veterans preference, but beyond that you don't
8  know how that would come into play, is that right?
9     A   Correct.
10    Q   Exhibit 18, that's the handwritten notes
11 of one of the interviewers.  Maybe it's of both
12 interviewers of Mr. Thompson, is that right?  I
13 don't remember if it's one or both.
14    A   It looks like one.
15    Q   I think I may have already handed you
16 Exhibit 19 earlier.
17    A   Yes.
18    Q   And is Exhibit 19 the same only with the
19 other interviewer's form?
20    A   Yes.
21    Q   And these are something that you would
22 hand blank to the interviewers and then they'd
23 return them back to you.  They'd also provide you

40

1  with Candidate Evaluation Forms that they would
2  write notes in.  Would you use Exhibit 18 or 19
3  for anything in your part of the hiring process?
4     A   No.
5     Q   All you do is you would rely on the
6  handwritten notes that they gave you, that you
7  would use to fill out the Candidate Evaluation
8  Form and then the decision form, is that right?
9     A   Correct.
10    Q   Would you have instructed Mr. Smith or
11 Mr. Shaw to review the employment applications or
12 any resumes that were provided by the applicants?
13    A   No, I don't instruct them for anything.
14    Q   Do you know if they would typically
15 review those or not review those?
16    A   I don't know.
17    Q   Would you provide them with copies of
18 the -- I'll hand you what's been marked Exhibit
19 No. 20.  That's Mr. Abron's application for the
20 position, is that right?
21    A   Yes.
22    Q   And handing you Exhibit No. 21, that's
23 Mr. Abron's resume, is that correct?

41

1     A   Yes.
2     Q   Do you know if the resume and the
3  application of Mr. Abron would have been provided
4  to Mr. Smith and Mr. Shaw before they did the
5  interviews?
6     A   They should have been provided at the
7  time of the interview.
8     Q   Have you ever been to the rutan training
9  too?
10    A   No.
11    Q   Do you have any idea whether the
12 interviewers are supposed to put any weight to
13 what is included in the applications or the
14 resumes?
15    A   I don't know.
16    Q   Are you familiar at all with the
17 document that I've handed you that's labeled
18 Exhibit 23?
19    A   No.
20    Q   And I'm going to hand you -- hopefully
21 it's not been marked yet, but it says Interview
22 and Selection Criteria and Techniques, State of
23 Illinois.  Are you familiar with this book at all?

**E-FILED**
Friday, 09 November, 2007  03:34:07 PM
Clerk, U.S. District Court, ILCD

Attached # 7

# CANDIDATE EVALUATION FORM

EXHIBIT

9

| | |
|---|---|
| | Date:  12/21/04 |

| | |
|---|---|
| Candidate Name: Steven Abron | Soc. Sec. No. ▮▮▮▮▮ |
| Agency:  **DEPARTMENT OF CORRECTIONS** | Division or Institution: Hill Correctional Center |
| Position Title: Barber | Position Number: 04250-29-98-280-00-01 | Pin # 0104 |

*In using the Candidate Evaluation Form: (a) Prior to the interview, complete the "Hiring Criteria" and "% Weight" sections of the form; (b) Following the interview, use the "Comments" space to indicate experience or qualifications the candidate possesses related to each hiring criteria; (c) Average the "Points" from the interview questionnaire for each hiring criteria or indicate a numerical "Rating" for each hiring criteria; (d) Calculate the "Weighted Score" for each hiring criteria by multiplying the "% Weight by the Points/Rating"; and (e) Calculate the "Overall Score by summing the "Weighted Scores" for each of the hiring criteria.

| HIRING CRITERIA | COMMENTS | PERCENT WEIGHT | PTS / RTG | WTD SCORE |
|---|---|---|---|---|
| EDUCATION, TRAINING AND SKILLS:  Requires possession of a valid Illinois License as a barber. Requires training necessary to qualify as a barber, and the skills necessary to maintain and supervise barber facility and staff. Requires elementary knowledge of first aid. | Completed all requirements for this position with above average shills. Maintains Correctional experience. | 30% | 3.3 | .99 |
| JOB KNOWLEDGE AND EXPERIENCE:  Requires experience necessary to qualify as a journeyman barber. Requires working knowledge of barbering techniques, methods, practices and the operation, maintenance and sterilization of barber shop tools and equipment. | Maintains excellent knowledge regarding barbering duties. Has Correctional experience. | 30% | 3.5 | 1.05 |
| INTERPERSONAL RELATIONS: Must be capable of supervising and instructing inmate workers in performing various barbering services. | Demonstrated good instructions for working with inmates. | 25% | 2.3 | .58 |
| WORK HISTORY:  Requires work history related to the total operation of a barbering facility, the safekeeping of barbering tools and the ability to perform all tasks usually associated with journeyman barbers. | Has demonstrated work history to complete the required duties. | 15% | 4.0 | .6 |

| HIRING CRITERIA | COMMENTS | PERCENT WEIGHT | PTS / RTG | WTD SCORE |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**AFFIDAVIT:** "I certify that the hiring criteria and interview questions related to this employment decision were developed prior to initiating the candidate interview process. Furthermore, I certify that political party affiliation, support or lack thereof were not discussed or considered at any point in the interview process."

| | | |
|---|---|---|
| **Interviewing Officer(s) (Typed):**<br>Frank Shaw, Assistant Warden of Operations<br>William Smith, Business Administrator II | | |
| | **OVERALL SCORE:** | 3.22 |
| **Interviewing Officer(s) Signature(s):** | **Title(s):**<br>Assistant Warden of Operations<br>Business Administrator II | **Date:**<br>12/22/04 |

(05/17/07)    00023

E-FILED
Friday, 09 November, 2007  03:34:27 PM
Clerk, U.S. District Court, ILCD

Date: 12-21-04

| Candidate Name: Larry Thompson | | Soc. Sec. No. C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 | |
|---|---|---|---|
| Agency:  **DEPARTMENT OF CORRECTIONS** | | Division or Institution: Hill Correctional Center | |
| Position Title: Barber | | Position Number: 04250-29-98-280-00-01 | Pin #  0104 |

*In using the Candidate Evaluation Form: (a) Prior to the interview, complete the "Hiring Criteria" and "% Weight" sections of the form; (b) Following the interview, use the "Comments" space to indicate experience or qualifications the candidate possesses related to each hiring criteria; (c) Average the "Points" from the interview questionnaire for each hiring criteria or indicate a numerical "Rating" for each hiring criteria; (d) Calculate the "Weighted Score" for each hiring criteria by multiplying the "% Weight by the Points/Rating"; and (e) Calculate the "Overall Score by summing the "Weighted Scores" for each of the hiring criteria.

| HIRING CRITERIA | COMMENTS | PERCENT WEIGHT | PTS / RTG | WTD SCORE |
|---|---|---|---|---|
| EDUCATION, TRAINING AND SKILLS:  Requires possession of a valid Illinois License as a barber. Requires training necessary to qualify as a barber, and the skills necessary to maintain and supervise barber facility and staff. Requires elementary knowledge of first aid. | Completed all requirements for this position with above average skills. | 30% | 3.7 | 1.11 |
| JOB KNOWLEDGE AND EXPERIENCE:  Requires experience necessary to qualify as a journeyman barber. Requires working knowledge of barbering techniques, methods, practices and the operation, maintenance and sterilization of barber shop tools and equipment. . | Maintains excellent knowledge and job experience for the position. | 30% | 3.5 | 1.05 |
| INTERPERSONAL RELATIONS:  Must be capable of supervising and instructing inmate workers in performing various barbering services. | Demonstrated excellent instructions on supervising inmates and working with others. | 25% | 3.0 | .75 |
| WORK HISTORY:  Requires work history related to the total operation of a barbering facility, the safekeeping of barbering tools and the ability to perform all tasks usually associated with journeyman barbers. | Has documented work history to complete the required duties as a barber. | 15% | 3.5 | .525 |

DC 5653 (8/95)
IL 426-16072



EXHIBIT

Page 1 of 2

TOTAL P.03

**E-FILED**
Friday, 09 November, 2007  03:35:15 PM
Clerk, U.S. District Court, ILCD

# CMS

**ILLINOIS DEPARTMENT OF**
**CENTRAL MANAGEMENT SERVICES**

## POSITION DESCRIPTION

| 1. POSITION TITLE | WORKING TITLE (IF ANY) | BILINGUAL CODE | POSITION TITLE OPTION | 2. POSITION NUMBER | | | | |
|---|---|---|---|---|---|---|---|---|
| Existing Position | | | | | | | | |
| New / Revised Position Barber | | | | 04250-29-98-280-00-01 | | | | |

| 3. AGENCY | 4. BUREAU / DIVISION | | | 5. EXMT CODE | 6. WORK COUNT | 7 A/I AUTH | 8. AUDIT | 9. OFFICE USE |
|---|---|---|---|---|---|---|---|---|
| Existing Position | | | | | | | | |
| New / Revised Position Corrections | Hill Correctional Center | | | 4D4 | 048 | N | R | |

| 10. SECTION | 11. UNIT | | 12. TRANSACTION CODE | | 13. EFFECTIVE DATE |
|---|---|---|---|---|---|
| Existing Position | | | | | 12/16/99 |
| New / Revised Position Programs | Barber | | | | |

| | | | | |
|---|---|---|---|---|
| ☐ | MA021 | ESTABLISH | | |
| ☐ | MC022 | EXEMPT CODE CHANGE | | |
| ☐ | MC024 | POSITION NO. CHANGE | | |
| ☒ | MC026 | CLARIFY | | |
| ☐ | MC027 | ADDITIONAL IDENTICAL CHANGE | | |
| ☐ | MC028 | WORK COUNT CHANGE | | |
| ☐ | MD021 | ABOLISH | | |
| ☐ | MC149 | DOWNLOAD REALLOCATION | | |
| ☐ | MC150 | LATERAL REALLOCATION | | |
| ☐ | MC158 | UPWARD REALLOCATION | | |

| 14. WORK LOCATION | 15. BARGAINING / TERM CODE | RUTAN EXEMP |
|---|---|---|
| Existing Position | | |
| New / Revised Position Knox | PR000 | N |

| % OF TIME | 16. COMPLETE, CURRENT AND ACCURATE STATEMENT OF POSITION ESSENTIAL FUNCTIONS |
|---|---|
| | Under general supervision of the Senior Public Service Administrator (Asst. Warden of Programs), performs journeyman barber work, being responsible for supervising the cutting and styling of inmates hair at the inmate barber shop; conducting the general practice of barbering. Has supervision responsibilities of the institutional barber shop. |
| 40% | 1. Supervises, instructs and trains all inmate barbers in cutting other inmates hair in the inmate barber shop. |
| 15% | 2. Maintains barber shop in appropriate sanitary condition by meeting all Public Health and sanitation standards. |
| 10% | 3. Requisitions and stores all barber supplies and tools. Maintains tools in good working condition. Accounts for tools daily. |
| 10% | 4. Maintains records of inmate schedules and individual inmate work performance. |
| 10% | 5. Maintains a close coordination with the security staff. |
| 5% | 6. Performs internal audits of Department Rules, Administrative Directives and Institutional Directives as assigned by the audit liaison. |
| 5% | 7. Supervises employee barber and shoe shine services. |
| 5% | 8. Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above. |

**EXHIBIT**

_tabbies_

| DIRECTOR OF CMS SIGNATURE | IMMEDIATE SUPERVISOR | HEAD SIGNATURE | DATE |
|---|---|---|---|
| | Ward... L. Boss | Donald N. Snyder | |

(05/17/07)    : 00008

| 16. (CONTINUED) |
| --- |
| % OF TIME |

**17. POSITION TITLE AND NUMBER OF IMMEDIATE SUPERVISOR** (Responsible for assigning and reviewing work, preparing, conducting and signing performance evaluations; effectively recommending and imposing discipline and adjusting grievances for the incumbent of this position.)

| | WORKING TITLE (IF ANY) |
| --- | --- |
| SENIOR PUB.SERVICE ADMIN.      40070–29–98–200–00–01 | ASST.WARDEN PROGRAMS |

**18. CHECK THE APPROPRIATE BOX IF THIS POSITION IS A:**
☐ SUPERVISOR    OR    ☐ LEAD WORKER

NOTE: Supervisory or lead worker responsibilities must be described in a detailed duty statement(s) with a time percentages(s) allotted

If a box was checked above, list position title, position number, and number of subordinate incumbents or authorized funded head count:

| Position Title | Position Number | No. of incumbents or Funded Vacancies |
| --- | --- | --- |
| None | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**19. SPECIALIZED KNOWLEDGES, SKILLS, ABILITIES, LICENSURE OR CERTIFICATION NECESSARY FOR THE SUCCESSFUL PERFORMANCE OF THE WORK OF THIS POSITION. NOTE: SINCE THERE ARE NOW SEVERAL OPTIONS OF SKILLS AND ABILITIES AND LICENSURE OR CERTIFICATION IDENTIFIED ON STANDARDS, THE PHRASE "SAME AS SPECIFICATION" CAN NO LONGER BE USED.**

Education: Requires possession of a valid Illinois License as a barber.

Experience: Requires experience necessary to qualify as a journeyman barber. Requires working knowledge of modern barbering techniques, methods, practices and the operation, maintenance and sterilization of barber shop tools and equipment. Requires elementary knowledge of first aid.

Significant Responsibilities: Requires responsibility for safekeeping barbering tools.

(05/17/07)    00009

MAY-23-2007  15:53     IL ATTORNEY GENERAL     217 782 8767     P.027

**E-FILED**
Friday, 09 November, 2007  03:35:35 PM
Clerk, U.S. District Court, ILCD

## *RESUME*

*Steven Duane Abron*
*Social Security Number:* ▮▮▮▮
*Birthdate:* ▮▮▮ ▮▮▮
*Address:* 246 Holton Street, Galesburg, IL 61401, Phone: 309-343-1884 (Home)
     Abron's Hair Design, 427 South Henderson Street, Galesburg, IL 61401, Phone: 309-342-7014

### OBJECTIVE

    To be employed as a Barber.

### EMPLOYMENT

BARBER AND HAIR STYLIST               1976 - CURRENT
*Abron's Hair Design*                  *Galesburg, IL 61401*
                                    *309-342-7014*

Owner and operator of Abron's Hair Design since 1976. As owner and manager of the business
I supervise three licensed operators who work there. I also continue to cut/style hair of
customers. General practices of barbering and perms, maintenance and sterilization of barber
tools.

IL Youth Center - Kewanee          2001 - Current
Barber                         2021 Kentville Road, PO Box 518
                                    Kewanee, IL 61443

BARBER AND HAIR STYLIST               1985 - Current
*St. Mary's Square Living Center*     239 S. Cherry St, Galesburg, IL 61401
                                    309-343-4101

Part-time barber supervisor.

BARBER AND HAIR STYLIST               1987 - 1999
*Knox County Public Safety Building*   150 S. Broad St, Galesburg, IL 61401
                                    309-343-9131

On call as inmate barber for 12 years.

BARBER AND HAIR STYLIST               1989 - 1999
*Mary Davis Juvenile Detention Home*   1319 E. Fifth St, Galesburg, IL 61401
                                    309-343-5112

On call as resident's barber for 12 years.

APPRENTICE BARBER                  OCTOBER 6, 1973 - JUNE 8, 1976
*Moore's Barber Shop*                  *Galesburg, IL 61401*

I worked at Moore's Barber Shop as an apprentice to fulfill the requirement necessary to obtain
my barber's license.



EXHIBIT
12

(05/22/07)     : 00357

## EDUCATION

BARBER
*National Barber College*

*GRADUATED: OCTOBER 6, 1973*
*Springfield, Il*

CERTIFICATE #006-057507

BARBER
*Shaw's Barber College*

1973
*San Antonio, TX*

Galesburg Senior High School

GRADUATED: June 1968

## CONTINUING EDUCATION

- Laverne's Distributors Inc., Advance Cosmetology Techniques.  July 26, 1993

- Soft Sheen Products, Inc., Trained for relaxer system - 1000  87th Street, Chicago, IL 60619, May 3, 1993

- Milo , Care Free Curl Training, Peoria, IL 61600, November 14, 1988

- N & R Supreme Beauty Supply, Modern beauty and barbering techniques, 623 McArthur Highway, Peoria, IL 61600

## MILITARY SERVICE

Veteran - U. S. Army
January 18, 1971 - January 17, 1973
Honorable Discharge
Selective Service # 11 149 49 177

Selective Service Board Member
1991 - 1997
Region 111, Building 1, room M-29
Great Lakes, IL  60088-5027

## COMMUNITY ACTIVITIES

Founder of Support Group for Minority Affairs,
Co-founder of Friends of Carver - Served as President
Carl Sandburg College Board Member of Cosmetology
Habitat for Humanity of Knox County - Board of Directors
Member of Galesburg High School Band Booster Club

## REFERENCES

Furnished upon request.

MAY-23-2007  16:49    IL ATTORNEY GENERAL    217 782 8767    P.004

E-FILED
Friday, 09 November, 2007 12:36:36 PM
Clerk, U.S. District Court, ILCD

# CMS
ILLINOIS
**DEPARTMENT OF CENTRAL MANAGEMENT SERVICES**

## EXAMINING/EMPLOYMENT APPLICATION (CMS100)

CMS administers civil service testing for agencies under the jurisdiction of the Governor; however, actual employment decisions are made by the hiring agencies. Pencil or fax copies of applications will not be accepted. Legible photocopies are accepted.
**PLEASE PRINT LEGIBLY OR TYPE INFORMATION.**

Barber

Thompson        Larry        Ray        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

2136 Chappell Ave.        Knox        7-30-45

Galesburg        Ill.    61401    (909) 344-2786    (   )

T512-5364-5216    Ill.    7-30-02    ☑YES ☐NO    A B C ☑D L ☑M    A B    X ☑N

Knox

A. ☑ Available for permanent employment; will not accept temporary employment. (Trainee titles must choose A.)  
B. ☐ Available for permanent employment; will accept temporary employment.  
C. ☐ Available for temporary employment only.

9.  If your answer to any of the following questions is "yes" please attach a signed detailed explanation.

1. Have you ever been fired from a job? (Downsize/layoff is not applicable.)  ☐ YES  ☑ NO
2. Have you ever pled guilty to or been convicted of any criminal offense other than a minor traffic violation?  ☐ YES  ☑ NO
3. Are you currently in default on the repayment of any state educational loan?  ☐ YES  ☑ NO

State law provides that any employee who is in default on the repayment of any education loan for a period of six months or more and in the amount of $600 or more shall, as a condition of employment, make a satisfactory loan repayment arrangement with the maker or guarantor of the loan.

**EXHIBIT**
13

10.  **VETERANS PREFERENCE:** For assistance contact Veterans Outreach at 1-800-643-8138 or Illinois Relay Center at 1-800-526-0844 (TDD/TTY only).

☐  I wish to claim Veterans Preference; attached is the most recent certified copy of my DD214/215. (If claiming service-connected disability, also include a copy of U.S. Veterans Affairs award letter.)

☐  I wish to claim Veterans Preference as an IL National Guard/Reservist. Attached is a letter from my unit personnel indicating I am currently serving under honorable conditions or a copy of my NGB22 stating my discharge was under honorable conditions.

☐  I wish to claim Veterans Preference as a surviving unmarried spouse or one parent of an unmarried veteran who suffered a service-connected death or disability that prevents the veteran from qualifying for civil service employment.

☐  I have submitted required military documentation to CMS after January 01, 2000 and have already established Veterans Preference with CMS.

☑YES  ☐NO        0 1 2 3 ☑        ☐YES ☐NO

Lincoln Barber College    6  1963  9  1964  ✓        Barbering    9.000s  ✓
Moline Ill.

Department of Professional Regulation    006-054249    Ill.    10  1964
Registered Barber

| FOR CMS USE ONLY | | | |
|---|---|---|---|
| EXAM DATE | | | TEST CENTER |
| MONTH | DAY | YEAR | |

CMS 100 (Rev. 10/01)
IL 401-0090
Printed on Recycled Paper

**14. EDUCATION REPORT:  LIST YOUR EDUCATION ACCURATELY AND COMPLETELY.  DO NOT** submit transcripts/degrees.  The number of credit hours you have earned may be needed to meet the minimum requirements for some titles.  This information is also useful for career counseling purposes.  Proof of education/training may be required during the hiring process.





| MANUAL/TRADES | CLERICAL | TECHNICAL/PARA-PROFESSIONAL | PROFESSIONAL | ADMINISTRATIVE |
|---|---|---|---|---|

**REASON FOR LEAVING:**

| MANUAL/TRADES | CLERICAL | TECHNICAL/PARA-PROFESSIONAL | PROFESSIONAL | ADMINISTRATIVE |
|---|---|---|---|---|

**REASON FOR LEAVING:**

- State law requires that you furnish certain information about your child support obligations at the time you are hired. The possibility of employment is not affected by a child support obligation or default in payment.
- As a condition of employment, state law requires that "every male born on or after January 1, 1960, and less than 27 years old, shall submit documentation, at time of appointment, evidencing his registration with the Federal Selective Service System."
- In compliance with the state and federal constitutions, the Illinois Human Rights Act, the U.S. Civil Rights Act, the Americans with Disabilities Act, and Section 504 of the Federal Rehabilitation Act, the Department of Central Management Services does not discriminate in employment, contracts, or any other activity. If you have a complaint, please contact the Department of Central Management Services at 217/782-6921 (voice) or 217/785-3979 (TDD/TTY).

16. This application may be utilized as the actual test for some titles. If the title for which you wish to test is a closed exam or an exam based only on training and experience, mail completed application to: Central Management Services, Examining and Counseling, Room 500, Stratton Office Building, 401 South Spring Street, Springfield, Illinois 62706. Applications for a closed exam will be maintained until an agency requests that the test be administered or for a maximum of one year.

17. I understand that I may be required to submit proof of previous employment, education, military service or other statements in this application. I authorize release of this and other information covering job-related factors for the purpose of verification and determination of suitability for state employment. **I state that I have not submitted an application for this written and/or performance examination within the last 30 days.** I certify that the information on this application is true and accurate and understand that misrepresentation of any material fact may be grounds for ineligibility or termination of employment.

_Larry R. Thompson_

**WRITTEN SIGNATURE REQUIRED**                    DATE _12·12·04_

15. **WORK HISTORY:** Complete this section ... tail. Begin with most recent payroll title and w... ...ackward. If you have an extensive work histor... with one employer, list each change in payroll title separately including duties and dates associated with each. Unsigned or incomplete applications w... be returned. If additional space is needed, attach a separate sheet following the same format as below. Resumes submitted must be in same format as the application. Place additional sheets/resumes inside the application.

INCLUDE THE FOLLOWING INFORMATION:
* College internships/practicums successfully completed
* Military experience including dates, listing each change in rank and title
* Related volunteer experience including dates and hours worked

Thompsons Barber Shop

329 Main Blvd.                    42 hrs                          $40,000

Galesburg         Ill.     4D    1982    12    2004    22      6

| MANUAL/TRADES | CLERICAL | TECHNICAL/PARA-PROFESSIONAL | PROFESSIONAL | ADMINISTRATIVE |
|---|---|---|---|---|
| | | | Self Empl | |

Self Employed - Cutting Hair

**REASON FOR LEAVING:** Still Working - Looking for Better Benifits

Archer Daniels Midland Co.              Truck Driver

So. Henderson St.  1021        100 hrs.                          $50,000

Galesburg         Ill.            1977         1981    9

| MANUAL/TRADES | CLERICAL | TECHNICAL/PARA-PROFESSIONAL | PROFESSIONAL | ADMINISTRATIVE |
|---|---|---|---|---|
| | | | Truck Driver | |

Truck Driver

**REASON FOR LEAVING:** Job Elimination

Thompsons Barber Shop

857 So. Seminary St.        45 hrs.                          $20,000

Galesburg         Ill.            1964         1972    8

| MANUAL/TRADES | CLERICAL | TECHNICAL/PARA-PROFESSIONAL | PROFESSIONAL | ADMINISTRATIVE |
|---|---|---|---|---|
| | | | Self Empl. | |

Self Employed - Cutting Hair

**REASON FOR LEAVING:**



IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

Steve Abron,                    )
                                )
              Plaintiff,        )
                                )
        -vs-                    )    No. 06-1157
                                )
State of Illinois, Department   )
of Corrections, Henry Hill      )
Correctional Center and Don     )
Hulick, Warden, Individually,   )
Bill Smith, Business Admini-    )
strator, Individually, and      )
Frank Shaw, Assistant Warden,   )
Individually and in their       )
official capacity,              )
                                )
              Defendants.       )

THE DEPOSITION OF STEVE ABRON, taken before
Amy S. Powers, Illinois CSR 084-003653, RPR
038546, a Notary Public, on Thursday, the 24th
day of May 2007, commencing at the hour of 10:00
a.m., at 311 East Main Street, Suite 412, in the
City of Galesburg, County of Knox, and State of
Illinois.

CIRCUIT WIDE REPORTING
Suite 316 Hill Arcade Building
Galesburg, Illinois 61401
(309) 343-3376 * 1-800-342-DEPO

COPY

2

PRESENT:

JOHN REHN, ESQ.,
311 East Main Street, Suite 412
Galesburg, Illinois 61401
    on behalf of the Plaintiff;

THOMAS KLEIN, ESQ.,
500 South Second Street
Springfield, Illinois 62706
    on behalf of the Defendant

I N D E X

WITNESS                                    PAGE
STEVE ABRON,
    Direct Examination by Mr. Klein     4 - 57
    Cross-Examination by Mr. Rehn      58 - 59
    Redirect Examination by Mr. Klein  59 - 60
    Recross Examination by Mr. Rehn    61 - 63
    Certificate of Reporter            64 - 65
    Signature Page                          66

EXHIBITS
    No Exhibits

EXHIBIT
tabbies
14

---

1  [Witness sworn.]
                                STEVE ABRON,
3  having been first duly sworn, was examined and
4  testified on his oath as follows:
5
6        MR. KLEIN:   Mr. Abron, have you ever
7  had your deposition taken before?
8        THE WITNESS:   No, I haven't.
9        MR. KLEIN:   Kind of let me give you a
10  few basic ground rules. I'm going to be
11  asking you some questions. I ask you to
12  answer them as truthfully and completely as
13  you can.
14        If you don't understand a
15  question, let me know that and I'll try to
16  rephrase it. If you answer a question, I'm
17  going to assume that you understand what I'm
18  asking you.
19        If you need a break at any time,
20  let me know and we can take one. The only
21  thing I'm going to ask is that if I ask you
22  a question, that you finish answering that
23  question before we take the break.
24        I need you to answer audibly, yes,

4

1  no, rather than uh-huh or huh-uh, because
2  those don't come out well on the transcript.
3  And head shakes and nods and things like
4  that don't come out well either.
5        And if you have any questions as
6  we go, let me know that. If you think of
7  something that you should have said in
8  response to an earlier question later on in
9  the deposition, let me know that and we can
10  go back, if there is something that you want
11  to add at any time. Like I said, let me
12  know if you have any questions.
13        THE WITNESS:   Not at this time, no.
14
15  **DIRECT EXAMINATION BY MR. KLEIN:**
16  Q.   For starters, I'm going to show you a resume
17       that I believe you submitted to the
18       Department of Corrections. Is that your
19       resume?
20  A.   Yes, it is.
21  Q.   Would that be a complete and accurate
22       reflection of your educational and work
23       experience as of December 2004?
24  A.   Yes, it is. The only thing is, the resume

**41**

1      candidate. That's when. I'm not too sure,
2      the interview, I think it was on the 20th of
3      December, and I imagine two or three weeks
4      right after that, 2004, December 2004, two
5      or three weeks. But it's in my papers, you
6      know, when I started that problem.
7   Q.   How long did the problem last?
8   A.   That -- that one there, it really lasted --
9      I was tossing and turning for the longest,
10      for many -- I imagine a couple months, yeah,
11      two to three months, you know, because I'm
12      still having a lot of different, you know,
13      flashbacks and saying -- no matter what I
14      do, I wake up and I say what did I do wrong,
15      because I also applied for Spoon River as a
16      barber there.
17          And that's another thing right
18      there, you see. Now, I applied for Spoon
19      River. When I applied for Spoon River, I
20      was a little upset with that, but notice, I
21      didn't holler discrimination. Because why?
22      No one called me and said I was
23      discriminated against. I couldn't find
24      anything. I said, Steve, most likely

**42**

1      somehow, somebody maybe more qualified than
2      you.
3          Then in the meantime, I know one
4      individual who worked down there who was --
5      I cut hair with, I can't remember the
6      gentleman's name offhand, but he was a
7      customer from Macomb, Illinois. I called
8      him up. I said, Hey, I heard that this
9      other guy got the barber job. He said, It
10      was in-house hiring. They hired within
11      house. Then I found out he works in the
12      Corrections, and he also had a barber
13      license, so he got hired. So I left it
14      alone. I felt that he's in the system, so I
15      left it alone. I didn't -- I didn't holler
16      discrimination.
17          But in the meantime, in this case
18      I'm hollering discrimination because people
19      are telling me so many things. Then when I
20      file through the EEOC, the paper, and I was
21      able to get this information back, the
22      information what I'm seeing is the
23      application that he had and my evaluation
24      papers, that's when I really went off, I

**43**

1      really had problems against. . .
2   Q.   Let's talk a little about your interview.
3      Did you talk about your continuing education
4      in your interview?
5   A.   Yes, because I -- basically I went down -- I
6      had in my mind my resume. So when he was
7      talking, I had a chance to go through my
8      resume as we were talking. Then a lot of
9      questions was answered -- you know,
10      questions and answers at that time. It
11      wasn't really a lot of hands-on talking,
12      just me talking like I'm talking to you. It
13      was more questions and answers. You know,
14      they gave you a question, and I would give
15      them an answer.
16   Q.   Okay.
17   A.   But I tried to remember my resume in my
18      mind's eye. I didn't want to try to leave
19      anything out of there. Even on my -- you
20      notice on my resume, it said preference --
21      or reference only on request. Because a lot
22      of them I was going to put on -- people I
23      was going to give their names, found out
24      they had issues. I didn't want to put their

**44**

1      names now. You know, most of the blacks was
2      having problems out there. That's why I
3      didn't put any names down.
4   Q.   What other things did you bring up in the
5      interview about your qualifications?
6   A.   What was that?
7   Q.   What other things did you bring up about
8      your qualifications during your interview?
9   A.   What other things?
10   Q.   Yes.
11   A.   Basically really everything I been saying,
12      you know, over the whole time talking here
13      is qualifications. Like I say, my
14      experience in all the Corrections, in all
15      the St. Mary Square facilities, all the
16      years, chemical service, 80 percent of my
17      clientele are black. That's what's going on
18      out there at Hill's Correction. My
19      continuing education over the years. I can
20      get proof of more of that kind of stuff like
21      that. And basically that's about it, you
22      know.
23          Then there's more stuff -- there
24      might be stuff in my file I left out. I've

MAY-23-2007  15:56    FL ATTORNEY GENERAL          217 782 8767

## BARBER INTERVIEW

**NAME OF APPLICANT:** _Steven Adran_

**DATE OF INTERVIEW:** _12-21-1_

**INTERVIEWER'S NAME:** _F. Stone / Jarnly / Shav_



**EXHIBIT**

tabbies

15

## BARBER INTERVIEW

| | WEIGHT | POINTS |
|---|---|---|
| I. EDUCATION, TRAINING AND SKILLS | 30% | |

**1.** What special skills do you believe you
Possess which would enable you to successfully
Perform the duties of this job and why?

_4_

OWN & OPERATE MY OWN
SHOP  ADDN'S HAIR DOOFN (SINCE 1976)
26 YD) Exp.
(3) CORRECTIVE
(12) YD. ON CALL AT KNOX COUNTY JAIL

**2.** Describe how the education and training you
Possess will help you perform the responsibilities
Of this job.

_3_

S/A
SPECIS NATIONAL BARBER
COLLEGE / GRAD 1973

**3.** Explain how to sanitize and sterilize barber
Equipment.

_3_

STEAM, DISINFECT,
USE CHEMICAL. USE
WARM WATER, BARBICIDE,
THE ULTRA FAST

**EDUCATION TRAINING AND SKILLS TOTAL POINTS** _3.3_

|  | WEIGHT | POINTS |
|---|---|---|

## II.  JOB KNOWLEDGE AND EXPERIENCE                30%

1.  Describe the specific job duties and responsibilities
Of your previous barbering position.                    4

_Check Appointment, roll,
then Cutter (Pleasure.
I order my supplies on
my shop - I supervise
(3) other BARBER.
Some Exp._

2.  An inmate receives a cut while receiving a
Haircut and is bleeding moderately. What
**Would you do?**                                       3

_I would try and
treat and send them
rights to the Nurse._

JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS  _3.5_

|  | WEIGHT | POINTS |
|---|---|---|

## III.  INTERPERSONAL RELATIONS                    25%

1.  Describe the relationship you strive to establish
With your co-workers. _Inmate_ .                        2

_I try to be nice Guy but
you know when to say
No._

2.  **How do you deal with people who have different**
    **Backgrounds and interests from yours?**

    2

    _See where they are_
    _coming from. Treat them_
    _People as they want to_
    _Be Treated._

3.  **What role do you see communication playing**
    **In this job and how would you approach this role?**

    3

    _Very Important. I'm a_
    _Raiser / Even on my s son_
    _Talk w/ anybody. I_
    _Deal w / all People and_
    _Communicate._

INTERPERSONAL RELATIONS TOTAL POINTS    2.3

|  |  | WEIGHT | POINTS |
|---|---|---|---|
| **IV.** | **WORK HISTORY** | 15% | 4 |

1.  Describe your work history and how it will
    Enable you to perform the responsibilities
    Of this job?

    _(2: yrs) as a Barber_
    _(3 yr) Commercial Ind. Leansee_

2.    How would you rate your use of time? How many
Sick days have you used within the last 12
Months? Explain any extenuating circumstances.

4

I Sin 1 mods Work.
I Have NEver missed A
Day At Kewanee

WORK HISTORY TOTAL POINTS _____ 4.0 _____

RATING SCALE
0 - UNSATISFACTORY
1 - MARGINALLY MET
2 - ACCEPTABLE
3 - VERY GOOD
4 - EXCELLENT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | |
|---|---|
| Steve Abron | ) |
| Plaintiff | ) |
| vs. | ) Case No. 06-1157 |
| | ) |
| State of Illinois, Department of | ) |
| Corrections, Henry Hill Correctional | ) |
| Center and Don Hulick, Warden, | ) |
| Individually, Bill Smith, Business | ) |
| Administrator, individually, and | ) |
| Frank Shaw, Assistant Warden, | ) |
| Individually and in their official capacity | ) |

**EXHIBIT 7**

### AFFIDAVIT

COMES NOW Steve Abron and after being first duly sworn upon his oath, swears and avers as follows:

1.  I told the interviewers during the interview for the Henry Hill barber position that using an ultra-violet ray is a technique for sterilizing barber equipment .

2.  Mr. Huggins who was hired at the Illinois River Correctional Center for the barber position is white.

STATE OF ILLINOIS        )
                         ) SS.
COUNTY OF KNOX           )

I, Steve Abron, after being duly sworn upon my oath, state that I have read the foregoing and the information contained therein is true and accurate to the best of my knowledge, information and belief.

_____
Steve Abron

SUBSCRIBED AND SWORN TO before me, a Notary Public on this _9th_ day of
November 2007.

_____

Notary Public

"OFFICIAL SEAL"
JULIE L. PATCH
Notary Public, State of Illinois
My Commission Exp. 12/11/2009

## BARBER INTERVIEW

NAME OF APPLICANT:  _Steve  Abron_

DATE OF INTERVIEW:  _12/21/04_

INTERVIEWER'S NAME:  _Wmg Smith_



EXHIBIT
16

## BARBER INTERVIEW

| | | WEIGHT | POINTS |
|---|---|---|---|
| I. | EDUCATION, TRAINING AND SKILLS | 30% | 4 |

1. What special skills do you believe you
Possess which would enable you to successfully
Perform the duties of this job and why?

> 28 yrs Exp
> Corr  3 ups
> 12 yr Knox on call Jail
> Black - Hair Care
> Knowledge Epping Comm srd

2. Describe how the education and training you
Possess will help you perform the responsibilities
Of this job.

**3**

> 28 - year
> Miltary Natl Barber
> in Springfield -

3. Explain how to sanitize and sterilize barber
Equipment.

**3**

> Boil - Steam - disinfect
> Ultra Ray - chemical
> Barbicid - mix + St -
> Hot Soap Than clean -
> rinse - Ultra Ray -

EDUCATION TRAINING AND SKILLS TOTAL POINTS _____

10 ÷

3.3



.99

(05/22/07)   00370

|  | WEIGHT | POINTS |
|---|---|---|

**II.   JOB KNOWLEDGE AND EXPERIENCE**          30%

_4_

1.   Describe the specific job duties and responsibilities
Of your previous barbering position.

checkmachine - tools +
opt Books - check chemical
cut - Safety - in +
out of prison
general - Order supplies.
also retail -

2.   An inmate receives a cut while receiving a
Haircut and is bleeding moderately. What
Would you do?

_3_

Antiseptic or Send To
Nurse -
good -

7÷2 = 3.5

JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS ____    [ 1.05 ]

|  | WEIGHT | POINTS |
|---|---|---|

**III   INTERPERSONAL RELATIONS**          25%

_2_

1.   Describe the relationship you strive to establish
With your co-workers.

Experience from Working
in institutions --
Be nice but can
say No -
Profession with humor -

2.  How do you deal with people who have different
Backgrounds and interests from yours?

_2_

Evaluate position
treat us would
be treated —
No sent — No court
No problem with customers —

3.  What role do you see communication playing
In this job and how would you approach this role?

_3_

Can call anyone in
Command — various
councillor, — Know who
to contact —

_____ 2 - 23 - |.58|

INTERPERSONAL RELATIONS TOTAL POINTS _____

IV.  WORK HISTORY

| WEIGHT | POINTS |
|--------|--------|
| 15% | |

1.  Describe your work history and how it will
Enable you to perform the responsibilities
Of this job?

_4_

28 years
com 3 yrs — Iyc .
on call — Knox —

2.  How would you rate your use of time? How many
    Sick days have you used within the last 12
    Months? Explain any extenuating circumstances.

    _____4_____

No problem don't miss
Work — None at
Kewanee —

WORK HISTORY TOTAL POINTS _____

8÷2 = 4.0

4.0 × 15  [1.6]

**RATING SCALE**
0 - UNSATISFACTORY
1 - MARGINALLY MET
2 - ACCEPTABLE
3 - VERY GOOD
4 - EXCELLENT

E-FILED
Friday, 09 November, 2007  03:39:37 PM
Clerk, U.S. District Court, ILCD

## BARBER INTERVIEW

**NAME OF APPLICANT:** LARRY THOMPSON

**DATE OF INTERVIEW:** 12-21-04

**INTERVIEWER'S NAME:** FRANK SHAW

EXHIBIT
18
tabbies

## BARBER INTERVIEW

|  | WEIGHT | POINTS |
|---|---|---|
| I.   EDUCATION, TRAINING AND SKILLS | 30% | |

1. What special skills do you believe you
Possess which would enable you to successfully
Perform the duties of this job and why?

_2_

Have cut Hair For all Ases
+ Nat. BEEN Cutt h
Hair (40) year. Graduated
In 1964 From Barber College

2. Describe how the education and training you
Possess will help you perform the responsibilities
Of this job.

_4_

Graduated 1964 Barber
School - 40 yN. Exp.
Current Hair.
Did the Apprentice

3. Explain how to sanitize and sterilize barber
Equipment.

_4_

Wet + Dry Sterized.
Del Combs In Barbering
Always Keep Ttable Clean
And wiped off.

**EDUCATION TRAINING AND SKILLS TOTAL POINTS** _3.7_

|  | WEIGHT | POINTS |
|---|---|---|
| **II. JOB KNOWLEDGE AND EXPERIENCE** | 30% | |

1.  Describe the specific job duties and responsibilities
    Of your previous barbering position.          *3*

    I own a manage m/own
    Barbershop. I manage
    my shop and order supplies.
    I work by myself/no
    Employee w/me.

2.  An inmate receives a cut while receiving a
    Haircut and is bleeding moderately. What
    Would you do?                                  *4*

    I would stop cut to the
    Hair. Call an officer
    For Assistance And
    Have Treated by
    Health Care Staff

JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS ___3.5___

|  | WEIGHT | POINTS |
|---|---|---|
| **III. INTERPERSONAL RELATIONS** | 25% | |

1.  Describe the relationship you strive to establish
    With your co-workers.                          *3*

    I can get along w/
    All People. I mean- others
    As they treat me. I have
    No problem dealing w/
    Inmates And well treat
    Them fair.

2.  How do you deal with people who have different
    Backgrounds and interests from yours?

    3

    TREAT THAN THE SAME
    AS OTHERS. CAN DEAL
    W/ ALL TYPE OF PEOPLE
    TREAT THEM ALL THE
    SAME.

3.  What role do you see communication playing
    In this job and how would you approach this role?

    3

    Communicate TO GET THE
    JOB Accomplished BUT NOT
    TO THE EXTENT OF BEING
    FRIENDS. Remember THEY
    ARE INMATES.

INTERPERSONAL RELATIONS TOTAL POINTS  3

|  | WEIGHT | POINTS |
|---|---|---|
| IV.  WORK HISTORY | 15% | 3 |

1.  Describe your work history and how it will
    Enable you to perform the responsibilities
    Of this job?

    I HAVE 40 yN. Exp.
    OF BEING A BARBER AND
    HAVE WORKED W/ ALL TYPE
    OF PEOPLE.

2. How would you rate your use of time? How many
Sick days have you used within the last 12
Months? Explain any extenuating circumstances.

_4_

I'm on time Everyday AND
Have only Missed a few
Days in the last 12 Days.
Should be a work Every day -

WORK HISTORY TOTAL POINTS  3.5

**RATING SCALE**
0 - UNSATISFACTORY
1 - MARGINALLY MET
2 - ACCEPTABLE
3 - VERY GOOD
4 - EXCELLENT

MAY-23-2007  15:50    IL ATTORNEY GENERAL

E-FILED
Friday, 09 November, 2007 03:40:35 PM
Clerk, U.S. District Court, ILCD

## BARBER INTERVIEW

NAME OF APPLICANT: Larry Thompson

DATE OF INTERVIEW: 12/21/04

INTERVIEWER'S NAME: Wm g Smith

EXHIBIT
1
tabbies

## BARBER INTERVIEW

I.   EDUCATION, TRAINING AND SKILLS

| | WEIGHT 30% | POINTS |
|---|---|---|

1. What special skills do you believe you
   Possess which would enable you to successfully
   Perform the duties of this job and why?                     **3**

   CUT All NATIONALITYS

   KNOWS  WET & DRY  CUTTING

   _____

   _____

2. Describe how the education and training you
   Possess will help you perform the responsibilities
   Of this job.                                                **4**

   40 yrs  EXP  grAd  1964

   ACTIVE  BehinD  chAir

   _____

   _____

3. Explain how to sanitize and sterilize barber
   Equipment.                                                  **L1**

   WET STErlizer  σ Dry

   Dip iN bArbicide  —

   Keep Things  cleAN

   iN goverAl

                                    **11.0 ÷**    **3.7**    ( **1.11** )

EDUCATION TRAINING AND SKILLS TOTAL POINTS _____

|  | | | | WEIGHT | POINTS |
|---|---|---|---|---|---|

**II.    JOB KNOWLEDGE AND EXPERIENCE**     30%

   1.    Describe the specific job duties and responsibilities     **3**
   Of your previous barbering position.

   MANAGE + OWN Shop
   Order Supplies
   Handle Towels
   Set hours

   2.    An inmate receives a cut while receiving a     **4**
   Haircut and is bleeding moderately.  What
   Would you do?

   STOP doing CUT —
   Would NOT START if
   open cut
   CALL officers
   Treat By Health care

   2 : 2          3.5          1,05

**JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS** _____


|  | | | WEIGHT | POINTS |
|---|---|---|---|---|

**III.    INTERPERSONAL RELATIONS**     25%

   1.    Describe the relationship you strive to establish     **3**
   With your co-workers.

   CAN get Along with
   Anyone
   Treat Like I
   WANT To be Treated
   NOT Smart acting —

2.  How do you deal with people who have different
    Backgrounds and interests from yours?                      **3**

    HAs Shop in Rough

    end of Town —

    Can deal with All Type)

    of People —

    No HArAssmeT —

3.  What role do you see communication playing
    In this job and how would you approach this role?          **3**

    NoT Too fAr boT cAn

    Work ANyone —

    Inmates Are here for

    A reAson - NoT To be

    friends —

                          9.0 ÷ 3  3.0  (.75)

INTERPERSONAL RELATIONS TOTAL POINTS _____

|  | WEIGHT | POINTS |
|---|---|---|
| IV.  WORK HISTORY | 15% |  |
| 1.  Describe your work history and how it will Enable you to perform the responsibilities Of this job? | | **3** |

                                                               .5

    forTy ysArs experience

    own his own Shop

    Be honesT with people

    Straight fwd —

2.  How do you deal with people who have different
    Backgrounds and interests from yours?                          _3_

    Has Shop in Rough
    end of Town -
    can deal with all Types
    of People -
    No Harassment -

3.  What role do you see communication playing
    In this job and how would you approach this role?              _3_

    Not Too far but can
    work Anyone -
    Inmates Are here for
    A reason - Not to be
    friends -

                          9.0 ÷ 3   3.0   ( .75 )
INTERPERSONAL RELATIONS TOTAL POINTS ____

                                              WEIGHT     POINTS
IV.  WORK HISTORY                               15%

    1.  Describe your work history and how it will          _3_
        Enable you to perform the responsibilities
        Of this job?
                                                          .5
        forty years experience
        own his own Shop
        Be honest with People
        Straight fwd -

2.   How would you rate your use of time? How many          _4_
     Sick days have you used within the last 12
     Months? Explain any extenuating circumstances.

     Only had 3 sick
     days in 22 years.
     Never in hospital
     in on Time —

WORK HISTORY TOTAL POINTS _____  7.0 ÷ 2  3.5

                                        .525

RATING SCALE
0 - UNSATISFACTORY
1 - MARGINALLY MET
2 - ACCEPTABLE
3 - VERY GOOD
4 - EXCELLENT

## BARBER INTERVIEW

NAME OF APPLICANT: _Larry Thompson_

DATE OF INTERVIEW: _12/21/04_

INTERVIEWER'S NAME: _Wm g Smith_

EXHIBIT
tabbies

MAY-23-2007 15:50    IL ATTORNEY GENERAL    FAX NU. 217 155 1011    217 782 8767    P.011
JAN 15 03 MON 1:45 PM    LOGAN CORRECTIONAL CNTR.    P. 3

## BARBER INTERVIEW

| | | WEIGHT | POINTS |
|---|---|---|---|
| I. | EDUCATION, TRAINING AND SKILLS | 30% | |

**1.** What special skills do you believe you Possess which would enable you to successfully Perform the duties of this job and why?     **3**

> CUT All NATIONALITYS
> KNOWS WET & Dry CUTTING

**2.** Describe how the education and training you Possess will help you perform the responsibilities Of this job.     **4**

> 40 yrs Exp grAd 1964
> ActIve BehInd chair

**3.** Explain how to sanitize and sterilize barber Equipment.     **4**

> WeT Sterlizer or Dry
> Dip iN barbicide —
> Keep things cleAn
> iN goweral

           11.0 ÷     3.7      1.11

**EDUCATION TRAINING AND SKILLS TOTAL POINTS** _____

| | | **WEIGHT** | **POINTS** |
|---|---|---|---|
| **II.** | **JOB KNOWLEDGE AND EXPERIENCE** | 30% | |

1. Describe the specific job duties and responsibilities
Of your previous barbering position.                                    _3_

> MANAGE + OWN Shop
> Order Supplos
> Handle Towels
> SeT hours

2. An inmate receives a cut while receiving a
Haircut and is bleeding moderately. What
Would you do?                                                             _4_

> STOP doing CUT -
> Would NOT STArT if
> ODON CUT
> CAll officers
> Treat By Health care

$7 \div 2$    $3.5$    $\boxed{1.05}$

**JOB KNOWLEDGE AND EXPERIENCE TOTAL POINTS** _____

| | | **WEIGHT** | **POINTS** |
|---|---|---|---|
| **III.** | **INTERPERSONAL RELATIONS** | 25% | |

1. Describe the relationship you strive to establish
With your co-workers.                                                    _3_

> CAN get Along with
> Anyone
> Treat Like I
> WANT TO be treated
> NOT Smart puting -

2.   How do you deal with people who have different
     Backgrounds and interests from yours?                                3

     Has Shop in Rough
     end of Town -
     Can deal with All Types
     of People ——
     No HARASSMENT—

3.   What role do you see communication playing
     In this job and how would you approach this role?                    3

     NoT Too far boT can
     Work ANyone ——
     Inmates Are here for
     A reason - NoT TO be
     frieds ——

                                       9.0 ÷ 3   3.0    .75

INTERPERSONAL RELATIONS TOTAL POINTS

| | WEIGHT | POINTS |
|---|---|---|
| IV.  WORK HISTORY | 15% | |

1.   Describe your work history and how it will
     Enable you to perform the responsibilities
     Of this job?                                                         3

                                                                         1.5
     forTy years experience
     own his own Shop
     Be honest with People
     Straight fwd —

2. How do you deal with people who have different
Backgrounds and interests from yours?

_3_

HAS Shop in Rough
end of Town -
Can deal with All Types
of People ----
NO HARASSMENT -

3. What role do you see communication playing
In this job and how would you approach this role?

_3_

NoT Too Far boT caN
Work ANyone ----
INMATES Are here for
A reason - NoT TO be
friends ----

9.0 ÷ 3    3.0    (.75)

INTERPERSONAL RELATIONS TOTAL POINTS ____

| | WEIGHT | POINTS |
|---|---|---|
| IV.  WORK HISTORY | 15% | |

1. Describe your work history and how it will
Enable you to perform the responsibilities
Of this job?

_3_

.5

forTy yeArs experience
own his own Shop
Be honest with People
Straight fwd ----

MAY-23-2007  15:51       IL ATTORNEY GENERAL         FAX NO.   217 782 8767    P.014
JAN-15-05 MON  1.45 PM   LOGAN CORRECTIONAL CRTR.    FAX NO.   217 735 1077     P. 6

2. How would you rate your use of time? How many
   Sick days have you used within the last 12
   Months? Explain any extenuating circumstances.

   <u>4</u>

   Only had 3 sick
   days in 22 years.
   Never in hospital
   In on Time —

   7.0 ÷ 2  3.5

WORK HISTORY TOTAL POINTS _____

.525

RATING SCALE
0 - UNSATISFACTORY
1 - MARGINALLY MET
2 - ACCEPTABLE
3 - VERY GOOD
4 - EXCELLENT

# EMPLOYMENT DECISION FORM

| | |
|---|---|
| Candidate Name:  Larry Thompson | Soc. Sec. No.:  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 |

| | |
|---|---|
| Agency:  Department Of Corrections | Division/Institution:  Hill Correctional Center |

| | | |
|---|---|---|
| Position Title:  BARBER | Position Number:  04250 - 29 -<br>98 - 280 - 00 - 01 | Transaction Code: BA045 |

| | |
|---|---|
| Transaction Description:  Exempt Appointment | Pin #  104 |

## CANDIDATE EVALUATION

| | | |
|---|---|---|
| Overall Score   3.435 | Selected Candidate's Ranking   1 | # Candidates Interviewed   8 |

## JUSTIFICATION

Explain the reasons for hiring the selected candidate with others that were interviewed.  If selection is out of rank order, include rationale.

This candidate has the necessary education, training and work history which placed him as the most qualified candidate for the barber position.

All of the candidates interviewed had extensive experience as a barber.  Mr. Thompson had additional skills demonstrated during the interview process, which made him an excellent selection.



**EXHIBIT**

**AFFIDAVIT:** "I certify that the hiring criteria and interview questions related to this employment decision were developed prior to initiating the candidate interview process.  Furthermore, I certify that hiring decisions documented on this form have not been decided on the basis of political party affiliation, support or lack thereof."

| | |
|---|---|
| Director's Name: (typed)<br>Robert E. Walker Jr. | Title:<br>Director |
| Director's Signature:<br>Roan E. Walker Jr. | Date:<br>01-19-05 |

# HIR  G AND PROMOTIONAL MO    OR

[x] New Hire          [ ] Promotion

The Rules and Regulations of the Illinois Department of Human Rights require reporting of the following information:

1. EEO Category of Position: _____ 7 _____
   1. Official/Manager          5. Para-professional
   2. Professional              6. Office/Clerical
   3. Technician                7. Skilled Craft
   4. Protective Service        8. Service Maintenance

   ** (To be completed by Facility Personnel Office from the *CMS Alpha Index of Position Titles*.)

2. Is there documented underutilization of an affirmation action group in the EEO Category?

   [x] Yes              [ ] No

   (See *Workforce Analysis Affirmation Action Report* or contact the Office of Affirmation Action, 312-814-3790)

   If yes, underutilization exists for the following affirmation action group (s)
   [ ] Blacks            [ ] Hispanics          [x] Asians
   [ ] Native Americans  [x] Females            [ ] Disabled

3. Were there any applicants of the underutilized protected class group who were available but not selected?

   [ ] Yes              [x] No

   If yes, explain: _____

4. Were there any eligible applicants of the underutilized protected class group(s) who were not interviewed?

   [ ] Yes              [x] No

   If yes, explain: _____

5. Indicate race and sex of selected candidate, and, if applicable, whether selected candidate reported a disability **.

   Race: ___White___   Sex: ___Male___   Disability: _____

   ** (To be completed by Facility Personnel Office from the IL-442-0254 Form.)

Signature of Interviewing Officer                                    12/22/04

Date:

E-FILED
Friday, 09 November, 2007 03:18:18 PM
Clerk, U.S. District Court, ILCD

Attachment # 6

EXHIBIT
21

# CANDIDATE EVALUATION FORM

Date:  12-21-04

| | |
|---|---|
| Candidate Name: Larry Thompson | Soc. Sec. No.  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 |

| | |
|---|---|
| Agency:  **DEPARTMENT OF CORRECTIONS** | Division or Institution: Hill Correctional Center |

| | | |
|---|---|---|
| Position Title: Barber | Position Number: 04250-29-98-280-00-01 | Pin #  0104 |

*In using the Candidate Evaluation Form: (a) Prior to the interview, complete the "Hiring Criteria" and "% Weight" sections of the form; (b) Following the interview, use the "Comments" space to indicate experience or qualifications the candidate possesses related to each hiring criteria; (c) Average the "Points" from the interview questionnaire for each hiring criteria or indicate a numerical "Rating" for each hiring criteria; (d) Calculate the "Weighted Score" for each hiring criteria by multiplying the "% Weight by the Points/Rating"; and (e) Calculate the "Overall Score by summing the "Weighted Scores" for each of the hiring criteria.

| HIRING CRITERIA | COMMENTS | PERCENT WEIGHT | PTS / RTG | WTD SCORE |
|---|---|---|---|---|
| EDUCATION, TRAINING AND SKILLS:  Requires possession of a valid Illinois License as a barber. Requires training necessary to qualify as a barber, and the skills necessary to maintain and supervise barber facility and staff. Requires elementary knowledge of first aid. | The candidate has 40 years experience. He graduated from Lincoln Barber College in 1964. Mr. Thompson manages his own shop and performs all associated duties such as scheduling appointments, purchasing supplies, payment of invoices and maintaining safety and sanitation. | 30% | 3.7 | 1.11 |
| JOB KNOWLEDGE AND EXPERIENCE:  Requires experience necessary to qualify as a journeyman barber. Requires working knowledge of barbering techniques, methods, practices and the operation, maintenance and sterilization of barber shop tools and equipment. | As manager of his own shop that is subject to all rules pertaining to sanitation in order to keep his state license, the candidate has a working knowledge of current laws. The candidate expressed a thorough knowledge of equipment sanitation procedures. | 30% | 3.5 | 1.05 |
| INTERPERSONAL RELATIONS: Must be capable of supervising and instructing inmate workers in performing various barbering services. | Candidate indicated that his shop in is an economically depressed area, and he is use to serving a wide range of personnel. He has never had any problems and no harassment charges in his entire career. He believes in treating people as he would like to be treated. | 25% | 3.0 | .75 |
| WORK HISTORY:  Requires work history related to the total operation of a barbering facility, the safekeeping of barbering tools and the ability to perform all tasks usually associated with journeyman barbers. | In addition to managing his own shop, the candidate also works nights in a second shop in another town. This indicates a diversity and strong work ethic. The candidate has only missed 3 sick days in 22 years, has never been in the hospital, and reports to work on time. | 15% | 3.5 | .525 |

(05/17/07)    : 00020

| HIRING CRITERIA | COMMENTS | PERCENT WEIGHT | PTS / RTG | WTD SCORE |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

AFFIDAVIT: "I certify that the hiring criteria and interview questions related to this employment decision were developed prior to initiating the candidate interview process. Furthermore, I certify that political party affiliation, support or lack thereof were not discussed or considered at any point in the interview process."

| Interviewing Officer(s) (Typed): Frank Shaw, Assistant Warden of Operations William Smith, Business Administrator II | | |
|---|---|---|
|  |  | OVERALL SCORE: 3.43 |

| Interviewing Officer(s) Signature(s): | Title(s): Assistant Warden of Operations Business Administrator II | Date: 12/22/04 |
|---|---|---|

# EMPLOYMENT DECISION FORM

| | |
|---|---|
| Candidate Name: Huggins, Lawrence | Soc. Sec. No.: 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 |

| | |
|---|---|
| Agency: Department Of Corrections | Division/Institution: Illinois River Correctional Center |

| | | |
|---|---|---|
| Position Title: BARBER | Position Number: 04250-29-55-200-00-01 | Transaction Code: BA045 |

| | |
|---|---|
| Transaction Description: Exempt Appointment | Pin # 0102 |

## CANDIDATE EVALUATION

| | | |
|---|---|---|
| Overall Score  3.95 | Selected Candidate's Ranking  1 | # Candidates Interviewed  6 |

## JUSTIFICATION

Explain the reasons for hiring the selected candidate with others that were interviewed. If selection is out of rank order, include rationale.

Overall, candidate #1 answered questions on interview in an outstanding manner. Candidate outscored or evenly scored all other candidates in all other categories. Candidate has an extensive amount of knowledge and experience in barbering and corrections. Candidate #1 has a committed attitude with regard to staying on top of security issues (i.e., tool control, toxic control, etc.). During interview, candidate #1 had an excellent working knowledge of corrections and security procedures.



EXHIBIT
22

**AFFIDAVIT:** "I certify that the hiring criteria and interview questions related to this employment decision were developed prior to initiating the candidate interview process. Furthermore, I certify that hiring **decisions documented on this form** have not been decided on the basis of political party affiliation, support or lack thereof."

| | |
|---|---|
| Director's Name: (typed)  Roger E. Walker Jr. | Title:  Director |
| Director's Signature: | Date: |

## HIRING AND PROMOTIONAL MONITOR

☒ New Hire          ☐ Promotion

The Rules and Regulations of the Illinois Department of Human Rights require reporting of the following information:

1. EEO Category of Position: 7
   1. Official/Manager          5. Para-professional
   2. Professional              6. Office/Clerical
   3. Technician                7. Skilled Craft
   4. Protective Service        8. Service Maintenance

   ** (To be completed by Facility Personnel Office from the *CMS Alpha Index of Position Titles*.)

2. Is there documented underutilization of an affirmation action group in the EEO Category?

   ☒ Yes          ☐ No

   (See *Workforce Analysis Affirmation Action Report* or contact the Office of Affirmation Action, 312-814-3790).
   If yes, underutilization exists for the following affirmation action group (s)
   ☒ Blacks          ☒ Hispanics          ☒ Asians
   ☒ Native Americans   ☒ Females          ☐ Disabled

3. Were there any applicants of the underutilized protected class group who were available but not selected?

   ☒ Yes          ☐ No

   If yes, explain: Was Outscored By Selected By Candidate

4. Were there any eligible applicants of the underutilized protected class group(s) who were not interviewed?

   ☐ Yes          ☒ No

   If yes, explain: _____

5. Indicate race and sex of selected candidate, and, if applicable, whether selected candidate reported a disability **.

   Race: White          Sex: Male          Disability: No

   ** (To be completed by Facility Personnel Office from the IL-442-0254 Form.)

**EXHIBIT**
13

_____
Signature of Interviewing Officer

12/5/2003
Date:

E-FILED
Friday, 09 November, 2007  03:42:17 PM
Clerk, U.S. District Court, ILCD

**EXHIBIT**
23

L. Huggins

## BARBER
## INTERVIEW QUESTIONS

### KNOWLEDGE & EXPERIENCE                    35%

1. Describe the specific job duties and responsibilities of your previous barbering position.

   4.0    Currently co-owner of Image Styling Salon in Canton since 04-03. Barber since 1974. Graduated from Barbering school 1972. 8 years exp. @ Parkview Barber Shop in Cuba, IL. 13 years exp. in corrections.

2. Explain how to sanitize and sterilize barber equipment.

   4.0    2- Basic was
   1.) Barbicide - clean with soap + water and place in Barbicide.
   2.) Utra-Violet rays.
   Would ensure inmates were checked for lice.

3. An inmate receives a cut while receiving a haircut and is bleeding moderately. What would you do?

   4.0    Put on latex gloves. Inspect wound. Call HCU + write 434 + accident report.

### EDUCATION/TRAINING SKILLS                    20%

1. What special skills do you believe you possess which would enable you to successfully perform the duties of this job and why?

   4.0    Been a barber for 29 years. Very familiar with cutting all types of hair. 13 years of training in corrections, familiarizing him in tool control, topics, etc. Would adhere to all security procedures.

2. Describe how the education and training you possess will help you perform the responsibilities of this job and why?

   3.5    13 years of cycle training. Learned the trade in barber school and passed state exam.

**PLANNING**                                        15%

1.  How do you ensure that your day to day activities are done?

4.0  Come in a little early + speak with Shift Supervisor aboot any outstanding issues. Thoroughly inspect barber shop including tool control safety/san. etc. Start an evaluation process for inmates.

**ORAL COMUNICATIONS**   Develop checklist   10%

1.  What role do you see communication playing in this job and how would you approach this role?

4.0  Most important issue with exception of Security issues. Must communicate with inmate worker on how to use tools + equipment. Keep training + updating workers.

**JUDGMENT**                                        10%

Very Good Answer.

1.  If an inmate asks you to buy a hairbrush for him and bring it into the facility for him, what would you do?

4.0  NO - would write a DC434 and request the inmate be removed from the assignment immediately

2.  While scheduling inmates for a haircut, an inmate barber asks you to put his friend on tomorrow's barber line knowing that there are other inmates ahead of him to get a haircut. What would you do?

4.0  NO - and would document in an evaluation log.

**INTERPERSONAL RELATIONS**            10%

1.  Describe the relationship you strive to establish with co-workers.

4.0  Staff = assist in any way + be professional

Inmates - Not a "buddy, buddy" thing, professional manner

2.  How do you deal with people who have different backgrounds and interest from your own?

4.0  Maintain an open mind. Maintain professionalism. Don't debate personal issues. PPL are entitled

E-FILED
Friday, 09 November, 2007  03:42:52 PM
Clerk, U.S. District Court, ILCD

S Abron

EXHIBIT
24

**BARBER**
**INTERVIEW QUESTIONS**

**KNOWLEDGE & EXPERIENCE**                     35%

1.   Describe the specific job duties and responsibilities of your previous barbering position.

*Cutting hair, sterilizing equipment maintenance of equipment, count of tools for safety.*
*29 years total as barber.*

4.0

2.   Explain how to sanitize and sterilize barber equipment.

*Wet bar - 70% Alchol - 10 minutes*
*Dry bar - Blue Violet light - at least minutes*
*Wash with cold + hot water soap.*

4.0

3.   An inmate receives a cut while receiving a haircut and is bleeding moderately. What would you do?

*Use antiseptic - Call in First Aid / Nurse.*

3.5

**EDUCATION/TRAINING SKILLS**                     20%

1.   What special skills do you believe you possess which would enable you to successfully perform the duties of this job and why?

*Educated to cut any type of hair. Worked with handicapped people. 12 years cutting hair in Sherrif's dept. 2 years eff training at Kewaunee Juv. Centr. Has trained other staff.*

4.0

2.   Describe how the education and training you possess will help you perform the responsibilities of this job and why?

*# Acknowledgement and know how. Has had continuing education 1800 hours of Barbering school verses 1500 hours required by state.*

3.5

**PLANNING**                                      15%

1.    How do you ensure that your day to day activities are done?

*3.5*    up schedule every 15 minutes. Ensure all
tools accounted for. Develop checklist.

**ORAL COMUNICATIONS**                            10%

1.    What role do you see communication playing in this job and how would you
approach this role?

*40*    Very vital. Respect for one another while
communicating. Be professional.

**JUDGMENT**                                      10%

1.    If an inmate asks you to buy a hairbrush for him and bring it into the facility for
him, what would you do?

*3.5*    NO

2.    While scheduling inmates for a haircut, an inmate barber asks you to put his
friend on tomorrow's barber line knowing that there are other inmates ahead of
him to get a haircut. What would you do?

*3.5*    No- keep it on schedule

**INTERPERSONAL RELATIONS**                       10%

1.    Describe the relationship you strive to establish with co-workers.

*4.0*    Keep it on a professional basis. Treat everyone
the same.

2.    How do you deal with people who have different backgrounds and interest from
your own?

*3.5*    Deal real well with ppl. People are
entitled to their own opinion

(05/17/07)    00122

E-FILED
Friday, 09 November, 2007 **EXHIBIT** PM
Clerk, U.S. District Court, ILCD
25

# CMS
ILLINOIS
DEPARTMENT OF CENTRAL
MANAGEMENT SERVICES

## EXAMINING/EMPLOYMENT APPLICATION (CMS100)

CMS administers civil service testing for agencies under the jurisdiction of the Governor; however, actual employment decisions are made by the hiring agencies. Pencil or fax copies of applications will not be accepted. Legible photocopies are accepted.
PLEASE PRINT LEGIBLY OR TYPE INFORMATION.

| 1. POSITION TITLE | OPTION | LEAVE BLANK |
|---|---|---|
| Barber | No | |

| 2. LAST NAME | FIRST NAME | MI | 3. SOCIAL SECURITY NUMBER |
|---|---|---|---|
| Abron | Steven | Duane | 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 |

| MAILING ADDRESS | COUNTY | 4. BIRTHDATE (OPTIONAL) |
|---|---|---|
| 246 Holton | Knox | 3-6-49 |

| CITY | STATE | ZIP CODE | 5. HOME TELEPHONE | WORK TELEPHONE |
|---|---|---|---|---|
| Galesburg | IL | 61401 | (309) 343-1884 | (309) 342-7014 |

| DRIVERS LICENSE NUMBER | STATE | MO / YR ISSUED | CURRENT | REST | NON-CDL | CDL | ENDR |
|---|---|---|---|---|---|---|---|
| 165-7844-9068 | IL | 3 / 01 | ☒ YES ☐ NO  B | A B C D L M | A B | X N |

| 7. COUNTY CHOICE (Select one or two) | COUNTY | COOK/ZONE | LEAVE BLANK | COUNTY | COOK/ZONE | LEAVE BLANK |
|---|---|---|---|---|---|---|
| | Fulton | | | Knox | | |

8. AVAILABILITY (Check one)
- A. ☒ Available for permanent employment; will not accept temporary employment. (Trainee titles must choose A.)
- B. ☐ Available for permanent employment; will accept temporary employment.
- C. ☐ Available for temporary employment only.

9. If your answer to any of the following questions is "yes" please attach a signed detailed explanation. | LEAVE BLANK
   1. Have you ever been fired from a job? (Downsize/layoff is not applicable.)  ☐ YES  ☒ NO
   2. Have you ever pled guilty to or been convicted of any criminal offense other than a minor traffic violation?  ☐ YES  ☒ NO
   3. Are you currently in default on the repayment of any state educational loan?  ☐ YES  ☒ NO
State law provides that any employee who is in default on the repayment of any education loan for a period of six months or more and in the amount of $600 or more shall, as a condition of employment, make a satisfactory loan repayment arrangement with the maker or guarantor of the loan.

10. VETERANS PREFERENCE: For assistance contact Veterans Outreach at 1-800-643-8138 or Illinois Relay Center at 1-800-526-0844 (TDD/TTY only).
- ☐ I wish to claim Veterans Preference; attached is the most recent certified copy of my DD214/215. (If claiming service-connected disability, also include a copy of U.S. Veterans Affairs award letter.)
- ☐ I wish to claim Veterans Preference as an IL National Guard/Reservist. Attached is a letter from my unit personnel indicating I am currently serving under honorable conditions or a copy of my NGB22 stating my discharge was under honorable conditions.
- ☐ I wish to claim Veterans Preference as a surviving unremarried spouse or one parent of an unmarried veteran who suffered a service-connected death or disability that prevents the veteran from qualifying for civil service employment.
- ☐ I have submitted required military documentation to CMS after January 01, 2000 and have already established Veterans Preference with CMS.

LEAVE BLANK

| 11. HIGH SCHOOL GRADUATE | NUMBER OF YRS COMPLETED | GED |
|---|---|---|
| ☒ YES ☐ NO | 0  1  2  3 ☒ | ☐ YES ☐ NO |

| 12. BUSINESS, TRADE, CORRESPONDENCE SCHOOL NAME AND ADDRESS | FROM MO / YR | TO MO / YR | TIME FULL / PART | SUBJECTS | COURSE LENGTH | COMPLETED YES / NO |
|---|---|---|---|---|---|---|
| National Barber College Springfield IL 61401 | 72 | 9 73 | X | Barbering | 1,873 hrs. | X |

| 13. TECHNICAL/PROFESSIONAL LICENSE | NUMBER | STATE ISSUED | DATE ISSUED MO / YR | EXPIRATION DATE MO / YR |
|---|---|---|---|---|
| Registered Barber | 06-57507 | IL | | |

| FOR CMS USE ONLY | | |
|---|---|---|
| EXAM DATE | | TEST CENTER |
| MONTH   DAY   YEAR | | |

CMS 100 (rev. 10/01)
IL 401-0090
Printed on Recycled Paper

(05/17/07)    :00125

15. **WORK HISTORY:** Complete this section in detail. Begin with most recent payroll title and work backward. If you have an extensive work history with one employer, list each change in payroll title separately including duties and dates associated with each. Unsigned or incomplete applications will be returned. If additional space is needed, attach a separate sheet following the same format as below. Resumes submitted must be in same format as the application. Place additional sheets/resumes inside the application.

### INCLUDE THE FOLLOWING INFORMATION:
- College internships/practicums successfully completed
- Military experience including dates, listing each change in rank and title
- Related volunteer experience including dates and hours worked

| CURRENT (OR LAST) EMPLOYER | | | PAYROLL TITLE | | | |
|---|---|---|---|---|---|---|
| ABRONS HAIR DESIGN | | | Self employed Barber | | | |
| STREET ADDRESS | | | NUMBER OF HOURS WORKED PER WEEK OR MONTH | | CURRENT OR LAST SALARY WEEKLY OR MONTHLY OR ANNUALLY | |
| 427 S Henderson | | | 50 | | | |
| CITY | STATE | | DATES OF EMPLOYMENT | | | TOTAL |
| | | | MONTH / YEAR TO MONTH / YEAR | | YEARS | MONTHS |
| Galesburg | IL | | 6  74  12  03 | | 29 | 5 |

| SUPERVISORY RESPONSIBILITY: LIST THE NUMBER OF EMPLOYEES YOU SUPERVISED IN THE APPROPRIATE BOX(ES) | MANUAL/TRADES | CLERICAL | PROFESSIONAL 3 | PROFESSIONAL | ADMINISTRATIVE |
|---|---|---|---|---|---|

DESCRIBE DUTIES AND RESPONSIBILITIES FOR EACH PAYROLL TITLE SEPARATELY:

Supervisor of three: Two Licensed Beauty operators One Barber. General practice of Barbering perms cuts maintenance and Sterilization of Tools

REASON FOR LEAVING: Current

| EMPLOYER | | | PAYROLL TITLE | | | |
|---|---|---|---|---|---|---|
| IYC Youth Center Correction | | | Barber | | | |
| STREET ADDRESS | | | NUMBER OF HOURS WORKED PER WEEK OR MONTH | | CURRENT OR LAST SALARY WEEKLY OR MONTHLY OR ANNUALLY | |
| 2021 Kentville Road | | | 24 | | | |
| CITY | STATE | | DATES OF EMPLOYMENT | | | TOTAL |
| | | | MONTH / YEAR TO MONTH / YEAR | | YEARS | MONTHS |
| Kewanee | IL | | 10  01  12  03 | | 2 | 2 |

| SUPERVISORY RESPONSIBILITY: LIST THE NUMBER OF EMPLOYEES YOU SUPERVISED IN THE APPROPRIATE BOX(ES) | MANUAL/TRADES | CLERICAL | TECHNICAL/PARA-PROFESSIONAL | PROFESSIONAL | ADMINISTRATIVE |
|---|---|---|---|---|---|

SCRIBE DUTIES AND RESPONSIBILITIES FOR EACH PAYROLL TITLE SEPARATELY:

General Practice of Barbering Haircut & Sterilization of tools

REASON FOR LEAVING: Current Part-time

| EMPLOYER | | | PAYROLL TITLE | | | |
|---|---|---|---|---|---|---|
| UNITED STATE Army | | | Rank 4 PFC Spec 4 | | | |
| STREET ADDRESS | | | NUMBER OF HOURS WORKED PER WEEK OR MONTH | | CURRENT OR LAST SALARY WEEKLY OR MONTHLY OR ANNUALLY | |
| UNITED STATES | | | Full Time | | | |
| CITY | STATE | | DATES OF EMPLOYMENT | | | TOTAL |
| | | | MONTH / YEAR TO MONTH / YEAR | | YEARS | MONTHS |
| | | | 1  71  1  73 | | 2 | |

| SUPERVISORY RESPONSIBILITY: LIST THE NUMBER OF EMPLOYEES YOU SUPERVISED IN THE APPROPRIATE BOX(ES) | MANUAL/TRADES | CLERICAL | TECHNICAL/PARA-PROFESSIONAL | PROFESSIONAL | ADMINISTRATIVE |
|---|---|---|---|---|---|

DESCRIBE DUTIES AND RESPONSIBILITIES FOR EACH PAYROLL TITLE SEPARATELY:

Military experience

REASON FOR LEAVING: Honorable Discharge

| EMPLOYER | | PAYROLL TITLE | | |
|---|---|---|---|---|
| ADMIRAL CO. | | Assembly worker | | |
| STREET ADDRESS | | NUMBER OF HOURS WORKED PER WEEK OR MONTH | CURRENT OR LAST SALARY WEEKLY OR MONTHLY OR ANNUALLY | |
| 1801 Monmouth Blvd. | | 40 | | |
| CITY | STATE | DATES OF EMPLOYMENT MONTH / YEAR / TO / MONTH / YEAR | | TOTAL YEARS / MONTHS |
| Galesburg | IL | 69 | 70 | 1 |

| SUPERVISORY RESPONSIBILITY LIST THE NUMBER OF EMPLOYEES YOU SUPERVISED IN THE APPROPRIATE BOXES | MANUAL/TRADES | CLERICAL | TECHNICAL/PARA-PROFESSIONAL | PROFESSIONAL | ADMINISTRATIVE |
|---|---|---|---|---|---|

DESCRIBE DUTIES AND RESPONSIBILITIES FOR EACH PAYROLL TITLE SEPARATELY:

Assembly worker - refrigerator parts

REASON FOR LEAVING: U.S. Army

| EMPLOYER | | PAYROLL TITLE | | |
|---|---|---|---|---|
| STREET ADDRESS | | NUMBER OF HOURS WORKED PER WEEK OR MONTH | CURRENT OR LAST SALARY WEEKLY OR MONTHLY OR ANNUALLY | |
| CITY | STATE | DATES OF EMPLOYMENT MONTH / YEAR / TO / MONTH / YEAR | | TOTAL YEARS / MONTHS |

| SUPERVISORY RESPONSIBILITY LIST THE NUMBER OF EMPLOYEES YOU SUPERVISED IN THE APPROPRIATE BOXES | MANUAL/TRADES | CLERICAL | TECHNICAL/PARA-PROFESSIONAL | PROFESSIONAL | ADMINISTRATIVE |
|---|---|---|---|---|---|

DESCRIBE DUTIES AND RESPONSIBILITIES FOR EACH PAYROLL TITLE SEPARATELY:

REASON FOR LEAVING:

State law requires that you furnish certain information about your child support obligations at the time you are hired. The possibility of employment is not affected by a child support obligation or default in payment.
- As a condition of employment, state law requires that "every male born on or after January 1, 1960, and less than 27 years old, shall submit documentation, at time of appointment, evidencing his registration with the Federal Selective Service System."
- In compliance with the state and federal constitutions, the Illinois Human Rights Act, the U.S. Civil Rights Act, the Americans with Disabilities Act, and Section 504 of the Federal Rehabilitation Act, the Department of Central Management Services does not discriminate in employment, contracts, or any other activity. If you have a complaint, please contact the Department of Central Management Services at 217/782-6921 (voice) or 217/785-3979 (TDD/TTY).

16. This application may be utilized as the actual test for some titles. If the title for which you wish to test is a closed exam or an exam based only on training and experience, mail completed application to: Central Management Services, Examining and Counseling, Room 500, Stratton Office Building, 401 South Spring Street, Springfield, Illinois 62706. Applications for a closed exam will be maintained until an agency requests that the test be administered or for a maximum of one year.

17. I understand that I may be required to submit proof of previous employment, education, military service or other statements in this application. I authorize release of this and other information covering job-related factors for the purpose of verification and determination of suitability for state employment. **I state that I have not submitted an application for this written and/or performance examination within the last 30 days.** I certify that the information on this application is true and accurate and understand that misrepresentation of any material fact may be grounds for ineligibility or termination of employment.

DATE 12-01-03

WRITTEN SIGNATURE REQUIRED

**14. EDUCATION REPORT: LIST YOUR EDUCATION ACCURATELY AND COMPLETELY.** DO NOT submit transcripts/degrees. The number of credit hours you have earned may be needed to meet the minimum requirements for some titles. This information is also useful for career counseling purposes. Proof of education/training may be required during the hiring process.

| NAME AND ADDRESS OF COLLEGES/UNIVERSITIES ATTENDED | HOURS EARNED SEM / QTR | MAJOR (DO NOT ABBREVIATE) | MINOR (DO NOT ABBREVIATE) | DATES ATTENDED FROM / TO MO/YR | LEVEL AND DATE OF DEGREE EARNED LEVEL / MO/YR |
|---|---|---|---|---|---|
| *Undergraduate:* Carl Sandburg College | 22 / 2 | MID - Management | | 9 /68  9 /69 | NONE |
| | | | | / | |
| *Graduate:* | | | | / | |
| | | | | / | |
| | | | | / | |

| FIELDS OF STUDY LIST ACTUAL CREDIT HOURS | UNDERGRADUATE # OF SEM HRS | # OF QTR HRS | GRADUATE # OF SEM HRS | # OF QTR HRS | FIELDS OF STUDY LIST ACTUAL CREDIT HOURS | UNDERGRADUATE # OF SEM HRS | # OF QTR HRS | GRADUATE # OF SEM HRS | # OF QTR HRS |
|---|---|---|---|---|---|---|---|---|---|
| Accounting | | | | | Humanities | | | | |
| Actuarial Science | | | | | Human Service | | | | |
| African American Studies | | | | | Hydrology | | | | |
| Agriculture | | | | | Industrial Arts | | | | |
| Agronomy | | | | | Industrial Hygiene | | | | |
| Animal Science | | | | | Insurance | | | | |
| Architecture | | | | | Journalism | | | | |
| Art | | | | | Law (specify) | | | | |
| Atmospheric Science | | | | | Law Enforcement | | | | |
| Audiovisual Instruction | | | | | Library Science | | | | |
| Bacteriology | | | | | Limnology | | | | |
| Biochemistry | | | | | Mgmt. Info. Systems | | | | |
| Biology | | | | | Marketing | | | | |
| Biostatistics | | | | | Mathematics | | | | |
| Botany | | | | | Medical Records | | | | |
| Business Admin/Mgmt | | | | | Medical Technology | | | | |
| Cell/Molecular Biology | | | | | Medicine | | | | |
| Chemistry | | | | | Microbiology | | | | |
| Computer Science | | | | | Nursing (specify) | | | | |
| Conservation | | | | | Park Management | | | | |
| Criminal Justice Admin | | | | | Pastoral Counseling | | | | |
| Criminology | | | | | Pharmacy | | | | |
| Demography | | | | | Physics | | | | |
| Dietetics/Nutrition | | | | | Political Science/Govt. | | | | |
| Divinity/Theology | | | | | Programming | | | | |
| Early Childhood Development | | | | | Psychology | | | | |
| Economics | | | | | Public Administration | | | | |
| Education (specify) | | | | | Radio-Television | | | | |
| Engineering (specify) | | | | | Recreation | | | | |
| Engineering Technology | | | | | Rehab. Counseling/Admin | | | | |
| Environmental Science | | | | | Risk Assessment | | | | |
| English | | | | | Secretarial Science | | | | |
| Entomology | | | | | Social Work | | | | |
| Environmental Health | | | | | Sociology | | | | |
| Epidemiology | | | | | Soil Science | | | | |
| Finance | | | | | Speech and Drama | | | | |
| Fire Science | | | | | Statistics | | | | |
| Fish Management | | | | | Therapy (specify) | | | | |
| Food Service Mgmt | | | | | Toxicology | | | | |
| Foreign Language (specify) | | | | | Urban Studies | | | | |
| Forensic Science | | | | | Wildlife Management | | | | |
| Forestry | | | | | Zoology | | | | |
| Geography | | | | | Other: | | | | |
| Geology | | | | | | | | | |
| Genetics | | | | | MID - | | | | |
| Guidance and Counseling | | | | | Management | 2 | — | — | — |
| Health/Public Health | | | | | | | | | |
| History | | | | | | | | | |
| Home Economics | | | | | | | | | |

Use separate sheet of paper for additional coursework if necessary.

The State of Illinois is an Equal Opportunity Employer. We invite you to complete the following. Completion of this information is not required. Circle ONE letter.

| FEMALE | MALE | |
|---|---|---|
| A | G | **White not of Hispanic Origin.** A person having origins in any of the original peoples of Europe, North Africa or the Middle East. |
| B | (H) | **African American not of Hispanic Origin.** A person having origins in any of the black racial groups of Africa. |
| C | J | **Native American.** A person having origins in any of the original peoples of North America, and who maintains cultural identification through tribal affiliation or community. |
| D | K | **Asian.** A person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent or the Pacific Islands. This area includes, for example, China, Japan, Korea, the Philippine Islands and Samoa. |
| E | L | **Hispanic.** A person of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish Culture or origin, regardless of race. |

**Employment Counseling** is available to provide direction and assistance in obtaining state employment. Employment counseling includes suggesting and describing job titles and duties after a review and discussion of your education and work experiences; recommending specific examinations; and answering procedural questions. A comprehensive counseling session is available by appointment in all test locations. A brief counseling session is available only in Springfield and Chicago prior to testing. All counseling sessions require a completed CMS application for the counselor to review. The telephone number for the Office of Career Services in Springfield is (217) 524-1321 (voice) or (217) 524-1383 (TDD/TTY only). The phone numbers for other counseling locations may be found on the reverse side under State of Illinois Test Centers.

●**LATE APPLICANTS ARE NOT ADMITTED**          ●**IDENTIFICATION IS REQUIRED**

**Testing Information** Examinations may be canceled or limited to certain localities without notice as hiring needs are met. For written and/or performance tests, bring your completed application to the test center approximately 30 minutes before test time. Titles not requiring a multiple choice and/or performance test can be submitted to Central Management Services, Examining and Counseling, Room 500, Stratton Office Building, 401 South Spring Street, Springfield, Illinois 62706. Legible photocopies are accepted. A separate application is required for each title and option tested. **Exceptions:** You may use one application to apply for multiple options for the Public Service Administrator (PSA) or Senior Public Service Administrator (SPSA) titles. You may use one application to apply for Office Aide, Clerk, and Assistant with related options.

**Group A** (continuous testing) Testing will be conducted on a regular basis at CMS Test Centers in Springfield, Chicago, Champaign, Marion, and Rockford. Off-site testing is periodically scheduled in Kankakee and Quincy. For testing dates contact a test center. See reverse side under State of Illinois Test Centers.

**Group B** (closed exams) Applications for a closed exam will be maintained until an agency requests that the test be administered or for a maximum of one year.

**Veterans Preference** is awarded to veterans after CMS receives appropriate documentation and verifies eligibility. For more information contact the Veterans Outreach Office at 800-643-8138; Illinois Relay Center 800-526-0844 (TDD/TTY only).

**Highway Maintainer Examination** requires the possession of a valid commercial drivers license, Class "A," with endorsements of "N" (Tankers) or "X" (Tankers with hazardous materials) and non-restrictive air brakes, before an applicant can participate in the examination.

**Automotive Mechanic Examination Opt. 1, 2 and 3 and Maintenance Equipment Operator Examination** require the possession of a valid Class "A" or "B" commercial drivers license before an applicant can participate in the examination.

If you are an individual with a disability and need assistance to participate in the testing process, please contact Disability Services at Springfield (217) 785-1985 (voice) or (217) 524-1383 (TDD/TTY only) before the date of the test.

ILLINOIS DEPARTMENT OF CORRECTIONS

## Applicant Information Sheet

Print legibly in blue or black ink or type in black only

Name (Last, First, MI) A RON STEVEN DUANE          SSN: 320 42 9655

Daytime Telephone: 309 342-2014   Evening Telephone: 309 343-1884    Date of Birth: 3 - 6 - 49

Driver's License #: A165 7844 9006 State of Issue: IL    Selective Service Registration # 11 149 49 177
(required for males 18-26, regardless of prior military service)

Are you a U.S. Citizen? ☒ Yes   ☐ No   If not, are you a registered alien authorized to work in the U. S.? ☐ Yes   ☐ No

*Please complete all requested information.* Volunteers need not complete questions 27 through 41
If more space is needed, use the additional space on the last page.

1. Are you presently a resident of the State of Illinois?          ☒ Yes          ☐ No

2. Have you EVER resided anywhere besides Illinois?          ☐ Yes (list below)     ☒ No

   Other states/countries: _____

3. Do you have a current valid driver's license?          ☒ Yes          ☐ No

4. Have your driver's privileges EVER been suspended in any
   state/country?          ☐ Yes (explain below)     ☒ No

   Explain: _____

5. Have you ever been committed to any Illinois Department of Corrections
   adult or juvenile facility?          ☐ Yes (explain below)     ☒ No

   Explain: _____

6. Have you EVER been *convicted of anything other than a **minor
   traffic violation as an adult?          ☐ Yes (explain below)     ☒ No

   Sentence: _____
   Offense: _____  Explain: _____
   Arrest Date: _____  _____
   Location: _____
            City          State          County

   *convicted is defined to include a fine, conditional discharge, probation, court supervision, jail sentence, periodic imprisonment, prison term, or other sentence
   imposed in a court of law.
   **minor traffic violation is defined as a parking or speeding ticket.

7. Are you currently on court supervision or probation?          ☐ Yes (explain below)     ☒ No

   Location: _____
            City          State          County

   Explain: _____

Distribution: Appropriate Screening or Personnel File          Page 1          DOC 0031 (Rev. 10/2003)
                                    Printed on Recycled Paper

(05/17/07)   : 00137

14. Do you have any known relatives or close associates who are presently incarcerated within the Department or who are currently on parole, mandatory supervised release, or electronic detention?    ☐ Yes (indicate below)   ☒ No

Name: _____    Relationship: _____
Facility: _____    Inmate Number: _____
(or releasee's address)

Name: _____    Relationship: _____
Facility: _____    Inmate Number: _____
(or releasee's address)

15. Have you EVER corresponded with or do you currently correspond with any inmate in the Illinois Department of Corrections?    ☐ Yes (indicate below)   ☒ No

| Individual's Name | Relationship | Facility | Inmate Number |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

16. Have you EVER visited or do you currently visit with any inmate in the Illinois Department of Corrections?    ☐ Yes (indicate below)   ☒ No

| Individual's Name | Relationship | Facility | Inmate Number |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

17. Have your visiting privileges with any inmate in the Illinois Department of Corrections EVER been suspended, denied, or terminated?    ☐ Yes (indicate below)   ☒ No

| Individual's Name | Relationship | Facility | Inmate Number |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

18. Have you EVER resided or are you currently residing with any inmate or person on parole, mandatory supervised release, or electronic detention in the Illinois Department of Corrections?    ☐ Yes (indicate below)   ☒ No

| Individual's Name | Inmate Number (or releasee's address) |
|---|---|
| _____ | _____ |
| _____ | _____ |

19. Have you or any relative or close associate EVER been the victim of a crime for which the offender was or is currently an inmate in the Illinois Department of Corrections?    ☐ Yes (indicate below)   ☒ No

| Victim's Name | Relationship | Inmate Name and Number if known |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

(05/17/07)    :00138

26.  Have you EVER been prohibited from possessing, purchasing, or using
a firearm or ammunition, including by order of protection or bond?          ☐ Yes (explain below)        ☒ No

Explain: _____

_____

_____

NOTE:  Questions 27 through 41 are only required for employment or contractual service applicants.  Volunteer applicants,
please go to page 8 to complete the remainder of the requested information.

27.  Have you EVER held a supervisory position?                  ☒ Yes (list below)        ☐ No

Company Name: _Abron Hair Design_        Employed from: _June 1976_ to _Current_
Address: _4275 Henderson Galesburg IL 61401_
Position Title: _Owner - Barber_        Number of Employees Supervised: _3_

Company Name: _St Mary Sq Living Center_        Employed from: ___ to ___
Address: _7345 Cherry Galesburg IL 61401_
Position Title: _Barber_        Number of Employees Supervised: _2_

28.  Have you EVER received an employment promotion?          ☐ Yes (explain below)        ☒ No

Company Name: _____        Employed from: _____ to _____
Address: _____
Explain: _____

Company Name: _____        Employed from: _____ to _____
Address: _____
Explain: _____

29.  Have you EVER been fired or terminated for cause from any
employment?                          ☐ Yes (explain below)        ☒ No

Company Name: _____        Employed from: _____ to _____
Address: _____
Explain: _____

Company Name: _____        Employed from: _____ to _____
Address: _____
Explain: _____

30.  Have you EVER resigned from any employment
under unfavorable circumstances                          ☐ Yes (explain below)        ☒ No

Company Name: _____        Employed from: _____ to _____
Address: _____
Explain: _____

Company Name: _____        Employed from: _____ to _____
Address: _____
Explain: _____

37. Have you EVER applied or attempted to apply for the U. S. or foreign Armed Forces but were not accepted for any reason other than health issues? ☐ Yes (explain below) ☒ No

Explain: _____

_____

_____

38. Have you EVER been denied re-enlistment in the U. S. or foreign Armed Forces for any reason other than health Issues? ☐ Yes (explain below) ☒ No

Explain: _____

_____

_____

39. Have you EVER been the subject of any judicial or non-judicial disciplinary action (e.g., court martial, captain's mast, Article 15, company punishment, etc.) while in the U. S. or foreign Armed Forces? ☐ Yes (explain below) ☒ No

Explain: _____

_____

_____

40. Have you EVER received a reduction in rank or grade, including a suspended sentence, while in the U. S. or foreign Armed Forces? ☐ Yes (explain below) ☒ No

Explain: _____

_____

_____

41. Do you have bilingual skills? ☐ Yes (indicate below) ☒ No

☐ Spanish    ☐ Sign Language    ☐ Other (specify): _____

E-FILED



## ILLINOIS
**CMS** DEPARTMENT OF CENTRAL MANAGEMENT SERVICES

Complete this application by typing or printing all the relevant facts. Failure to do so may cause forfeiture of rights to promotion in the service of the State of Illinois. Applications without necessary information will be returned. *PLEASE TYPE OR PRINT IN BLACK INK.*

A separate application is required for each position. Staple all attachments to reverse side of this application. The Bureau of Personnel cannot assume responsibility for unattached documents. Mail completed application to: CMS Bureau of Personnel, Examining and Counseling Division, William G. Stratton Building, Room 500, Springfield, Illinois 62706.

## PROMOTIONAL EMPLOYMENT APPLICATION

PRINT COMPLETE TITLE OF POSITION APPLIED FOR: **Barber**

OPTION: **None**

LEAVE BLANK - (POS. CODE)

EXHIBIT **26**

NOTE: Individuals may NOT be promoted into Trainee titles.

SOCIAL SECURITY NUMBER: **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**

OFFICE USE ONLY – Exam Date at Test Center
MONTH   DAY   YEAR   CENTER

LAST NAME: **Huggins**   FIRST NAME: **Lawrence**   MI: **E**

STREET ADDRESS: **23 N 17th Ave**   COUNTY: **Fulton**

BIRTH DATE (Optional): MONTH **01** DAY **25** YEAR **53**

CITY: **Canton**   STATE: **Il**   ZIP CODE: **61520**   AREA CODE: **309**   TELEPHONE NUMBER: **647-4124**

Only State employees currently employed under the jurisdiction of the Illinois Personnel Code may apply.
Indicate your current status by marking only **one** of the boxes shown below.
Applications for promotional examinations will be accepted **only** from eligible State employees who are **currently:**

1. Certified, or who have held certified status during their current period of continuous service,   ☒ Yes   ☐ No

   or

2. In Trainee status who received appointments in accordance with open competitive standards.   ☐ Yes   ☐ No

Appointments from competitive promotional eligible lists may be made only for employees who are in a lesser title at time of promotion.

CURRENT PAYROLL TITLE & OPTION (IF APPLICABLE): **Corrections Vocational Instructor**

CURRENTLY EMPLOYED IN: AGENCY **Corrections** DIVISION (OR INSTITUTION) **Illinois River Correctional Industries**

(LEAVE BLANK)
(AGENCY)
(DIVISION)
(COUNTY)

MAILING ADDRESS OF WORK SITE: **RR 9 West Canton Il 61520**

COUNTY WHERE EMPLOYED: **Fulton**
IF EMPLOYED IN COOK COUNTY, ALSO LIST ZONE, (SEE MAP BELOW).

The State of Illinois is an Equal Opportunity Employer. To assist in the accomplishment of Affirmative Action goals, we invite you to complete the following information. Completion of this part is not required. Circle the ONE letter and, if applicable, the appropriate number(s).

**COOK COUNTY ZONE MAP**

ZONE 5
City of Chicago
ZONE 2
ZONE 4   City of Chicago
ZONE 1
95th Street
ZONE 3

| FEMALE | MALE | |
|---|---|---|
| A | (G) | **White, not of Hispanic Origin.** A person having origins in any of the original people of Europe, North Africa or the Middle East. |
| B | H | **Black, not of Hispanic Origin.** A person having origins in any of the black racial groups of Africa. |
| C | J | **Native American.** A person having origins in any of the original peoples of North America, and who maintain cultural identification through tribal affiliation or community. |
| D | K | **Asian American.** A person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands. This area includes, for example, China, Japan, Korea, the Philippine Islands, and Samoa. |
| E | L | **Hispanic.** A person of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish Culture or origin, regardless of race. |

1. blindness / visual impairment
2. deafness / hearing impairment
3. orthopedic impairment
4. cardiovascular disorder
5. mental disorder
6. nervous system disorder
7. respiratory related impairment
8. loss of limbs
9. other (specify)

For certain positions it is a job requirement that employees be able to communicate with individuals who are not fluent in English.

If you do not know a language other than English, DO NOT COMPLETE the following section.

I certify that I am able to speak, write and understand the following language(s):

Signed:

Date:

| | Wrt | Typ | Dict | Final Grade |
|---|---|---|---|---|
| DO NOT WRITE IN FOLLOWING BOXES — FOR BUREAU OF PERSONNEL USE ONLY | Qual Unqual | | | |

CMS-100B (Rev. 7/95)   IL 401-0788   (OVER)

**(05/17/07)   :00056**

EDUCATION AND EXPERIENCE REPORT. Previous applications will not be considered. Do not submit resumes. List information accurately and completely so we may properly evaluate your application. INCLUDE ALL TITLE CHANGES (WITH DATES) — pertinent military experience.

| HIGH SCHOOL | | OR | GED | | CIRCLE NO. | COLLEGE - UNIVERSITY | | |
|---|---|---|---|---|---|---|---|---|
| CIRCLE NO.<br>YEARS COMPLETED 0 1 2 3 4  GRADUATED? ☐ YES ☐ NO | | | RECEIVED GED CERTIFICATE ☐ YES ☐ NO | | YEARS COMPLETED 0 1 2 3 4 5 6 7 8  GRADUATED? ☐ YES ☐ NO | | | |

| BUSINESS, TRADE OR CORRESPONDENCE SCHOOL NAME AND LOCATION | FROM | | TO | | TIME | | SUBJECTS | LENGTH OF COURSE | COMPLETED? |
|---|---|---|---|---|---|---|---|---|---|
| | MO. | YR. | MO. | YR. | FULL | PART | | | ☐ YES ☐ NO |

| IL DRIVERS LICENSE | ENDORSEMENT | RESTRICTION | CLASS RATINGS – (CIRCLE BELOW) | LICENSE NUMBER | DATE ISSUED | | CURRENT? |
|---|---|---|---|---|---|---|---|
| CDL:    A    B | | | NON CDL:  A  B  C  D  L  M | | MO. | YR. | ☐ YES ☐ NO |

| TECHNICAL / PROFESSIONAL LICENSE | NUMBER | STATE IN WHICH ISSUED | DATE ISSUED | | CURRENT? |
|---|---|---|---|---|---|
| | | | MO. | YR. | ☐ YES ☐ NO |

| TYPE OF INTERNSHIP | FACILITY NAME - CITY AND STATE | DATE – FROM | | TO | |
|---|---|---|---|---|---|
| | | MO. | YR. | MO. | YR. |

| NAMES OF COLLEGES OR UNIVS. ATTENDED UNDERGRADUATE: (NAME/CITY/STATE) | TOTAL NO. OF HOURS EARNED SEM. HRS. (OR) QTR. HRS. (OR) UNITS | NAME OF MAJOR | NAME OF MINOR | DATES ATTENDED FROM | TO | LEVEL OF DEGREE EARNED | DATE DEGREE AWARDED |
|---|---|---|---|---|---|---|---|
| | | | | MO.   YR. | MO.   YR. | | |
| | | | | / | / | | / |
| | | | | / | / | | / |
| GRADUATE: (NAME/CITY/STATE) | | | | / | / | | / |

List and describe your work experience separately by title. Begin with your present position and work backwards, listing both State and non-State experience. VOLUNTEER EXPERIENCE: Related volunteer experience for which no salary was received will be given the same credit as equivalent paid experience. List the actual number of hours worked per week or month, and describe fully the duties performed so appropriate credit can be given.

CONT.   LIST EACH CHANGE IN PAYROLL TITLE AND THE APPROPRIATE DATES OF EMPLOYMENT FOR EACH TITLE.

CURRENTLY
EMPLOYED BY: Johnny's Barber Shop
ADDRESS: 110 Adam's St.
          Elmwood Il.
PAYROLL TITLE: Barber / Stylist

DATES OF EMPLOYMENT: FROM 8 1980 to 6 1982
                                     MO.  YR.    MO.  YR.
TOTAL: YEARS 1 MONTHS 10
HOURS WORKED PER WEEK 50 to 60
MONTHLY SALARY: STARTING 710.00 ENDING 950.00

LIST AND DESCRIBE YOUR DUTIES AND RESPONSIBILITIES: General cutting and styling of hair working knowledge of modern barber techniques, methods, practices operation, maintainance and sterilization of tools and equipment scheduled appointments ordering & inventory of supplies maintained barber tools and equipment in proper working condition.

REASON FOR LEAVING: better benefits

| LEAVE BLANK | |
|---|---|
| Level _____ | Amount _____ |

EMPLOYED BY: Parkview Barber Shop
ADDRESS: Jackson St.
          Cuba Il.
PAYROLL TITLE: Owner / Operator

DATES OF EMPLOYMENT: FROM 10 72 to 6 80
                                     MO.  YR.    MO.  YR.
TOTAL: YEARS 7 MONTHS 8
HOURS WORKED PER WEEK 50 to 60
MONTHLY SALARY: STARTING 500.00 ENDING 900.

LIST AND DESCRIBE YOUR DUTIES AND RESPONSIBILITIES: 10/72 to 04/74 served apprenticeship under previous owner 4/74 to 6/80: general cutting & styling of hair modern barber techniques methods, practices operation, maintainance & sterilization of tools and equipment scheduled appointments ordering & inventory supplies maintained barber tools & equipment in proper working condition

REASON FOR LEAVING: Sold business

| LEAVE BLANK | |
|---|---|
| Level _____ | Amount _____ |

EMPLOYED BY: _____
ADDRESS: _____
PAYROLL TITLE: _____

DATES OF EMPLOYMENT: FROM ___ ___ to ___ ___
                                     MO.  YR.    MO.  YR.
TOTAL: YEARS ___ MONTHS ___
HOURS WORKED PER WEEK ___
MONTHLY SALARY: STARTING ___ ENDING ___

LIST AND DESCRIBE YOUR DUTIES AND RESPONSIBILITIES:

REASON FOR LEAVING:

| LEAVE BLANK | |
|---|---|
| Level _____ | Amount _____ |

IF ADDITIONAL SPACE IS NEEDED, ATTACH A SEPARATE SHEET, FOLLOWING THE FORMAT ON THIS PAGE.

| OFFICE USE ONLY | |
|---|---|
| Ed _____ | Rej. Qual. _____ |
| A _____ | |
| B _____ | By _____ |
| C _____ | Date _____ |
| Total: _____ | Grade: _____ |

I understand I may be required to submit proof of previous employment, education, or any other statements in this application. I authorize release of this and other information covering job related factors for purposes of verification. I certify that the information on this application is true and correct to the best of my knowledge, and misrepresentation of any material fact may be grounds for ineligibility or termination of employment.

WRITTEN SIGNATURE _____     DATE _____

In compliance with the State and Federal Constitutions, the Illinois Human Rights Act, the U.S. Civil Rights Act, the Americans with Disabilities Act, and Section 504 of the Federal Rehabilitation Act, the Department of Central Management Services does not discriminate in employment, contracts, or any other activity. If you have a complaint, please call the Department of Central Management Services at 217 782-6921 or TDD 217 524-1380.

(05/17/07)   :00057

EDUCATION AND EXPERIENCE REPORT. Previous applications will not be considered. Do not submit resumes. List information accurately and completely so we may properly evaluate your applica. INCLUDE ALL TITLE CHANGES (WITH DATES) d pertinent military experience.

| CIRCLE NO.    HIGH SCHOOL | OR | GED | CIRCLE NO.    COLLEGE – UNIVERSITY |
|---|---|---|---|
| YEARS COMPLETED 0 1 2 ③ 4  GRADUATED? ☐ YES ☒ NO | RECEIVED GED CERTIFICATE ☒ YES ☐ NO | | YEARS COMPLETED 0 1 2 3 4 5 6 7 8  GRADUATED? ☐ YES ☐ NO |

| BUSINESS, TRADE OR CORRESPONDENCE SCHOOL NAME AND LOCATION | FROM MO. YR. | TO MO. YR. | TIME FULL PART | SUBJECTS | LENGTH OF COURSE | COMPLETED? |
|---|---|---|---|---|---|---|
| MidWest Barber College | 6   69 | 6   70 | ✕ | Registered Barber | 1 yr | ☒ YES ☐ NO |

| IL DRIVERS LICENSE | ENDORSEMENT | RESTRICTION | CLASS RATINGS – (CIRCLE BELOW) | LICENSE NUMBER | DATE ISSUED MO. YR. | CURRENT? |
|---|---|---|---|---|---|---|
| CDL:  A  B | X  N | NONE | NON CDL: A B C Ⓓ L M | H252-5255-3025 | 4   01 | ☒ YES ☐ NO |

| TECHNICAL / PROFESSIONAL LICENSE | NUMBER | STATE IN WHICH ISSUED | DATE ISSUED MO. YR. | CURRENT? |
|---|---|---|---|---|
| TYPE OF INTERNSHIP  BARBER | 6-057199 | Illinois | 4   1974 | ☒ YES ☐ NO |
| | FACILITY NAME – CITY AND STATE | | DATE – FROM MO. YR. | TO MO. YR. |

| NAMES OF COLLEGES OR UNIVS. ATTENDED | TOTAL NO OF HOURS EARNED SEM. HRS. (OR) QRT. HRS. (OR) UNITS | NAME OF MAJOR | NAME OF MINOR | DATES ATTENDED FROM MO. YR.  TO MO. YR. | LEVEL OF DEGREE EARNED | DATE DEGREE AWARDED MO. YR. |
|---|---|---|---|---|---|---|
| UNDERGRADUATE: (NAME/CITY/STATE) | | | | | | |
| Spoon River College (Canton) | | Food Sanitation | | 5   89   7   89 | license | N/A |
| University of Illinois U. (Champaign) | 3 | Labor Studies | | 2   02   8   02 | | / |
| GRADUATE: (NAME/CITY/STATE) | | | | /   /   / | | / |
| | | | | /   /   / | | / |

List and describe your work experience separately by title. Begin with your present position and work backwards, listing both State and non-State experience. VOLUNTEER EXPERIENCE: Related volunteer experience for which no salary was received will be given the same credit as equivalent paid experience. List the actual number of hours worked per week or month, and describe fully the duties performed so appropriate credit can be given.

**LIST EACH CHANGE IN PAYROLL TITLE AND THE APPROPRIATE DATES OF EMPLOYMENT FOR EACH TITLE.**

CURRENTLY EMPLOYED BY: Illinois Dept. of Corrections

ADDRESS: R #9 west

Canton Il 61520

PAYROLL TITLE: Corrections Vocational Instructor

DATES OF EMPLOYMENT:  FROM J 1991 TO 01 03  MO. YR.

TOTAL:  YEARS 11  MONTHS 9

HOURS WORKED PER WEEK 40

MONTHLY SALARY: STARTING $2400.00  ENDING $4100.00

LIST AND DESCRIBE YOUR DUTIES AND RESPONSIBILITIES: Instruct inmates on proper baking procedures, safety and sanitation, product quality, delivery procedures. Instruct updated Baking class.

| REASON FOR LEAVING: Still employed | LEAVE BLANK Level _____ Amount _____ |
|---|---|

EMPLOYED BY: Eddie's Limited

ADDRESS: Box 13

Canton Il 61510

PAYROLL TITLE: Owner / manager

DATES OF EMPLOYMENT:  FROM 4 88 TO 5 91  MO. YR.

TOTAL:  YEARS 3  MONTHS 1

HOURS WORKED PER WEEK 50 to 60

MONTHLY SALARY: STARTING 1450.00  ENDING 1800.00

LIST AND DESCRIBE YOUR DUTIES AND RESPONSIBILITIES: manage and train employees in a medium sized set down restaurant. responsible for quality control, shipping + recieving, inventory, ordering of supplies, payroll, safety & sanitation

| REASON FOR LEAVING: Closed due to economic conditions | LEAVE BLANK Level _____ Amount _____ |
|---|---|

EMPLOYED BY: Prairie Farms Dairy

ADDRESS: 401 S. 1st Ave

Canton Il 61520

PAYROLL TITLE: Head cooler manager

DATES OF EMPLOYMENT:  FROM 7 79 TO 3 88  MO. YR.

TOTAL:  YEARS  MONTHS 8

HOURS WORKED PER WEEK 40

MONTHLY SALARY: STARTING 960.00  ENDING 1600.00

LIST AND DESCRIBE YOUR DUTIES AND RESPONSIBILITIES: operation of a large scale dairy production, shipping, receiving, inventory, safety and sanitation, quality control, payroll.

| REASON FOR LEAVING: Job advancement | LEAVE BLANK Level _____ Amount _____ |
|---|---|

**IF ADDITIONAL SPACE IS NEEDED, ATTACH A SEPARATE SHEET, FOLLOWING THE FORMAT ON THIS PAGE.**

| OFFICE USE ONLY | |
|---|---|
| Ed _____ . Rej. Qual. _____ | |
| A _____ | |
| B _____ | By _____ |
| C _____ | Date _____ |
| Total: _____ | Grade: _____ |

I understand I may be required to submit proof of previous employment, education, or any other statements in this application. I authorize release of this and other information covering job related factors for purposes of verification. I certify that the information on this application is true and correct to the best of my knowledge, and misrepresentation of any material fact may be grounds for ineligibility or termination of employment.

WRITTEN SIGNATURE: _Lawrence F. Higgins_   DATE: 1/5/03

In compliance with the State and Federal Constitutions, the Illinois Human Rights Act, the U.S. Civil Rights Act, the Americans with Disabilities Act, and Section 504 of the Federal Rehabilitation Act, the Department of Central Management Services does not discriminate in employment, contracts, or any other activity. If you have a complaint, please call the Department of Central Management Services at 217 782–6921 or TDD 217 524–1383.

ILLINOIS DEPARTMENT OF CORRECTIONS

## Applicant Information Sheet

Print legibly in blue or black ink or type in black only

Name (Last, First, MI) _HUGGINS   LAWRENCE  L._   SSN: _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_
Daytime Telephone: _309-647-4124_   Evening Telephone: _309-647-4124_   _309-647-8870_   _309-338-0476_   Date of Birth: _01/25/53_

Driver's License #: _H252-5255-3025_   State of Issue: _IL_   Selective Service Registration # _N/A_
(required for males 18-25, regardless of prior military service)

Are you a U.S. Citizen? ☒ Yes   ☐ No   If not, are you a registered alien authorized to work in the U. S.? ☐ Yes   ☐ No

---

*Please complete all requested information.* Volunteers need not complete questions 27 through 41
If more space is needed, use the additional space on the last page.

1. Are you presently a resident of the State of Illinois?   ☒ Yes   ☐ No

2. Have you EVER resided anywhere besides Illinois?   ☒ Yes (list below)   ☐ No

   Other states/countries: _IOWA  FOR  1  YEAR_

3. Do you have a current valid driver's license?   ☒ Yes   ☐ No

4. Have your driver's privileges EVER been suspended in any
   state/country?   ☐ Yes (explain below)   ☒ No

   Explain: _____

5. Have you ever been committed to any Illinois Department of Corrections
   adult or juvenile facility?   ☐ Yes (explain below)   ☒ No

   Explain: _____

6. Have you EVER been *convicted of anything other than a **minor
   traffic violation as an adult?   ☐ Yes (explain below)   ☒ No

   Sentence: _____
   Offense: _____   Explain: _____
   Arrest Date: _____
   Location: _____
       City    State    County

   *convicted is defined to include a fine, conditional discharge, probation, court supervision, jail sentence, periodic imprisonment, prison term, or other sentence imposed in a court of law.
   **minor traffic violation is defined as a parking or speeding ticket.

7. Are you currently on court supervision or probation?   ☐ Yes (explain below)   ☒ No

   Location: _____
       City    State    County
   Explain: _____

(05/17/07)   00060

8. Do you have any criminal charges pending?          ☐ Yes (explain below)  ☒ No

Arrest Date: _____    Explain: _____
Offense: _____                _____
Location: _____                _____
      City    State   County

Arrest Date: _____    Explain: _____
Offense: _____                _____
Location: _____
      City    State   County

9. Have you EVER been questioned by a law enforcement agency concerning a criminal matter not previously mentioned herein?    ☐ Yes (explain below)  ☒ No

Explain: _____
_____
_____
_____

10. Have you EVER been subject to an Order of Protection?    ☐ Yes (explain below)  ☒ No

Effective Date of Order: _____    Explain: _____
Expiration Date of Order: _____            _____
Location: _____
      City    State   County

11. Did any of the offenses you listed in questions 5 - 10 involve the use or attempted use of force or threatened use of a weapon?    *N/A*    ☐ Yes (list each victim)  ☒ No

Victim: _____    Relationship: _____
Victim: _____    Relationship: _____

12. Are you currently employed?    ☒ Yes    ☐ No (explain below)

Explain: *IL. DEPT. OF CORRECTIONS*
*ILLINOIS RIVER CORR. CENTER*
*CORRECTIONAL INDUSTRIES*

13. Do you have any known *relatives or **close associates currently employed by or who provide services to the Department?    ☒ Yes (indicate below)  ☐ No

Name: *C.S.S. JERRY ROHLER*    ↑N/W
Relationship: *COUSIN*
Facility: *I.N.C.C.*

Name: *LT. JOHN HUGGINS*
Relationship: *COUSIN*
Facility: *I.N.C.C.*

*relative means a spouse, parent, sibling, child, grandchild, grandparent, aunt, uncle, niece, nephew, and cousin, including first-blood, step, half, foster, or in-law relationships.

**close associate means any person other than a relative with whom you are currently residing or have previously resided or with whom you have or have had a close personal relationship.

(05/17/07)  : 00061

E-FILED
Friday, 09 November, 2007  03:46:44 PM
Clerk, U.S. District Court, ILCD

14. Do you have any known relatives or close associates who are presently incarcerated within the Department or who are currently on parole, mandatory supervised release, or electronic detention?

☐ Yes (indicate below)    ☒ No

Name: _____    Relationship: _____
Facility: _____    Inmate Number: _____
                    (or releasee's address)
Name: _____    Relationship: _____
Facility: _____    Inmate Number: _____
                    (or releasee's address)

15. Have you EVER corresponded with or do you currently correspond with any inmate in the Illinois Department of Corrections?

☐ Yes (indicate below)    ☒ No

| Individual's Name | Relationship | Facility | Inmate Number |
|---|---|---|---|
| | | | |
| | | | |

16. Have you EVER visited or do you currently visit with any inmate in the Illinois Department of Corrections?

☐ Yes (indicate below)    ☒ No

| Individual's Name | Relationship | Facility | Inmate Number |
|---|---|---|---|
| | | | |
| | | | |

17. Have your visiting privileges with any inmate in the Illinois Department of Corrections EVER been suspended, denied, or terminated?

☐ Yes (indicate below)    ☒ No  N/A

| Individual's Name | Relationship | Facility | Inmate Number |
|---|---|---|---|
| | | | |
| | | | |

18. Have you EVER resided or are you currently residing with any inmate or person on parole, mandatory supervised release, or electronic detention in the Illinois Department of Corrections?

☐ Yes (indicate below)    ☒ No

| Individual's Name | Inmate Number (or releasee's address) |
|---|---|
| | |
| | |

19. Have you or any relative or close associate EVER been the victim of a crime for which the offender was or is currently an inmate in the Illinois Department of Corrections?

☐ Yes (indicate below)    ☒ No

| Victim's Name | Relationship | Inmate Name and Number if known |
|---|---|---|
| | | |
| | | |

(05/17/07)  : 00062

20. Have you EVER testified against any person who was committed to a state or federal prison?  ☐ Yes (indicate below)  ☒ No

| Individual's Name | Facility | Inmate Number |
|---|---|---|
| | | |
| | | |
| | | |

21. Do you have ANY tattoos?  ☐ Yes (describe below)  ☒ No

Describe each tattoo: _____

22. Are you or have you EVER been a member of or associated with a street or prison gang?  ☐ Yes (explain below)  ☒ No

Name of gang: _____  Type of affiliation: _____

Dates of affiliation:  From _____ to _____  Location: _____

Circumstances: _____

23. Has any relative or close associate EVER been a member of or associated with a street or prison gang?  ☐ Yes (explain below)  ☒ No

Individual's Name: _____  Relationship: _____

Name of gang: _____  Type of affiliation: _____

Dates of affiliation:  From _____ to _____  Location: _____

Circumstances: _____

24. Have you ever previously applied for any position with the Department?  ☒ Yes (explain below)  ☐ No

Explain: _EMROS FOR C.F.J.S. II_

25. Are you a current or former employee, student worker, intern, volunteer, or contractual employee of the Department?  ☒ Yes (indicate below)  ☐ No

Position: _CONNECTIONS VOC. INSTRUCTOR_  Facility: _IL. RIVER CORR. CENTER_

Dates: From _5/1/1991_ to _CURRENT_  Reason for leaving: _____

26. Have you EVER been prohibited from possessing, purchasing, or using a firearm or ammunition, including by order of protection or bond?  ☐ Yes (explain below)  ☒ No

Explain: _____

_____

_____

NOTE: Questions 27 through 41 are only required for employment or contractual service applicants. Volunteer applicants, please go to page 8 to complete the remainder of the requested information.

27. Have you EVER held a supervisory position?  ☒ Yes (list below)  ☐ No

Company Name: _ENNISS LIMITED_  Employed from: _4/88_  to _5/91_
Address: _BOX 73  EAST SIDE SQUARE  CANTON  IL_
Position Title: _OWNER / MANAGER_  Number of Employees Supervised: _11_

Company Name: _PRAIRIE FARMS_  Employed from: _7/82_  to _3/88_
Address: _401  SOUTH FIRST AVE  CANTON IL_
Position Title: _COOLER SUPERVISOR_  Number of Employees Supervised: _9_

28. Have you EVER received an employment promotion?  ☒ Yes (explain below)  ☐ No

Company Name: _PRAIRIE FARMS_  Employed from: _7/82_  to _3/88_
Address: _401  SOUTH FIRST  CANTON  IL_
Explain: _PROMOTION FROM BOTTLING MACHINE OPERATOR TO COOLER SUPERVISOR_

Company Name: _____  Employed from: _____  to _____
Address: _____
Explain: _____

29. Have you EVER been fired or terminated for cause from any employment?  ☐ Yes (explain below)  ☒ No

Company Name: _____  Employed from: _____  to _____
Address: _____
Explain: _____

Company Name: _____  Employed from: _____  to _____
Address: _____
Explain: _____

30. Have you EVER resigned from any employment under unfavorable circumstances  ☐ Yes (explain below)  ☒ No

Company Name: _____  Employed from: _____  to _____
Address: _____
Explain: _____

Company Name: _____  Employed from: _____  to _____
Address: _____
Explain: _____

(05/17/07)  : 00064

31. Do you have a current Firearms Owners Identification (FOID) Card?      ☐ Yes (indicate # below)   ☒ No

Number: _____

32. Has ANY request to obtain a FOID Card ever been denied?      ☐ Yes (explain below)   ☒ No

Explain: _____

_____

_____

33. Has your FOID Card EVER been revoked?      ☐ Yes (explain below)   ☒ No

Explain: _____

_____

_____

34. Do you have work experience in Security, Law Enforcement, or Corrections?      ☒ Yes (list below)   ☐ No

| Company | Employment Dates |
|---|---|
| IL. RIVER CORRECTIONAL CENTER | 5/91 to CURRENT |
|  | to |
|  | to |

Total years completed in good standing: 12 ½ years

35. Have you EVER been the defendant in a lawsuit or the subject of a grievance alleging you used coercion, unauthorized or excessive use of force, or corporal punishment as a law enforcement, correctional, or security officer?      ☒ Yes (explain)   ☐ No

Explain including the type (lawsuit or grievance) and outcome of each charge (pending or awaiting settlement; dropped or no settlement was made; upheld or settlement was made):

LAWSUIT BY I/M MCDOWELL (PENDING) I/M IMPROPERLY USED A CUTTING TORCH WITHOUT SUPERVISION AND WITHOUT MY KNOWLEDGE.

36. Have you EVER served or are you currently serving in the U.S. or foreign Armed Forces?      ☐ Yes (list below)   ☒ No

| Type of Service | National Guard – Reserves | Active Service | Character of Service |
|---|---|---|---|
| ☐ Air Force | ☐ Air Force–National Guard–Reserve | Have you served 6 months or more outside of training? | Have you ever been dishonorably discharged? |
| ☐ Army | ☐ Army National Guard–Reserve |  |  |
| ☐ Marines | ☐ Marine Reserve | ☐ Yes  ☐ No | ☐ Yes  ☐ No |
| ☐ Navy | ☐ Navy Reserve |  |  |
| ☐ Coast Guard | ☐ Coast Guard Reserve |  |  |
| ☐ Merchant Marines |  |  |  |
| ☐ Foreign (specify): |  |  |  |

_____

Dates of Service   Active Duty: _____ to _____      Reserves: _____ to _____

37. Have you EVER applied or attempted to apply for the U. S. or foreign Armed Forces but were not accepted for any reason other than health issues?                   ☐ Yes (explain below)    ☒ No

Explain: _____

_____

_____

38. Have you EVER been denied re-enlistment in the U. S. or foreign Armed Forces for any reason other than health issues?                   ☐ Yes (explain below)    ☒ No

Explain: _____

_____

_____

39. Have you EVER been the subject of any judicial or non-judicial disciplinary action (e.g., court martial, captain's mast, Article 15, company punishment, etc.) while in the U. S. or foreign Armed Forces?                   ☐ Yes (explain below).    ☒ No

Explain: _____

_____

_____

40. Have you EVER received a reduction in rank or grade, including a suspended sentence, while in the U. S. or foreign Armed Forces?                   ☐ Yes (explain below)    ☒ No

Explain: _____

_____

_____

41. Do you have bilingual skills?                   ☐ Yes (indicate below)    ☒ No

☐ Spanish        ☐ Sign Language        ☐ Other (specify): _____

(05/17/07)    :00056

NOTE: All applicants, please complete the following. If more space is needed to complete any of the above listed questions, use the additional space on the next page.

## Emergency Contact

In the event of an emergency, please contact:

_ALICE HUGGINS_
Print Name

_WIFE_
Relationship

_23 NORTH 17 TH AVE  CANTON IL_
Address

_CANTON_
City

_IL_
State

_61520_
Zip Code

_309-647-8870 /309-647-4124_
Daytime Telephone Number

_309-647-4124_
Evening Telephone Number

OR

_BEVERLY HUGGINS_
Print Name

_MOTHER_
Relationship

_250 S. MAIN_
Address

_CANTON_
City

_IL_
State

_61520_
Zip Code

_309-647-1887_

_309-647-1887_
Evening Telephone Number

I certify and affirm, subject to the penalty of perjury, that the information provided herein is true and correct to the best of my knowledge. I understand that providing false information may be grounds for ineligibility or termination of employment or service. I further understand that I have a continuing obligation to report any changes in the documentation herein, including new information, to the Illinois Department of Corrections prior to hire or service. I further understand that the Illinois Department of Corrections reserves the right to administer a Polygraph Examination to verify truthfulness of any information contained herein.

_LAWRENCE E HUGGINS_
Print Name of Applicant

_Lawrence E Huggins_
Signature

_11/26/03_
Date

Witnessed by (if applicable)

Print Name of Witness

Signature

Date





**Rod R. Blagojevich**
Governor

**Roger E. Walker Jr.**
Director

Hill Correctional Center / 600 Linwood Road / P.O. Box 1327 / Galesburg, IL 61401 / Telephone: (309) 343-4212 / TDD: (800) 526-0844

## M E M O R A N D U M

DATE:       February 21, 2006                    *CONFIDENTIAL*

TO:         Janet Richmond, Administrator
            Office of Affirmative Action

FROM:       Frank L. Shaw, Warden
            Hill Correctional Center

SUBJECT:  EEOC 210-2005-05617 – Steve Abron vs. State of Illinois

Per your request, the following information is being submitted.

Interviewers:

     Shaw, Frank             White male
     Smith, William          White male

Candidates Not Selected:

     Abron, Steven           Black male
     Anderson, James         White male
     Conrad, Loren           White male
     Dredge, John            White male
     Elliott, Gaylen         White male
     Schaumleffel, Samuel    White male
     Wilkinson, Brian        White male

FLS:cl

C: File

**EXHIBIT**
21

(05/17/07)    :00011